

**SO ORDERED,**

**Judge Edward Ellington**
**United States Bankruptcy Judge**
**Date Signed: June 3, 2014**

**The Order of the Court is set forth below. The docket reflects the date entered.**

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

IN RE:

COMMUNITY HOME FINANCIAL
SERVICES, INC.,                                           CASE NO. 12-01703-EE

DEBTOR.                                                         CHAPTER 11

**AGREED ORDER GRANTING TRUSTEE'S APPLICATION TO EMPLOY**
**LOAN SERVICING COMPANY AND TO ESTABLISH SETTLEMENT**
**AUTHORITY *[DKT. #618]***

There came on for the Court's consideration the Trustee's Application To Employ Loan

Servicing Company And To Establish Settlement Authority ("**Application**") **[Dkt. #618]** filed

by Kristina M. Johnson, Trustee ("**Trustee**") of the Estate of Community Home Financial

Services, Inc. ("**Debtor**"), and the Edwards Family Partnership, LP and Beher Holdings Trust's

Objection To Trustee's Motion To Employee Loan Servicing Company and to Establish

Settlement Authority **[Dk #630]** filed by Edwards Family Partnership, L.P. ("**EFP**") and Beher

Holdings Trust ("**BHT**") in the above-styled Chapter 11 proceeding.  The Court, being fully

advised in the premises, and having considered the testimony of the Trustee and Alan Sercy of

Vantium Capital, Inc., as well as the arguments presented, at the hearing on the Motion, finds as

follows:

{JX102866.4}

## I.   Jurisdiction

1.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 327, Fed. R. Bankr. Proc. 2014 and 9019, and the order granting automatic reference to this Court.  This is a core proceeding.

## II.   Procedural History

2.   On May 23, 2012, (the "**Petition Date**"), the Debtor filed a voluntary petition for relief in this Court under Chapter 11 of the Bankruptcy Code.

3.   On December 20, 2013, a Disclosure of Transfer of Funds and other Matters ("**Disclosure**") **[Dkt #426]** was filed in the Chapter 11 case indicating that: (1) the Debtor changed its principal place of business to Panama; (2) the Debtor had transferred funds from its debtor-in-possession account(s) to the Debtor's bank accounts in Panama;[1] and (3) the Debtor continues to service its business operations in Panama and Costa Rica.

4.   In response to the Disclosure, the United States Trustee filed an Emergency Motion for Order for the Appointment of a Chapter 11 Trustee.  On December 23, 2013, the Court entered an Order Granting the United States Trustee's Emergency Motion for Order for the Appointment of a Chapter 11 Trustee **[Dkt. #429]** directing the appointment of a trustee in this case.

5.   On January 8, 2014, the United States Trustee's Office filed its Application For Approval of Chapter 11 Trustee **[Dkt. #455]**.  On January 16, 2014, the Court approved the United States Trustee's appointment of the Trustee pursuant to a bench ruling that was confirmed in an Order dated January 21, 2014 **[Dkt. #473]**.

---

[1] Since that Disclosure, it has been asserted in filed pleadings that the funds transferred from the Debtor's debtor-in-possession accounts were moved to accounts titled in the name of non-debtor entities.

{JX102866.4}

6.      The Trustee is now the duly acting and qualified trustee in this case.

### III.      Nature of the Debtor's Operations

7.      According to the Debtor's Disclosure Statement **[Dkt. #167, p. 9]** "CHFS is in the business of purchasing and servicing loan portfolios consisting of mostly Class B loans of 2nd to 3rd mortgages."     The Disclosure Statement at page 20 valued the loan portfolio at $39,177,486.27.

8.      During the course of this Chapter 11 case, the Debtor has generated substantial sums of money from these loans.     For example, the Debtor showed cash receipts of $2,223,875.06 in October, 2013. *See* Monthly Operating Report, **Dkt.# 416**, p. 8. The value in these loans primarily lies in the servicing of the loans, including receipt of payments, accurate crediting of payments and borrower relations.

### IV.      Trustee's Initial Investigation and Efforts at Stabilization

#### A.      Initial Investigation

9.      Consistent with her statutory duties, the Trustee has sought expeditiously to proceed with her statutory investigatory duties.   Those efforts include (but are not limited to) interviewing counsel for the parties, obtaining possession of the Debtor's debtor-in-possession accounts, taking control of the Debtor's web site, demanding turnover of the Debtor's books and records[2] and  interviewing creditors and borrowers of the Debtor.

10.     The Trustee's initial investigation indicates that the Debtor may have had inadequate staff to provide the "high touch" service required to properly service loans of this

_____
[2] While some information has been provided to the Trustee, much of the relevant information demanded by the Trustee has not been provided.  Critically, the Trustee has not been provided with some original loan assignments that may be needed for the Trustee to cancel mortgages upon payment in full.

{JX102866.4}

kind.[3]  Furthermore, the Trustee has received notices from some state agencies alleging that the Debtor's servicing license has expired or will shortly expire.  Some borrowers have alleged that the Debtor was not properly licensed to service loans in their state. The Trustee has also been advised by many borrowers that they did not receive 1098 mortgage statements for the year 2013 required to be sent under federal law and, in many instances, did not receive monthly statements. Other borrowers have alleged improper credit reporting.  The Trustee has received copies of numerous Better Business Bureau complaints against the Debtor from borrowers for actions allegedly taken by Debtor prior to her appointment.

11.     As further set forth below, the Trustee has also gleaned information from borrowers of the Debtor that has yielded information as to ongoing efforts of former management and employees of the Debtor to de-stabilize the Estate and to siphon additional money from the Estate.

12.     While the Trustee's investigation is not yet complete, and some of the information reported to the Trustee has not yet been independently confirmed, the Trustee contends that it appears at a minimum  the Debtor was having difficulty properly servicing loans prior to the Court's order directing the appointment of a trustee.

**B.     Challenges to Stabilization**

13.     On January 31, 2014, the Trustee intercepted at the Debtor's 234 East Capitol Street location a customer/borrower of the Debtor who was making her customary cash payment on her loan to an individual at the 234 East Capitol Street location (this individual, when questioned, claimed she worked for Discount Mortgage, Inc. – an entity related to the Debtor). This naturally raised alarm that the former officers, employees and/or principals of the Debtor

---

[3] The Trustee may not have all of the Debtor's computer records and, therefore, has not yet reached any conclusions on these issues.

(together, "**Former CHFS Representatives**"), as well as its affiliates and/or insiders were engaging in a full-court press to re-direct payments away from the Estate.[4]  These concerns were elevated when the Trustee learned that just prior to the filing of the Disclosure, employees of the Debtor filed notices in at least 5 Chapter 13 cases requesting that Chapter 13 payments owed to the Debtor be sent to a Las Vegas, Nevada, post office box controlled by the Debtor post-petition but not previously disclosed to this Court.   Furthermore, the Trustee learned the week of February 10, 2014, that the Former CHFS Representatives apparently continued to accept payments on-line for a period time.   Since that time, the Trustee has learned that the Former CHFS Representatives have continued through various means to divert funds away from the bankruptcy Estate, even after the Trustee was appointed.   For example, the Former CHFS Representatives established a call center that sent out collection letters, payoff statements, monthly statements, and communicated with borrowers by telephone, despite having no authority to do so, and directed borrowers to remit payments to a post office box in Miami, Florida, in violation of the Court's order approving the appointment of the Trustee.   While the Trustee's investigation is not yet complete, the Trustee estimates that in excess of $8 million has been diverted from the bankruptcy Estate since approximately November of 2013 to the present. Nevertheless, based on the Debtor's schedules, significant value exists in the remaining payment stream under the Debtor's loan portfolio.

14.   In some instances, the Trustee has been advised that the Former CHFS Representatives denied that the Debtor was in bankruptcy, with the result that some borrowers questioned the Trustee's authority to receive payments.

---

[4] On March 10, 2014, a criminal complaint was filed against William D. Dickson, who has since been detained in federal custody.  An indictment was issued on April 9, 2014, Criminal No. 3:14-cr-00078-TSL-FKB, United States District Court for the Southern District of Mississippi.

{JX102866.4}

15.     The conduct of the Former CHFS Representatives has resulted in a borrower-base that ranges from angry to confused, to the detriment of both borrowers and the Estate.

16.     Furthermore, the Trustee has received numerous e-mails and phone calls from borrowers requesting payoff information and short sale requests.  However, the Trustee's ability to respond to such requests has been hindered since some of the Debtor's books and records have not been provided to her despite her demand for same.  Also, many borrowers have asked to be able to make payments on-line or via automatic draft; however, the Trustee has no present ability to accept on-line or automatic draft payments.

### C.     Initial Stabilization

17.     Due to the unusual circumstances of this case, the Trustee as an interim crisis management measure has engaged in basic servicing of the loans with the assistance of counsel.[5] Shortly after her appointment, and as part of her initial investigation, the Trustee sent notification letters to as many borrowers as could be located given the incomplete information at her disposal, advising them of her appointment and the address to which future payments should be sent.  Furthermore, many borrowers began contacting the Trustee through the Debtor's web site. As a result of these efforts, some borrowers have begun sending their monthly payments to the Trustee and some borrowers have paid off their loans in full.  Nevertheless, a substantial number of borrowers either have not yet been contacted due to lack of contact information or have not complied with the Trustee's request and/or instructions.[6]

---

[5] As part of this interim servicing, the Trustee filed a Motion For Interim Authority *Nunc Pro Tunc* To January 8, 2014, To Service Loans In The Ordinary Course Of Business **[Dkt. # 553]**.  An Order was entered on that Motion on April 11, 2014. *See* **Dkt. #616**.

[6] For example, the Trustee recently discovered that an entire set of loans exists for which the Trustee has no historical borrower data.

{JX102866.4}

18.    Since her appointment, the Trustee and her counsel have fielded hundreds of e-mails, faxes and telephone calls from borrowers in an attempt to reduce the confusion created by the actions of the Former CHFS Representatives and to stabilize the Estate.  While this exercise was highly beneficial to the Estate and the Trustee's investigation – yielding much of the information as to how the Former CHFS Representatives continued diverting funds from the Estate – the costs of the Trustee and her counsel servicing the loans are substantial.  Additionally, the Trustee and her counsel desire to focus on other important matters that need to be addressed.[7]

19.    Additionally, the Trustee and her staff are not equipped to handle the volume of phone calls and correspondence needed to effectively service consumer loans.  Moreover, without all of the Debtor's books and records, it will be difficult and expensive for the Trustee to reconstruct as needed the Debtor's records, provide payoff and other information to the Debtor's borrowers, and otherwise service the loans for the benefit of the Estate.  Without active and effective servicing, many borrowers may simply stop making payments and the value of the Estate assets will decrease substantially, to the detriment of the Debtor's creditors.  And, mortgage servicing is a highly specialized industry subject to state and federal law, such as RESPA and related regulations and the Fair Debt Collection Practices Act and related regulations.    Importantly, the Consumer Financial Protection Board enacted new regulations effective January 10, 2014.[8]

---

[7] To the extent practical, the Trustee has utilized non-billing entities to reduce costs.

[8] While the Trustee's investigation is not yet complete, she contends preliminarily that it appears the Debtor's servicing practices would not have been compliant under the new regulations, such as the requirement to provide prompt payoff, adjustment notices and monthly statements, if the Debtor is covered by these regulations.

{JX102866.4}

20.     In short, while the Trustee has done much to stabilize the Estate, more work needs to be done to stabilize the value of the mortgage portfolio – work that will be handled more efficiently going forward by a professional mortgage servicing company that is fully compliant with current regulations.

21.     The Trustee, in her business judgment, has determined that it would be in the best interests of the Estate for a professional servicing company to handle servicing on a going-forward basis, subject to the Trustee's supervision and control.

### V.     Trustee's Selection Process

22.     The Trustee initially sought recommendations for mortgage servicers from attorneys experienced in the residential mortgage industry.  From there, the Trustee made contact with servicers who were recommended to her.  While several capable companies exist who could service the Debtor's loans, the Trustee determined to retain Vantium Capital, Inc., a Delaware Corporation doing business as Acqura Loan Services ( "**Servicer**"),[9]  subject to Court approval, following: (a) review of Servicer's due diligence package and recommendations and/or references; (b) several conference calls with Servicer and exchanges of numerous revised terms sheets; (c) an in-person meeting with Servicer representatives and representatives of EFP/BHT, who have asserted the largest claims in the case; and (d) the fact that Servicer (unlike the Debtor) is licensed in all 50 states both as a servicer and debt collector.  For the reasons set forth herein, the Trustee believes that Servicer is the ideal company to take over a largely de-stabilized portfolio and stabilize it effectively.

---

[9] The Servicer is in the process of changing its name.  Once that has been accomplished, the Trustee will file a Notice of Change of Servicer Name with this Court.

{JX102866.4}

## VI.   Retention of Servicer

23.   Section 327(a) of the Code provides that "the trustee, with the court's approval, may employ ... other professional persons, that do not hold or represent an interest adverse to the Estate, and that are disinterested persons, to ... assist the trustee in carrying out the trustee's duties under this title."

24.   The Trustee seeks authority to retain Servicer to assist the Trustee in servicing the Debtor's mortgage portfolio substantially according to the terms and conditions of the Residential Mortgage Special Servicing Agreement ("**Servicing Agreement**") between the Trustee and the Servicer attached hereto as Exhibit "1" (without supporting schedules due to volume). While the terms and conditions of the Servicing Agreement control, certain provisions are highlighted as follows:

- Certain entities will be required to release documents to the Servicer upon request as needed in order for it to effectively carry out its duties (Servicing Agreement, Section 2.2);

- Servicer will be compensated out of amounts it collects for the Trustee and will deduct its monthly fees and expenses before remitting the monthly balance to the Trustee (Servicing Agreement, Section 2.5);

- Trustee is granting Servicer a limited indemnity by the Estate subject to various conditions (Servicing Agreement, Sections 8.3). EFP/BHT are granting Servicer a separate and independent indemnity attached hereto as Exhibit "2" (Servicing Agreement, Section 8.4) to which the Trustee is not a party;

- Servicer expressly disclaims and does not assume liability arising from, among other things, third party claims or actions that were caused by or

{JX102866.4}

9

resulted from any actions or omissions in respect of any loans or real estate owned ("**REO**") property by the Debtor, any prior servicer, sub-servicer, owner or originator of a loan or REO property and relating to the failure or refusal of Trustee or any trustee or custodian in possession of original loan documents to timely provide to Servicer the originals of any loan documents in order to allow Servicer sufficient time to timely process satisfactions, payoffs and releases. Trustee has agreed to seek injunctive relief against any person or entity seeking to hold Servicer liable for the liability disclaimed by Servicer. (Servicing Agreement, Section 8.5).

25.     As evidenced by Exhibit "2" to the Application and the testimony provided by Mr. Sercy, Servicer is experienced in the mortgage loan servicing industry (particularly subordinate mortgages of the kind that predominantly comprise the Debtor's portfolio) and is well qualified to provide assistance to the Trustee. Servicer is licensed in all 50 states, not only as a loan servicer, but also as a debt collector, such that Servicer is a "soup to nuts" entity that can assist the Trustee in all steps needed to liquidate the assets of the Estate.

26.     The Trustee believes that the Servicer will maximize the value of the Estate and stabilize borrower concerns regarding their loans. Servicer's duties will include, but not necessarily be limited to: (a) collecting payments and depositing those payments (net of Servicer's fees) into United States Trustee-approved accounts and remitting net amounts to the Trustee on a monthly basis; (b) providing reports of payments received; and (c) interacting with borrowers. Additionally, the Debtor scheduled several pieces of foreclosed real property as Estate property. At the Trustee's request, Servicer will manage and make recommendations to

the Trustee for the disposition of such REO property.  Servicer will not retain outside counsel on

Trustee's behalf, nor will it sell REO property unless approved by this Court.

