**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE: COMMUNITY HOME
FINANCIAL SERVICES, INC.                           CASE NUMBER: 12-01703 EE

---

**EDWARDS FAMILY PARTNERSHIP, LP AND BEHER HOLDINGS TRUST'S MOTION TO CONVERT TO CHAPTER 7**

---

Edwards Family Partnership, LP and Beher Holdings Trust ("Edwards Entities") creditors and parties-in-interest in this proceeding, pursuant to 11 U.S.C. §1112(b)(4)(A) respectfully move the Court to convert this case to Chapter 7 because: 1) the recent actions of the trustee ensure that there is no reasonable likelihood of rehabilitation of the debtor; and 2) the estate is experiencing a substantial and continuing diminution in value that is detrimental to its creditors.  In support thereof, the Edwards Entities would state as follows:

**REQUEST FOR IMMEDIATE HEARING**

Pursuant to 11 U.S.C. §1112 (a)(3), the Edwards Entities are statutorily entitled to a hearing on this motion within 30 days.  The Edwards Entities do not consent to a waiver of their rights under this section. Further, the fact that the trustee has filed a motion to withdraw the reference of the entire case does not preclude this Court from conducting a hearing on the Edwards Entities' motion.  Pursuant to Federal Rule of Bankruptcy Procedure 5011(c), a motion to withdraw the reference "shall not stay administration of the case or any proceedings before the bankruptcy judge ..." Accordingly, the Edwards Entities request that this matter be scheduled for trial as soon as possible.

1

## Introduction

1. The trustee has completely lost her way in this Chapter 11 case. She has withdrawn her proposed plan of reorganization and is instead waging a litigation war against the estate's largest, indeed almost sole creditors who hold 99.9% of the bankruptcy claims. The significant legal fees generated by the trustee's new "strategy" will further deplete the estate. And any damages the trustee recovers from the estate's largest creditors will ultimately be paid right back to those very same creditors.

2. Only the lawyers fighting the legal war will profit from the trustee's new circular strategy. The estate's creditors will not.

3. The trustee's actions make rehabilitation impossible and contribute to the continued diminution in value of the estate. For these reasons, cause exists to convert this Chapter 11 case to Chapter 7.

## The Chapter 11 Bankruptcy Generally

4. This bankruptcy case is essentially a two-party dispute between CHFS and its principal, William D. "Butch" Dickson ("Dickson"), and EFP and BHT ("Edwards Entities") and their principal, Dr. Charles Edwards. The two groups had two distinct business relationships. One relationship was a debtor/creditor relationship whereby the Edwards Entities supplied **all of the money** for CHFS to purchase home improvement loans to be serviced ("Home Improvement Loans"). Those loans are pledged to the Edwards Entities to secure repayment of their loan to CHFS. The second relationship involved a series of joint ventures whereby the Edwards Entities

2

provided **all of the money** to purchase a series of loans that are owned either by the Edwards Entities or by each joint venture, *not* by the bankruptcy estate ("Joint Venture Loans").[1]

5. The business relationships soured, resulting in litigation. CHFS, led by Dickson, filed this bankruptcy when it became apparent in May 2012 that the federal district court was going to appoint a receiver to run CHFS.

6. CHFS is deeply insolvent. At this point, CHFS owes much more money to its creditors than CHFS could ever possibly be worth.

7. After operating CHFS as a debtor in possession for a little more than a year, in December 2013, Dickson absconded to Panama and Costa Rica with approximately $9,000,000 of bankruptcy estate money.

8. The Edwards Entities, with a *$25,000,000+* secured claim stemming from the Home Improvement Loans, undisputedly hold 99.9% of all claims in this case. There are only roughly $220,000 in other claims (all unsecured) aside from any purported claim Dickson may have.[2] Dickson's theft of millions from the estate clearly puts any claim he asserts in serious jeopardy, as even the trustee acknowledges.

