___

SO ORDERED,

**Judge Neil P. Olack**
United States Bankruptcy Judge
Date Signed: May 1, 2017

The Order of the Court is set forth below. The docket reflects the date entered.

___

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**COMMUNITY HOME FINANCIAL SERVICES, INC.,**   CASE NO. 12-01703-NPO

**DEBTOR.**   CHAPTER 11

### MEMORANDUM OPINION AND ORDER DENYING SECOND FEE APPLICATION OF ROBERT A. CUNNINGHAM AND GRANTHAM, POOLE, RANDALL, REITANO, ARRINGTON & CUNNINGHAM, PLLC

This matter came before the Court for hearing on February 27, 2017 (the "Hearing"), on the Second Application of Accountants/Consultants/Experts for the Debtor for Allowance of Fees and Allowance of Costs and Expenses (the "Second Fee Application") (Dkt. 461) filed by Community Home Financial Services, Inc. (the "CHFS"), acting as the debtor in possession, and the Edwards Family Partnership, LP and Beher Holdings Trust's Objection to Debtor's Second Application for Fees, Costs, and Expenses of Robert A. Cunningham, CPA (Doc # 461) (the "Objection") (Dkt. 497) filed by Edwards Family Partnership, LP and Beher Holdings Trust (collectively, the "Edwards Entities") in the above-referenced chapter 11 bankruptcy case (the "Bankruptcy Case"). At the Hearing, Douglas C. Noble represented Robert A. Cunningham, CPA ("Cunningham") and the accounting firm of Grantham, Poole, Randall, Reitano, Arrington &

Cunningham, PLLC ("Grantham Poole"), Jim F. Spencer, Jr. and Stephanie M. Rippee represented the Edwards Entities, and Jeffrey R. Barber appeared on behalf of Kristina M. Johnson, the duly-appointed chapter 11 trustee (the "Trustee").[1] After considering the testimony, evidence, and arguments of counsel, the Court denied the Second Fee Application from the bench. This Opinion memorializes and supplements the Court's bench ruling.

## Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B). Notice of the Second Fee Application was proper under the circumstances.

## Facts

1.  This Opinion is one in a series of opinions rendered in the Bankruptcy Case. For a detailed discussion of the facts leading up to the filing of the Bankruptcy Case and the appointment of the Trustee, see *In re Community Home Financial Services, Inc.*, Case No. 12-01703-EE, 2015 WL 6511183, at *1-5 (Bankr. S.D. Miss. Oct. 27, 2015) (Ellington, J.).[2]

2.  On May 29, 2013, CHFS, acting as the debtor in possession, filed the Application to Employ Accountants/Consultants/Experts (the "Employment Application") (Dkt. 253), seeking approval from the Court to retain Cunningham and Grantham Poole "for the specific purpose of reviewing financial records, preparing accounting of findings, prepar[ing] reports and analyses to assist in determining amounts owed and receivable[s] from various parties, prepar[ing] exhibits for use in settlement negotiations and/or court proceedings, provid[ing] testimony regarding work

---

[1] On January 21, 2014, an Order (Dkt. 473) was entered appointing the Trustee for CHFS.

[2] An order entered on February 1, 2017, reassigned the Bankruptcy Case from Judge Edward Ellington to Chief Judge Neil P. Olack. (Dkt. 1609).

performed and conclusions reached and to serve as an expert as requested." (*Id*. at 1). For these services, CHFS agreed to pay a retainer of $5,000.00 and hourly billing rates of $210.00 for a project partner and $110.00 for paraprofessional staff, as reflected in the engagement letter attached to the Employment Application. (*Id*. at 6 & 9).

3.      On July 11, 2013, the Court approved the Employment Application, including the terms of the engagement letter, pursuant to 11 U.S.C. § 327.[3] (Dkt. 279 at 2).

