SO ORDERED,

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: May 1, 2017**

The Order of the Court is set forth below. The docket reflects the date entered.

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**COMMUNITY HOME FINANCIAL**                                **CASE NO. 12-01703-NPO**
**SERVICES, INC.,**

**DEBTOR.**                                                              **CHAPTER 11**

### MEMORANDUM OPINION AND ORDER
### DENYING MOTION FOR ALLOWANCE OF ADMINISTRATIVE
### EXPENSES AND FEES PURSUANT TO 11 U.S.C. § 503(b)(4) OF LUKE DOVE

This matter came before the Court for hearing on February 28, 2017 (the "Hearing"), on

the Motion for Allowance of Administrative Expenses and Fees Pursuant to 11 U.S.C. § 503(b)(4)

(the "Motion") (Dkt. 1577) filed by Luke Dove ("Dove"); the Edwards Family Partnership, LP

and Beher Holdings Trust's Objection to Motion for Allowance of Administrative Expenses and

Fees Pursuant to 11 U.S.C. § 503(b)(4) (the "Edwards Entities' Objection") (Dkt. 1599) filed by

Edwards Family Partnership, LP and Beher Holdings Trust (the "Edwards Entities"); and the

United States Trustee's Objection to Motion for Allowance of Administrative Expenses and Fees

Pursuant to 11 U.S.C. § 503(b)(4) (Dkt. # 1577) (the "U.S. Trustee's Objection") (Dkt. 1610) filed

by Henry G. Hobbs, Jr., Acting U.S. Trustee for Region 5 (the "U.S. Trustee"), in the above-

referenced chapter 11 bankruptcy case (the "Bankruptcy Case"). At the Hearing, Dove, a licensed

Page 1 of 21

attorney, represented himself; Jim F. Spencer, Jr. represented the Edwards Entities, Ronald H. McAlpin and Christopher J. Steiskal represented the U.S. Trustee, and Mark A. Mintz represented Kristina M. Johnson ("Johnson"), the duly appointed chapter 11 trustee (the "Chapter 11 Trustee"). Dove and the Chapter 11 Trustee testified at the Hearing.  Dove introduced four (4) exhibits into evidence.[1]   After considering the testimony, other evidence, and arguments of counsel, the Court finds as follows:

## Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  Notice of the Motion was proper under the circumstances.

## Facts

1.      This Opinion is one in a series of opinions entered in the Bankruptcy Case.  For a detailed discussion of the background facts leading up to the filing of the Bankruptcy Case and the appointment of the Chapter 11 Trustee, see *In re Community Home Financial Services Inc.*, Case No. 12-01703-EE, 2015 WL 6511183 (Bankr. S.D. Miss. Oct. 27, 2015) (Ellington, J.).[2]

2.      Community Home Financial Services, Inc. ("CHFS") is a home mortgage lending company that was initially based in Jackson, Mississippi.  Its founder, William D. Dickson ("Dickson"), was its chief executive officer.  (Mot. at 1).

---

[1] These exhibits will be cited as "(Dove Hr'g Ex. _____)".

[2] An order entered on February 1, 2017, reassigned the Bankruptcy Case from Judge Edward Ellington to Chief Judge Neil P. Olack.  (Dkt. 1609).

3.      On May 23, 2012, CHFS filed a chapter 11 petition for relief.  (Dkt. 1).  For more than a year, CHFS operated as the debtor in possession (the "DIP") pursuant to 11 U.S.C. § 1101, with Dickson controlling its business operations and exercising control over the estate funds.

4.      Early in the Bankruptcy Case, Eileen N. Shaffer ("Shaffer") filed a Notice of Appearance and Request for Notification (Dkt. 84), entering her appearance as Dickson's personal bankruptcy lawyer.  Dickson filed a proof of claim in the Bankruptcy Case (Claim 10-1), seeking an unknown amount against the estate as a "result of an indemnity which may arise regarding his personal guaranty" on loans made to CHFS by the Edwards Entities.  (Dove Hr'g Ex. 1).

5.      On December 20, 2013, bankruptcy counsel for CHFS, Derek A. Henderson, filed a Disclosure of Transfer of Funds and Other Matters (the "Disclosure") (Dkt. 426), informing the Court that CHFS had moved its principal place of business from Jackson, Mississippi, to Panama, had transferred funds (the "DIP Funds") from its DIP operating account (the "DIP Account") to bank accounts in Panama, and had set up branch offices in Panama and Costa Rica, where it continued conducting its mortgage business.  (*Id.*).