27.     In order to enable Servicer to maximize efficiencies, the Trustee will execute a

Limited Power of Attorney in substantially the form attached to the Application as Exhibit "3."

28.     The Trustee proposes to compensate Servicer according the following scheduled

that is also reflected in Exhibit C of the Servicing Agreement:

- Electronic Boarding:  $25, (includes dormant loans).

- Deboarding/Transfer: $25, except no de-board fee if Vantium terminates or if upon
  negligence or breach of contract by the Trustee or for Loans Charged Off with No
  Further Action.   The de-board fee for Loans Charged Off with Further Action shall be
  $12.50 per Loan.

- Interim Accounting Work (for uploading servicing notes and payments calculations for
  period from Trustee's appointment to transfer of Loans to Servicer)(separate from
  Electronic Boarding Fee):   $35 per loan, one-time fee.

- Administrative Fee:  If a borrower documents payments that were not recorded, Vantium
  will receive a one-time payment of $40 per loan for the additional work required to
  follow up with borrower, update system of record and send confirmation to borrower.
  Vantium may use its reasonable business judgment in determining what constitutes
  proper documentation of payments.

- Performing Loans:
  o   Base Fees - 10% of payments collected, up to $50 per loan with a floor of $20
      per loan, 50% of late fees.
  o   Additional Fees - Bankruptcy and Foreclosure loans - onetime payment of $100
      in addition to the Base Fee.

- Dormant Loans:
  □   Base Fees -  $7.50 per loan, per month.
  □   Additional Fees - Bankruptcy – onetime payment of $100 in addition to the Base
      Fee.
  □   Activation Bonus - For each loan that had not paid within 3 months of the last
      CHFS report to EFP/BHT and those that cannot document payment since
      September 2013, Vantium will receive an activation bonus of the lesser of $300
      or 1.5% of principal balance for those it receives at least 3 P&I payments, in
      addition to the monthly Base Fee.

{JX102866.4}

11

29.     The Trustee recognizes that there is a significant front-end cost associated with retaining the Servicer due to the largely destabilized condition of the Debtor's mortgage portfolio and the uncertain condition of certain information the Trustee currently possesses (due to the refusal of the Former CHFS Representatives to surrender the Debtor's books and records). However, this case presents an unusual and difficult set of facts as the Trustee is not able to hand over to a servicer a largely stabilized portfolio.   Higher front-end costs under the unusual circumstances of this case are essential to preserve borrower relationships (especially in light of the confusion caused by the Former CHFS Representatives) and preserve the long-term value to the Estate.   Importantly, the cost of Trustee and her counsel continuing to service the loans is significantly higher than what has been proposed by Servicer and comes without the added borrower confidence that the Servicer can provide.   Servicer expects that it will take approximately six (6) months to stabilize the portfolio.

30.     The foregoing notwithstanding, as reflected in the Affidavit of Alan Sercy ("**Affidavit**") attached to the Application as Exhibit "4," Servicer is aware of the provisions of 11 U.S.C. § 328(a) and has agreed, notwithstanding the terms and conditions of employment herein set forth, that the Court may allow compensation different from the compensation provided herein if such terms and conditions prove to have been improvident in light of developments anticipatable at the time of the fixing of such terms and conditions.

31.     As reflected in the Affidavit, Servicer is a disinterested person within the meaning of 11 U.S.C. § 101.

32.     The Trustee proposes that she will send a letter to borrowers enclosing a copy of the Order approving this Application, along with an introductory letter from Servicer, in order to

smooth the transition and satisfy borrower concerns that the Servicer has indeed been employed by the Trustee with the approval of this Court.

## VII.   Role of EFP and BHT and Protections Granted to Them

33.    EFP and BHT have asserted various interests in the Debtor's portfolio that are the subject of adversary proceedings pending before this Court.  For clarity, nothing herein affects the rights, claims or defenses of EFP/BHT (including, but not limited, alleged rights of offset or to seek administrative expenses claims) or those of the Trustee with respect to those adversary proceedings, any others that may be filed or any present or future contested matters and/or administrative expense claims.

34.    EFP and BHT were granted certain protections by the Court prior to the Trustee's appointment and obtained reporting data from the Debtor up through October of 2013.  Additionally, the Servicing Agreement places a duty on the Trustee to supply Servicer with Loan Files.  EFP and BHT are in possession of certain original notes and other documents that may be needed by the Servicer in order to service payoffs and otherwise service the loans, and they will supply originals or copies to Servicer upon request as necessary to permit servicing of the loans for payoffs, short sales, subordinations, or otherwise.  Moreover, EFP and BHT may be called upon to consent to the release of certain original documents in the possession of a third-party custodian.  By their counsel executing this Order, EFP and BHT have agreed to voluntarily cooperate with the Servicer in order to smooth the transition, reduce costs and otherwise further servicing by supplying to Servicer upon request as needed additional data, surrendering original loan documents, consenting to the release of documents from third-parties, and otherwise providing information that may assist Servicer, all of which are solely intended to maintain and/or enhance the loan portfolio.  In exchange, EFP and BHT will be given "view only" access to Servicer's proprietary web-based software in order to track servicing activities subject to EFP

{JX102866.4}

and BHT executing confidentiality/non-disclosure agreements with Servicer. The Trustee will also provide EFP and BHT with monthly reports of collections she receives from Servicer.

35.     For clarity, the Trustee has agreed that the release by EFP and BHT of original documents or their consent to the release of original documents by a third-party custodian: (a) shall not impair, waive or otherwise affect any interest they may assert in such loans or the proceeds thereof or the Trustee's rights, claims and defenses as to same; and (b) to the extent EFP and BHT are later adjudicated to have a valid interest in any loans, that interest shall attach to the proceeds in the Trustee's debtor-in-possession accounts in the same order and with the same priority that would have existed but for the Debtor's Chapter 11 filing,[10] subject to the surcharge provisions set forth below.

36.     The Servicer will preserve and benefit any interest EFP and BHT may ultimately be determined to have in the loans and, as a result, the Servicer's fees and expenses should be subject a Section 506(c) surcharge that is not subject to "claw back" by creditors for any cause other than violation of the terms of the Servicing Agreement.

## VIII. Settlements With Borrowers

37.     While the Trustee contends she has authority to settle, adjust and otherwise resolve borrower issues in the ordinary course of business, the Trustee out of an abundance of caution seeks approval for herself and the Servicer of a protocol for settling, adjusting or otherwise modifying loans.[11]

---

[10] These issues and others are currently the subject of multiple adversary proceedings that were pending at the time of Trustee's appointment but which have been stayed pending the Trustee's stabilization of the Estate.

[11] In the Application, the Trustee proposed a Baseline. However, EFP/BHT objected to the Baseline and as a result of the agreement reached by which the Objection is being withdrawn, that approach is not approved herein.

{JX102866.4}

### A.     Class Settlements

38.     Attached hereto as Exhibit "3" is a Settlement Matrix that provides various scenarios under which Servicer can take action on behalf of the Trustee in Servicer's best business judgment, while in other scenarios Servicer must obtain the Trustee's consent.  This approach will enable the Servicer to efficiently and quickly resolve garden variety borrower issues without having to seek the Trustee's input on routine matters and without the Trustee having to continually seek Court approval to the extent required.  This approach will also enable more complex matters to be settled in the Trustee's discretion without having to repeatedly seek Court approval to the extent required.

### B.     Settlement Standards

39.     In summary, the Trustee seeks authority to settle a class of claims (namely, assorted borrower claims as described above) under Fed. R. Bankr. Proc. 9019(b), which provides, "After a hearing on such notice as the court may direct, the court may fix a class or classes of controversies and authorize the trustee to compromise and settle controversies within such class or classes and without further hearing or notice."  The Trustee's proposal under Fed. R. Bankr. Proc. 9019(b) complies with the Fifth Circuit standards for approving compromises and settlements under Fed. R. Bankr. Proc. 9019(a).

40.     A basic policy in bankruptcy cases is that compromise is favored.  Lawrence P. King, Collier on Bankruptcy, ¶ 9019.01.  Courts have built on this policy by adopting the standards set forth in the U. S. Supreme Court decision, *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).  In *TMT*, the Supreme Court held that a compromise would be approved by a bankruptcy court only "after it apprise[s itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.  Further, the judge should form an educated

{JX102866.4}

estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties in collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Id.* at 424.

41.    "'Settlement agreements have always been a favored means of resolving disputes' in the Fifth Circuit." *Hyperion Foundation, Inc. v. Academy Health Ctr., Inc.*, 2009 WL 3633878 at 3 (Bankr. S.D. Miss. Oct. 27, 2009).   The Fifth Circuit standard for the approval of settlements has been stated in *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.*:

        a.    [t]he probability of success in the litigation, with due consideration for the uncertainty in fact and law,

        b.    [t]he complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

        c.    [a]ll other factors bearing on the wisdom of the compromise.   119 F.3d 349, 356 (5th Cir. 1997).

42.    These factors have been summarized as requiring the compromise to be "fair and equitable" and "in the best interests of the Estate." *TMT*, 390 U.S. at 424; *Cajun Elec.*, 119 F.3d at 355.

43.    The proposal to approve compromises and settlements meets the Rule 9019(a) standards and, in fact, is generally consistent with the relief the Court approved on April 9, 2014, in the Order Granting Trustee's Motion To Approve Procedure For Compromise And Settlement Of A Class Of Claims, As Amended, On An Interim Basis **[Dkt. #615]**.   The proposal is fair and equitable and is in the best interest of the Estate and affected borrowers.   It avoids claim litigation as to the amounts owed by many borrowers, saves the Estate the significant

administrative expense associated with unnecessary claims litigation or filing separate motions to approve compromise and settlement for what could possibly be hundreds or thousands of settlements, enables the Estate to meet its obligations to borrowers under applicable regulations and to immediately maximize reasonable value for many loan assets. The proposal is also in the interest of judicial economy as the Court will not be burdened with numerous, separate motions to approve compromise and settlement to the extent required.

44.    The Trustee requests that the Court waive the 30-day requirements of RESPA with regard to the transfer of loans to the Servicer for servicing, and that request is well taken.

45.    EFP/BHT have agreed to withdraw their Objection based on the terms and conditions set forth herein. A professional servicing company is needed to enable the Trustee to administer the Estate. Therefore, the Application is well taken and should be granted.

IT IS, THEREFORE, ORDERED that the Objection is withdrawn, the Application is granted and the Trustee is authorized to retain the Servicer on the terms and conditions herein and in the Servicing Agreement.

IT IS FURTHER ORDERED that Servicer expressly disclaims and does not assume liability arising from, among other things, third party claims or actions that were caused by or resulted from any actions or omissions in respect of any loans or REO property by the Debtor, any prior servicer, sub-servicer, owner or originator of a loan or REO property and relating to the failure or refusal of Trustee or any trustee or custodian in possession of original loan documents to timely provide to Servicer the originals of any loan documents in order to allow Servicer sufficient time to timely process satisfactions, payoffs and releases.

IT IS FURTHER ORDERED that the 30-day requirements of RESPA with regard to the transfer of loans to the Servicer are hereby waived.

{JX102866.4}

IT IS FURTHER ORDERED that the Trustee will send a letter to borrowers enclosing a copy of this Order, along with an introductory letter from Servicer, in order to smooth the transition and satisfy borrower concerns that the Servicer has indeed been employed by the Trustee with the approval of this Court.

IT IS FURTHER ORDERED that EFP and BHT shall upon request cooperate with the Servicer in supplying additional data, surrendering original loan documents, consenting to the release of documents from third-parties, and otherwise providing information that may assist Servicer.   Servicer shall provide EFP and BHT the "view only" access set forth in the Application subject to their execution of confidentiality agreements with Servicer.

IT IS FURTHER ORDERED that the release by EFP and BHT of original documents or their consent to the release of original documents by a third-party custodian: (a) shall not impair, waive or otherwise affect any interest they may assert in such loans or the proceeds thereof or the Trustee's rights, claims and defenses as to same; and (b) to the extent EFP and BHT are later adjudicated to have a valid interest in any loans, that interest shall attach to the proceeds in the Trustee's debtor-in-possession accounts in the same order and with the same priority that would have existed but for the Debtor's Chapter 11 filing, subject to the surcharge provisions set forth below. Nothing herein affects the rights, claims or defenses of EFP/BHT (including, but not limited to, any alleged rights of offset or to seek administrative expenses claims that EFP and BHT have advised the Trustee they plan to seek for the difference between the contractual agreements with the Debtor and the charges of Vantium approved herein) or those of the Trustee with respect to those adversary proceedings, any others that may be filed or any present or future contested matters and/or administrative expense claims, nor shall this Order constitute a finding as to any issues raised in such proceedings.

IT IS FURTHER ORDERED that the Servicer's fees and expenses are subject to a Section 506(c) surcharge that is not subject to "claw back" by creditors for any cause other than violation of the terms of the Servicing Agreement.

IT IS FURTHER ORDERED that entities required to surrender documents to the Servicer under the Servicing Agreement in order for it to effectively carry out its duties are directed to do so.

IT IS FURTHER ORDERED that the settlement authority requested by the Trustee in Part VIII above is hereby approved, and the Trustee is authorized to execute all documents and instruments necessary thereto including, but not limited to, lost instrument affidavits. State and local agencies are authorized to accept this Order for recording in land records and other record repositories.

IT IS FURTHER ORDERED that nothing herein waives or otherwise impairs any claims, defenses and/or rights the Trustee or creditors (including EFP and BHT) may have against the Debtor, its employees, officers, directors, insiders, agents, affiliates, or control persons (including, specifically, the Former CHFS Representatives), and all such rights, claims and defenses against the Debtor, its employees, officers, directors, affiliates, insiders, agents and/or control persons (including specifically the Former CHFS Representatives) are hereby expressly preserved.

**\*\*END OF ORDER\*\***

Submitted by:

*s/Jeffrey R. Barber*
Counsel for the Trustee
JONES WALKER LLP
P.O. Box 427
Jackson, MS 39205-0427
Telephone: (601) 949-4765
Telecopy: (601) 949-4804
jbarber@joneswalker.com


Agreed to and Approved as to Form:

*s/Jim F. Spencer*
Counsel for EFP/BHT

{JX102866.4}

# EXHIBIT "1"

RESIDENTIAL MORTGAGE SPECIAL SERVICING AGREEMENT

BETWEEN

VANTIUM CAPITAL, INC. DBA
ACQURA LOAN SERVICES

AND

KRISTINA M. JOHNSON, TRUSTEE OF THE CHAPTER 11 BANKRUPTCY
ESTATE OF COMMUNITY HOME FINANCIAL SERVICES, INC.