9. The Edwards Entities did not initiate this bankruptcy. Dickson initiated it as a last ditch effort to maintain control of CHFS while he looted its assets. Dr. Edwards and the Edwards Entities have been significantly frustrated by the time and expense associated with the bankruptcy

---

[1] Neither the Edwards Entities nor the joint ventures are in bankruptcy, and thus, there is no credible argument that the Joint Venture Loans are property of the bankruptcy estate. Rather than being the owner of the Joint Venture Loans, CHFS is merely a servicer and, as a joint venturer, is eventually entitled to a 25% interest in net profits *after* the Edward Entities recoup their investment in purchasing the loans.

[2] Attached hereto as Exhibit 1 is the claims register in this matter.

and by the undeniable opportunity the bankruptcy gave Dickson to steal the Edwards Entities' money.

10. The Edwards Entities clearly have the most to lose if this bankruptcy goes poorly and the most to gain if it is promptly, successfully resolved. ***The Edwards Entities and Dr. Edwards have no reason whatsoever to sabotage or harm the bankruptcy estate.***

## The Meritless Adversary Proceedings

11. During the course of the Chapter 11 case, while CHFS was under Dickson's control, he filed three adversary proceedings challenging the status of the Edwards Entities as creditors in this case.[3]

12. There is no merit to these adversary proceedings. They are based primarily on allegations that directly contradict the documents that control the transactions at issue and sworn testimony Dickson gave before the bankruptcy petition was filed.

13. Despite their lack of merit, these pending matters have prevented the Edwards Entities from enforcing their rights as secured creditors on the Home Improvement Loans and as owners or a joint venturer of the Joint Venture Loans. This fact is critical because collections on the Home Improvement Loans, financed by the Edwards Entities, are the **only** source of revenue for CHFS. That revenue is the Edwards Entities' cash collateral. It cannot be used without their consent.[4] The Joint Venture Loans are not property of the estate and the collections on those loans cannot be used by the Trustee.

---

[3] AP 12-00091, AP 12-00109, and AP 13-00104.

[4] The trustee paid a large administrative expense claim of $84,000 in March of 2015, in clear violation of the Edwards Entities rights in cash collateral and in complete disregard of their motion to prohibit the use of same. See April 14, 2015 Operating Report, p. 13, Ct Dkt #1036, attached hereto as Exhibit 3.

14.     Dickson filed these three adversary proceedings because he was desperate to try to "un-do" his past business dealings and somehow transform the status of the Edwards Entities' claims. Without the pending adversary proceedings, there would be no funds with which Dickson could operate CHFS's administratively insolvent bankruptcy estate.

15.     Dickson's ultimate theft of the bankruptcy estate funds is a tacit admission that the adversary proceedings he spearheaded have no merit.

16.     From virtually the onset of her appointment in January 2014, the Edwards Entities have pleaded with the trustee to investigate and resolve these adversary proceedings so that this bankruptcy can be concluded.

17.     Although the trustee has been in place for more than 15 months, she has thus far been completely unwilling to address these adversary proceedings in any manner. She has, without explanation, simply allowed them to languish as a stumbling block to the resolution of this case.[5]

## The Chapter 11 Trustee Has Lost Her Way

18.     Beyond her failings with regard to the adversary proceedings, the trustee has now demonstrated that she has completely lost her way in this case.

19.     It is the trustee's job to manage the debtor's business after the current management has been removed for whatever reason (here, fraud and dishonesty). 28 U.S.C. § 1106. The trustee is supposed to work with an eye toward reorganization of the business and is required to file a reorganization plan "as soon as practicable." 28 U.S.C. §§ 1106, 1121. The trustee has a responsibility to protect the creditors and in fact, has a *fiduciary duty* to administer the estate for

---

[5] The trustee's now withdrawn plan did offer to dismiss the adversary proceedings but there was a significant "catch." She got to keep all the money collected in the case to fund the administration of the estate. There was no resolution of the Edwards Entities' rights in those funds.

5

the ***benefit*** of the creditors. *In re Office Products of America, Inc.*, 136 B.R. 983 987 (Bankr. W. D. Tex. 1992). The creditors' interests take precedence over the interests of the debtor.

20. Rehabilitation for the benefit of the creditors is no longer possible and indeed is not even a consideration for this trustee.