4.      On November 21, 2013, CHFS filed the Application of Accountants/ Consultants/Experts for the Debtor for Allowance of Fees and Allowance of Costs and Expenses (the "First Fee Application") (Dkt. 408), seeking permission to pay Cunningham and Grantham Poole $10,339.00 in fees and $7.00 in expenses, a total of $10,346.00, for professional services rendered from May 21, 2013, through November 12, 2013, "on behalf of [CHFS] and the bankruptcy estate and no other persons, creditors or parties." (First Fee App. at 1); 11 U.S.C. § 330(a), § 503(b); FED. R. BANKR. P. 2016.[4]  No objection to the First Fee Application was filed, and the Order Granting Application of Accountants/Consultants/Experts for the Debtor for Allowance of Fees and Allowance of Costs and Expenses (the "First Interim Fee Order") (Dkt. 434) was entered on December 26, 2013. The First Fee Application and First Interim Fee Order were not before the Court at the Hearing.

5.      On January 14, 2014, CHFS filed the Second Fee Application, requesting authority to pay Cunningham and Grantham Poole compensation of $12,723.26 for professional services

---

[3] Hereinafter, all code sections refer to the United States Bankruptcy Code found at title 11 of the United States Code unless otherwise noted.

[4] Rule 2016 provides that "[a]n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." FED. R. BANKR. P. 2016(a); *see also* MISS. BANKR. L.R. 2016-1.

"rendered on behalf of [CHFS] and the bankruptcy estate and no other persons, creditors or parties" from November 19, 2013, through December 27, 2013.  (Dkt. 461 at 1).  Attached to the Second Fee Application is an itemization of the services performed by Cunningham and Grantham Poole (the "Itemization") (*Id*. at 5-8).  Pursuant to the Itemization, Cunningham and Grantham Poole seek an interim award of $12,723.26, consisting of 49.2 hours billed by Cunningham at an hourly rate of $210.00, 21.5 hours billed by paraprofessionals at an hourly rate of $110.00, and an expense of $26.26.  (Cunningham Hr'g Ex. 1).[5]

6.  On February 3, 2014, the Edwards Entities filed the Objection, questioning the "necessity, reasonableness, and value to the estate" of the work conducted by Cunningham and Grantham Poole and suggesting that a considerable amount of Cunningham's time was spent on matters intended to benefit William D. Dickson ("Dickson"), CHFS's founder and chief executive officer,[6] rather than CHFS.  (Obj. at 3-5).  Additionally, the Edwards Entities alleged that the Itemization does not describe the work performed in sufficient detail to permit a finding that it was reasonable, necessary, or beneficial to the estate.  (Obj. at 4).

7.  As to their contention that the work performed by Cunningham and Grantham Poole benefitted Dickson, the Edwards Entities alleged that the services reflected in the Second Fee Application concerned a lawsuit brought by the Edwards Entities against Dickson in the U.S. District Court for the Southern District of Mississippi (the "District Court"), *Edwards Family*

---

[5] At the Hearing, three (3) exhibits were introduced into evidence. Cunningham's single exhibit is cited as "(Cunningham Hr'g Ex. 1)"; the Edwards Entities' two (2) exhibits are cited as "(Edwards Entities Hr'g Ex. ____)".
.
[6] Dickson's involvement in the bankruptcy case is multifaceted.  He served as "chief executive officer of the Debtor" (Dkt. 67 ¶3), was a "former officer and equity security holder of [CHFS]" (Dkt. 1577 ¶1), and is a purported creditor of the estate according to the proof of claim (Cl. # 10-1) he filed in the Bankruptcy Case.