6.      A later criminal investigation revealed that Dickson had orchestrated the actions described in the Disclosure.  (Dkt. 1017-2).  He controlled the Panamanian accounts to which the DIP Funds were transferred, and he had moved to Costa Rica with family members where he had set up a "rogue" operation of CHFS's business that siphoned the revenue stream away from the estate.  (Dkt. 918 at 7).  In a series of wire transfers beginning in November 2013, he withdrew all but approximately $7,500.00 from the DIP Account.  As a mortgage servicing company, CHFS's business operations historically generated substantial sums of money.  For example, the October 2013, monthly operating report (Dkt. 416 at 6), the last one signed by Dickson as president of CHFS, showed a cash balance of $9,059,191.49.

7.     In response to the Disclosure, the U.S. Trustee filed the United States Trustee's Emergency Motion for Order for the Appointment of a Chapter 11 Trustee (Dkt. 427), which was granted on December 23, 2013.  (Dkt. 429).  The entry of that order meant that Dickson no longer had decision-making authority for CHFS.  11 U.S.C. § 704, § 1106.

8.     The U.S. Trustee filed an application for approval of the appointment of Johnson as the Chapter 11 Trustee.  (Dkt. 455).  Dickson and CHFS opposed Johnson's appointment.  (Dkt. 458).  After a hearing, the prior bankruptcy judge approved Johnson's appointment pursuant to the Order (Dkt. 473) entered on January 21, 2014.

9.     The Chapter 11 Trustee testified at the Hearing that after her appointment, she faced "chaos."  She had hardly any funds, no employees, and no records or books of the loans serviced by CHFS.  Her primary goal was to recover the funds that Dickson withdrew from the DIP Account.  Her initial attempts to recover the DIP Funds were unsuccessful because of the Panamanian bank's refusal to recognize her authority.  For more details of the obstacles she faced, she referred the Court to the detailed reports she filed intermittently in the Bankruptcy Case.  (Dkt. 918, 1017, 1188 & 1648).

10.     In early 2014, Dickson retained Dove as his criminal defense attorney (Hr'g at 3:46:10)[3] and paid him a retainer fee.[4]  (Hr'g at 3:54:32).  Dove associated Joe Holloman ("Hollomon") as co-counsel for Dickson in his criminal case.

---

[3] The Hearing was not transcribed.  Citations to testimony at the Hearing are to the timestamp of the audio recording.

[4] Dove did not disclose the amount of the retainer fee on grounds of attorney-client privilege.

11.    On February 25, 2014, Dove filed a Notice of Appearance (Dkt. 538) as Dickson's personal bankruptcy lawyer although his representation of Dickson in the Bankruptcy Case was outside the scope of his retention agreement in the criminal case. Dove explained at the Hearing that he believed that Shaffer would likely withdraw as Dickson's personal bankruptcy counsel[5] and was concerned that Dickson then would have no representation in the Bankruptcy Case. Also, he agreed to "take on" some bankruptcy matters to assist the Chapter 11 Trustee. Dove described the decision to undertake the bankruptcy representation as being made on an "ad hoc" basis, "at my expense," and "my choice." (Hr'g at 3:47:43). There was no promise of compensation for this work from either Dickson or the Chapter 11 Trustee. (Hr'g at 3:47:00).

12.    Dickson was detained in Panama and deported to the United States while en route to Costa Rica on March 12, 2014. Upon his return, Dickson was arrested for bank fraud and ordered to be held without bond. On April 8, 2014, he was indicted by a federal grand jury for bank fraud, bankruptcy fraud, and wire fraud. *See United States v. Dickson*, Case No. 3:14-cr-00078-TSL-FKB (S.D. Miss.).

13.    At some point prior to his arrest, Dickson had retained counsel in Panama, Bernal Chavarría Herrera ("Herrera"), to assist him in matters related to CHFS's business operations there which apparently continued until March 2014. The Chapter 11 Trustee attempted to contact

---

[5] Shaffer filed a Motion to Withdraw as Counsel (Dkt. 1358) on May 10, 2016, and an order granting Shaffer permission to withdraw as Dickson's personal bankruptcy attorney was entered on June 9, 2016. (Dkt. 1377). It appears that the last pleading filed by Shaffer on Dickson's behalf in the Bankruptcy Case was Dickson's objection to the Chapter 11 Trustee's employment of Jones Walker LLP filed on February 14, 2014. (Dkt. 512). Orders granting Shaffer permission to withdraw as Dickson's personal bankruptcy attorney were entered in four (4) related adversary proceedings on February 15, 2017. (Adv. Proc. 12-00091-NPO, Adv. Proc. Dkt. 276; Adv. Proc. 12-00109-NPO, Dkt. 110; Adv. Proc. 13-00104, Dkt. 54; Adv. Proc. 14-00030, Dkt. 170).