DATED: JUNE ___, 2014

RESIDENTIAL MORTGAGE LOANS, DEFAULTED LOANS, CHARGE-OFFS,
AND REO PROPERTIES

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS .................................................................................................2

    Section 1.1  Definitions.....................................................................................2

    Section 1.2  Interpretation of Agreement. ........................................................8

Article II TRANSFER OF SERVICING, SERVICING  RESPONSIBILITIES AND
SERVICING COMPENSATION ..................................................................................9

    Section 2.1  Transfer of Servicing Files to Servicer. ......................................9

    Section 2.2  Release of Loan Documents.......................................................10

    Section 2.3  Servicing Responsibilities. ........................................................11

    Section 2.4  Collection and Resolution Activities..........................................14

    Section 2.5  Servicing Compensation ............................................................14

Article III DEFAULT MANAGEMENT SERVICES ...................................................14

    Section 3.1  Default Management Responsibilities .......................................14

    Section 3.2  Foreclosure ................................................................................15

    Section 3.3  Deed in Lieu...............................................................................15

    Section 3.4  Collection Proceedings...............................................................15

    Section 3.5  Bankruptcy of Obligor ..............................................................15

Article IV PROPERTY MANAGEMENT AND DISPOSITION SERVICES.............16

    Section 4.1  Property Management and Disposition Responsibilities .............16

    Section 4.2  Environmental Problems.............................................................16

Article V STANDARDS FOR CONDUCT ..................................................................16

    Section 5.1  Standards of Care and Delegation of Duties. .............................16

    Section 5.2  Transactions with Third Party Service Providers and Related Persons. ......17

    Section 5.3  Access to Records. .....................................................................17

    Section 5.4  Annual Audit..............................................................................18

Article VI BILLING OF AND REPORTS TO TRUSTEE............................................18

    Section 6.1  Property Protection Expenses and Property Improvement Expenses ..........18

    Section 6.2  Remittances and Monthly Report...............................................18

    Section 6.3  Remittance Upon Termination. ..................................................19

    Section 6.4  Billing........................................................................................19

    Section 6.5  Missing Document Report .........................................................20

# TABLE OF CONTENTS

**Page**

Article VII REPRESENTATIONS AND WARRANTIES ........................................................... 20

    Section 7.1   Representations and Warranties of Servicer ........................... 20

    Section 7.2   Representations and Warranties of Trustee .......................... 21

Article VIII LIMITATION OF LIABILITY ...................................................................... 22

    Section 8.1   Liabilities to Obligors ................................................ 22

    Section 8.2   Servicer's Indemnity of Trustee ...................................... 23

    Section 8.3   Trustee's Limited Indemnity of Servicer. ............................. 23

    Section 8.4   Limitation on Liability of Servicer .................................. 24

    Section 8.5   Indemnification Procedures .......................................... 26

    Section 8.6   Operation of Indemnities ............................................ 27

Article IX DEFAULT ........................................................................................... 27

    Section 9.1   Servicer Events of Default ........................................... 27

    Section 9.2   Trustee Events of Default ............................................ 28

    Section 9.3   Advances Following Trustee Event of Default ......................... 28

    Section 9.4   Effect of Transfer ................................................... 28

Article X TERM ................................................................................................ 28

    Section 10.1   Term of Agreement. .................................................. 28

    Section 10.2   Transfers of Servicing ............................................... 29

    Section 10.3   Servicer Not to Resign ............................................... 30

    Section 10.4   Successor Servicer ................................................... 30

Article XI MISCELLANEOUS ................................................................................... 30

    Section 11.1   Successors and Assigns; No Third Party Beneficiaries ............... 30

    Section 11.2   Choice of Law and Venue .............................................. 30

    Section 11.3   Notices .............................................................. 31

    Section 11.4   Entire Agreement; Amendments; Waivers ............................... 31

    Section 11.5   No Joint Venture; Limited Agency .................................... 31

    Section 11.6   Severability; Interpretation ......................................... 32

    Section 11.7   Counterparts ......................................................... 32

    Section 11.8   Waiver of Jury Trial ................................................. 32

    Section 11.9   Limitation of Damages ................................................ 32

## EXHIBITS

The following exhibits are incorporated into this Agreement:

EXHIBIT A          Monthly Report
EXHIBIT B          Servicing File
EXHIBIT C          Setup, Servicing and Termination Fees
EXHIBIT D          Loss Mitigation Authority Matrix
EXHIBIT E          Adversary Proceedings
EXHIBIT F          Litigation/Foreclosure
EXHIBIT G          Bankruptcy Proceedings
EXHIBIT H          Bankruptcy Court Order

RESIDENTIAL MORTGAGE SPECIAL SERVICING AGREEMENT

This Residential Mortgage Special Servicing Agreement (this "Agreement") dated the ____ day of June, 2014, by and between Kristina M. Johnson, solely in her capacity as Trustee (the "Trustee") of the Chapter 11 bankruptcy estate of Community Home Financial Services, Inc. (the "Debtor") and not in her individual capacity, and Vantium Capital, Inc., a Delaware Corporation doing business as Acqura Loan Services (the "Servicer").

W I T N E S S E T H:

WHEREAS, the Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on May 23, 2012, in the United States Bankruptcy Court for the Southern District of Mississippi (the "Bankruptcy Court"), Case No. 12-01703-EE (the "Bankruptcy Case");

WHEREAS, the Debtor asserted in the Bankruptcy Case that it was in the business of purchasing for its own account and servicing for others loan portfolios consisting of mostly Class B loans of 2nd to 3rd mortgages and/or deeds of trust;

WHEREAS, the Trustee's appointment was approved by an Order of the Bankruptcy Court entered on January 21, 2014;

WHEREAS, the Debtor is no longer debtor-in-possession in the Bankruptcy Case;

WHEREAS, the Trustee has demanded turnover of the Debtor's books and records from the Debtor and others;

WHEREAS, the Debtor has not surrendered to the Trustee all of its books and records but the Trustee has obtained copies of the Debtor's mortgage software system;

WHEREAS, through the Debtor's mortgage software system, cooperation with certain of the Debtor's creditors, the use of subpoenas, direct conversations with many borrowers whose loans were serviced by the Debtor, and other means, the Trustee has obtained information (although incomplete) regarding the Debtor's loan servicing operations;

WHEREAS, subject to approval of the Bankruptcy Court, Trustee and Servicer desire to set forth the terms and conditions on which Servicer will service or sub-service and provide management and disposition services for those mortgage loans and "real estate owned" properties selected by the Trustee that were previously serviced or owned by the Debtor.

NOW, THEREFORE, in consideration for the mutual benefits and obligations as hereinafter set forth, the parties hereby agree as follows:

# ARTICLE I
## DEFINITIONS

Section 1.1    <u>Definitions</u>.  Capitalized terms used in this Agreement and not otherwise defined shall have the meanings given to them in this Section 1.1.

"<u>Accepted Servicing Practices</u>" means, with respect to any Loan or REO Property, those special servicing, collection, resolution or disposition practices that are undertaken to maximize the net present value in any Loan or REO Property followed with the same care, skill, prudence and diligence with which Servicer services and administers mortgage loans or properties held for other portfolios similar to the Loan or REO Property, as the case may be, but without regard to:

1.  any relationship that Servicer or any affiliate of Servicer or any sub-servicer may have with the related Obligor; or

2.  Servicer's right to receive compensation for its services hereunder or with respect to any particular transaction; or

3.  the ownership, or servicing or management for others, by Servicer of any other mortgage loans or property;

Provided, however, that such services are performed in compliance with the terms of this Agreement.

"<u>Agreement</u>" means this Servicing Agreement as amended, modified or supplemented from time to time, including all exhibits and schedules hereto.

"<u>Ancillary Income</u>" means all income (other than interest and any prepayment penalties) from the Loans and Properties to which Servicer is entitled (exclusive of the Servicing Fee), in those amounts set forth in Exhibit "C" including, without limitation, 50% of late charges assessed against Loans that are in payment default after ninety (90) days from the Effective Date of the Agreement, insufficient fund fees, assumption fees, modification fees, fees associated with any repayment plan or forbearance agreement, fees associated with any discounted payoff, interest on the Collection Account and Escrow Accounts (but only to the extent that applicable Requirements or the Loan Documents do not require that such interest be paid to the applicable Obligor) and all other incidental fees.

"<u>Association</u>" means any homeowners association or condominium association.

"<u>Balloon Mortgage Loan</u>" means any Loan that by its original terms or by virtue of any modification provides for an amortization schedule extending beyond its originally scheduled Maturity Date.

"<u>Balloon Payment</u>" means, with respect to a Balloon Mortgage Loan as of any date of determination, the amount outstanding on the Maturity Date of such Balloon Mortgage Loan in excess of the related Monthly Payment.

"Bankruptcy Code" means 11 U.S.C. 101 *et. seq.*, as the same may be amended, modified or supplemented from time to time.

"BHT" means Beher Holdings Trust.

"Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking and savings and loan institutions in the State of Delaware or Texas are authorized or obligated by law or executive order to be closed.

"Collection Account" means the separate account(s) in a depository institution approved by the Office of United States Trustee and created pursuant to Section 2.3(a) of this Agreement, which shall be entitled "Acqura Loan Services as Servicer, in trust for Kristina M. Johnson, Trustee of the Chapter 11 Bankruptcy Estate of Community Home Financial Services, Inc."

"Collection Period" means with respect to each Distribution Date, the period commencing on the first day of the month preceding the month of the Distribution Date and ending on the last day of the month preceding the month of the Distribution Date.

"Custodian" means any custodian appointed by the Trustee or previously appointed by the Debtor to hold Loan Documents.

"Disposition" means any (a) taking of Mortgaged Property by eminent domain or condemnation or sale in lieu thereof, (b) the liquidation of a defaulted Loan through a foreclosure sale, trustee's sale, deed-in-lieu of foreclosure or otherwise, (c) a sale or assignment of a Loan or REO Property in accordance with the terms hereof, and/or (d) any other disposition of the Loan or REO Property whether through a discounted payoff, prepayment, Balloon Payment or any other similar disposition.

"Distribution Date" means the fifth (5th) Business Day following the close of the prior month, or if such day is not a Business Day, the next succeeding Business Day.

"EFP" means Edwards Family Partnership.

"Eligible Account" means an account maintained with a depository institution approved by the Office of United States Trustee, (i) whose accounts are insured by the FDIC and (ii) whose (or whose direct or indirect parent's) long term unsecured debt obligations are rated at least "A" or better by one of the Rating Agencies.

"Environmental Liability" shall have the meaning ascribed thereto in Section 8.3(c).

"Environmental Problem Property" means a Property that is in violation of any environmental law, rule or regulation.

"Escrow Accounts" means the separate account(s) created pursuant to Section 2.3(a) of this Agreement, for the payment of taxes, Association dues, assessments, Hazard Insurance and Mortgage Insurance premiums, ground rents and similar items which shall be entitled "Acqura Loan Services, as Servicer, in trust for Kristina M. Johnson, Trustee of the Chapter 11 Bankruptcy Estate of Community Home Financial Services, Inc. and various mortgagors."

"Escrow Payments" means amounts required to be paid for taxes, Association dues, assessments, Hazard Insurance and Mortgage Insurance premiums, ground rents and similar items and any and all other purposes for which funds are required to be held in escrow.

"FDIC" means the Federal Deposit Insurance Corporation or any successor thereto.

"FHLMC" means the Federal Home Loan Mortgage Corporation or any successor thereto.

"Fitch" means Fitch Investors Services, L.P.

"Flood Insurance (or "Flood Insurance Policy")" means an insurance policy insuring against flood damage to a Mortgaged Property.

"FNMA" means the Federal National Mortgage Association or any successor thereto.

"Hazard Insurance" means casualty, fire, hazard, flood, wind, liability or similar insurance policies relating to a Property.

"Information Holders" means the Trustee, the Debtor or any other servicer, sub-servicer, document Custodian, holder, originator or other Person who, as of the date of this Agreement, has possession of any document or information constituting a part of the Servicing File and including, but not limited to, EFP and BHT.

"Liability" shall have the meaning ascribed thereto in Section 8.2.

"Liquidation Proceeds" means cash received in connection with the liquidation of defaulted Loans, whether through a Disposition or otherwise, net of the amount of any broker's fees payable in connection with any sale of a REO Property (but without any deduction for any legal fees or other costs or expenses).

"Loan" means a loan, secured by a mortgage, deed of trust, UCC financing statement or comparable security interest on certain real property, acquired or serviced by the Debtor prior to the filing of the Bankruptcy Case or acquired by the Trustee after the Bankruptcy Case and for which the servicing is transferred to Servicer from time to time pursuant to the terms and provisions of Section 2.1; the term "Loan" shall include Performing Loans and Non-Performing Loans.

"Loan Documents" means the contract or promissory note, mortgage or deed of trust, title insurance policy or binder (to the extent one exists), Mortgage Insurance or guaranty agreement, financing statements, and any other agreement, instrument or other document evidencing or relating to a Loan and any other agreement, instrument or other document evidencing ownership of a REO Property.

"Maturity Date" means, with respect to any Loan as of any date of determination, the date on which the last payment of principal is due and payable under the related contract/promissory note.

"Missing Document Report" means the report prepared by Servicer and delivered to Trustee pursuant to Section 6.5.

"Monthly Collection Amount" means, for each Collection Period, all amounts actually received by Servicer through any means including into Servicer's lock box during the related Collection Period with respect to the Loans and REO Properties from whatever source (other than partial and forbearance payments), minus amounts representing accrued taxes and insurance premiums not yet due and payable to the applicable taxing authority or insurer, calculated in accordance with the then current escrow analysis performed by Servicer in accordance with applicable Requirements.

"Monthly Payment" means with respect to any Loan and any Collection Period, the scheduled monthly payment of principal and interest, excluding any Balloon Payment, on such Loan which is payable in such Collection Period.

"Monthly Report" means the monthly report prepared by Servicer and delivered to Trustee pursuant to Section 6.2.

"Moody's" means Moody's Investor's Service Inc.

"Mortgage Insurance" means any mortgage insurance or guaranty relating to a Loan issued by a Mortgage Insurer.

"Mortgage Insurer" means the Federal Housing Administration as a mortgage insurer, the United States Department of Veterans Affairs as a mortgage guarantor and any issuer of private mortgage insurance.

"Mortgaged Property" means the real property securing a Loan.

"Non-Recoverable Advance" shall have the meaning set forth in Section 2.3(b) below.

"Obligor" means the Person or Persons obligated to make payments of principal and interest on the Loan, and includes all joint, several or joint and several obligors and all guarantors other than Mortgage Insurers.

"Person" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, limited liability company, unincorporated organization or government or agency or political subdivision thereof.

"Property" means any Mortgaged Property and/or REO Property.

"Property Improvement Expenses" means any costs and expenses for repairs, replacements or improvements which Servicer recommends to the Trustee and which are approved by the Trustee, and only to the extent that they:

(a)    are paid to Persons who are generally in the business of providing such goods and services;

(b)     are reasonable for the types of goods or services provided in the geographical area in which such goods or services are provided;

(c)     are designed to maintain or improve the value of a Property but not immediately necessary to operate it; and

(d)     are incurred for the purpose of facilitating the sale of the related Loan or REO Property and maximizing the proceeds thereof, including but not limited to the following:

(i)     cosmetic improvements such as painting and landscaping;

(ii)     replacement of items which are obsolete or wearing out but which may not be dysfunctional; and

(iii)     moneys paid to a tenant or buyer for a purpose similar to a Property Improvement Expense.

"Property Protection Expenses" means the following costs and expenses, (but as to subparagraphs (a)-(f), (h), (j), and (k), only to the extent that they are approved by the Trustee) and are paid to Persons who are generally in the business of providing such goods and services and are reasonable for the types of goods or services provided in the geographical area in which such goods or services are provided:

(a)     utility costs;

(b)     payments required under service contracts, including but not limited to service contracts for heating, ventilation and air conditioning systems, landscape maintenance, pest extermination, security, model furniture, swimming pool service, trash removal, answering service and credit checks;

(c)     property management fees;

(d)     usual and customary leasing and sales brokerage expenses and commissions;

(e)     permits, licenses and registration fees and costs;

(f)     any expense necessary in order to prevent or cure a breach under a lease, contract or agreement including any debt secured by a lien which is superior or prior to the lien encumbering the Loan, if the consequences of failure to prevent or cure could, in the sole judgment of Servicer, have a material adverse effect with respect to a Loan or Property;

(g)     any expense necessary in order to prevent or cure a material violation of any applicable law, regulation, code or ordinance;

(h)     costs and expenses of brokers' price opinions and surveys incidental to evaluation, leasing and/or sale of the Loans and/or Properties;

(i)     fees and expenses of surveyors, title and escrow companies (including, without limitation, costs, fees and/or expenses for title insurance premiums, title searches, escrow fees, recording costs and all costs similar or related thereto), costs incurred to obtain documents or information for the Servicing File, and any costs and expenses related to the preparation and/or recordation of releases of liens or satisfactions of mortgages (in whole or in part);

(j)     property inspections; and

(k)     other such reasonable fees and expenses incurred by Servicer in connection with the enforcement, collection, foreclosure, management and operation of the REO Property or the Mortgaged Property, sales of REO Properties (including, without limitation, the costs and expenses set forth in subsection (i) above and any and all transfer taxes and other closing costs customarily paid by the seller in the locale where such sale occurs) and the performance of its servicing activities.