21. The trustee was recently presented with information from Mike Meehan ("Meehan"), a business partner of Dickson in Costa Rica whose credibility and motivation are at this point unknown and untested. The trustee received information that after Meehan contacted Dr. Edwards, Dr. Edwards communicated with Meehan in an attempt to locate information and assets related to Dickson's theft of the money.

22. Dr. Edwards has a right to investigate Dickson in Costa Rica. The Edwards Entities, which supplied all of the money involved,[6] have significant ***non-bankruptcy estate assets*** at stake.

23. The Edwards Entities have a large judgment against Dickson personally as personal guarantor of the Home Improvement Loans.[7] Dickson is not a bankruptcy debtor despite his repeated efforts to have the bankruptcy stay extended to him.

24. The Edwards Entities also have a significant property/ownership interest in the seven portfolios of Joint Venture Loans that are not property of the bankruptcy estate.

---

[6] All of the money involved in this case is either: 1) money loaned to the debtor by the Edwards Entities to fund the purchase of the Home Improvement Loans; 2) money invested in the joint ventures by the Edwards Entities to fund the purchase of the Joint Venture Loans; or 3) proceeds of (i.e., collections from) the loans purchased with the Edwards Entities' money.

[7] See September 10, 2014 order granting summary judgment in favor of the Edwards' Entities, Civil Action No. 3:13cv587 (S.D. Miss. 2014), Ct Dkt #52 attached hereto as Exhibit 2. Evidence regarding the amount of the indebtedness has been submitted to the district court, but the district court has not yet fixed an amount for the judgment. Based on a borrowing base certificate *provided to the Edwards Entities by CHFS itself*, the Edwards' Entities calculated the indebtedness, as exceeding $25,000,000 as of September 2014 (without including attorneys' fees). Interest has continued to accrue since that time.

25.     The trustee's notion that a creditor cannot attempt to locate its collateral is misplaced. The trustee forgets the fact that without loan information provided to her by Dr. Edwards at the beginning of her tenure, she would have had very little information to work with at all as she undertook to fulfill her duties to recover estate assets. The trustee ignores the fact that during the bankruptcy, but before her appointment, Dr. Edwards' subpoenaed information from various banks about Dickson's transfer of funds from the bankruptcy estate. Dr. Edwards provided that information to the Trustee and it significantly reduced the amount of time that the trustee had to spend locating the stolen money.

26.     Nevertheless, when provided with information that Dr. Edwards had communicated with Meehan, the trustee did not reach out to Dr. Edwards or anyone at the Edwards Entities to hear Dr. Edwards' explanation of what he had done and why, or to ask what he had or had not uncovered. The trustee did not reach out to the attorneys for the Edwards Entities. The trustee conducted no inquiry of anyone associated with the Edwards Entities – unquestionably the largest creditors of this estate – to determine the truth, or lack thereof, of what Meehan reported to her. She made no effort to advise Dr. Edwards that she had any concerns about his actions or to discourage him from further conducting his own independent investigation.

27.     Instead, demonstrating a complete lack of impartiality, the trustee took everything Meehan said (despite his untested credibility and motivation) as true and as evidence of improper conduct by the Edwards Entities.

28.     The trustee used the Edwards Entities' cash collateral, without court authority, to pay Meehan $6,000,[8] drafted a statement for him, and used this purchased information to accuse

---

[8] See April 14, 2015 Operating Report, p. 13, Ct Dkt #1036, attached hereto as Exhibit 3.

Dr. Edwards and his family members of *criminal* behavior designed to damage the estate. The trustee exercised what can only be described as the legal equivalent of the nuclear option, instituting an all-out legal war on the principal victims of the Dickson fraud – the estate's largest creditors, Dr. Edwards, his entities and some of his family members.

## The Nuclear Option Exercised By the Trustee

29. Instead of rehabilitating CHFS, here is how the trustee is now spending her time.

30. STEP 1: The trustee filed a civil RICO complaint against Dr. Edwards, *his children* and his entities in federal district court accusing them of conspiring to commit a pattern of criminal activity to damage the very bankruptcy estate from which the Edwards Entities stand to benefit more than any other party.[9] She seeks damages from the Edwards Entities supposedly "on behalf of the bankruptcy estate" that will, if recovered, be primarily paid right back to the Edwards Entities as the estate's largest creditors, profiting only the lawyers fight this pointless legal battle. [Civil Action No. 3:15cv00260, Ct Dkt #1].