*Partnership, LP & Beher Holdings Trust v. Dickson*, 3:13-cv-00587-CWR-LRA (the "Guaranty Suit").[7] (Obj. at 5). The Edwards Entities argued at the Hearing that the Itemization includes time expended by Cunningham and Grantham Poole assisting Dickson in responding to their summary judgment motion and preparing for the deposition of their principal in the Guaranty Suit. (Obj. at 3). To provide context for the Edwards Entities' contention, a brief summary of the Guaranty Suit follows below:

  (a.) In the Guaranty Suit, the Edwards Entities sought to hold Dickson liable based on personal guaranties made by Dickson on loans granted to CHFS for the purpose of purchasing home improvement loans, which CHFS serviced. (Guar. Suit, Dkt. 12 at 1-2). The loans to CHFS allegedly were in default and, in any event, had matured on August 1, 2013. (Guar. Suit, Dkt. 12 at 1-2). On October 11, 2013, the Edwards Entities moved for partial summary judgment as to Dickson's liability as guarantor of the loans. (Guar. Suit, Dkt. 14). In support of their motion, the Edwards Entities attached excerpts from a transcript of Dickson's testimony in which he purportedly admitted that the loans were in default. (Guar. Suit, Dkt. 14-1 at 18).

  (b.) In response to the summary judgment motion, Dickson submitted the Affidavit of Robert A. Cunningham, CPA (the "Cunningham Affidavit")

---

[7] The claims alleged by the Edwards Entities in the Guaranty Suit were originally asserted as counterclaims in a removed state court action initiated by CHFS and Dickson against the Edwards Entities in which they sought, *inter alia,* damages for alleged breach of contract. *See Cmty. Home Fin. Servs., Inc. v. Edwards Family P'ship, LLP*, Case No. 3:12-cv-252-CWR-LRA (S.D. Miss.). Following the commencement of the Bankruptcy Case, the District Court on March 29, 2013, severed the counterclaims, transferred them into a separate and discrete cause of action (the Guaranty Suit), and realigned the Edwards Entities as plaintiffs and Dickson as the defendant. (Guar. Suit, Dkt. 13).

(Edwards Entities Hr'g Ex. 2) on December 27, 2013, in which Cunningham stated that his "preliminary findings" revealed errors in the Edwards Entities' accounting records related to the home improvement loans, that the Edwards Entities had overstated the amount CHFS owed by more than $1.2 million, and that he had "reason to believe" that CHFS had not defaulted on the loans in 2010 when the Edwards Entities sent notice of default for nonpayment. (*Id*. at 2-3). At the Hearing, Cunningham explained that he was given the task of determining the date CHFS defaulted on the loans. He reviewed CHFS's monthly bank statements dating for the years from 2006 to 2011 for the home improvement loans serviced by CHFS and compared them to spreadsheets to recreate payments on the loans and calculate interest amounts, a process he referred to as "forensic accounting." (Edwards Entities Hr'g Ex. 2 ¶ 7). He never completed a full reconciliation of CHF's accounts because sometime in December 2013, counsel for CHFS told him to cease all work.[8]

(c.) Before he was told his services were no longer needed, counsel for CHFS asked Cunningham to attend the deposition of Charles Edwards, M.D., the owner of the Edwards Entities, which was then set to take place in Baltimore, Maryland, on December 12, 2013. (Edwards Entities Hr'g Ex. 1). Some of Cunningham's time in the Itemization was expended preparing for that deposition. (Cunningham Hr'g Ex. 1 at 2). Cunningham understood that he was asked to attend

---

[8] On December 20, 2013, bankruptcy counsel for CHFS filed a notice disclosing to the Court that CHFS had moved its principal place of business from Jackson, Mississippi, to Panama, had transferred funds from the debtor-in-possession operating account to bank accounts in Panama, and had set up branch offices in Panama and Costa Rica, where it continued conducting its mortgage business. (Dkt. 426).

Page 6 of 18

the deposition because of the work he performed on the home improvement loans. His presence was characterized as an opportunity for a "free look" into the accounting methods used by the Edwards Entities to determine the amount owed by CHFS.