Herrera, but he refused to speak with her unless she had a written release from Dickson or unless Dove was present.  The Chapter 11 Trustee asked for Dove's assistance.

14.    In his testimony, Dove described the efforts that he undertook, at the request of the Chapter 11 Trustee, to recover the funds that Dickson transferred from the DIP Account to bank accounts in Panama and also to locate CHFS's business records.  (Hr'g at 3:48:12).  Those efforts included the following:

(a.)    Dove hired Michael Pierce ("Pierce"), a local attorney in Panama. (Hr'g at 3:25:59).

(b.)    In June 2014, Dove met with Dickson, then housed in the Madison County Detention Center in Madison, Mississippi.  (Hr'g at 3:25:44).  Also at that meeting were Hollomon, Pierce, the Chapter 11 Trustee, and counsel for the Chapter 11 Trustee.  As a result of that meeting, Dickson granted Dove power of attorney[6] over his business affairs. (Hr'g at 3:26:58).

(c.)    Through the Chapter 11 Trustee's contacts, Pierce was able to provide Dove's power of attorney to bank officials in Panama and to facilitate the return of approximately $5.8 million.[7]  (Hr'g at 3:27:52).

(d.)    Dove and his wife traveled to Costa Rica on May 5, 2015.  (Dove Hr'g Ex. 3).  Dove's presence there and the power of attorney helped facilitate a

---

[6] A copy of the power of attorney was not introduced into evidence but apparently granted Dove limited authority over Dickson's business affairs in Panama and was drafted to comply with Panamanian law.

[7] The Chapter 11 Trustee testified that in early 2015, the government of Costa Rica seized at least $700,000.00 from bank accounts owned by affiliates of CHFS and/or Dickson after it learned about the criminal proceedings against Dickson in the United States.  (Hr'g at 3:28:55).

meeting in Costa Rica between Herrera and the Chapter 11 Trustee during which she was able to learn about the location of certain loan records.

15.     Testimony given at the Hearing provided no evidence that Dove had ever discussed or requested compensation for these services from Dickson.  Moreover, the Chapter 11 Trustee testified that she did not pay Dove for his services, although she agreed that Dove's power of attorney may have saved the estate the expense of legal proceedings in Panama and may have resulted in a faster recovery of the funds in the Panamanian accounts.  Nevertheless, it is undisputed that Dickson has not returned all of the DIP Funds withdrawn from the DIP Account.

16.     On September 10, 2015, Dickson pled guilty to two (2) counts of bankruptcy fraud in violation of 18 U.S.C. § 152.  *See United States v. Dickson*, No. 3:14-cr-00078-TSL-FSB (S.D. Miss.).  He was sentenced to fifty-seven (57) months and is currently incarcerated in a federal penitentiary.  Pursuant to an Agreed Order of Restitution (Case No. 3:14-cr-00078-TSL-FSB, Dkt. 83), Dickson was ordered to pay the bankruptcy estate $5,442,004.58.  In the criminal action, the total loss to the estate was deemed to be $12,145,842.36, and the $5.8 million recovered by the Chapter 11 Trustee was credited against the total amount of restitution.  (Dkt. 1648).

17.     After Dickson's conviction, the Chapter 11 Trustee questioned Dickson about the location of missing loan documents.  Dickson told her that he was unable to remember either the encryption codes on computer servers or the location of a warehouse in Panama where loan documents were stored.  (Hr'g at 3:41:50-3:44:00).  Dickson's lack of memory, whether genuine or deliberate, hampered the Chapter 11 Trustee's investigation and increased the expenses of administering the estate.  (Hr'g at 3:44:27-3:44:48).

18.     On January 11, 2017, Dove filed the Motion on his own behalf, seeking compensation from CHFS's estate for the actions he undertook as counsel for Dickson in both

criminal and bankruptcy cases, which purportedly benefitted Dickson and the estate. (Mot. at 1-2). In the Motion, Dove alleged that he expended "hundreds of hours and incurred substantial personal expenses" while representing Dickson in the Bankruptcy Case and working to recover funds from foreign bank accounts. (Motion at 2). According to Dove, these services constituted a "substantial benefit to the CHFS bankruptcy estate." (*Id.* at 2 & 4).