"Rating Agencies" means, collectively, Fitch, Moody's and S&P.

"Requirements" means all federal, state or local laws and any other requirements of any government or agency or instrumentality thereof applicable to the servicing of the Loans, the management of the REO Properties or the provision of services hereunder by Servicer.

"REO Property" means, (a) as of any Determination Date for the purpose of calculating the relevant Servicing Fee, and (b) as of the actual date of acquisition of title for all other purposes:  any (i) real property owned by Trustee and made subject to this Agreement, and (ii) any Mortgaged Property that was subject to a Loan, after the Mortgaged Property has been acquired on behalf of Trustee pursuant to this Agreement through foreclosure or similar proceedings, acceptance of deed-in-lieu of foreclosure, acquisition of title in lieu of foreclosure or the acquisition of title by operation of law.

"S&P" means Standard & Poor's Rating Group.

"Servicer" means Vantium Capital Inc., a Delaware Corporation doing business as Acqura Loan Services, its successors in interest and permitted assigns.

"Servicer Event of Default" shall have the meaning set forth in Section 9.1.

"Servicing Advances" means all amounts advanced by Servicer in payment of Property Protection Expenses, Escrow Payments, Setup Expenses and Property Improvement Expenses.

"Servicing Fee" means, collectively, the servicing fees set forth on Exhibit C.

"Servicing File" means with respect to each Loan, the Loan Documents and information (including any servicing tapes, images and conversion reports) received from the Information Holders (including title company investigations of matters relating to the Loans and the REO

Properties), or obtained through the efforts of Servicer hereunder. To the extent reasonably practicable, the Servicing File will contain the Loan Documents and information described in Exhibit B hereto.

"Servicing Portfolio" means all Loans and REO Properties serviced by Servicer pursuant to this Agreement.

"Setup" means, in connection with the transfer of servicing of Loans and REO Properties to Servicer, the conversion of any data tape from the Information Holders, the uploading and quality control review of data, the uploading of final trial balances, the posting of interim payment activity of the Loans, the setup of tax, escrow and insurance records, and the management of the document delivery process.

"Setup Expenses" means the direct out-of-pocket expenses incurred by Servicer in connection with Setup of a Loan or REO Property, including, without limitation, title searches, recording fees for powers of attorney and tax search services.

"Setup Fee" means an initial fee for the Setup of each Loan and/or REO Property, as set forth on Exhibit C.

"Termination Fee" means the fee, set forth on Exhibit C, and paid by Trustee to Servicer pursuant to Section 10.1(c).

"Transfer Date" means the date on which Servicer accepts Trustee's request to add a Loan or REO Property to the Servicing Portfolio, in accordance with Section 2.1.

"Trustee" means Trustee/Client in her representative capacity and not in her individual capacity. For clarity, any reference herein to the Trustee's liability for charges, costs, fees or other claims shall refer mean liability of the Debtor's bankruptcy estate exclusively and not in the Trustee in her personal, individual capacity.

"Trustee Event of Default" shall have the meaning set forth in Section 9.2.

Section 1.2    Interpretation of Agreement.

(a)    All references in this Agreement to designated Sections, Articles, Exhibits and Schedules are to the designated sections and articles of and exhibits and schedules to this Agreement.

(b)    Use of the masculine gender is intended to include the feminine and neuter genders.

(c)    The headings and captions used in this Agreement are for convenience of reference only and do not define, limit or describe the scope or intent of the provisions of this Agreement.

(d)    Terms in the singular include the plural and vice versa.

(e)     The terms "includes" or "including" are intended to be inclusive rather than exclusive.

## ARTICLE II
## TRANSFER OF SERVICING, SERVICING
## RESPONSIBILITIES AND SERVICING COMPENSATION

Section 2.1     Transfer of Servicing Files to Servicer.

(a)     The Trustee may request that Servicer add a Loan or an REO Property to the Servicing Portfolio by designating in writing to Servicer the Loan or REO Property as an asset to be serviced hereunder and sending to Servicer those parts of the Servicing File in Trustee's possession.  When Servicer accepts a Loan or an REO Property, it will become a part of the Servicing Portfolio.  Trustee shall use reasonable efforts to cause the Information Holders to transfer to Servicer any other parts of Servicing Files and/or servicing records necessary to provide current data with respect to each of the Loans and REO Properties which were not transferred to Servicer on the applicable Transfer Date.  Such transfer shall occur in accordance with such procedures as Trustee and Servicer shall mutually agree upon taking into account the requirements of this Agreement.  The Servicer shall transfer and convert the Servicing Files to Servicer's system as soon as reasonably possible from the date of receipt by Servicer of the Servicing Files and such other documents as are reasonably necessary to service the Loans and REO Properties from the Information Holders.

(b)     As of each Transfer Date, Trustee hereby appoints Servicer to provide and Servicer hereby assumes and accepts responsibility for providing the services described herein with respect to each Loan and REO Property; provided, however, that if Servicer is making diligent efforts to complete and verify the Servicing File because a Servicing File is not complete or contains incorrect information on the Transfer Date, Servicer shall not be responsible for any failure to provide any service hereunder, or for any inaction or any action taken hereunder related to such incompleteness or incorrectness.

(c)     Prior to the transfer to Servicer of the complete Servicing File with respect to a Loan, Servicer shall not be responsible for the payment of Escrow Payments with respect to such Loan unless Servicer has actual knowledge of the existence, amount and due date of such obligations, in which case Servicer shall determine in accordance with Accepted Servicing Practices whether or not to make any Escrow Payments within five (5) Business Days after it has actual knowledge of the existence, amount and due date of such obligations.  In the case of property taxes and similar items, Servicer shall be deemed not to have knowledge of the existence, amount and/or due date of such obligations until five (5) Business Days after receiving a current report with respect to the Mortgaged Property from a tax service retained by Servicer.  The Servicer shall be entitled to rely in all respects on any tax service report and shall have no liability to Trustee if a tax sale occurs for which Servicer (i) received no notice from the applicable taxing authority, or (ii) received a report from a tax service indicating that the taxes were current.

(d)     Upon reasonable request by Servicer, Trustee shall furnish Servicer with such limited powers of attorney and other documents prepared by Servicer and satisfactory in

form and substance to Trustee as may be necessary or appropriate to enable Servicer to liquidate, collect payments against and otherwise service and manage the Loans and Properties in accordance with this Agreement.   Additionally, Servicer may appoint certain designated servicing officers in writing to Trustee and such designated servicing officers shall be authorized to act upon behalf of Trustee hereunder.   Such list (or any amended list) designating such servicing officers shall be sufficient so long as it is executed by any officer of Servicer.   All documents so provided to Servicer shall be held in trust by Servicer on behalf of Trustee.

(e)      From and after the Transfer Date for any Loan, Trustee shall remit to Servicer any payments the Trustee receives on such Loan.

(f)      Trustee agrees to cooperate fully with Servicer with respect to all reasonable requests made by Servicer in connection with the transfer of servicing pursuant to this Section 2.1.

Section 2.2   <u>Release of Loan Documents</u>.  From time to time as is appropriate for the servicing or foreclosure of a Loan or the acquisition of Mortgaged Properties in lieu of foreclosure or for the making of any claim against or collection under any Mortgage Insurance policy, Hazard Insurance policy, other insurance policy, Servicer's fidelity bond, Servicer's errors and omissions policy, or for purposes of effecting a partial release of any Mortgaged Property from the lien of the mortgage or for making any corrections to the mortgage note or the mortgage or other Loan Documents, Servicer shall deliver to the Trustee an officer's certificate of Servicer certifying as to the reason for such release and designating the Loan Documents requested to be released to Servicer.

Within five (5) Business Days of receipt of the foregoing, Trustee shall deliver or use reasonable efforts to cause Custodian or EFB/BHT to deliver to Servicer the Loan Documents so requested.   The Servicer shall cause the Loan Documents so released to be returned to the Trustee when the need therefore by Servicer no longer exists, unless the Mortgage Loan is liquidated and the proceeds thereof are deposited in the Collection Account.  Upon receipt of an Officer's Certificate of Servicer stating that such Mortgage Loan was liquidated and the Liquidation Proceeds were deposited in the Collection Account, the servicing receipt shall be released by the Custodian or Trustee, as applicable, to Servicer.

The Servicer shall retain possession of any Loan Documents that have been released to Servicer by the Custodian, Trustee or EFP/BHT, as applicable, at all times unless (i) the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Collection Account, (ii) the Loan Documents have been delivered to an attorney or to a public trustee or other public official as required by law for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgage Property or (iii) Servicer's need therefore no longer exists and Servicer returns the Loan Documents to the Trustee, pursuant to the previous paragraph.

Loan Documents held by Servicer are and shall be held in trust by Servicer for the benefit of Trustee as the trustee thereof and Servicer's possession of the Loan Documents so retained is at the will of Trustee for the sole purpose of servicing the related Loan, and such retention and

possession by Servicer is in a custodial capacity only. The Loan Documents with respect to each Loan shall be appropriately marked to clearly reflect the Trustee's interest in such Loan.

Section 2.3     Servicing Responsibilities.

Subject to Accepted Servicing Practices or the terms of this Agreement, Servicer shall have full power and authority to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable. Subject to Section 2.1 and in accordance with Accepted Servicing Practices, in performing its obligations hereunder, Servicer shall comply with the following with respect to each Loan or REO Property, continuously from the date hereof until the date each Loan or REO Property ceases to be subject to this Agreement:

(a)     The Servicer shall hold all funds received for Trustee hereunder in trust for Trustee in a segregated Collection Account in accordance with all applicable Requirements. The Collection Account shall be an Eligible Account. The Servicer shall make remittances from the Collection Account as provided in Sections 6.2 and 6.3. The Servicer shall hold all funds received to cover Escrow Payments in connection with the Loans in trust for Trustee, and the related Obligor in a segregated Escrow Account (which shall be maintained in accordance with all applicable Requirements and the terms of the Loan Documents). The Servicer shall disburse such funds from the appropriate Escrow Accounts as necessary or advisable.

(b)     To the extent the Trustee directs the Servicer to establish an escrow as to a particular Loan or Loans, the Servicer shall timely determine the amounts of all required disbursements from the Escrow Accounts and shall make disbursements as they become due. The Servicer shall also determine whether any delinquency exists in the payment of Escrow Payments and shall use commercially reasonable efforts to cause such deficient amounts to be paid by the Obligor. If there are not sufficient funds in the appropriate Escrow Account to make such payments as they become due, Servicer shall advance Escrow Payments unless Servicer determines in its reasonable judgment that an advance pursuant to this or any other section will not be ultimately recoverable from late payments, insurance proceeds, Liquidation Proceeds or any other recovery on such Loan or Property (a "Non-Recoverable Advance"). If Servicer determines that the Escrow Payment would constitute a Non-Recoverable Advance, Servicer will not be obligated to make such advance. Any advances made towards Escrow Payments shall be deemed to be Servicing Advances. Any advances made towards Escrow Payments shall be deemed to be Servicing Advances. The Servicer shall be entitled to reimbursement of all such Servicing Advances made pursuant to this Section 2.3 from all amounts subsequently deposited in the Collection Account.

(c)     The Servicer shall comply with the provisions of all applicable Requirements and the Loan Documents relating to the giving of all notices or other communications required to be given by or on behalf of Trustee to any Mortgage Insurer, title insurer or other insurer or guarantor, as applicable. Where any applicable Requirement or the Loan Documents require any notice or other communication to be given to an Obligor, Servicer shall, in the absence of instructions to the contrary from Trustee, give such notice or other communication to the Obligor.

(d)     With approval of the Trustee, Servicer shall, as a Property Protection Expense if not paid by an Obligor, (i) enforce the Obligor's obligations under the Loan Documents to cause each Mortgaged Property to be insured against risks, hazards and liabilities as required by all applicable Requirements and the Loan Documents, in an amount at least equal to the unpaid principal balance of the Loan, and (ii) cause each REO Property to be insured against risks, hazards and liabilities, in an amount which is at least equal to the lesser of (A) the full replacement value of the improvements which are a part of such REO Property, and (B) the outstanding principal balance of the related Mortgage Loan at the time it became an REO Property; such insurance shall be obtained from a financially sound and reputable insurance carrier.  The Servicer shall retain copies of all Hazard Insurance policies or certificates of insurance representing such coverage.  The Servicer shall comply with all of the terms of Mortgage Insurance and guarantees relating to any Loan and shall use its best efforts to maintain such Mortgage Insurance and guarantees in full force and effect provided that Servicer has actual knowledge of such insurance or guaranty.  In the event of an insured loss with respect to any Property, unless Servicer has actual knowledge that the Obligor has filed such a claim with respect to a Mortgaged Property, Servicer shall promptly file or cause to be filed a claim on the Hazard Insurance.  In the case of a Mortgaged Property, Servicer shall apply or disburse all insurance proceeds in accordance with the terms and provisions of the Loan Documents and all Requirements, and, in the case of a REO Property, Servicer shall apply or disburse all insurance proceeds in accordance with the instructions of Trustee, in each case net of any amounts due to Servicer as otherwise provided herein. The Servicer shall be responsible for submitting a claim under any Mortgage Insurance or other guaranty or insurance on a timely basis provided that Servicer has actual knowledge of such insurance or guaranty.  With approval of the Trustee, Servicer shall, as a Property Protection Expense and where the Obligor fails or refuses to maintain insurance on the Mortgaged Property in accordance with the applicable Loan Documents (or to pay escrows sufficient therefore, as the case may be), subject the Mortgaged Properties to the coverage of its "force-placed" hazard insurance policy with such deductible as Servicer maintains for similar mortgaged properties serviced for itself and for others by Servicer. The amount of any premiums to Servicer resulting from obtaining such coverage shall be treated as a Property Protection Expense hereunder.  The Trustee shall be solely responsible for the amount of the deductible in the event of any loss and Servicer shall have no liability to Trustee therefore.

Subject to the preceding paragraph, Servicer shall keep in force during the term of this Agreement a fidelity bond and a policy or policies of insurance covering errors and omissions in the performance of Servicer's obligations under this Agreement in sufficient amounts to protect the Trustee from any errors or omissions committed by Servicer.  Such fidelity bond and policy or policies shall be maintained with recognized insurers and shall be in such form and amount as would permit Servicer to be qualified as a FNMA or FHLMC seller-servicer.  The Servicer shall be deemed to have complied with this provision if an affiliate of Servicer has such errors and omissions and fidelity bond coverage and, by the terms of such insurance policy or fidelity bond, the coverage afforded thereunder extends to Servicer.

With the Trustee's approval, the Servicer shall ensure that Flood Insurance is maintained on Mortgaged Premises (and REO) that are identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and the flood insurance described below has been made available).  Any such Flood Insurance shall meet the current

guidelines of the Federal Insurance Administration and shall be with a generally acceptable insurance carrier.

The amount of the Flood Insurance Policy shall equal not less than the least of (i) the lesser of (a) the unpaid principal balance of the Loan, plus accrued interest and the aggregate of all Servicing Advances, and (b) the full insurable value of the Mortgaged Property, but in each case not less than such amount as is necessary to prevent the mortgagor and/or the mortgagee from becoming a co-insurer or loss payee, and (ii) the maximum amount of insurance which was available under the Flood Disaster Protection Act of 1973.