31. This type of foolishness is precisely the scenario Judge Houston found intolerable in *In re Waterway Barge Partnership*, 104 B.R. 776, 786-787 (Bankr. N.D. Miss. 1989):

> The debtors announced intention to prosecute litigation against MARAD is interesting. If the debtor were successful in suing MARAD [the primary creditor], while remaining in existence as a legal entity, any recovery would enhance the value of the limited partnership interests and substantiate the argument presented by MARAD that the debtor's plan violates the absolute priority rule. Otherwise, any recovery would have to be paid over to MARAD in reduction of its unsecured claim. Under those circumstances, the only persons that would benefit, if the potential claims against MARAD have merit, are the debtor's attorneys. The debtor's position as to this issue can be likened to those scenarios confronted Yossarian in Joseph Heller's Catch-22.

---

[9] The Edwards Entities will address the lack of merit to the irresponsibly filed RICO complaint in the district court.

8

32. <u>STEP 2</u>: Failing to see the futility of the war she seeks to wage against the Edwards Entities, the trustee moved the Court for permission to use the Edwards Entities' cash collateral to wage this war against the Edwards Entities before ultimately having to pay the money back to the Edwards Entities. [Ct Dkt ##1023, 1024].  Unbelievably, though this permission has *not* been granted, the trustee has indeed been using the Edwards Entities' cash collateral as she sees fit. (See footnotes 4 and 8 supra).

33. <u>STEP 3</u>: The trustee, in an almost unprecedented act, moved to withdraw the reference of this entire case from this Bankruptcy Court, apparently thinking these matters now too complex for this Court. [Ct Dkt ##1026 and 1027]. Alternatively, she moved to have certain pieces and parts that she apparently wishes to litigate elsewhere withdrawn from this Court. [Ct Dkt ##1026 and 1027].

34. <u>STEP 4</u>: The trustee moved to intervene in various litigation the Edwards Entities have against Dickson personally and Dickson's companies, <u>other than</u> CHFS.  [Civil Action No. 3:13cv00387, Ct Dkt ##57, 58; Civil Action No. 3:14cv00436, Ct Dkt ##27, 28].  If permitted to intervene, the trustee plans to jump into non-CHFS litigation to oppose the Edwards Entities, and necessarily advocate the positions advanced by Dickson (the individual perpetrator of the multi-million dollar theft from the bankruptcy estate) and other non-CHFS Dickson entities.  The trustee will be doing so to the severe detriment of the estate's largest creditors, the Edwards Entities, to which she owes fiduciary duties.  The trustee will necessarily be ignoring the controlling documents and Dickson's prior sworn testimony.

35. <u>STEP 5</u>: The trustee filed a notice to serve Dr. Edwards, the Edwards Entities and Dr. Edwards' children with substantially overbroad, burdensome subpoenas designed to ferret out

information and documents she hopes will support her litigation war against the estate's largest creditors. [Ct Dkt #1034].

36. It is unclear whether Dr. Edwards may have, due to lack of experience and familiarity with bankruptcy law, violated the bankruptcy stay during his independent investigation of the events surrounding Dickson's theft. According to even Meehan's statement, drafted by the trustee, the only "property" of the estate Dr. Edwards received was a CD with some information on it about some CHFS loans.[10] Even if possession of the CD is a stay violation, which is denied, section 362 (k) provides a mechanism for the trustee to seek relief, assuming she can meet her burden of proof.

37. The unprecedented and overblown actions of this trustee are not an appropriate response to a possible stay violation that has not yet even been proven. The trustee's actions described herein demonstrate that she has completely lost her objectivity, and she can no longer be allowed to administer this estate, which is losing money every day and has no prospects of any rehabilitation as a going concern.