(d.)   On September 10, 2014, the District Court ruled in favor of the Edwards Entities, finding that CHFS had defaulted on the loans and that "Dickson can be held individually liable to [the Edwards Entities] based on the personal guaranties he executed." (Guar. Suit, Dkt. 52 at 4). The District Court did not determine the amount recoverable under the loans at that time and invited the parties to submit affidavits attesting to the amount of Dickson's liability. (Guar. Suit, Dkt. 52 at 6). The Edwards Entities submitted a supplemental affidavit showing a total amount due of $25,777,168.00. (Guar. Suit, Dkt. 53). Dickson disagreed with the Edwards Entities' calculations and filed a competing affidavit consisting of his own testimony, to which he attached as an exhibit the same Cunningham Affidavit. (Guar. Suit, Dkt. 54). The District Court entered an order adopting the Edwards Entities' calculations. (Guar. Suit, Dkt. 67-68).

(e.)   Dickson appealed the summary judgment award, challenging, among other things, the extent of his guaranty liability. (Guar. Suit, Dkt. 70). The Fifth Circuit Court of Appeals found that the Cunningham Affidavit was "conclusional" and that it lacked supporting records or documents, and found the evidence provided by Dickson insufficient to survive summary judgment as to the amount of his obligation under the guaranty contracts. *Edwards Family P'ship, LLP v. Dickson*, 821 F.3d 614, 619 (5th Cir. 2016). In the end, the Fifth Circuit

affirmed the District Court's award of summary judgment in favor of the Edwards Entities.

8. In the Objection, the Edwards Entities contended that the preliminary analysis performed by Cunningham purportedly showing that CHFS was not in default on the loans in 2010 was of no value to the estate in light of Dickson's previous sworn testimony that CHFS had in fact defaulted on the loans before the commencement of the Bankruptcy Case. (Obj. at 6). They suggested that the sole purpose behind filing the Cunningham Affidavit was to delay the Guaranty Suit. (Obj. at 3).

9. The hearing on the Second Fee Application was set and reset on several occasions (Dkts. 503, 593, 642, & 701), and the matter was held in abeyance. (Dkt. 751). After the Bankruptcy Case was reassigned,[9] the Court set aside the abeyance order (Dkt. 1667), and the Hearing was held. Cunningham was the only witness to testify at the Hearing.

## Discussion

A professional retained by a corporation in chapter 11 owes allegiance to that entity and not its insiders. *See* 9 NORTON BANKR. L. & PRAC. 3d § 172:8 (2017). Yet by assisting Dickson in the Guaranty Suit while at the same time serving as an accounting consultant for CHFS, Cunningham placed himself in an untenable position. His purported attempt to serve both the interests of the estate (in preserving the estate for the benefit of the creditors) and Dickson (in disputing the extent of his liability in the Guaranty Suit) presented a conflict because what was good for Dickson was not necessarily beneficial to the estate and *vice versa*.

---

[9] *See supra* note 2.

**I.      Standard for Awarding Compensation Under § 330**

Under § 330, a bankruptcy court may award a debtor in possession "reasonable compensation for actual, necessary services rendered by . . . [a] professional person" employed by the estate. 11 U.S.C. § 330(a)(1)(A). In considering "the nature, the extent, and the value of such services," § 330(a)(3) requires that courts take into account all relevant factors, including:

> (A)   the time spent on such services;
>
> (B)   the rates charged for such services;
>
> (C)   *whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of a case under this title*;
>
> (D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E)   with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F)   whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A)-(F) (emphasis added). To reinforce the point made in § 330(a)(3)(C) that compensable services must be necessary and beneficial to the estate, the statute repeats itself in § 330(a)(4)(a) by mandating that courts *shall not* allow compensation for services not "reasonably likely to benefit the debtor's estate . . . or necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A)(i)-(ii); *In re IRH Vintage Park Partners, L.P.*, 456 B.R. 673, 676 (Bankr. S.D. Tex. 2011). It is § 330(a)(3)(C) and § 330(a)(4)(A) that the Edwards Entities contend the Second Fee Application fails to satisfy.