19.     Dove requests compensation from the estate in the total amount of $60,000.00, which is approximately one percent (1%) of the funds recovered (0.01 x $6,000,000.00 = $60,000.00). (Hr'g at 3:57:14). Dove, therefore, seeks an enhancement of his actual fees because his testimony and other evidence at the Hearing showed that his actual fees and expenses totaled only $31,118.40, as summarized below:

> (a.)     As to his fees, Dove estimated that he worked eight (8) hours each day for three and a half days while in Costa Rica from May 5-9, 2015. At an hourly billing rate of $350.00, the total of his claimed fees is $9,800.00.[8] (Hr'g at 3:51:18). Dove did not provide an itemization of the services he rendered and time expended either in the form of an exhibit attached to the Motion or an exhibit introduced into evidence at the Hearing.[9]

> (b.)     As to his expenses, Dove testified that he paid Pierce a total of $19,958.40 from the retainer Dickson paid him for representing him in the criminal case. (Hr'g at 3:51:00). At the Hearing, Dove introduced into evidence a chart

---

[8] $9,800.00 = $350.00 per hour × 8 hours per day × 3.5 days.

[9] By analogy, Bankruptcy Rule 2016(a) requires that an application for compensation include a "detailed statement of the services rendered, time expended and expenses incurred." FED. R. BANKR. P. 2016.

showing the date and amount of each payment made to Pierce, which is reproduced below, but in chronological order:

| Date | Amount |
|------|--------|
| April 24, 2014 | $5,000.00 |
| August 27, 2014 | $10,000.00 |
| April 29, 2015 | $1,000.00 |
| November 27, 2015 | $3,958.40 |
| Total | $19,958.40 |

(Dove Hr'g Ex. 2). In support of his claim, Dove provided copies of bank statements of his firm's trust account for the months of June 2014, August 2014, and October 2014, and a copy of a wire transfer request dated April 20, 2015. (*Id.*). These documents support the amounts paid to Pierce, but not the dates of the payments, which differ slightly from those shown in the chart. There is no itemization of the services rendered and time expended by Pierce. Dove testified that he also incurred expenses that he paid from his own pocket, including $900.00 for airfare to Costa Rica and $460.00 for a two-night hotel stay there. (Hr'g at 3:34:53). The total of his claimed expenses is $21,318.40.[10]

20.    In the Edwards Entities' Objection, filed on January 30, 2017, the Edwards Entities objected to the award of administrative expenses for time spent by Dove securing the return of funds "stolen" by Dickson. (Edwards Entities' Objection at 3). As a threshold matter, the Edwards Entities objected to Dove filing the Motion "on his own behalf" when it should have been filed by Dickson. (*Id.* at 2). The Edwards Entities framed the issue this way: Did Dickson, as a creditor of the estate, make a substantial contribution when he returned some of the funds he stole?

---

[10] $21,318.40 = $19,958.40 + $900.00 + $460.00.

According to the Edwards Entities, Dickson's criminal conduct precludes him from an award of administrative expenses.

21.     In the U.S. Trustee's Objection, filed on February 1, 2017, the U.S. Trustee objected to any award of administrative expenses that Dickson may have incurred as a result of his "criminal actions."  (U.S. Trustee's Objection at 3).  The U.S. Trustee reasoned that in as much as Dickson is not entitled to any administrative expense claim, his attorney Dove likewise should not be allowed such a claim.

**Discussion**

Section 503(b)(4)[11] allows an "entity" to recover the cost of professional services rendered by either an attorney or accountant when that entity also holds a claim for "actual, necessary expenses" allowable under subsection (A), (B), (C), (D), or (E) of § 503(b)(3).[12]  Relevant here is

---

[11] Hereinafter, all code sections refer to the United States Bankruptcy Code found at title 11 of the United States Code unless otherwise noted.

[12] Section 503(b) provides as follows:

After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
* * *
    (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—
* * *
        (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;
* * *

§ 503(b)(3)(D), which allows for "actual, necessary expenses" incurred by a creditor or equity security holder in making a "substantial contribution" to a chapter 11 case. *In re Garcia*, No. 12-93049-ELL, 2016 WL 7324153, at *5 (Bankr. E.D. Cal. Dec. 14, 2016). Together, § 503(b)(3) and § 503(b)(4) create a framework under which a qualified entity may be reimbursed for professional services as an administrative expense of the estate entitled to priority status. 4 COLLIER ON BANKRUPTCY ¶ 503.11[3] (16th ed. 2016). The underlying policy of § 503(b)(4) is to "promote meaningful creditor participation in the reorganization process" and reimburse creditors and others for services that "foster and enhance, rather than retard or interrupt the progress or reorganization." *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986) (internal citations omitted). In considering claims under § 503(b)(4), courts must balance the competing goals of "stimulating, encouraging, and promoting meaningful creditor participation" in chapter 11 proceedings with the "need to keep administrative expenses to a minimum." *In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. 246, 250 (Bankr. D. Colo. 1990). Because the Bankruptcy Code provides a scheme of ratable distribution among similarly situated creditors, the provisions for priority treatment of claims and expenses are construed strictly against the claimant. *E.g.*, *In re Gurley*, 235 B.R. 626, 631 (Bankr. W.D. Tenn. 1999).