(e)    Between 60 and 90 days from execution of this agreement (and periodically thereafter as new Loans are added), Servicer will review the portfolio and identify the Loans deemed in Servicer's professional opinion to be uncollectable and unlikely to make further payments.  Servicer will recommend to the Trustee (with the final decision to be in her sole discretion) Loans that may be charged off and will further recommend which of such Loans may be:  1)  charged off with further action; or 2) charged off with no further action.  With respect to each category:

(i)    Charged Off with Further Action:  for Loans where there is still a valid lien on the property and there may be possibility of future collection, such Loans will be kept on Servicer's system in a charged off status and no further collection activity will occur. Servicer will comply with minimum CFPB standards (such as answering inbound calls, sending statements, 1098/1099 reporting, respond to qualified written requests, issue payoffs, etc.) and shall charge the minimum servicing fee of $7.50/month as set forth in Schedule C.  Servicer shall be entitled to a deboarding fee in the amount specified in Schedule C for any transfer to another servicer or owner as determined by the Bankruptcy Court.

(ii)    Charged Off with No Further Action:  for Loans where no further action will be taken (such as where the second lien has been foreclosed, a Chapter 7 discharge has been entered under the Bankruptcy Code, an Obligor is deceased), Servicer will charge no monthly servicing fee and no deboarding fee.  Instead, such Loans will be closed in Servicer's system and remain inactive and not subject to transfer to another servicer or owner as determined by the Bankruptcy Court.

(f)    The Servicer shall prepare promptly each report required by all applicable Requirements including reports to be delivered to all governmental agencies having jurisdiction over the servicing of the Loans and the Escrow Accounts, shall execute such reports or, if Trustee must execute such reports, shall deliver such reports to Trustee for execution prior to the date on which such reports are due and shall file such reports with the appropriate Persons.  The Servicer shall timely prepare and deliver to the appropriate Persons Internal Revenue Service forms 1098, 1099 and 1099A (or any similar replacement, amended or updated Internal Revenue Service forms) relating to any Loan for the time period such Loan has been serviced by Servicer. Trustee shall be solely responsible for filing any other forms including, without limitation and to the extent applicable, forms 1041 and K-1 or any similar replacement, amended or updated Internal Revenue Service forms.  The reports to be provided under this subsection shall cover the period through the end of the month following the termination of this Agreement or, in the case of reports to be sent to the Internal Revenue Service, the end of the calendar year following

termination of the Agreement. The Servicer shall promptly prepare all reports or other information required to respond to any inquiry from or give any necessary instructions to any Mortgage Insurer, provider of Hazard Insurance or other insurer or guarantor, taxing authority, tax servicer, Association or the Obligor. Servicer is not required to do any credit reporting until such time that the Trustee, in her sole discretion, directs Servicer to do so.

(g)    The Servicer shall maintain adequate facilities and experienced staff to carry out its obligations hereunder.

(h)    The Servicer shall hold and be responsible for responding promptly and accurately to all reasonable requests from Trustee, the Obligor or other Persons for information relating to a Loan or Property or to the Obligor that Servicer is required or permitted to disclose to such Person, upon compliance by such Person of any conditions to the release of such information.

(i)    The Servicer shall cooperate with Trustee in facilitating any financing or securitization or whole loan transfer of the Loans, including furnishing such reports and information with respect to the Loans as Trustee may reasonably request, and facilitating the transfer of servicing of the Loans to such entity as Trustee may designate in connection with a securitization or whole loan transfer of the Loans. Any and all costs, fees and expenses incurred by Servicer in connection with the foregoing shall be deemed to be Servicing Advances and shall be reimbursed by Trustee if not previously withdrawn from the Collection Account, such obligation of Trustee to survive any termination hereof, but only to the extent funds are available in the Debtor's Bankruptcy Case and then only in such amount as may be approved by the Bankruptcy Court.

Section 2.4    Collection and Resolution Activities. The Servicer shall be responsible continuously from the Transfer Date until the date each Loan ceases to be subject to this Agreement, for using measures consistent with the Accepted Servicing Practices to attempt to collect delinquent payments on each Loan.

Section 2.5    Servicing Compensation. The Servicer shall be entitled to the Setup Fee related to a Loan or REO Property on the related Transfer Date, and Servicer may withdraw such Setup Fee from the Collection Account on or after such date. The Servicer shall be entitled each month to the Servicing Fee. The Servicing Fee shall not be prorated for any period of less than a full calendar month. In addition, Servicer shall be entitled to retain all Ancillary Income. Servicer shall not be obligated to deposit any Ancillary Income into the Collection Account. In the event that Servicer deposits into the Collection Account any Ancillary Income, Servicer may withdraw such amount at any time from the Collection Account, any provision herein to the contrary notwithstanding.

## ARTICLE III
## DEFAULT MANAGEMENT SERVICES

Section 3.1    Default Management Responsibilities. Without limiting the generality of Section 2.3, Servicer is hereby authorized and empowered by Trustee to take the following actions, without limitation: (i) prepare, execute and deliver, on behalf of Trustee, any and all

financing statements, continuation statements and other documents or instruments necessary to maintain the lien on each Mortgaged Property and related collateral; and modifications, waivers (including, without limitation, waivers of any late payment charge in connection with any delinquent payment on a Loan), consents, amendments, discounted payoff agreements, forbearance agreements, cash management agreements or consents to or with respect to any documents contained in the related Servicing File; and any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other instruments comparable to any of the types of instruments described in this subsection (i).

Section 3.2   Foreclosure.   If Servicer reasonably determines that foreclosure is appropriate with respect to a Loan (including if it determines that foreclosure is appropriate in conjunction with or as an alternative to collection efforts and default management services hereunder), Servicer shall recommend to the Trustee the pursuit of foreclosure.  However, the decision to foreclosure shall be exclusively the Trustee's and the Trustee shall be responsible for retaining an attorney to pursue foreclosure.  If the Property is acquired in the foreclosure proceeding, Servicer may acquire the Property in the name of Trustee or her designee, subject to applicable state law, and Servicer shall commence providing property management and disposition services as provided in Section 4.1.   Notwithstanding anything to the contrary contained herein, in the event Servicer has reasonable cause to believe that a Property is an Environmental Problem Property as described in Section 4.2 hereof, Servicer shall notify Trustee of the existence of the Environmental Problem Property, describe such problem, and make a recommendation to Trustee regarding handling the Property. In no event will Servicer be required to acquire record title to an Environmental Problem Property.

Section 3.3   Deed in Lieu.   If Servicer recommends a deed in lieu of foreclosure pursuant to the authority granted to Servicer by the terms and provisions of Section 3.1 above, Trustee will retain counsel or other third party vendor to prepare appropriate documentation. Notwithstanding anything to the contrary contained herein, in connection with a deed in lieu of foreclosure, in the event Servicer has reasonable cause to believe that a Property is an Environmental Problem Property as described in Section 4.2 hereof, Servicer shall notify Trustee of the existence of the Environmental Problem Property, describe such problem, and make a recommendation to Trustee regarding handling the Property. In no event will Servicer be required to acquire record title to an Environmental Problem Property.  The Servicer will provide the services described in Section 4.1 with respect to each Property for which a deed in lieu of foreclosure is received by Servicer.

Section 3.4   Collection Proceedings.   If Servicer reasonably determines that suits on promissory notes, deficiencies, indemnities, guaranties or other Loan Documents, actions for equitable and/or extraordinary relief (including, without limitation, actions for temporary restraining orders, injunctions, and appointment of receivers), suits for waste, fraud and any and all other tort, contractual and/or other claims of whatever nature are necessary, Servicer shall recommend a proposed course of action.  However, the decision to pursue such course of action shall be exclusively the Trustee's and the Trustee shall be responsible for retaining an attorney to pursue such course of action.

Section 3.5   Bankruptcy of Obligor.  If Servicer has actual knowledge that an Obligor is the subject of a proceeding under the Bankruptcy Code or any other similar law, has made an

assignment for the benefit of creditors or has had a receiver or custodian appointed for its property, Servicer shall notify the Trustee who shall exclusively determine whether to pursue claims for payment on the Loan and foreclosure on the Property and to retain an attorney for that purpose. Servicer's responsibility in such proceedings, if so directed by the Trustee, will be limited to monitoring proceedings, and notifying Trustee of key events in the case that may affect the Loan. If the Property is acquired in an insolvency proceeding, it shall be acquired in the name of Trustee or her designee.

## ARTICLE IV
## PROPERTY MANAGEMENT AND DISPOSITION SERVICES

Section 4.1    Property Management and Disposition Responsibilities.    With respect to each REO Property made subject to this Agreement and with respect to each Mortgaged Property that becomes an REO Property, Servicer shall, in accordance with Accepted Servicing Practices, but subject to the approval of the Trustee, provide property management and disposition services with respect to such REO Property, including analysis of sale and leasing potential of such REO Property, leasing and collection of rents, property management (including maintenance and repairs to such REO Property to render it leasable or salable), Escrow Account administration for payment of Escrow Payments and property sales. Any sale or lease of REO property shall only be pursuant to order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code.

Section 4.2    Environmental Problems.    If Servicer hereafter becomes aware that a Property is an Environmental Problem Property, Servicer will notify Trustee of the existence of the Environmental Problem Property. Additionally, Servicer shall set forth in such notice a description of such problem, a recommendation to Trustee relating to the proposed action regarding the Environmental Problem Property and Servicer shall carry out the recommendation set forth in such notice unless otherwise directed by Trustee in writing within five (5) days after Trustee's receipt (or deemed receipt) of such notice in accordance with the terms and provisions of Section 11.3 below. If Servicer has reason to believe that a Property is an Environmental Problem Property (*e.g.*, Servicer obtains a broker's price opinion which reveals the potential for such problem), Servicer will not accept a deed-in-lieu of foreclosure upon any such Property without first obtaining a preliminary environmental investigation for the Property satisfactory to Trustee.

## ARTICLE V
## STANDARDS FOR CONDUCT

Section 5.1    Standards of Care and Delegation of Duties.

(a)    The obligation of Servicer to perform its duties under this Agreement, including any duty to obtain or verify information, will be satisfied so long as Servicer acts in a manner consistent with Accepted Servicing Practices. In the event a Loan requires reconciliation, Servicer shall have sole and complete discretion as to the adequacy of verification information in its commercially reasonable judgment and may adjust a Loan to reflect the updated information accordingly. Servicer shall not be required to obtain any prior approval to make any adjustment, and absent any gross and willful negligence, Servicer shall not have any liability to the Trustee for any adjustment made to a Loan. The Servicer shall not be responsible for the form, substance,

validity, perfection, priority, effectiveness or enforceability of any documents in the Servicing File on the Transfer Date or on the date that it obtains such documents from the Information Holders.

        (b)    In the performance of its duties and obligations under this Agreement, Servicer may act directly or through agents. Additionally, in the event that Servicer believes that it is unable to comply with the requirements of Section 5.1(a) with respect to any particular Loan or REO Property as a result of Servicer's relationship with an Obligor or some other reason which would cause Servicer to be in violation of Accepted Servicing Practices, it shall notify the Trustee in writing, and Servicer shall have no further responsibility for that Loan or REO Property other than to assist Trustee in the transfer of the Loan File to a replacement servicer.

        (c)    The Servicer shall be entitled to rely upon any notice, document, correspondence, request or directives received by it from Trustee that Servicer believes to be genuine and to have been signed or presented by Trustee or a representative of Trustee (including her legal counsel), and shall not be obligated to inquire as to the authority or power of any Person so executing or presenting any notice, document, request or directive or as to the truthfulness of any statements set forth therein.

        Section 5.2    <u>Transactions with Third Party Service Providers and Related Persons</u>.

        In carrying out its obligations and duties under this Agreement, Servicer may contract with its affiliates, provided that the compensation for all Persons with whom Servicer may contract, enter into arrangements with or otherwise deal with, shall be included in the terms set forth in Exhibit C. Servicer shall not engage on behalf of Trustee outside counsel, brokers or other professionals contemplated by Section 327 of the Bankruptcy Code without first obtaining Trustee's consent and then only upon entry of an order by the Bankruptcy Court approving the engagement.

        Section 5.3    <u>Access to Records</u>.

        (a)    To the extent required by this Agreement, Servicer will establish and maintain a system of (i) records of operational information relating to the collection of Loans, the conduct of default management services and the administration, management, servicing, repair, maintenance, rental, sale or other disposition of Loans and Properties and (ii) books and accounts, which shall be maintained in accordance with customary business practices, of financial information relating to the Loans and the Properties. Information may be maintained on a computer or electronic system.

        (b)    If Trustee provides reasonable prior written notice, Trustee and her respective accountants, attorneys, agents or designees may examine Servicer's books and records relating to the Loans and the Properties during normal business hours of Servicer at Trustee's expense. Such records shall not include any proprietary or confidential information, as reasonably determined by Servicer. Trustee shall provide to Servicer a copy of any report generated in connection with any such examination. In addition, Servicer shall provide to Trustee any other information, related to the Loans and Properties, reasonably requested by Trustee.

(c)    Servicer shall arrange for Trustee to have access to Servicer's Velocity™ system so that Trustee will have real-time ability to manage the Servicing Portfolio and provide input and approval on loan level strategies.  Servicer shall also arrange for EFP and BHT to have "view only" access to Servicing Portfolio via Velocity™ upon EFP and BHT executing confidentiality and non-disclosure agreements.

Section 5.4    Annual Audit.  On or before April 30 of each year, beginning with April 30, 2015.  Servicer shall cause a firm of independent public accountants (who may also render other services to Servicer), which is a member of the American Institute of Certified Public Accountants, to furnish a statement to Trustee, and to Servicer, to the effect that such firm has examined certain documents and records for the preceding calendar year (or during the period from the date of commencement of such servicer's duties hereunder until the end of such preceding calendar year in the case of the first such certificate) and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that Servicer's overall servicing operations have been conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers except for such exceptions that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers requires it to report, in which case such exceptions shall be set forth in such statement.

## ARTICLE VI
## BILLING OF AND REPORTS TO TRUSTEE

Section 6.1    Property Protection Expenses and Property Improvement Expenses.  To the extent no funds remain on deposit in the Collection Account to pay Property Protection Expenses and/or Property Improvement Expenses, Servicer shall advance such amounts with approval of the Trustee.  Any advances made towards Property Protection Expenses and/or Property Improvement Expenses shall be deemed to be Servicing Advances.  The Servicer shall be entitled to reimbursement of all such Servicing Advances made pursuant to this Section 6.1 from all amounts subsequently deposited in the Collection Account.  To the extent that Servicer has previously withdrawn funds from the Collection Account to pay for third party costs relating to loan modifications and Servicer thereafter recovers cash from the Obligor for such amounts, Servicer shall deposit such recovered cash into the Collection Account.

Section 6.2    Remittances and Monthly Report.  As soon as practicable prior to each Distribution Date, Servicer shall submit a Monthly Report in electronic format substantially in the form set forth on Exhibit A hereto (or in such other form and manner as may be hereafter mutually agreed upon by Trustee and Servicer), showing all collections of interest and principal (from whatever source) on the Loans and all collections in respect of the Properties (including sale proceeds and rental payments) during the related Collection Period as well as the amounts, and a detailed description of all Servicing Advances incurred during the related Collection Period and all distributions from the Collection Account since the preceding Distribution Date. On each Distribution Date Servicer shall withdraw the Monthly Collection Amount from the Collection Account and distribute the amount withdrawn in the following priority:

(a)   to refund to any Obligor any funds determined to be in excess of the amounts required under the terms of the related Loan Documents to the extent approved by the Trustee and, if necessary, the Bankruptcy Court;

(b)   to pay itself the Servicing Fee earned per Loan or REO Property during the related Collection Period and to pay itself all Ancillary Income earned during the related Collection Period;

(c)   to reimburse itself for Servicing Fees and Ancillary Income earned during Collection Periods prior to the related Collection Period, to the extent not previously paid or reimbursed;

(d)   to reimburse itself for Servicing Advances made during the related Collection Period;

(e)   to reimburse itself for Servicing Advances made during Collection Periods prior to the related Collection Period, to the extent not previously reimbursed; and

(f)   to Trustee.