38. It is time to convert this case to Chapter 7 for cause as described below.

## Cause Exists For Conversion To Chapter 7

39. As part of the legal war against the Edwards Entities that is now her primary focus, *the trustee withdrew her disclosure statement and plan.* [Ct Dkt #1022]. This is a clear admission that rehabilitation is no longer possible, and thus, because the estate also continues to lose money, cause grounds exist to convert this case to Chapter 7. It is that simple, and the trustee's conduct is sufficient proof.

---

[10] Dr. Edwards has turned over possession of the CD to the United States Attorney's office.

40. Pursuant to 11 U.S.C. §1112(b)(1) the Court may convert a Chapter 11 case to Chapter 7 for cause. Section 1112(b)(4)(A) defines cause to include "substantial and continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." According to *Resnick & Sumner, Collier Bankruptcy,* 16th Ed., §1112.04[6][a] p. 1112-27, to succeed on a motion to convert to Chapter 7 under this section, a creditor must meet two tests:

> In general, this standard has two basic requirements. First, it tests whether, after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow or, alternatively, declining asset values. Second, it tests whether there is any reasonable likelihood that the debtor, or some other party will be able to stem the debtor's losses and place the debtor's business enterprise back on a solid financial footing within a reasonable amount of time. Both tests must be satisfied in order for cause to exist under this subparagraph . . . .

41. Clearly, both tests are met here. The only assets the debtor owns are: 1) Home Improvement Loan portfolios that are pledged to the Edwards Entities as collateral; and 2) a joint venture interest in each of the seven Joint Venture Loan joint ventures.

42. Many of these subprime loans have not had any payment activity in months. Further, some of the loans are missing, a fact the Edwards Entities raised long before this trustee was appointed. The payments collected on the Home Improvement Loans are not sufficient to service the secured debt CHFS owes to the Edwards Entities for those loans.

43. Additionally, the collections on these loans have substantially decreased during this case. The trustee hired a servicing company whose collection efforts have been woefully inadequate. As shown on the attached Charts, the percent collection on the loans in both the Home Improvement Loan Portfolio and Joint Venture Loan Portfolios has decreased substantially. See Affidavit of Martha Edwards Borg attached hereto as Exhibit 4. The continuing decline in the collections on these loans means that it is unlikely that the only

significant creditors in the case, the Edwards Entities, will be paid in full. It is a waste of estate assets to continue in Chapter 11.

44. Moreover, by engaging in the unprecedented litigation tactics against the 99.9% creditors in this case, the administrative expenses of this estate will continue to mount and cause further loss to the estate.

45. Finally, the trustee has not even attempted to rehabilitate the debtor. The plan she initially proposed contemplated liquidation of CHFS rather than rehabilitation. Her withdrawn plan itself is proof that she had no intention of rehabilitating the debtor, as is required under 1112(b)(4)(A).

46. Rehabilitation means just that. It does not include liquidation. *Sante Fe Minerals, Inc. v. BEPCO, L.P.*, 386 b.r. 548, 552 (Bankr. D. Del. 2008)(holding that rehabilitation means restoration of business, not liquidation.) Nor can rehabilitation be based upon speculative outcomes of litigation. *Quarles v. United States* Trustee, 194 B. R. 94, 96 (W.D. Va. 1996); *In re: Imperial Heights Apartments, Ltd.*, 18 B.R. 858, 863-864 (Bankr. S.D. Ohio 1982).

47. Her withdrawal of even that plan to instead pursue futile, expensive litigation against the estate's largest creditors demonstrates that rehabilitation of CHFS is not a focus for the trustee at this point at all.

48. Allowing this case to continue as a Chapter 11 proceeding under these undisputed facts will not serve the interests of justice. It is time to convert the case to Chapter 7 so that a substituted trustee who recognizes the fiduciary duties owed to the estate's largest creditors can liquidate this estate.

**The Intolerable Consequence of the Trustee's Litigation War: A Serious Conflict of Interest**

49. The intolerable consequence of the trustee's new circular litigation strategy is that the only potential beneficiaries are the trustee's lawyers. And the trustee's lawyers are the law firm in which this trustee herself is a partner. This fact creates a serious conflict of interest.