Although a benefit to the estate is "hard to fully quantify," courts have awarded fees for services adjudged necessary to preserve the value of an estate during bankruptcy proceedings. *In*

*re Spillman Dev. Group, Ltd.*, 376 B.R. 543, 552 (Bankr. W.D. Tex. 2007) (awarding fees for services required to properly advise the debtor in possession about the operation of a golf course and to assist the debtor in opposing a sale of assets that would have decreased the value of the estate); *see also Okin Adams & Kilmer, LLP v. Hill (In re Yazoo Pipeline Co., L.P.)*, No. 08-38121, 2012 WL 6682025, at *13 (S.D. Tex. Dec. 21, 2012) (concluding that efforts to organize the estate, determine the value of disputed oil and gas leases, and assist the debtor in possession with funding were compensable under § 330); *In re Broughton Ltd. P'ship*, 474 B.R. 206, 216 (Bankr. N.D. Tex. 2012) (allowing payment for professional services required to negotiate the sale of debtor's assets with a prospective buyer); *In re Mohsen*, 473 B.R. 779, 788 (Bankr. N.D. Cal. 2012) (compensating an accountant for forensic work to identify potentially hidden assets of the estate that was "reasonably likely to benefit the estate at the time the services were rendered").

When a professional's work serves the interests of an individual over those of the estate, however, courts have reduced or denied compensation. In *In re Digerati Techs., Inc.*, 537 B.R. 317, 361 (Bankr. S.D. Tex. 2015), *aff'd sub nom. Herrera v. Dishon*, No. 4:15-cv-00227, 2016 WL 7337577 (S.D. Tex. Dec. 16, 2016), for example, the bankruptcy court reduced compensation to the debtor's counsel for services that it found to be indicative of a "slavish desire" to favor particular officers of the debtor with whom the law firm maintained an "overly cozy relationship." *Id.* at 360-61. There, because the law firm worked to confirm a reorganization plan that would leave two former officers with sole control of the debtor and provide them with "absurdly high compensation packages," the bankruptcy court reduced its fees by five percent (5 %). *Id.* at 361-62. Similarly, other bankruptcy courts have denied compensation when the attorney's role indicates interests that reach beyond preserving the bankruptcy estate. *In re Miell*, No. 09-01500, 2009 WL 2253256, at *2 (Bankr. N.D. Iowa July 27, 2009) (denying compensation under

§ 330(a)(4)(B) for attorneys who represented the debtor in a criminal case and tax litigation, along with chapter 11 bankruptcy issues); *In re Stoecker*, 114 B.R. 965, 975 (Bankr. N.D. Ill. 1990) (denying compensation for a category of services expended for protection of the debtor instead of for the benefit of the estate).

In the Fifth Circuit, the seminal case on the issue of whether professional fees should be considered necessary or beneficial to the administration of the estate is *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner*, 783 F.3d 266, 276 (5th Cir. 2015). The *Woerner* Court reviewed the text of § 330 and its legislative history, and joined the majority of other Circuits in adopting a prospective test that looks to the necessity or reasonableness of the professional services *at the time they were rendered* for determining whether services are compensable. *Id.* at 274-77. The *Woerner* Court overruled *Andrews & Kurth, L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414, 426 (5th Cir. 1998), to the extent it required compensable professional services to actually result in an "identifiable, tangible, and material benefit to the bankruptcy estate." *Woerner*, 783 F.3d at 270. The Fifth Circuit in *Woerner* listed factors that bankruptcy courts "ordinarily consider" when determining whether professional services were necessary or beneficial at the time they were rendered: "the probability of success at the time the services were rendered, the reasonable costs of pursuing the action, what services a reasonable lawyer or legal firm would have performed in the same circumstances, . . . and any potential benefits to the estate (rather than to *the individual debtor*)." *Id.* at 276 (emphasis added).

If a court awards professional compensation under § 330(a), the amount of such compensation or reimbursement is entitled to priority status as an administrative expense under § 503(b)(2). 4 COLLIER ON BANKRUPTCY ¶ 503.09 (16th ed. 2016). Section 503(b) allows administrative expenses that are "actual, necessary costs and expenses of preserving the estate."