In addition to determining whether professional services are compensable as an administrative expense, the amount must be "reasonable . . . based on the time, the nature, the

---

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]

11 U.S.C. § 503(b)(3)-(4).

extent, and the value of such services." 11 U.S.C. § 503(b)(4). Courts have found that the standards for allowing compensation under § 503(b)(4) "mirror" the standards that govern fee applications under § 330(a).[13] *In re 29 Brooklyn Ave., LLC*, 548 B.R. 642, 652 (Bankr. E.D.N.Y. 2016). To demonstrate reasonableness, the applicant bears the burden of submitting sufficiently detailed records of time and purpose. *Id.*

In the Fifth Circuit Court of Appeals, the seminal case on the issue of whether professional fees should be considered necessary or beneficial to the administration of the estate is *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 276 (5th Cir. 2015). The *Woerner* Court reviewed the text of § 330 and its legislative history, and joined the majority of other Circuits in adopting a prospective test that looks to the necessity or reasonableness of the professional services *at the time they were rendered* for determining whether services are compensable. *Id.* at 274-77. The *Woerner* Court overruled *Andrews & Kurth, L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414, 426 (5th Cir. 1998), to the extent it required professional services, to be compensable, to actually result in an "identifiable, tangible, and material benefit to the bankruptcy estate." *Woerner*, 783 F.3d at 270. The Fifth Circuit in *Woerner* listed factors that bankruptcy courts "ordinarily consider" when determining whether professional services were necessary or beneficial at the time they were rendered: "the probability of success at the time the services were rendered, the reasonable costs of pursuing the action, what services a reasonable lawyer or legal firm would have performed in the same circumstances, . . .

---

[13] Section 330(a) directs the court to consider (1) the time spent on services; (2) the rates charged for services; (3) whether the services were necessary or beneficial to the administration of the estate; (4) whether the services were performed within a reasonable amount of time with respect to the complexity of the issue; (5) the professional qualifications of the person performing the services; and (6) the reasonableness of the compensation rates as compared to other professionals performing similar services. 11 U.S.C. § 330(a)(3)(A)-(F).

and any potential benefits to the estate (rather than to *the individual debtor*)." *Id.* at 276 (emphasis added).

Dove has asked the Court to grant administrative expense status to fees and expenses incurred as a result of services that he rendered on an ad hoc basis while representing Dickson in both the Bankruptcy Case and in criminal proceedings for bankruptcy fraud. Under § 503(b)(4), the Court must grant Dove's request for compensation if he shows that: (a.) he is an entity qualified under § 503(b)(4) to seek compensation or, in the alternative, that his request is made on behalf of a qualified entity obligated to pay him for his services; (b.) his work made a substantial contribution to the estate; and (c.) the claimed professional fees were reasonable and his claimed expenses were actual and necessary.

### A.    Is Dove an "entity" eligible to seek compensation?

The Edwards Entities raised the threshold question of whether Dove—rather than Dickson—is an "entity" qualified to seek compensation under § 503(b)(4). Dove filed the Motion on his own behalf, but, in effect, asks the Court to find that his client, Dickson, is a creditor or equity security holder who has incurred "actual, necessary expenses" while "making a substantial contribution" in the Bankruptcy Case. 11 U.S.C. § 503(b)(3). At the Hearing, Dove pointed to Dickson's status as a creditor and equity security holder of CHFS as factors qualifying Dickson for § 503(b)(4) entity status. (Hr'g at 3:49:26; Dove Hr'g Ex. 1). Dickson's status, however, does not answer the question as to whether the administrative expense claim belongs to Dickson or his attorney, Dove, as the "entity whose expense is allowable under subparagraph . . . (D)." 11 U.S.C. § 503(b)(4).

Courts are split on whether professionals may seek reimbursement of their fees and expenses on their own behalf. *In re R.L. Adkins Corp.*, 505 B.R. 770, 777 (Bankr. N.D. Tex. 2014).