Amounts payable to Trustee shall be paid by wire transfer in immediately available funds (by 4:00 p.m., central time on the day of transfer) to accounts designated by Trustee as determined by prior Order of the Bankruptcy Court.

Section 6.3   Remittance Upon Termination.

Upon the termination of this Agreement, the Servicer shall withdraw all funds from the Collection Account and shall distribute them as follows:

(a)   to refund to any Obligor any funds determined to be in excess of the amounts required under the terms of the related Loan Documents;

(b)   to reimburse itself for all unpaid Servicing Fees, Servicing Advances and Ancillary Income; and

(c)   to Trustee.

Amounts payable to Trustee shall be paid by wire transfer in immediately available funds (by 4:00 p.m., central time on the day of transfer) to accounts designated by Trustee as determined by prior Order of the Bankruptcy Court.

Section 6.4   Billing.  If the Monthly Collection Amount on any Distribution Date is insufficient to pay or reimburse Servicer for any of the items payable to Servicer in Section 6.2(b) through Section 6.2(e) incurred, accrued or earned through the end of the related Collection Period, Servicer may withdraw such sums from future Monthly Collection Amounts. If funds in the Collection Account upon the termination of this Agreement are insufficient to reimburse Servicer for any items in Section 6.3(b), Servicer may file an application with the

Bankruptcy Court for payment of such sums as an administrative expense request and the Trustee is reserved all rights, claims and defenses as to such application.

Section 6.5   Missing Document Report.   To the extent Servicer becomes aware of missing documents that it needs in connection with servicing a Loan or REO Property, pursuant to a report ("Missing Document Report") Servicer shall notify Trustee of same. Trustee shall, to the extent reasonably practical, cure, or cause the Information Holders to cure, any such deficiencies as soon as reasonably possible following receipt of the Missing Document Report. Servicer shall not be responsible for any failure to perform any action related to such Loan to the extent Servicer is impaired by the absence of such document(s). Moreover, if Trustee has not cured any document deficiency within 30 days following receipt of the Missing Document Report or subsequent notification by Servicer of missing documents, and such document is reasonably necessary to service such Loan or REO Property, then Servicer may, but is not obligated to, cure such deficiency. All out-of-pocket expenses, including those paid to third parties engaged by Servicer in connection with curing any deficiency, incurred by the Servicer in connection with such cure shall constitute Servicing Advances.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

Section 7.1   Representations and Warranties of Servicer.   The Servicer, as a condition to the consummation of the transactions contemplated hereby, hereby makes the following representations and warranties to Trustee as of the initial Transfer Date:

(a)   Organization and Good Standing; Licensing.   The Servicer is in good standing under the applicable laws and has the power and authority to own its assets and to transact the business in which it is currently engaged. The Servicer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the business transacted by it or properties owned, or leased or serviced by it requires such qualification (except where there is an appropriate statutory exemption applicable to Servicer or the failure so to qualify would not have a material adverse effect on the business, properties, assets or financial condition of Servicer or Trustee).

(b)   Insurance:   Servicer has errors and omissions and directors and officers insurance with the coverage limits consistent with Fannie Mae guidelines, which Servicer acknowledge must be maintained in full force and effect for the duration of this Agreement.

(c)   Authorization: Binding Obligations.   The Servicer has the power and authority to make, execute, deliver and perform this Agreement, including all instruments of transfer to be delivered pursuant to this Agreement, and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement. Subject to Bankruptcy Court approval, when executed and delivered, this Agreement will constitute the legal, valid and binding obligation of Servicer enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

(d)     No Consent Required.  The Servicer is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except such as have been obtained or made or as to which the failure to obtain or make will not materially adversely affect the ability of Servicer to perform its obligations hereunder.

(e)     No Violations.   The execution, delivery and performance of this Agreement by Servicer will not violate any provision of any existing law or regulation or any order or decree of any court applicable to Servicer, except for violations that will not adversely affect Servicer's ability to perform its obligations hereunder, or the charter or by-laws of Servicer, or constitute a material breach of any mortgage, indenture, contract or other agreement to which Servicer is a party or by which Servicer may be bound.

(f)     Litigation.  No litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending or to the knowledge of Servicer threatened, against Servicer or any of its properties or with respect to this Agreement, which if adversely determined, would have a material adverse effect on the transactions contemplated by this Agreement.

(g)     Privileged Information. Servicer acknowledges that Loan Files delivered by the Trustee may contain communications between the Trustee and her counsel and/or mental impressions of her counsel, and that such communications and impressions are subject to the attorney-client and/or work product privilege ("Privileged Information").   Such Privileged Information shall be identifiable either by bearing the Jones Walker LLP logo or e-mail address information or by the Trustee stamping such Privileged Information "Confidential" before the Privileged Information is transferred to Servicer.  Servicer warrants and represents that it will not disclose such Privileged Information to any third party unless the Trustee consents thereto or unless disclosure of the Privileged Information is required by a statute, regulation or court order. Servicer will provide the Trustee at least ten (10) days written notice of any proposed disclosure of Privileged Information or of any motion filed by a third party in any judicial or administrative proceeding seeking disclosure of Privileged Information.

Section 7.2     Representations and Warranties of Trustee.  Trustee, as a condition to the consummation of the transactions contemplated hereby, hereby makes the following representations and warranties to Servicer as of the initial Transfer Date:

(a)     Authority to Act Under Bankruptcy Code.  Trustee is the duly appointed Trustee in the Bankruptcy Case and has the power and authority to collect and liquidate the Debtor's assets in accordance with the Bankruptcy Code.

(b)     Authorization: Binding Obligations.  Subject to a final, non-appealable Order of the Bankruptcy Court approving this Agreement, the Trustee has the power and authority to make, execute, deliver and perform this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement.  Subject to a final, non-

appealable Order of the Bankruptcy Court approving this Agreement, when executed and delivered, this Agreement will constitute the legal, valid and binding obligation of Trustee enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally, by the availability of equitable remedies, or supplemental orders of the Bankruptcy Court.

(c)    No Consent Required.    To the best of her knowledge, Trustee is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except for obtaining approval of this Agreement by the Bankruptcy Court.

(d)    No Violations.    To the best of her knowledge, the execution, delivery and performance of this Agreement by Trustee will not violate any provision of any existing law or regulation or any order or decree of any court applicable to Trustee, or constitute a material breach of any mortgage, indenture, contract or other agreement to which Trustee is a party or by which Trustee may be bound.

(e)    Litigation.    To the best of the Trustee's knowledge, no litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending or, to the knowledge of Trustee threatened, against Trustee or any of the Debtor's properties or with respect to this Agreement, which if adversely determined would have a material adverse effect on the transactions contemplated by this Agreement except for the following as of the date of this Agreement:

    1) Adversary Proceedings filed in the Bankruptcy Case identified on Exhibit E;

    2) Known judicial or non-judicial foreclosure proceedings identified in Exhibit F;

    3) Known Obligor bankruptcy proceedings identified on Exhibit G.

(f)    Trustee's Representative Status.    The Trustee is the authorized representative of the Debtor's Chapter 11 estate and has authority over all property of such estate under Section 323 and 541 of the Bankruptcy Code.

(g)    Tax Identification Number.    The Debtor's tax identification number is 43-1949956.

## ARTICLE VIII
## LIMITATION OF LIABILITY

Section 8.1    Liabilities to Obligors.    No liability to any Obligor under any of the Loans or Properties arising out of any act or omission to act of any servicer, sub-servicer, Trustee, holder or originator of the Loans or Properties prior to the Transfer Date is assumed by Servicer under or as a result of this Agreement and the transactions contemplated hereby and, to the

maximum extent permitted and valid under mandatory provisions of law, Servicer expressly disclaims such assumption.

Section 8.2    Servicer's Indemnity of Trustee.  The Servicer shall defend and indemnify Trustee against any and all claims, losses, damages, liabilities, judgments, penalties, fines, forfeitures, reasonable legal fees and expenses, and any and all related costs and/or expenses of litigation, administrative and/or regulatory agency proceedings, and any other costs, fees and expenses (each, a "Liability"), suffered or incurred by Trustee arising out of or resulting from third party claims or actions that were caused directly by or directly resulted from a breach of any of Servicer's representations and warranties contained in this Agreement or the failure of Servicer to perform its duties in accordance with the terms of this Agreement.  The Servicer shall not be liable to Trustee, however, with respect to action taken, or for refraining from taking any action, with respect to any Loan or REO Property at or in conformity with the direction of Trustee (for this purpose, the terms of this Agreement are directions of Trustee), or for any Liability caused by or resulting from a delay occasioned by Trustee's objection to a proposal by Servicer hereunder, or for any Liability caused by or resulting from Trustee's breach of a representation or warranty herein or for any Liability incurred by reason of Trustee's willful misfeasance, bad faith or negligence in acting or refraining from acting.  In any event, Servicer shall not have any liability or obligations for any actions of any prior servicer, sub-servicer, originator, holder or Trustee, or any successor servicer, of the Loans or Properties.

Section 8.3    Trustee's Limited Indemnity of Servicer.

(a)    Trustee shall indemnify Servicer against any Liability arising from (i) third party claims or actions that were caused by or resulted from (A) any actions or omissions in respect of any Loan or REO Property, any prior servicer, sub-servicer, owner or originator of a Loan or REO Property, and/or (B) taking any action, or refraining from taking any action, with respect to any Loan or REO Property at or in conformity with this Agreement or the direction of Trustee, and/or (ii) any breach by Trustee or her agents of Trustee's obligations under Section 8.4(d) below, (iii) any Liability relating to the failure or refusal of Trustee or any trustee or custodian in possession of original Loan Documents to timely provide to Servicer the originals of any Loan Documents in order to allow Servicer sufficient time to timely process satisfactions, payoffs and releases, and (iv) any Liability relating to Servicing Advances not made as a result of Trustee's failure to pre-fund such Servicing Advances pursuant to Section 9.3.

(b)    Trustee shall have no obligation to indemnify Servicer for any claim or expense that is either (i) judicially determined to have resulted primarily from the willful misconduct, gross negligence, bad faith or self-dealing of Servicer, (ii) for a contractual dispute in which the Trustee alleges the breach of Servicer's contractual obligations unless the Bankruptcy Court determines that indemnification, contribution or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F3d 217 (3d Cir. 2003), or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by the Bankruptcy Court, after notice and hearing, to be a claim or expense for which Servicer should not receive an indemnity;

(c)    If, before the earlier of (i) the entry of an order confirming a Chapter 11 plan in this case (that order having become a final order no longer subject to appeal), and (ii) the

entry of an order closing this case, Servicer believes that it is entitled to the payment of any amounts by the Debtor's estate on account of the Trustee's indemnification herein, Servicer must file an application therefore in the Bankruptcy Court, and the Trustee shall not pay any such amounts to Servicer before the entry of a final, non-appealable order by the Bankruptcy Court approving the payment.  Trustee shall provide Servicer with notice of the confirmation hearing and objection date with regard to any Chapter 11 plan proposed by the Trustee.  Trustee is reserved all rights, claims and defenses with regard to such application; and

(d)     For clarity, Servicer acknowledges that any claim by Servicer for indemnity shall be asserted exclusively in the Bankruptcy Court as a claim against the Debtor's bankruptcy estate.  Any such claim that is approved by the Bankruptcy Court shall be a claim solely against the Debtor's bankruptcy estate and not against the Trustee in her individual capacity.

Section 8.4     Indemnity of Servicer by EFP/BHT.  Servicer shall negotiate a separate indemnification agreement with EFP/BHT with respect to Loans in which EFP/BHT assert an ownership interest or lien, such agreement to be in a form acceptable to Trustee.  Such indemnification agreement is a condition precedent to the effectiveness of this Agreement.

Section 8.5     Limitation on Liability of Servicer.

(a)     Trustee will use her best efforts to extend the automatic stay of Section 362 of the Bankruptcy Code and/or any discretionary stay available under Section 105 of the Bankruptcy Code and/or Fed. R. Bankr. Proc. 7065 as to any litigation asserted against Servicer relating to allegations of Liability arising from (i) third party claims or actions that were caused by or resulted from (A) any actions or omissions in respect of any Loan or REO Property by the Debtor, any prior servicer, sub-servicer, owner or originator of a Loan or REO Property, and/or (B) taking any action, or refraining from taking any action, with respect to any Loan or REO Property at or in conformity with this Agreement or the direction of Trustee, and/or (ii) any Environmental Liability (as defined in Section 8.4(c) below), (iii) any breach by Trustee or agents of Trustee's obligations under Section 8.4(d) below, (iv) any Liability relating to the failure or refusal of Trustee or any trustee or Custodian in possession of original Loan Documents to timely provide to Servicer the originals of any Loan Documents in order to allow Servicer sufficient time to timely process satisfactions, payoffs and releases, and (v) any Liability relating to Servicing Advances not made as a result of Trustee's failure to pre-fund such Servicing Advances pursuant to Section 9.3 below.

(b)     Neither Servicer nor any directors, officers, employees or agents of Servicer shall be liable to Trustee for any action taken or for refraining from taking any action in good faith pursuant to this Agreement or for errors in judgment; provided, however, that this provision shall not protect Servicer against any Liability directly and solely caused by Servicer that would otherwise be imposed by reason of Servicer's willful misfeasance or bad faith in the performance of or failure to perform duties hereunder.  The Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted to Servicer respecting any matters arising hereunder and shall not be liable for taking any action or refraining from taking any action in good faith reliance thereon, pursuant to this Agreement.

(c)     The term "Environmental Liability" shall mean any and all claims, losses, damages, liabilities, judgments, penalties, fines, forfeitures, reasonable legal fees and expenses, and any and all related costs and/or expenses of litigation, administrative and/or regulatory agency proceedings, and any other costs, fees and expenses, suffered or incurred by Servicer arising out of or resulting from the introduction of hazardous materials on any Property before and/or after the date hereof, including, without limitation, (a) any liability under or on account of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 *et seq.*, as the same may be amended from time to time, and/or any other federal or state environmental laws, and specifically including, without limitation, any liability relating to asbestos and asbestos containing materials, polychlorinated biphenyls, radon gas, petroleum and petroleum products, urea formaldehyde and any substances classified as being "in inventory", "usable work in process" or similar classification which would, if classified as unusable, be included in the foregoing definition, including the assertion of any lien there under, (b) claims brought by third parties for loss or damage incurred or sustained subsequent to the date hereof, and (c) liability with respect to any other matter affecting the Property within the jurisdiction of the federal Environmental Protection Agency or state environmental regulatory agencies pursuant to any state laws, and in the regulations adopted pursuant to any of said laws; provided, however, that Trustee shall have no duty to defend Servicer for Environmental Liability with respect to any liability directly and solely caused by Servicer that would otherwise be imposed by reason of Servicer's willful misfeasance or bad faith in the performance of or failure to perform duties hereunder.

(d)     It is understood and agreed that during the term of this Agreement, Trustee may have access to certain of Servicer's confidential and proprietary information including, without limitation, Servicer's computer systems and models, secure web site, investor reporting systems, default management systems and procedures, and other proprietary systems and procedures (the "Confidential Information"). The term "Confidential Information" does not include information which becomes generally available to the public other than as a result of disclosure by Trustee or her representatives, but shall be deemed to include any passwords or identification codes, access codes, modem dial-up numbers and similar items. The Trustee shall keep confidential and shall not divulge to any party other than an officer or employee of Trustee who has a need to know, without Servicer's prior written consent, any Confidential Information. Additionally, Trustee shall only permit her staff and legal counsel to perform procedures on Servicer's system which are specifically authorized by Servicer. The Confidential Information shall not be used or duplicated by Trustee for any purpose other than those purposes specified by Servicer. Trustee further agrees that the Confidential Information will not be used by her employees, agents or representatives, including, but not limited to outside counsel, in any way detrimental to Servicer. For clarity, Trustee shall have no responsibility toward Servicer as to EFP/BNT's "view only" rights for Velocity$^{TM}$ provided for herein. In the event that Trustee is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, it is agreed that Trustee will provide Servicer with prompt notice of such request(s) so that Servicer will seek an appropriate protective order and/or waive compliance with the provisions of this subsection, in Servicer's sole and absolute discretion. Trustee acknowledges that Servicer may incur irreparable damage if Trustee should breach the terms and provisions of this subsection. Accordingly, if Trustee or Trustee's employees, agents or representatives breaches or threatens to breach any of the provisions of this subsection, Servicer shall be entitled,

without prejudice, to all non-monetary rights and remedies available to it, including a temporary restraining order and an injunction restraining any breach of the provisions of this subsection.