50. As explained above, despite repeated requests, for 15 months the trustee has been unwilling to examine the merits (or lack thereof) of the adversary proceedings. If the Edwards Entities prevail in those proceedings, this estate is administratively insolvent. The Edwards Entities will be entitled to the return of all their collateral on the Home Improvement Loans, and the Joint Venture Loans do not belong to the estate. The estate will have virtually no money to operate. The estate will have virtually no assets to pay any claims.

51. At this point, the trustee's counsel – the Jones Walker law firm - holds the second largest claim in this bankruptcy. Over the strenuous objections of the Edwards Entities,[11] the Jones Walker law firm seeks $800,000+ for their first seven months of work on this matter. The Edwards Entities shudder to think what exorbitant amount the trustee through her law firm will next attempt to foist upon the estate, and ultimately the Edwards Entities, for payment for the administrative excesses over the subsequent eight months.

52. The "equitable" relief sought by the trustee in her RICO complaint, however, will change the estate's ability to pay the Jones Walker law firm. In addition to futile damages, the trustee seeks to have the $25,000,000+ in claims of the Edwards Entities subordinated to the roughly $220,000 in claims of all other creditors. In other words, she seeks to subordinate the 99.9% of secured claims to the .1% of claims which are all unsecured. She also seeks to have the

---

[11] As this Court is well aware, the Edwards Entities have challenged to the unreasonableness of the supposed $100,000 per month legal fees the Jones Walker law firm is attempting to bill to the estate. This Court tried this matter on December 18, 2014. No ruling has yet been made.

Edwards Entities' claims "re-characterized" as "equity contributions." The trustee advocates this action as punishment for the Edwards Entities supposed "bad behavior." [Civil Action No. 3:15cv00260, Ct Dkt #1].

53.     Whether this relief is granted or not, the Edwards Entities will still hold 99.9% of the claims in this bankruptcy. They will still receive the lion's share of the estate funds.

54.     However, this proposed "transformation" of the status of the Edwards Entities' claims would enormously benefit the trustee's law firm. If the Edwards Entities are no longer secured creditors with the rights and protections that secured creditor status entails, the bankruptcy estate will no longer be administratively insolvent. The Home Improvement Loan collection proceeds will no longer be the Edwards Entities' cash collateral. The proceeds will instead be freed up to pay administrative claims, most notably the extremely large claim of the Jones Walker law firm.

55.     This significant benefit of the trustee's new circular litigation path that will be bestowed upon the law firm in which the trustee is a partner raises objective questions concerning the independence and impartiality of the trustee in fulfillment of her fiduciary duties.

56.     This conflict of interest, in addition to the §1112(b)(4)(A) cause that exists, is one more reason to convert this case to Chapter 7 so that an independent, impartial Chapter 7 trustee can take over this matter and liquidate CHFS.

**Conclusion**

57. Cause exists to convert this case to a Chapter 7 proceeding. The trustee has no intention of rehabilitating the debtor, and the estate is continuing to diminish in value to the detriment of the creditors. Conversion of the estate will better protect and benefit the interests of all the estate's creditors.

WHEREFORE, PREMISES CONSIDERED, EFP and BHT respectfully ask this Court to convert the case to Chapter 7 for cause.

Dated this 17th day of April, 2015.

        EDWARDS FAMILY PARTNERSHIP, LP
        AND BEHER HOLDINGS TRUST

        By: /s/ Jim F. Spencer, Jr.
        Jim F. Spencer, Jr.

OF COUNSEL:
Jim F. Spencer, Jr. (MSB #7736)
Stephanie M. Rippee (MSB #8998)
Watkins & Eager PLLC
Post Office Box 650
Jackson, MS 39205-0650
(601) 965-1900 (p)
(601) 965-1901 (f)
jspencer@watkinseager.com
srippee@watkinseager.com

**CERTIFICATE OF SERVICE**

I, Jim F. Spencer, Jr., hereby certify that I have filed the foregoing document using the CM/ECF System which sent notice of the filing to all persons requesting notice.

This 17th day of April, 2015.

        By: /s/ Jim F. Spencer, Jr.
        Jim F. Spencer, Jr.