11 U.S.C. § 503(b)(1)(A). Because fees awarded under this section are paid directly from the estate and reduce the funds available to other creditors, courts traditionally strictly construe § 503(b). *E.g.*, *In re Enloe*, No. 14-36358, 2016 WL 4595921, at *2 (Bankr. S.D. Tex. Sept. 2, 2016). Thus, the administrative expenses approved for an attorney or accountant must be "reasonable" and claims should be "narrowly construed" so as to keep administrative expenses at a minimum. *In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) (citing *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 865 (4th Cir. 1994)). The burden of proof is on the movant or applicant to establish their entitlement to an award under § 503(b), and the movant must demonstrate by a preponderance of the evidence that the work reflected in fees constitutes a substantial contribution to the estate. *E.g.*, *In re Buttes Gas & Oil Co.*, 112 B.R. 191, 193 (Bankr. S.D. Tex. 1989).

In assessing fee applications, the Fifth Circuit has held that courts should apply the lodestar method in concert with the *Johnson* factors.[10] *CRG Partners Grp., LLC v. Neary (n re Pilgrim's Pride Corp.)*, 690 F.3d 650, 655-56 (5th Cir. 2012). Under the lodestar method, a court first determines the compensable hours billed and then calculates a reasonable hourly rate for the compensable services. *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013). The court then multiplies the resulting sums to arrive at the lodestar amount. *In re Pilgrim's Pride Corp.*, 690 F.3d at 655. In *Perdue v. Kenny ex rel. Winn*, 559 U.S. 542, 551 (2010), the U.S. Supreme Court

---

[10] The twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill necessary to properly perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fees charged; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the court or the client; (8) the amount of money involved in the case and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship between the attorney and the client; and (12) fees awarded in similar cases.

emphasized the importance of the lodestar approach for calculating the reasonableness of professional fees. These holdings create a framework under which a bankruptcy court determines the proper compensation of professionals employed by the estate: § 330(a), the lodestar method, and the *Johnson* factors.

## II.     Second Fee Application

The Edwards Entities questioned whether the work performed by Cunningham and Grantham Poole was necessary or beneficial to the estate under the prospective *Woerner* standard. They also complained that some of the entries in the Itemization contained insufficient detail to determine whether the work benefitted the estate. They did not challenge, however, the qualifications, skill, experience, or reputation of Cunningham, Grantham Poole, or the paraprofessionals who performed the work. They also did not object to the hourly billing rates for the services rendered or the amount of time spent on such services. Thus, the Court examines the main issue raised by the Edwards Entities, that is, whether the services were either necessary to the administration of the Bankruptcy Case or reasonably likely to benefit the Bankruptcy Case at the time at which they were rendered. 11 U.S.C. § 330(a)(3)(C), (4)(A). This examination also involves the first step in the lodestar method, which requires the Court to evaluate the time entries in the Itemization and determine which are compensable.

As a threshold matter, this Court is not persuaded by the argument made by counsel for Cunningham and Grantham Poole at the Hearing that the Memorandum Opinion on the *Fifth Application of Attorney for the Debtor for Allowance of Fees and Allowance of Costs and Expenses*[11] (the "Memorandum Opinion") (Dkt. 1227) entered on December 7, 2015, by the prior

---

[11] *In re Community Home Financial Services, Inc.*, Case No. 12-01703-EE, 2015 WL 8113699 (Bankr. S.D. Miss. Dec. 7, 2015) *appealed*, No. 3:15-cv-00915 (S.D. Miss.).

bankruptcy judge assigned to this Bankruptcy Case requires or supports a finding that the services billed by Cunningham and Grantham Poole were reasonable or necessary.  In the Memorandum Opinion, the prior judge granted in part the Fifth Application of Attorney for the Debtor for Allowance of Fees and Allowance of Costs and Expenses (the "Henderson Fee Application") (Dkt. 443), filed by Derek A. Henderson ("Henderson").  Counsel's argument was not entirely clear, but it appeared to be an attempt to invoke the law of the case doctrine.  *See Browning v. Navarro*, 887 F.2d 553, 556 (5th Cir. 1989) (explaining that the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power").