The plain language of § 503(b)(4) suggests that the "entity" must make the request, rather than the professional employed by that entity.  4 COLLIER ON BANKRUPTCY ¶ 503.11[4] (16th ed. 2016) (noting that some courts have held that the "right to request compensation belongs to the client and *not* to the professional") (emphasis added); *see e.g., Olsen v. Robinson Brog Leinwand Greene Genovese & Gluck P.C.* (*In re Olsen*), 334 B.R. 104, 106 (S.D.N.Y. 2005) (holding that under § 503(b) only "the creditor, and not the creditor's attorney, may apply for the payment of fees from the estate").  *But see In re Western Asbestos Co.*, 318 B.R. 527, 531 (Bankr. N.D. Cal. 2004) (noting that an attorney may seek payment under § 503(b)(4) even though the attorney's client has neither paid the fees and expenses nor incurred an obligation to pay).  Even so, bankruptcy courts within the jurisdiction of the Fifth Circuit have held that § 503(b)(4) permits attorneys and accountants to apply directly for payment from the estate if they represent an entity enumerated in § 503(b)(3).  For example, in *In re Mirant Corp.*, 354 B.R. 113, 140 (Bankr. N.D. Tex. 2006) (rejecting *Olsen*), the bankruptcy court explained its decision to partially approve a fee application submitted by an attorney as follows:

> An attorney or accountant who identifies a potential benefit to a chapter 11 case but whose client is unwilling to absorb the whole cost of pursuing that benefit should not be denied the hope of compensation if he or she is prepared to accept the burden of going forward on the client's behalf.  The court thus holds that, by its plain language, Code § 503(b)(4) allows attorneys and accountants to apply directly for payment by the estate if they represent a party specified in section 503(b)(3).

*Id.* at 140.  Upon this reasoning, the *Mirant* court approved a percentage of the fee application, $15,000.00 from the total of $645,146.64 sought by the attorney.  *Id.* at 142.  Although the court in *Mirant* deemed the application proper, it reduced the payment because the attorney's contributions were not "entirely positive" and were duplicative of efforts of the equity committee. *Id.* at 141.

Likewise, the bankruptcy court in *Adkins* ruled that it was proper for a law firm to seek the allowance of its fees and expenses as administrative expenses. *In re R.L. Adkins Corp.*, 505 B.R. at 779. The *Adkins* Court distinguished § 503(b)(3)(D), which requires the incurrence of expenses by a qualified entity, from § 503(b)(4), which simply refers to the "*rendering* of legal services" and "contains no explicit requirement of *incurrence* of legal fees by the creditor." *In re R.L. Adkins Corp.*, 505 B.R. at 779. Under this reasoning, "the (b)(4) 'entity' need not be the (b)(3)(D) 'creditor.'" *Id.* Other courts have reached a similar result. *E.g.*, *In re Oxford Homes, Inc.,* 204 B.R. 264, 267 (Bankr. D. Me. 1997) (noting that a fee application may be considered even though the applying attorney "is not within the class of persons authorized to have their expenses allowed as administrative expenses under § 503(b)(3)"); *In re Glickman, Berkowitz, Levinson & Weiner, P.C.*, 196 B.R. 291, 295 n.3 (Bankr. E.D. Pa. 1996)) (finding it appropriate, under certain circumstances, to consider a law firm's request for payment of administrative expenses to have been made "on behalf of" its creditor client).

Dove's claim for administrative expenses, however, is removed from the facts of *Mirant* and *Adkins*. In *Mirant*, there was no question that the attorney applying for fee reimbursement had performed services on behalf of a § 503(b)(3) entity. *In re Mirant Corp.*, 354 B.R. at 140, 142. In *Adkins*, the § 503(b)(3) entity had already paid the expenses of its attorney seeking professional fees and had an "understanding" that the attorney would later seek reimbursement of such fees as a substantial contribution claim. *In re R.L. Adkins Corp.,* 505 B.R. at 776-77. Here, Dove alleged that he served Dickson both as a creditor/equity security holder of CHFS and as a criminal defendant, but Dickson did not pay Dove to represent him in the Bankruptcy Case and had no understanding with Dove that he would later seek payment for his services from the estate. Indeed, until June 2016, Shaffer was Dickson's personal bankruptcy lawyer. Dove's efforts to recover the

transferred funds more logically appear to be an extension of his criminal representation of Dickson. In that regard, Dove testified that Dickson "got credit" for the recovery of approximately $5.8 million towards the restitution order in his criminal case. (Hr'g at 3:59:25).

By Dove's own admission, he traveled to Costa Rica to assist in the recovery of funds from the Panamanian bank at the request of the Chapter 11 Trustee, not at the request of Dickson. (Hr'g at 3:51:45). It is undisputed that the Chapter 11 Trustee is neither a creditor, equity security holder, nor other § 503(b)(3)(D) entity. Had Dove traveled to Costa Rica at the request of Dickson and had Dickson incurred an obligation to pay him for his fees and expenses, Dove may have conceivably met the threshold eligibility requirement for seeking compensation.[14] Even under an expansive view of § 503(b)(4), however, the Court finds that Dove did not properly present the Motion on behalf of Dickson, and for that reason the Motion should be denied.