Section 8.6    Indemnification Procedures.  If, for so long as this Agreement is in effect, the party seeking indemnification ("Indemnified Party") has actual notice or knowledge of any claim or loss for which indemnification hereunder is asserted against the other party ("Indemnifying Party"), the Indemnified Party shall give to Indemnifying Party written notice within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail.  In the event that a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.

(a)    Unless applicable law mandates a cure within a shorter period of time, Indemnifying Party shall have 30 calendar days from the date of receipt by Indemnifying Party of written notice of a breach of Indemnifying Party's representations within which to cure such breach, or if such breach cannot be cured within 30 days but Indemnifying Party has commenced efforts to cure, then Indemnifying Party shall have 60 calendar days from the date of such notice to cure such breach.  In the event a breach is cured by Indemnifying Party, Indemnifying Party shall execute a written acknowledgment of the cure in such form as is approved or provided by Indemnified Party.

(b)    In the case of actual notice of indemnification hereunder involving any litigation, arbitration or legal proceeding, Indemnifying Party shall have responsibility to, and shall employ, counsel acceptable to Indemnified Party, and shall assume all expense with respect to the defense or settlement of such claim; provided however, that:

(i)    Any legal counsel retained by Servicer on behalf of the Trustee or any legal counsel retained by Trustee on behalf of Servicer must first be approved by the Bankruptcy Court;

(ii)    Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; and

(iii)    Indemnifying Party shall obtain the prior written approval of Indemnified Party before entering into any settlement of such claim or ceasing to defend against such claim.  Any settlement of such claim shall be subject to the approval of the Bankruptcy Court pursuant to Fed. R. Bankr. Proc. 9019 and other provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure;

(iv)    If Indemnifying Party does not provide to Indemnified Party within fifteen (15) days after receipt of a notice of indemnification a written acknowledgment that the Indemnifying Party shall assume responsibility for the defense or settlement of such claim as provided in this Section 8.5, Indemnified Party shall have the right to defend and settle the claim in such manner as it may deem appropriate at the cost and expense of Indemnified Party, subject to the remaining terms and conditions of Section 8.5.

Section 8.7   Operation of Indemnities.   If any Person has made any indemnity payments to any other Person pursuant to this Article VIII and such other Person thereafter collects any of such amounts from others, such other Person will repay such amounts collected, together with any interest collected thereon.  The provisions of this Article VIII shall survive any termination of this Agreement, the liquidation of any Loan, or the transfer or assignment by Trustee to another Person of any Loan or REO Property or any interest in any Loan or REO Property.

# ARTICLE IX
## DEFAULT

Section 9.1   Servicer Events of Default.   The following shall constitute "Servicer Events of Default" hereunder by Servicer:

(a)   any failure by Servicer to make any deposit or payment, or to remit any payment, required to be made under the terms of this Agreement which continues unremedied for a period of three (3) Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to Servicer by Trustee; or

(b)   failure on the part of Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of Servicer set forth in this Agreement which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to Servicer by Trustee; or

(c)   a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or appointing a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(d)   Servicer shall consent to the appointment of a trustee, conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to Servicer or of or relating to all or substantially all of the property of Servicer; or

(e)   Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations or take any action in furtherance of the foregoing; or

(f)   Servicer assigns or attempts to assign its rights to the servicing compensation hereunder or attempts to assign this Agreement or the servicing responsibilities hereunder without the consent of Trustee except as otherwise expressly permitted by the other terms and provisions of this Agreement.

Section 9.2    Trustee Events of Default.  The following shall constitute "Trustee Events of Default" hereunder by Trustee:

(a)    any failure by Trustee to make any payment required to be made by Trustee to Servicer under the terms of this Agreement which continues unremedied for the applicable cure period as set forth in this Agreement (i.e., 5 days in the event of a failure to make payment under Section 6.4), or in the case of payments required hereunder for which there is no applicable cure period, then a period of three (3) Business Days after the date upon which written notice of such failure shall have been given to Trustee by Servicer; or

(b)    failure on the part of Trustee duly to observe or perform in any material respect any other of the covenants or agreements on the part of Trustee set forth in this Agreement which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to Trustee by Servicer.

Section 9.3    Advances Following Trustee Event of Default.  Notwithstanding anything else in this Agreement to the contrary, if Trustee fails to make any payment to Servicer required under this Agreement, or has committed any other Trustee Event of Default, Servicer shall have the right to pre-fund any Servicing Advances to be made by Servicer hereunder out of the amounts that would otherwise be remitted to Trustee under Section 6.2(f) or 6.3(c) as applicable. Such pre-funding shall be made by wire transfer to Servicer within 3 days following written notice by Servicer to Trustee, which notice shall contain a listing of all Servicing Advances to be pre-funded by Trustee.  Such requests for pre-funding shall not be made more often than once per week.

Section 9.4    Effect of Transfer.  After the effective date of the termination of servicing duties pursuant to Section 9.1, 9.2 or Section 10.1, Servicer shall have no further obligations hereunder other than under Article VIII or Article X.

**ARTICLE X**
**TERM**

Section 10.1    Term of Agreement.

(a)    This Agreement shall terminate upon: (1) the distribution of the final payment or Liquidation Proceeds on the last Loan or REO Property subject to this Agreement; or (2) upon notice of termination as provided in Sections 10.1 (b)-(d).

(b)    If Trustee fails to perform any of her obligations which would result, after expiration of the applicable notice and cure or grace period (if applicable), in a Trustee Event of Default hereunder or is in breach of her representations and warranties hereunder or if Servicer fails to perform any of its obligations which would result, after expiration of the applicable notice and cure or grace period (if applicable), in a Servicer Event of Default hereunder, the non-breaching party may terminate this Agreement by written notice to the other party, specifying the effective date of such termination and instructions with respect to the Loan Documents.  The Servicer shall do all things necessary or appropriate to affect the purposes of such termination and the transfer of servicing, provided that the breaching party shall pay all costs and expenses

related to the transfer of servicing.  On or after the receipt by Servicer of such written notice, all authority and power of Servicer under this Agreement, whether with respect to the Loans or Properties, shall terminate effective as of the date specified in such written notice.  If Trustee fails to perform any of her obligations which would result, after expiration of the applicable notice and cure or grace period (if applicable), in a Trustee Event of Default hereunder or is in breach of her representations and warranties hereunder or if Servicer fails to perform any of its obligations which would result, after expiration of the applicable notice and cure or grace period (if applicable) in a Servicer Event of Default hereunder, the non-breaching party may also pursue whatever rights it may have at law or in equity to damages, including injunctive relief and specific performance.  To the extent that Trustee fails to perform any of her obligations which would result, after expiration of the applicable notice and cure or grace period (if applicable), in an Trustee Event of Default hereunder or is in breach of her representations and warranties hereunder, Servicer shall not be liable nor responsible for any ramifications which result therefrom; Trustee acknowledges that such failure and/or breach may impair Servicer's ability to perform hereunder (*e.g.*, if Trustee is not qualified to do business in a particular jurisdiction, this may impair Servicer's ability to service the Loans and/or Properties in such jurisdiction).

(c)     This Agreement may also be terminated by Trustee with respect to one or more Loans or REO Properties at her election at any time upon (i) ninety (90) days' prior written notice for any reason; provided, however, that the cost of any related transfer of servicing shall be borne by Trustee; and (ii) payment to Servicer of the Termination Fee.   Servicer shall not be entitled to a Termination Fee if Trustee terminates Servicer in connection with an Event of Default.

(d)     This Agreement may also be terminated by Servicer without cause (i) with respect to Loans being serviced by Servicer hereunder (*i.e.*, which, as of the date of the sending of the notice, are already being serviced under this Agreement), upon the sending of 180 days' written notice to Trustee, and/or (ii) with respect to the adding of any new Loans hereunder (*i.e.*, which, as of the date of the sending of the notice, are not being serviced under this Agreement), upon the sending of 60 days' written notice to Trustee.   Servicer shall not be entitled to a Termination Fee if it terminates without cause hereunder.

(e)     In the event of termination of this Agreement, Servicer may retain from the final Monthly Collection Amount all Servicing Fees and Servicing Advances to which Servicer is entitled to herein as of the effective date of termination.  Servicer shall be entitled to file an application in the Bankruptcy Court seeking reimbursement of Servicing Advances that become due and owing during the thirty-day period following the effective date of termination; provided, however, that the Trustee is reserved all rights, claims and defenses as to such application.  Servicer further agrees that any sums Servicer retains from the final Monthly Collection Amount are subject to the Trustee's right to seek disgorgement of same to the extent in violation of this Agreement and Servicer is reserved all rights, claims and defenses as to same.

Section 10.2   Transfers of Servicing.   The Servicer shall not pledge or assign this Agreement or its rights to the Servicing Fee or transfer the servicing hereunder or delegate its rights or duties hereunder without the prior written approval of Trustee.

Section 10.3    <u>Servicer Not to Resign</u>.  Servicer shall not resign from the obligations and duties imposed on Servicer by this Agreement, except (i) as set forth in Section 10.1 above, (ii) by mutual consent of Servicer and Trustee, or (iii) upon the determination that Servicer's duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by Servicer.  Any determination under clause (iii) above shall be evidenced by an opinion of counsel to such effect delivered to Trustee in form and substance reasonably acceptable to Trustee.  No resignation shall become effective until Trustee or its designee shall have assumed Servicer's responsibilities and obligations hereunder.

Section 10.4    <u>Successor Servicer</u>.  If any successor servicer succeeds to the obligations of Servicer after a termination pursuant to Sections 10.1 or 10.3 above, the successor servicer, to the extent necessary to permit the successor servicer to carry out the provisions of the terms hereof and without act or deed on the part of the successor servicer, shall succeed to all of the rights and obligations of Servicer under any sub-servicing agreement entered into pursuant to Section 5.1(b).  In such event, the successor servicer shall be deemed to have assumed all of Servicer's interest therein and to have replaced Servicer as a party to such sub-servicing agreement to the same extent as if such sub-servicing agreement had been assigned to the successor servicer, except that Servicer, as applicable, shall not have any liability or obligation under such sub-servicing agreement in respect of events that occur after such succession unless so provided in such sub-servicing agreement or unless such events arise out of actions or events that occurred prior to such succession.  In the event that the successor servicer assumes the servicing obligations of Servicer, upon request of the successor servicer, Servicer, shall at its own expense (if the transfer of servicing is occasioned by a Servicer Event of Default) or at Trustee's expense (if the transfer is occasioned by an Trustee Event of Default) deliver to the successor servicer (as the case may be) all documents and records relating to any sub-servicing agreement and the Loans then being serviced there under and an accounting of amounts collected and held by it, if any, and will otherwise use its best efforts to effect the orderly and efficient transfer of any sub-servicing agreement to the successor servicer.

## ARTICLE XI
## <u>MISCELLANEOUS</u>

Section 11.1    <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement will inure to the benefit of and be binding upon the parties hereto and their successors and assigns.  This Agreement is not intended to confer on any person other than the parties hereto and their successors and assigns any rights, obligations, remedies or liabilities.  For clarity, EFP and BHT shall not be third party beneficiaries under this Agreement despite the "view only" rights granted herein and their execution of a separate indemnification agreement in favor of Servicer.

Section 11.2    <u>Choice of Law and Venue</u>.  This Agreement is made under and shall be governed by and construed under the laws of Texas except to the extent provisions of the Bankruptcy Code control.  Venue over any dispute under this Agreement shall lie exclusively with the Bankruptcy Court or the United States District Court for the Southern District of Mississippi, as applicable.

Section 11.3   Notices.  All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed by overnight courier, addressed as follows (or such other address as may hereafter be furnished to the other Party by like notice):

    (i)    (a)    For servicing and operational notices, consents and approvals, to Trustee at the following Email address:

kjohnson@joneswalker.com

    (b)    For all other notices, to Trustee:

Jeffrey R. Barber
JONES WALKER LLP
190 East Capitol Street
Jackson, Mississippi  39201
Facsimile Number:    601-949-4804

If to Servicer:

Acqura Loan Services
7668 Warren Parkway, Suite 325
Frisco, Texas 75034

Attention:  Jodi Blanton
Facsimile Number: 888-641-3040

Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee, if delivered by overnight courier, or upon receipt by the addressee if delivered by fax or email.

Section 11.4   Entire Agreement; Amendments; Waivers.  This Agreement, together with any related order(s) of the Bankruptcy Court, constitutes the entire agreement between the parties with respect to the transactions contemplated hereby and supersedes all prior agreements (or contemporaneous oral agreements) of the parties with respect thereto.  This Agreement may be amended only in writing signed by the party against whom such amendment is sought to be enforced.  Each of Servicer or Trustee may, by written notice to the other, extend the time for or waive the performance of any of the obligations of such other hereunder.  The waiver by any party hereto of a breach of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.  No delay, omission or act by a party shall be deemed a waiver of such party's rights, powers or remedies.  No course of dealing between the parties hereto shall operate as a waiver of any provision hereof.

Section 11.5   No Joint Venture; Limited Agency.  The services provided by Servicer are in each case those of an independent contractor providing a service.  Nothing contained in this Agreement:  (i) shall constitute Servicer and Trustee as members of any partnership, joint

{JX099004.8}      31

venture, association, syndicate, unincorporated business or other separate entity; (ii) shall be construed to impose any liability as such on Servicer or Trustee or (iii) shall, except as otherwise expressly provided in this Agreement as to Servicer, constitute a general or limited agency or be deemed to confer on it any express, implied or apparent authority to incur any obligation or liability on behalf of the other.

Section 11.6    Severability; Interpretation.    If any provision hereof is invalid, illegal or unenforceable, the remaining provisions shall not be affected or impaired thereby.   No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other authority by reason of such party having or being deemed to have structured, dictated or drafted such provision.   The parties hereto acknowledge that no other agreement entered into by Servicer for the provision of servicing, default management services and property management and disposition services shall be used or referred to in construing the provisions of this Agreement.

Section 11.7    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

Section 11.8    Waiver of Jury Trial.    EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 11.9    Limitation of Damages.    NOTWITHSTANDING    ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PARTIES AGREE THAT NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above, but effective as of the date of entry of the Order attached as Exhibit H.

**TRUSTEE:**

_____

KRISTINA M. JOHNSON, TRUSTEE OF THE CHAPTER 11 BANKRUPTCY ESTATE OF COMMUNITY HOME FINANCIAL SERVICES, INC.