      Counsel for Cunningham and Grantham Poole suggested that the Second Fee Application and the Henderson Fee Application are similar in that they overlap in time, Henderson (as counsel for CHFS) was Cunningham's "contact person" in the Bankruptcy Case, and the Edwards Entities likewise challenged the Henderson Fee Application on the ground that some of the services provided by Henderson did not benefit the estate.  The services in question here, however, are not similar in scope or nature to those in the Henderson Fee Application.  The most obvious difference is that the Second Fee Application relates to <u>accounting</u> services whereas the Henderson Fee Application concerns <u>legal</u> services.  In the Memorandum Opinion, the prior bankruptcy judge found that most of the legal services rendered by Henderson were objectively reasonable at the time they were made, including the filing of several adversary proceedings against the Edwards Entities.  *Comm. Home Fin. Servs.*, 2015 WL 8113699, at *11.  The prior bankruptcy judge, however, disallowed fees for services provided by Henderson in connection with a motion to extend the stay to the Guaranty Suit against Dickson on the ground that the work did not benefit the estate.  *Id*.  There was no ruling in the Memorandum Opinion, however, as to whether the accounting services provided by Cunningham and Grantham Poole benefitted the estate.

Regardless, the Fifth Circuit has recognized that the law of the case doctrine is discretionary and, thus, prior decisions in the Bankruptcy Case do not bind this bankruptcy judge. *See Cont'l Ill. Nat'l Bank & Trust Co. v. Charles N. Wooten, Ltd. (In re Evangeline Ref. Co.)*, 890 F.2d 1312, 1321 (5th Cir. 1989).

Turning to the main issue, the Court is unconvinced that under *Woerner*, a forensic accounting of the home improvement loans was beneficial to the estate, rather than Dickson, at the time the service was rendered. Most of the time included in the Second Fee Application was expended creating and updating "spreadsheets" or "worksheets," performing a "home improvement loans analysis" and a "borrowing base calculation review," and discussing the results with Dickson, Dickson's attorney in the Guaranty Suit, and other counsel. (Cunningham Hr'g Ex. 1 at 1-2). Of the total of 70.7 hours of work performed by Cunningham and paraprofessionals in the Itemization, these tasks amounted to 65.2 hours, equating to $11,542.00 in fees. The remaining 5.5 hours, equating to fees of $1,155.00, was for setting up a conference (0.40 hours), making travel reservations for the deposition in Baltimore (0.70 hours), drafting an "expert's report" (3.30 hours), and preparing the Cunningham Affidavit (1.10 hours), all for matters pertaining to the Guaranty Suit. The only expense in the Itemization, consisting of a charge of $26.26 for canceling the trip to Baltimore, likewise relates to the Guaranty Suit. (*Id*. at 4).

All of these calculations ultimately lead Cunningham to conclude in the Cunningham Affidavit, albeit on an "ongoing" basis, that the default notice from the Edwards Entities was "without basis and improper." (Edwards Entities Hr'g Ex. 2 ¶¶ 8-9). The time period covered in the Second Fee Application (November 19, 2013 to December 27, 2013) coincides with the filing and prosecution of the summary judgment motion in the Guaranty Suit (October 11, 2013 to December 27, 2013). The only work product resulting from this time period appears to be the

Cunningham Affidavit. At a minimum, it was disingenuous for CHFS to allege in the Second Fee Application that the services provided by Cunningham and Grantham Poole were rendered "on behalf of [CHFS] and the bankruptcy estate *and no other persons, creditors or parties*." (Second Fee app. at 1) (emphasis added).