**B.    Did Dove's services make a "substantial contribution" to the estate?**

Even if the Motion were submitted "on behalf" of an § 503(b)(3)(D) entity, a question arises as to whether Dove's work made a "substantial contribution" to the Bankruptcy Case. The Bankruptcy Code does not define the term "substantial contribution," but conclusory statements regarding one's substantial contribution are insufficient for such services to be deemed compensable. *In re R.L. Adkins Corp.*, 505 B.R. at 780. The Fifth Circuit has defined "substantial contribution" to mean "a contribution that is 'considerable in amount, value, or worth,'" giving the phrase its "ordinary, everyday meaning." *Hall Fin. Group, Inc. v. DP Partners, Ltd. P'ship (In re DP Partners, Ltd. P'ship)*, 106 F.3d 667, 673 (5th Cir. 1997). (quoting *Webster's Third New International Dictionary* 2280 (4th ed. 1976)). Importantly, the Fifth Circuit rejected decisions

---

[14] The power of attorney was not submitted to the Court as authorizing Dove to act on behalf of Dickson in the Bankruptcy Case. *See supra* note 6; FED. R. BANKR. P. 9010(c).

from other Circuits that examined the motivations of the applicant in expending the fees at issue. *Id*. In those decisions, if an applicant pursued its own self-interest, then any benefit flowing to the estate from that pursuit were deemed to be merely incidental rather than substantial and not compensable. *Id*. In short, the Fifth Circuit does not interpret § 503 to require a "self-deprecating, altruistic intent" in order to recover fees and expenses. *Id*.

Whether the services in question provided a substantial contribution is an inquiry specific to the facts of each particular case. *In re Consolidated Bancshares, Inc.*, 785 F.2d at 1253. The Fifth Circuit has so far declined to create a concrete standard, but it has suggested that in determining whether services have made a substantial contribution in each case, courts should, at a minimum, weigh the benefits conferred upon the estate against the cost of claimed fees and expenses. *In re DP Partners,* 106 F.3d at 673.

Dickson was not merely a creditor/equity security holder of the estate, he was the person responsible for discharging the duties of the DIP. Dickson illegally removed funds from the DIP Account in breach of his fiduciary duty to CHFS. Courts have held that substantial contribution awards should not be made for services that are "expected." *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 291 (Bankr. W.D. Tex. 2005). The return of stolen funds should be expected from a fiduciary, and not an activity that constitutes a substantial contribution.

Also, the recovery of the transferred funds aided Dickson in his criminal case, not the estate. According to leading bankruptcy treatises, "[m]ost federal circuits follow the rule that criminal defense counsel fees are presumed noncompensable out of estate funds." 9 NORTON BANKR. L. & PRAC. 3d § 173:20; *see* ROBERT E. GINSBERG, ROBERT D. MARTIN & SUSAN V. KELLEY, GINSBERG & MARTIN ON BANKRUPTCY § 4.03[D]. This rule is premised on the fact that a debtor's criminal counsel will benefit the debtor individually, rather than the estate at large. *Id.*

In certain cases, however, the debtor in possession may overcome that presumption if the request for employment satisfies certain statutory requirements. *See In re Duque*, 48 B.R. 965, 975 (S.D. Fla. 1984) (establishing two-part test under § 327(e) and § 330 for determining whether bankruptcy estate moneys may be used to pay for the debtor's criminal counsel). Under the present facts, there is no legal basis for allowing the estate to pay the fees of a criminal defense attorney for Dickson, who engaged in criminal conduct harmful to the estate while acting as the principal of CHFS. Dove's involvement in the Bankruptcy Case came about as a result of his role as defense attorney for Dickson in the criminal case—and he never significantly departed from that role.[15]

The Edwards Entities in the Edwards Entities' Objection do not dispute that Dove's work to return funds from Panamanian accounts was, in the end, beneficial to the estate. (Edwards Entities' Obj. at 1) "In fact, Mr. Dove did more than he is given credit for in connection with the return of funds." (*Id.*). In that regard, the Chapter 11 Trustee testified about the chaos she faced in managing the estate after her appointment in January 2014. (Hr'g at 3:17:50). After taking over the day-to-day management of CHFS and learning that the DIP Account had been drained of all but $7,500.00 (Hr'g at 3:19:00), she tried unsuccessfully to convince Dickson to return the funds voluntarily. Dickson initially contested Johnson's appointment as the Chapter 11 Trustee and was not receptive to her. (Hr'g at 3:20:50). She reached out to Dove for his assistance in obtaining Dickson's cooperation. (Hr'g at 3:23:05). The Chapter 11 Trustee testified that Dove's involvement was helpful in ultimately obtaining Dickson's cooperation. (Hr'g at 3:24:40). The Chapter 11 Trustee concluded that the meetings with Dickson's attorneys in Costa Rica in May,

---

[15] As stated previously, the amount recovered from the Panamanian bank through Dove's power of attorney was credited against the total amount of restitution Dickson was ordered to pay the bankruptcy estate in his criminal case. (Dkt. 1648).