**SERVICER:**

**ACQURA LOAN SERVICES**

By:_____
Name: _____
Title:_____

# EXHIBIT A

## MONTHLY REPORT

**MONTHLY SNAPSHOT**
Delinquency Dashboard
Bankruptcy Activity Summary: Contractual Due Date
Bankruptcy Activity Summary: Post Petition Due Date
Bankruptcy Post Petition 120+ Detail
Foreclosure & FC Sales Graph
Bankruptcy Average Days Ch 7 & Ch 13

**Performance & Analytics**
Portfolio Stratification
Performance Trends
Roll Rates & Cure Analysis
Comparative Vintage Analysis
Fees / ROI Analysis
Performance & Loss Mitigation History
Detail Loan Performance Data
Recovery / Liq Rate Analysis
Expenses / Advances Analysis

**P&I Reporting - 5 Reports**
P&I Payment Detail Report
P&I Summary by Loan
P&I Summary by Day
P&I Summary by Pool
P&I Payments by Pool in Prior Month

**Month End Aggregate Reporting - 13 Reports**
Month End Data Dump
Summary SRG Billing Report
Client Loan # to SRG # Legend
Trial Balance Report
Payoffs Report
Servicing Fee Detail Report
New Loan Setup Detail Report
Servicing Released Report
Default Fee Report
Liquidation Report
Advances and Recoveries Report
Loan Modifications Report
Client Reconciliation
UPB Reconciliation

## EXHIBIT B

### SERVICING FILE

1. Copy of Note.
2. Copy of Mortgage or Deed of Trust.
3. Copy of Mortgagee's Title Policy or Attorney's Title Opinion.
4. Copy of Assignment in blank of the mortgage or deed of trust.
5. Any Hazard insurance policy.
6. Copy of Mortgage insurance or guaranty agreement, if applicable.
7. Copy of Deed with respect to any REO Property.
8. Any known correspondence by and between the Information Holders and the Obligor.
9. Any broker's price opinion and/or any appraisal relating to the Property.
10. Original or copy of the tax service contract, if available.
11. Originals (or copies) of any RESPA and TILA disclosure statements executed by the Obligor.
12. Any Settlement Statement.
13. Loan Application and credit reports, verification of employment, tax returns, if available.
14. Documentation relating to any release of collateral.

## EXHIBIT C
### SETUP, SERVICING AND TERMINATION FEES

- Electronic Boarding: $25, (includes dormant loans).

- Deboarding/Transfer: $25, except no de-board fee if Vantium terminates or if upon negligence or breach of contract by the Trustee or for Loans Charged Off with No Further Action. The de-board fee for Loans Charged Off with Further Action shall be $12.50 per Loan.

- Interim Accounting Work (to include uploading servicing notes and payments calculations for period from Trustee's appointment to transfer of Loans to Servicer)(separate from Electronic Boarding Fee): $35 per loan, one-time fee.

- Administrative Fee: If a borrower documents payments that were not recorded, Vantium will receive a one-time payment of $40 per loan for the additional work required to follow up with borrower, update system of record and send confirmation to borrower. Vantium may use its reasonable business judgment in determining what constitutes proper documentation of payments.

- Performing Loans:
  - Base Fees - 10% of payments collected, up to $50 per loan with a floor of $20 per loan, 50% of late fees.
  - Additional Fees - Bankruptcy and Foreclosure loans - onetime payment of $100 in addition to the Base Fee.

- Dormant Loans:
  - Base Fees - $7.50 per loan, per month.
  - Additional Fees - Bankruptcy – onetime payment of $100 in addition to the Base Fee.
  - Activation Bonus - For each loan that had not paid within 3 months of the last CHFS report to EFP/BHT and those that cannot document payment since September 2013, Vantium will receive an activation bonus of the lesser of $300 or 1.5% of principal balance for those it receives at least 3 P&I payments, in addition to the monthly Base Fee.

**EXHIBIT D**

LOSS MITIGATION AUTHORITY MATRIX

TBD

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT E

<u>ADVERSARY PROCEEDINGS</u>[1]

---

[1] As of April 11, 2014, to be periodically supplemented by the Trustee.

Form Flow Servicing Agreement
{JX099004.8}                    38

EXHIBIT F

<u>LITIGATION/FORECLOSURE[2]</u>

---

[2] As of April 11, 2014, to be periodically supplemented by the Trustee.

EXHIBIT G

<u>BANKRUPTCY PROCEEDINGS</u>[3]

---

[3] As of April 11, 2014, to be periodically supplemented by the Trustee.

EXHIBIT H

BANKRUPTCY COURT ORDER

# EXHIBIT "2"

<u>**INDEMNIFICATION AGREEMENT**</u>

This Indemnification Agreement ("Agreement") is entered into this _____ day of May 2014, by Vantium Capital, Inc., dba Acqura Loan Services ("Vantium") and Edwards Family Partnership ("EFP") and Beher Holdings Trust ("BHT") (each, separately, an "Indemnitor", and together the "Indemnitors").

**WITNESSETH**:

WHEREAS, Community Home Financial Services, Inc. ("Debtor") filed a Petition for Relief under Chapter 11 of the United States Bankruptcy Code on May 23, 2012, in the United States Bankruptcy Court for the Southern District of Mississippi (the "Bankruptcy Court"), Case No. 12-01703-EE (the "Bankruptcy Case"); and

WHEREAS, on January 21, 2014, Kristina M. Johnson (the "Trustee"), was appointed Trustee for the Debtor's bankruptcy estate; and

WHEREAS, the Debtor asserted in the Bankruptcy Case that it was in the business of purchasing for its own account and servicing for others loan portfolios consisting of mostly class B loans of second to third mortgages and/or deeds of trust (the "Loans"); and

WHEREAS, the Trustee desires to engage Vantium to service or subservice and provide management and disposition services for the Loans and "real estate owned" properties (the "REO Properties") selected by the Trustee that were previously serviced or owned by the Debtor, pursuant to the terms of a Residential Mortgage Special Servicing Agreement ("Servicing Agreement") which is being submitted to the Bankruptcy Court for approval in the Bankruptcy Case; and

WHEREAS, EFP and BHT assert certain ownership rights to the Loans or lien rights in the Loans and the REO Properties that will be serviced by Vantium, and will receive substantial benefits if Vantium undertakes the services contracted for in the Servicing Agreement; and

WHEREAS, the Indemnitors' execution of the Agreement is a condition precedent to Vantium's entry into the Servicing Agreement.

NOW THEREFORE in consideration of the foregoing recitations and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, EFP, and BHT as Indemnitors, and Vantium agree as follows concerning any Loan or REO Property determined by the Bankruptcy Court to be owned by or in which EFP and BHT have a security interest in as collateral:

1.    <u>Indemnity.</u>

(a)    Indemnitors shall defend and indemnify Vantium, and any successor servicer or subservicer under the Servicing Agreement, including any director, officer, employee or agent of Vantium or any successor servicer or subservicer under the Servicing Agreement (the "Indemnified Party" or "Indemnified Parties") against any claims, losses, damages, liabilities, judgments, penalties, fines, forfeitures, reasonable legal fees and expenses, and any and all

related costs and/or expenses of litigation, administrative and/or regulatory agency proceedings, and any other costs, fees and expenses (each a "Liability") arising from (i) third party claims or actions that were caused by or resulted from (A) any actions or omissions in respect of any Loan or REO Property, by any prior servicer, sub-servicer, owner or originator of a Loan or REO Property, and/or (B) taking any action, or refraining from taking any action, with respect to any Loan or REO Property at or in conformity with the Servicing Agreement or at the direction of Indemnitors, and/or (ii) any Environmental Liability (as defined in Section 1(c) below), (iii) any Liability relating to the failure or refusal of Indemnitors or any trustee or custodian in possession of original Loan Documents to timely provide to an Indemnified Party the originals of any Loan Documents in order to allow the Indemnified Party sufficient time to timely process satisfactions, payoffs and releases, and (v) any Liability arising for Servicing Advances that are not recovered from the Debtor's estate in the Bankruptcy Case.

(b)      An Indemnified Party shall not be liable to Indemnitors for any action taken or for refraining from taking any action in good faith pursuant to the Servicing Agreement; provided, however, that this provision shall not protect an Indemnified Party against any liability directly and solely caused by an Indemnified Party that would otherwise be imposed by reason of an Indemnified Party's gross negligence, willful misfeasance or bad faith in the performance of or failure to perform duties hereunder.   An Indemnified Party may rely in good faith on any document of any kind prima facie properly executed and submitted to an Indemnified Party respecting any matters arising hereunder and shall not be liable for taking any action or refraining from taking any action in good faith reliance thereon, pursuant to the Servicing Agreement.

(c)      The term "Environmental Liability" shall mean any and all claims, losses, damages, liabilities, judgments, penalties, fines, forfeitures, reasonable legal fees and expenses, and any and all related costs and/or expenses of litigation, administrative and/or regulatory agency proceedings, and any other costs, fees and expenses, suffered or incurred by an Indemnified Party arising out of or resulting from the introduction of hazardous materials on any property that is subject to a Loan or any REO Property before and/or after the date hereof, including, without limitation, (a) any liability under or on account of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as the same may be amended from time to time, and/or any other federal or state environmental laws, and specifically including, without limitation, any liability relating to asbestos and asbestos containing materials, polychlorinated biphenyls, radon gas, petroleum and petroleum products, urea formaldehyde and any substances classified as being "in inventory", "usable work in process" or similar classification which would, if classified as unusable, be included in the foregoing definition, including the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained subsequent to the date hereof, and (c) liability with respect to any other matter affecting any Loan or REO Property within the jurisdiction of the federal Environmental Protection Agency or state environmental regulatory agencies pursuant to any state laws, and the regulations adopted pursuant to any of said laws; provided, however, that the indemnity for Environmental Liability shall not be effective with respect to any liability directly and solely caused by an Indemnified Party that would otherwise be imposed by reason of an Indemnified Party's willful misfeasance or bad faith in the performance of or failure to perform duties hereunder.

(d)     Indemnitors expressly agree that their liability under this Agreement is joint and several, and an Indemnified Party may proceed to enforce its rights under this Agreement separately against any Indemnitor without joinder of the other Indemnitors.

2.     <u>Indemnification Procedures</u>.

If, for so long as this Agreement is in effect, an Indemnified Party has actual notice or knowledge of any claim or loss for which indemnification by an Indemnitor is asserted, the Indemnified Party shall give to an Indemnitor written notice within fifteen (15) days or within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail. In the event that a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.   Notice provided to one Indemnitor hereunder shall constitute notice to all Indemnitors.

(a)     Unless applicable law mandates a shorter period of time, the Indemnitors shall have 30 calendar days from the date of receipt by an Indemnitor of written demand for indemnity for a Liability within which to satisfy such Liability.

(b)     In the case of actual notice of indemnification hereunder for any Liability involving any litigation, arbitration or legal proceeding, the Indemnitors shall have responsibility to, and shall employ counsel acceptable to the Indemnified Party, and shall assume all expense with respect to, the defense or settlement of such claim; provided however, that:

    (i)     the Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; and

    (ii)     the Indemnitors shall obtain the prior written approval of the Indemnified Party before entering into any settlement of such claim or ceasing to defend against such claim if, pursuant to or as a result of such settlement or cessation, (1) injunctive or other relief (excepting the payment of money damages) would be imposed against any Indemnified Party which could materially interfere with the business, operations, assets, conditions (financial or otherwise) or prospects of the Indemnified Party, or (2) the settlement or cessation shall result in an indemnification obligation of the Indemnitors that, in the reasonable judgment of the Indemnified Party, cannot be fulfilled by the Indemnitors in accordance with the terms of this Agreement.  If the Indemnitors do not provide to the Indemnified Party, within fifteen (15) days after receipt of a notice of indemnification, a written acknowledgment that the Indemnitors shall assume responsibility for the defense or settlement of such claim as provided in this Section 2, the Indemnified Party shall have the right to defend and settle the claim in such manner as it may deem appropriate at the cost and expense of the Indemnitors, and the Indemnitors shall promptly reimburse the Indemnified Party therefore in accordance with this Agreement.

3.     Authorization: Binding Obligations.  Each Indemnitor warrants and represents that he or it has the power and authority to make, execute, deliver and perform this Agreement and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement. When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of each Indemnitor enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally, by the availability of equitable remedies, or orders of a court of competent jurisdiction.

4.     No Consent Required.  Indemnitors represent and warrant that they are not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement.

5.     Term of Agreement.  Indemnitors' obligations under this Agreement shall terminate on the third anniversary of the termination of the Servicing Agreement, except as to matters arising prior to the date of termination of the Servicing Agreement, whether known or unknown, as to which Indemnitors' obligations shall survive until paid or otherwise discharged.

6.     Choice of Law, Jurisdiction and Venue.  This Agreement is made under and shall be governed by and construed under the laws of Mississippi.  Venue over any dispute under this Agreement shall lie exclusively with the federal courts situated in Hinds County, Mississippi. Indemnitors each consent to personal jurisdiction in the State of Mississippi.

7.     Notices.  All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed by overnight courier, addressed as follows (or such other address as may hereafter be furnished to the other parties by like notice):

    If to Vantium:

    Vantium Capital, Inc. dba                    If to Edwards Family Partnership:
    Acqura Loan Services
    7668 Warren Parkway, Suite 325
    Frisco, Texas 75034                          3907 Greenway
    Attention: Jodi Blanton                      Baltimore, MD  21218
    Facsimile Number: 888-641-3040               Attn:  Charles Edwards, Managing Partner

    If to Beher Holdings Trust:

    Church Bay Trust Co., Trustee
    31 Victoria Street
    Hamilton, Bermuda

- 4 -

Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee, if delivered by overnight courier, or upon receipt by the addressee if delivered by fax or email.

8      Entire Agreement; Amendments; Waivers.   This Agreement constitutes the entire agreement between the parties with respect to the transactions contemplated hereby and supersedes all prior agreements (or contemporaneous oral agreements) of the parties with respect thereto.  This Agreement may be amended only in writing signed by the party against whom such amendment is sought to be enforced.  The waiver by any party hereto of a breach of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.  No delay, omission or act by a party shall be deemed a waiver of such party's rights, powers or remedies.  No course of dealing between the parties hereto shall operate as a waiver of any provision hereof.

9.      Severability; Interpretation.   If any provision hereof is invalid, illegal or unenforceable, the remaining provisions shall not be affected or impaired thereby.   No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other authority by reason of such party having or being deemed to have structured, dictated or drafted such provision.  The parties hereto acknowledge that no other agreement entered into by Vantium for the provision of servicing, default management services and property management and disposition services shall be used or referred to in construing the provisions of this Agreement.

10.      Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

11.      Waiver of Jury Trial.   EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

12.      Attorneys' Fees and Costs.   In the event any judicial proceeding or arbitration proceeding is initiated to enforce this Agreement, in addition to any other relief that may be awarded, the prevailing party in such proceeding, as determined by the court or arbitration tribunal, shall be entitled to recover its reasonable attorneys' fees, litigation expenses, and costs of the proceeding incurred in connection with such proceeding from the non-prevailing party.

Dated: _____          BEHER HOLDINGS TRUST

                                   By:  CHURCH BAY TRUST CO.
                                         ITS TRUSTEE

                                   By: _____
                                       Its: _____

Dated: _____          EDWARDS FAMILY PARTNERSHIP

                                   By: _____
                                       CHARLES EDWARDS
                                       ITS GENERAL PARTNER

Dated: _____          VANTIUM CAPITAL INC.

                                   By: _____
                                   ITS _____

# EXHIBIT "3"

## WORKOUT - LOSS MITIGATION AUTHORITY MATRIX

This authority matrix is specifically intended for use during the initial stabilization period following loan transfer, whereas the primary activities will be focused on addressing potential data errors due to the possible data integrity challenges, and getting borrowers back on a recurring payment schedule. This assumes there are no 1st liens that could necessitate foreclosure or a Deed in Lieu, should such a situation arise the Trustee can make exceptions as needed.

| | VANTIUM | Trustee/Trustee's Agent |
|---|---|---|
| Pre-transfer Payment Credits | Up to 3 payments with appropriate documentation<br><br>Up to 1 payment without documentation | No limit / written authorization required |
| Adjustments to Loan Terms | No restrictions provided valid documentation is provided | No restrictions / written authorization required |
| Repayment Plans | Full Authority | |
| Short Payoff | Up to 60% of the Outstanding Principal Balance.<br><br>Written Approval required from Trustee when lower than 60% of OPB | No limit or restrictions / written authorization required. |
| Modification | No Authority | Exception Only |
| Subordination | Full Authority (hierarchy of negotiation 1) payoff, 2)short payoff, 3) reinstatement 4) payment plan | |