Cunningham testified at the Hearing that he was unaware that Dickson had previously admitted that CHFS had defaulted on the loans. Not surprisingly, the Fifth Circuit found the preliminary conclusion in the Cunningham Affidavit to be of no benefit in Dickson's defense of the summary judgment motion in the Guaranty Suit. *Edwards Family P'ship, L.P.*, 821 F.3d at 619. This Court finds this sentiment equally applicable to the administration of the estate.

It is possible that Cunningham's efforts to reconcile the accounts of home improvement loans serviced by CHFS may have provided, theoretically, some benefit to CHFS, but the Itemization and Cunningham's testimony failed to draw a clear line between accounting work performed to defend Dickson in the Guaranty Suit and accounting work necessary for preserving CHFS's estate. The inability to separate the interests of Dickson and CHFS tainted the work of Cunningham and Grantham Poole. In that regard, Cunningham's testimony at the Hearing about the multiple entries in the Itemization for which the only description was "LIT Other Services," did not show that the services were reasonable or necessary or, even more importantly, that the services were related to the estate and not Dickson. (Obj. at 4). Cunningham stated only that the entries were for "spreadsheet preparation" performed by a paraprofessional at an hourly billing rate of $110.00. (Cunningham Hr'g Ex. 1). A version of the Itemization with handwritten edits showing this additional information was introduced at the Hearing as an exhibit. (*Id.*). These spreadsheets appear to be the same ones referred to elsewhere in the Itemization, none of which Cunningham was able to relate to services that benefitted the Bankruptcy Case. Analyzing a fee

application under the framework of § 330(a) and the lodestar method, however, requires, at a minimum, a detailed listing of tasks performed and time spent on each task. *In re New Towne Dev. Grp., L.L.C.*, No. 09-10029, 2010 WL 1451480, at *5 (Bankr. M.D. La. Apr. 9, 2010). Courts have rejected fee applications that were "exceedingly vague" and failed to describe the service performed and how the service benefited the estate. *E.g.*, *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995); *In re Speeds Billiards & Games, Inc.*, 149 B.R. 434, 440 (Bankr. E.D. Tex. 1993). For example, a bankruptcy court rejected fee applications that included descriptions such as "research issues," which did not allow the court to determine whether the services were reasonable or necessary. *In re Digerati Techs., Inc.*, 537 B.R. at 333. Indeed, the purpose of a fee application is to "provide the court with sufficient information to enable it to determine whether the services rendered were reasonable, actual, and necessary." *In re Viscount Furniture Corp.*, 133 B.R. 360, 362 (Bankr. N.D. Miss. 1991). In short, Cunningham's efforts to assist Dickson in the Guaranty Suit are not compensable by the estate for the simple reason that his services were not "beneficial at the time at which the service was rendered toward the completion of, a case under this title" as required by § 330(a)(3)(C) and were not "reasonably likely to benefit the debtor's estate" as required by § 330(a)(4)(A)(ii). *E.g.*, *In re Palmaz Scientific Inc.*, 556 B.R. 770, 784 (Bankr. W.D. Tex. 2016) (quoting § 330(a)(4)(A)).

## Conclusion

For the reasons set forth above, the Court finds that Cunningham did not carry his burden to show that the services reflected in the Second Fee Application were reasonable or necessary for the administration of the estate at the time they were rendered. The incomplete analysis performed by Cunningham and Grantham Poole on the status of the home improvement loans and the consulting work related to the deposition in the Guaranty Suit were intended to benefit Dickson.

Moreover, the vague and incomplete descriptions in the Itemization did not support the Second Fee Application.  Although it is understandable that Cunningham and Grantham Poole may not have fully known the requirements of the Bankruptcy Code for charging professional services to a bankruptcy estate as an administrative expense, their good faith, which is undisputed, does not change the fact that the Second Fee Application and Cunningham's testimony at the Hearing did not satisfy § 330(a)(3)(C), (a)(4)(A) or the lodestar method.

      IT IS, THEREFORE, ORDERED that the Second Fee Application is hereby denied in its entirety.

##END OF ORDER##