2015, "would not have ever occurred" without Dove's efforts. (Hr'g at 3:33:32). But she did not state that $5.8 million would never have been recovered without Dove's assistance.

Although Dove's involvement likely resulted in a faster recovery of $5.8 million, there is no proof that the Chapter 11 Trustee, without Dove's involvement, would not have recovered the funds eventually. The Court recognizes that the benefit to the estate need not be monetary and that "less readily calculable benefits" can support a finding of substantial contribution. *Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp. (In re TransAmerican Natural Gas Corp.)*, 978 F.2d 1409, 1420 (5th Cir. 1992). Here, Dove has not attempted to prove any benefit other than the return of the funds.

Dove's services can be deemed as a benefit to the estate only when viewed apart from Dickson's conduct, but § 503 measures the substantial contribution of the creditor or equity security holder, which is Dickson, not Dove. Because services of an attorney for the creditor or equity security holder are usually rendered at the behest of that creditor or equity security holder, a determination of whether services of the attorney made a substantial contribution generally fuses with the question of whether the creditor or equity security holder made a substantial contribution. *In re R.L. Adkins*, 505 BR. at 779. Here, the alleged contribution of Dove differs from Dickson's conduct. This point is made by the U.S. Trustee, who notes that the circumstances surrounding Dove's fees, such as the fact that his work "centers around the recovery of assets looted from the estate by his client," preclude this Court from considering Dove's efforts as actions constituting a "substantial contribution." (U.S. Trustee's Objection at 3).

The U.S. Trustee's point is that Dove's services reduced the amount of the loss attributable to Dickson's post-petition criminal conduct, but did not increase funds of the estate. For example, assuming that Dickson transferred approximately $9 million from the DIP Account, and Dove

assisted in recovering approximately $5.8 million, then Dove's services did not enlarge the estate so much as mitigate the loss to the estate. In the U.S. Trustee's view, Dove made no net monetary contribution to the estate. In the end, the benefit of Dove's work can be quantified primarily as saving the Chapter 11 Trustee time, but there was no direct, significant, and demonstrable benefit to the estate. This analysis is different from the view of some courts, rejected by the Fifth Circuit in *DP Partners*, that the motivation of a creditor, or other § 503(b)(4) entity, is relevant in determining whether a substantial contribution was made. Under these facts, those courts would outright deny the Motion given Dickson's obvious ulterior motive. Regardless of whether Dickson, through Dove, acted selfishly in returning some of the funds after his arrest (in order to gain some advantage in his criminal case), the Court finds that his conduct did not result in any "substantial contribution" to the estate as that term is defined in *DP Partners*.

**C.    Is the amount of Dove's fees and expenses actual, reasonable, and necessary?**

Dove asks for a percentage of the funds recovered for the value of his services. Although he does not expressly refer to the common fund doctrine, he appears to invoke that doctrine, which "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). First, the estate was not unjustly enriched by the return of the $5.8 million, which Dickson illegally transferred in the first place. Second, attorney's fees in bankruptcy cases are governed by the lodestar method, which multiplies the number of compensable hours billed by a reasonable hourly rate. *Perdue v. Kenny ex rel. Winn*, 559 U.S. 542 (2010); *In re Huffman*, No. 12-0009-NPO, 2014 WL 1767694, at *4 (Bankr. S.D. Miss. May 2, 2014). The percentage-of-fee method is used in other contexts, such as class action suits. Third, even assuming that it is proper

for Dove to seek reimbursement for the fees paid to another attorney, he did not present any records showing the reasonableness of Pierce's services or that they contributed to the estate.

### Conclusion

This Court does not question whether Dove had "good intentions" in working with the Chapter 11 Trustee to recover the funds, but unfortunately, "good intentions" do not meet the requirements of § 503(b)(4).  Dove has failed to meet his burden of establishing that the contribution was substantial by a preponderance of the evidence.  The Court finds it impossible to separate Dove's criminal representation from the bankruptcy representation.  Even taking a broad interpretation of the requirements for reimbursement under § 503(b)(4), the instant circumstances extend too far beyond the extent of expenses and fees that may be awarded as administrative expenses.

IT IS, THEREFORE, ORDERED that the Motion is hereby denied.

##END OF ORDER##