

**SO ORDERED,**

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: February 27, 2018**

The Order of the Court is set forth below. The docket reflects the date entered.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**COMMUNITY HOME FINANCIAL SERVICES, INC.,**                    **CASE NO. 12-01703-NPO**

**DEBTOR.**                                                      **CHAPTER 11**

---

**KRISTINA M. JOHNSON, AS TRUSTEE FOR THE ESTATE OF COMMUNITY HOME FINANCIAL SERVICES, INC.**                                      **PLAINTIFF**

**VS.**                                                          **ADV. PROC. NO. 12-00091-NPO**

**EDWARDS FAMILY PARTNERSHIP, LP AND BEHER HOLDINGS TRUST**                                   **DEFENDANTS**

---

**KRISTINA M. JOHNSON, AS TRUSTEE FOR THE ESTATE OF COMMUNITY HOME FINANCIAL SERVICES, INC.**                                      **PLAINTIFF**

**VS.**                                                          **ADV. PROC. NO. 13-00104-NPO**

**CHARLES EDWARDS, EDWARDS FAMILY PARTNERSHIP, LP, EDWARDS FAMILY PARTNERSHIP, LLP, AND BEHER HOLDINGS TRUST**                        **DEFENDANTS**

---

**KRISTINA M. JOHNSON, CHAPTER 11 TRUSTEE**          **PLAINTIFF**
**OF THE ESTATE OF COMMUNITY HOME**
**FINANCIAL SERVICES, INC.**

**VS.**                                    **ADV. PROC. NO. 15-00080-NPO**

**EDWARDS FAMILY PARTNERSHIP, LP,**          **DEFENDANTS**
**BEHER HOLDINGS TRUST, AND CHARLES C.**
**EDWARDS, INDIVIDUALLY AND AS**
**MANAGING PARTNER OF EDWARDS FAMILY**
**PARTNERSHIP, LP AND BEHER HOLDINGS TRUST**

---

**MEMORANDUM OPINION AND**
**ORDER ON THIRD AMENDED COMPLAINT**
**IN ADVERSARY PROCEEDING 12-00091-NPO;**
**CONSOLIDATED AMENDED COMPLAINT IN**
**ADVERSARY PROCEEDING 13-00104-NPO; AMENDED**
**COMPLAINT FOR TURNOVER, RECOVERY OF**
**PROPERTY TRANSFERRED POST-PETITION, DAMAGES,**
**DECLARATORY RELIEF, EQUITABLE SUBORDINATION,**
**AND OTHER RELIEF IN ADVERSARY PROCEEDING**
**15-00080-NPO; AND CONSOLIDATED CONTESTED MATTERS[1]**

---

From October 30, 2017, through November 2, 2017, and on November 27, 2017,

the Court conducted a consolidated trial (the "Trial") consisting of three (3) adversary

proceedings and five (5) related contested matters.

A.     **Adversary Proceedings**

At Trial, the Court heard evidence in:  (1) adversary proceeding 12-00091-NPO

(the "Home Improvement Loans Adversary"); (2) adversary proceeding 13-00104-NPO

(the "Mortgage Portfolios Adversary"); and (3) adversary proceeding 15-00080-NPO (the

"Post-Petition Conduct Adversary" or, collectively, the "Adversary Proceedings").  The

---

[1] The consolidated contested matters are defined and discussed at pages four (4)
and five (5) of this Opinion.

following pleadings were before the Court:  (1) in the <u>Home Improvement Loans</u> <u>Adversary</u>, the Third Amended Complaint (the "HIL Third Amended Complaint") (HIL Adv. Dkt. 237)[2] filed by Kristina M. Johnson ("Johnson"), chapter 11 trustee (the "Trustee") of the estate of Community Home Financial Services, Inc. ("CHFS"); the Answer, Defenses and Counterclaim of Edwards Family Partnership, LP and Beher Holdings Trust to Third Amended Complaint (Ct Dkt. #237) (the "HIL Answer & Counterclaim") (HIL Adv. Dkt. 289) filed by Edwards Family Partnership, LP ("EFP") and Beher Holdings Trust ("BHT" or, together with EFP, "EFP/BHT"); and the Reply and Affirmative Defenses to Counterclaim of Edwards Family Partnership, LP and Beher Holdings Trust (the "HIL Reply to Counterclaim") (HIL Adv. Dkt. 294) filed by the Trustee; (2) in the <u>Mortgage Portfolios Adversary</u>, the Consolidated Amended Complaint (the "MPF Complaint") (MPF Adv. Dkt. 61) filed by the Trustee; the Amended Joint Answer of Edwards Family Partnership, L.P., Edwards Family Partnership, LLP, Beher Holdings Trust, Charles C. Edwards, James R. Edwards, The Atkinson Trust, L.L.C. to Consolidated Amended Complaint (Dkt. # 61) (the "MPF Answer & Counterclaim") (MPF Adv. Dkt. 70) filed by EFP, BHT, Charles C. Edwards, M.D. ("Dr. Edwards"), James Edwards, and the Atkinson Trust, L.L.C. (the "Atkinson Trust"); and the Reply and Affirmative Defenses to Counterclaim of Edwards Family Partnership, LP and Beher

---

[2] Citations to the record are as follows: (1) citations to docket entries in the Home Improvement Loans Adversary are cited as "(HIL Adv. Dkt. ___)"; (2) citations to docket entries in the Mortgage Portfolios Adversary are cited as "(MPF Adv. Dkt. ___)"; (3) citations to docket entries in the Post-Petition Conduct Adversary are cited as "(PPC Adv. Dkt. ____); (4) citations to docket entries in the above-referenced bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. ___)"; and (5) citations to docket entries in other separate but related adversary proceedings are cited as "(Adv. Proc. ____, Dkt. ____)".  Citations to docket entries in cases before the U.S. District Court for the Southern District of Mississippi (the "District Court") are cited as "(Case No. ____, Dkt. ____)".

Holdings Trust, Acting by and Through its Trustee, Church Bay Trust (the "MPF Reply to Counterclaim") (MPF Adv. Dkt. 72) filed by the Trustee; and (3) in the <u>Post-Petition Conduct Adversary</u>, the Amended Complaint for Turnover, Recovery of Property Transferred Post-Petition, Damages, Declaratory Relief, Equitable Subordination, and Other Relief (the "PPC Amended Complaint") (PPC Adv. Dkt. 48) filed by the Trustee; and the Joint Answer and Defenses of Edwards Family Partnership, LP, Beher Holdings Trust and Charles C. Edwards, Individually and as Managing Partner of Edwards Family Partnership, LP and Beher Holdings Trust (PPC Adv. Dkt. 76) filed by EFP/BHT and Dr. Edwards.

**B.     Contested Matters**

Also before the Court at Trial were the following contested matters (collectively, the "Contested Matters") filed in the Bankruptcy Case, related to Proofs of Claim 4-1 through 9-1 and CHFS's use of alleged cash collateral:

<u>Proofs of Claim 4-1 & 5-1</u>

Objection to Claim of Beher Holdings Trust (Claim No. 4) and to Claim of Edwards Family Partnership (Claim No. 5) (the "Objection to POC 4 & 5") (Bankr. Dkt. 162) filed by CHFS

Edwards Family Partnership, LP and Beher Holdings Trust's Responses to Objection to Proof of Claim of Beher Holdings Trust No. 4 and to Proof of Claim of Edwards Family Partnership, LP No. 5 (DK #162) (the "Responses to Objection to POC 4 & 5") (Bankr. Dkt. 208) filed by EFP/BHT

<u>Proofs of Claim 6-1 & 9-1</u>

Objection to Claims of Edwards Family Partnership (Claim No. 6 and Claim No. 9) (the "Objection to POC 6 & 9") (Bankr. Dkt. 163) filed by CHFS

Edwards Family Partnership, LP's Responses to Objection to Proof of Claim of Edwards Family Partnership, LP No. 6 and to Proof of Claim of Edwards Family Partnership, LP No. 9 (DK #163) (the "Responses to Objection to POC 6 & 9") (Bankr. Dkt. 209) filed by EFP

<u>Proofs of Claim 7-1 & 8-1</u>

Objection to Claims of Beher Holdings Trust (Claim No. 7 and Claim No. 8) (the "Objection to POC 7 & 8") (Bankr. Dkt. 164) filed by CHFS

Beher Holding Trust's Response to Objection to Proof of Claim of Beher Holdings Trust No. 7 and to Proof of Claim of Beher Holdings Trust No. 8 (Dkt #164) (the "Response to Objection to POC 7 & 8") (Bankr. Dkt. 210) filed by BHT

<u>Cash Collateral</u>

Edwards Family Partnership, LP and Beher Holdings Trust's Third Motion to Prohibit Use of Cash Collateral Until the Court Rules in Adversary Proceeding 12-00091 (the "Cash Collateral Objection") (Bankr. Dkt. 901) filed by EFP/BHT

Trustee's Objection to Edwards Family Partnership, LP and Beher Holdings Trust's Third Motion to Prohibit Use of Cash Collateral Until the Court Rules in Adversary Proceeding 12-00091 (Dkt. No. 901) (the "Response to Cash Collateral Objection") (Bankr. Dkt. 927) filed by the Trustee

Trustee's Supplemental Objection to Edwards Family Partnership, LP and Beher Holdings Trust's Third Motion to Prohibit Use of Cash Collateral Until the Court Rules in Adversary Proceeding 12-00091 (Dkt. No. 901) (the "Supplemental Response to Cash Collateral Objection") (Bankr. Dkt. 1024) filed by the Trustee

Trustee's Motion for Use of Cash (to Extent Required) *Nunc Pro Tunc* (the "Trustee's Cash Motion") (Bankr. Dkt. 906) filed by the Trustee

Edwards Family Partnership, LP and Beher Holdings Trust's Response to Trustee's Motion for Use of Cash Collateral (to the Extent Required) *Nunc Pro Tunc* (DOC. No. 906) (the "Response to Trustee's Cash Motion") (Bankr. Dkt. 919) filed by EFP/BHT

Trustee's Reply to Edwards Family Partnership, LP and Beher Holdings Trust's Response to Trustee's Motion for Use of Cash Collateral (to the Extent Required) *Nunc Pro Tunc* (the "Reply to Response to Trustee's Cash Motion") (Bankr. Dkt. 926) filed by the Trustee

Trustee's Supplemental Reply to Edwards Family Partnership, LP and Beher Holdings Trust's Response to Trustee's Motion for Use of Cash Collateral (to the Extent Required) *Nunc Pro Tunc* (the "Supplemental Reply to Response to Trustee's Cash Motion") (Bankr. Dkt. 1023) filed by the Trustee

C.      **Pretrial Orders & Trial**

The Court consolidated the Contested Matters in the Bankruptcy Case, the Home Improvement Loans Adversary, the Mortgage Portfolios Adversary, and the Post-Petition Conduct Adversary for purposes of the Trial, due to common questions of fact, law, witnesses, and exhibits.  (HIL Adv. Dkt. 285; MPF Adv. Dkt. 57).  On September 5, 2017, the Joint Pretrial Order was entered in the Home Improvement Loans Adversary (HIL Adv. Dkt. 322) and in the Mortgage Portfolios Adversary (MPF Adv. Dkt. 118).  As agreed upon by the parties, the Addendum to Joint Pretrial Order was entered in the Home Improvement Loans Adversary (HIL Adv. Dkt. 324) and in the Mortgage Portfolios Adversary (MPF Adv. Dkt. 120) on September 18, 2017.  On October 17, 2017, the Joint Pretrial Order (PPC Adv. Dkt. 108) was entered in the Post-Petition Conduct Adversary.

On October 24, 2017, the Court entered an order granting the parties permission to correct certain errors that appeared in the document lists and to incorporate the Addendum to Joint Pretrial Order into a single amended joint pretrial order in the Home Improvement Loans Adversary and the Mortgage Portfolios Adversary.  (HIL Adv. Dkt. 330; MPF Adv. Dkt. 125).  That same day, the Amended Joint Pretrial Order was entered in the Home Improvement Loans Adversary (the "HIL Amended Pretrial Order") (HIL Adv. Dkt. 331) and in the Mortgage Portfolios Adversary (the "MPF Amended Pretrial Order") (MPF Adv. Dkt. 126).  On October 30, 2017, the Court entered an order in the Post-Petition Conduct Adversary likewise granting the parties permission to correct certain errors that appeared in the documents lists into a single amended joint pretrial order in the Post-Petition Conduct Adversary (PPC Adv. Dkt. 114), and on that say day, the Amended Joint Pretrial Order

was entered in the Post-Petition Conduct Adversary (the "PPC Amended Pretrial Order")
(PPC Adv. Dkt. 118).

At Trial,[3] Jeffrey R. Barber ("Barber"), Kristina M. Johnson, Mark A. Mintz, and
Stephanie B. McLarty represented the Trustee, and Jim R. Spencer, Jr. and Stephanie M.
Rippee represented EFP/BHT and Dr. Edwards.  During the Trial, the following witnesses
testified on behalf of the Trustee:  Jeffrey N. Aucoin, the Trustee, Alan Sercy, Jeffrey
Albert Kirk, and Harold B. McCarley, Jr.  The following witnesses testified on behalf of
EFP/BHT and Dr. Edwards:  Dr. Edwards, William Richard Hare, and Martha Edwards
Borg.

At the beginning of Trial, the Court took judicial notice of the pleadings filed in the
following cases before the U.S. District Court for the Southern District of Mississippi:
*United States v. Dickson*, Case No. 3:14-cr-00078-TSL-FKB; *Edwards Family
Partnership, LP v. William D. Dickson Enterprises, Inc.*, Case No. 3:14-cv-00436-CWR-
LRA; *Edwards Family Partnership, LP v. Dickson*, Case No. 3:13-cv-00587-CWR-LRA;
and *Johnson v. Edwards Family Partnership, LP*, Case No. 3:15-cv-00260-CWR-LRA.  At
Trial, the parties stipulated to the admissibility of 114 exhibits.  The Trustee introduced
into evidence seven (7) additional exhibits; Dr. Edwards and EFP/BHT introduced into
evidence thirteen (13) additional exhibits.  Sixteen (16) exhibits were admitted only for

---

[3] A transcript of each day of the Trial is docketed in the Home Improvement Loans
Adversary at the following docket numbers: #340 (October 30, 2017); #341 (October 31,
2017); #342 (November 1, 2017); #343 (November 2, 2017); and #352 (November 27,
2017).

demonstrative or identification purposes.[4]  Having considered the pleadings as well as the

testimony, exhibits, and the arguments of counsel, the Court makes the following findings

of fact and conclusions of law.[5]

## TABLE OF CONTENTS

**JURISDICTION** ..........................................................................................................15

**INTRODUCTION**.........................................................................................................15

**FACTS** ..........................................................................................................................20

A.    CHFS....................................................................................................................20

B.    Credit Facility—Home Improvement Loans .........................................................21

     1.    Rainbow Loan Term Sheet—Initial $10 Million Loan.............................22

     2.    Execution of Rainbow Loan Agreement...................................................23

     3.    Rainbow Group.........................................................................................24

     4.    Terms & Conditions of the Rainbow Loan Agreement ............................24

     5.    2006 Note..................................................................................................26

     6.    Custodial Agreement ................................................................................27

     7.    2007 Assignment ......................................................................................29

---

[4] The exhibits introduced into evidence at Trial in the Home Improvement Loans Adversary by the Trustee are cited as "(HIL Ex. P-#)" and by EFP/BHT are cited as "(HIL Ex. D-#)".  The exhibits introduced into evidence at Trial in the Mortgage Portfolios Adversary by the Trustee are cited as "(MPF Ex. P-#)" and by Dr. Edwards and EFP/BHT are cited as "(MPF Ex. D-#)".  The exhibits introduced into evidence at Trial in the Post-Petition Conduct Adversary by the Trustee are cited as "(PPC Ex. P-#)" and by Dr. Edwards and EFP/BHT are cited as "(PPC Ex. D-#)".  For each exhibit, the page number or the Bates stamp is provided when available.

[5] These findings of fact and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such.  Moreover, to the extent any conclusion of law is construed as a finding of fact, it is adopted as such.

8.      2007 Note ..................................................................................................29

9.      BVI Company Register ..........................................................................30

10.     2010 Assignment ...................................................................................31

11.     Amended Loan Agreements ..................................................................32

12.     BHT Note & EFP Note ..........................................................................34

13.     Guaranties ..............................................................................................34

C.     Mortgage Portfolios ...........................................................................................35

1.      Portfolio #1 ............................................................................................38

2.      Portfolio #2 ............................................................................................40

3.      Portfolio #3 ............................................................................................41

4.      Portfolio #4 ............................................................................................42

5.      Portfolio #5 ............................................................................................42

6.      Portfolio #6 ............................................................................................42

7.      Portfolio #7 ............................................................................................43

D.     Original State Lawsuit & Receivership Action ..................................................45

E.     Pre-petition Transfers ........................................................................................46

F.     Bankruptcy Case .................................................................................................47

1.      Proofs of Claim Filed by EFP/BHT ......................................................48

2.      Proof of Claim Filed by Dickson ..........................................................52

3.      Claims Register ......................................................................................52

4.      Cash Collateral Orders ..........................................................................52

G.     Initiation of Home Improvement Loans Adversary ...........................................54

H.     Initiation of Adversary Proceeding 12-00109-NPO ..........................................55

I.      Dickson Guaranty Suit ............................................................................55

J.      Initiation of Mortgage Portfolios Adversary ...........................................56

K.      Post-petition Transfers & Rogue Operation ............................................57

L.      Appointment of Trustee ...........................................................................59

M.      Trustee's Investigation of Funds Stolen & Diverted ...............................61

N.      Stay of Adversary Proceedings ...............................................................63

O.      Criminal Proceedings Against Dickson ...................................................63

P.      Trustee's Efforts to Locate Loan Documents ..........................................64

Q.      ClearSpring ..............................................................................................65

R.      Turnover Order ........................................................................................66

S.      Edwards TRO Case ..................................................................................67

T.      Dickson Adversary Proceeding ...............................................................68

U.      Recovery of Funds ...................................................................................68

V.      Partial Summary Judgment in Dickson Guaranty Suit ............................69

W.      Rejection of Servicing Contract ..............................................................71

X.      Dr. Edwards & Meehan ...........................................................................71

Y.      Extension of 11 U.S.C. § 546 Deadline ..................................................73

Z.      Dr. Edwards' Plans to Travel to Costa Rica ............................................73

AA.     Cash Collateral Objection & Trustee's Cash Motion ..............................74

BB.     Dr. Edwards' Trip to Costa Rica..............................................................76

CC.     Trustee & Meehan ...................................................................................78

DD.     Trustee's Initiation of RICO Case ...........................................................79

EE.     Trustee's Withdrawal Motions ................................................................80

FF.      RICO Case ..................................................................................81

GG.     Terminating the Stays ................................................................82

HH.     Restitution Order.......................................................................83

II.       HIL Third Amended Complaint................................................85

JJ.       Post-Petition Conduct Adversary .............................................87

KK.     Bankruptcy Court's Consolidation Orders................................88

LL.      MPF Complaint..........................................................................89

MM.    HIL Answer & Counterclaim.....................................................91

NN.     Panamanian Counsel ................................................................92

OO.     Adversary Proceeding 12-00109-NPO .....................................92

PP.      Settlement & Dismissals in Mortgage Portfolios Adversary ...............................93

QQ.     Restoration Order......................................................................93

RR.     Motion to Continue ....................................................................94

SS.      Motion to Prohibit Amendment .................................................95

TT.      Trial...........................................................................................96

**DISCUSSION** ...................................................................................97

A.       Home Improvement Loans Adversary.......................................97

          1.       Choice of Law—Generally ..........................................98

          2.       Doctrines of Waiver and/or Estoppel.........................101

          3.       Statute of Limitations................................................103

          4.       Count I (Legal Capacity of the Rainbow Group)....................108

                   a.       Choice of Law................................................108

                   b.       Are the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement void *ab initio*? ...........................................109

(1.) British Virgin Islands Law.................................................111

(2.) BCA ......................................................................111

(3.) Kirk .....................................................................112

(4.) Hare .....................................................................113

c. Analysis........................................................................115

5. Count II (Legal Capacity of Beher Limited).............................119

a. Choice of Law...............................................................119

b. Does the Trustee have standing to complain about the legal authority of Beher Limited to execute the 2010 Assignment or to object to the validity of the 2010 Assignment?...................120

c. Under British Virgin Islands law, does the striking of Beher Limited from the BVI Company Register in 2008 void the 2010 Assignment (of the 2006 Note to BHT?)............................122

(1.) Kirk .....................................................................124

(2.) Hare .....................................................................125

d. Analysis........................................................................127

6. Count IV (Perfection of Security Interest)...............................130

a. Choice of Law...............................................................130

b. Do EFP/BHT have a perfected security interest in the Home Improvement Loans? ...................................................132

(1.) Are EFP/BHT assignees of the Custodial Agreement? ...135

(2.) Are EFP/BHT required by the UCC to "re-perfect" their security interest? .............................................138

c. Analysis………………………………………………140

7. Count V (Tracing of Funds)..................................................140

8. Count VI (POC 4-1 & POC 5-1) ...........................................141

a.      Calculation of Claims ..................................................141

b.      Analysis......................................................................146

B.     Mortgage Portfolios Adversary........................................................147

1.     MPF Complaint...........................................................147

2.     MPF Counterclaim Counts ...........................................148

3.     Misjoinder of Parties...................................................148

4.     Choice of Law.............................................................150

5.     Counts I & IV/MPF Counterclaim Counts I-III (Mortgage Portfolios)...150

a.      Are Portfolios #1-#7 assets of true joint ventures, collateral for loans, or the subject of servicing contracts ..................................152

(1.)    Portfolios #1 & #2 (EFP & CHFS)..................................154

(a.)    Intent .........................................................157

(b.)    Control .......................................................159

(c.)    Profit Sharing.........................................159

(d.)    Who owns Portfolios #1 & #2 ............................161

(e.)    Does EFP have a perfected a perfected security interest?...............................................................161

(2.)    Portfolios #3-#6 (EFP & CHFS).....................................162

(a.)    Who owns Portfolios #3-#6? ..............................163

(b.)    Are the loans enforceable?................................163

(3.)    Portfolio #7 (BHT & CHFS) ...........................................164

6.     Counts II & III/MPF Counterclaim Count VIII (POC 6-1 to POC 9-1)..166

a.      Calculation of Claims ..................................................166

b.      Analysis......................................................................170

7.     MPF Counterclaim Count IV (Breach of MPF Agreements) .................171

8.     MPF Counterclaim Count V (Breach of Fiduciary Duty) ......................172

9.     MPF Counterclaim Count VI (Servicing Fees) ......................................173

10.    MPF Counterclaim Count VII (Tracing of Funds) ..................................175

C.    Tracing of Funds ..........................................................................................175

1.     Choice of Law............................................................................................176

2.     Does EFP have a security interest in the $5,490,132.19 wired to the Trustee from accounts at Banco Panameño or the $540,000 in loan payments intercepted by the Trustee? ...............................................................176

a.    Tracing of Funds-General ...........................................................177

b.    Tracing of Pre-petition Funds .....................................................178

c.    Tracing of Post-petition Funds....................................................179

d.    Tracing of Funds Recovered or Intercepted................................181

3.     Analysis…………………………………………………………………183

D.    Cash Collateral Contested Matters........................................................184

E.    Post-Petition Conduct Adversary .........................................................187

1.     Count I (Violation of Automatic Stay) ...................................................187

a.    Did Dr. Edwards know about the existence of the automatic stay? ...............................................................................189

b.    Did Dr. Edwards intend his actions?...........................................190

c.    Did Dr. Edwards violate the automatic stay?..............................190

d.    May the Trustee recover damages under 11 U.S.C. § 362(k)?....194

2.     Count II (Turnover of Property) ..............................................................196

3.     Count III (Post-petition Transfer) ...........................................................197

4.     Count IV (Civil Conspiracy)....................................................................198

          a.      Choice of Law ...............................................................198

          b.      Did EFP/BHT and Dr. Edwards act in concert to hinder, delay, and otherwise defraud the estate and its creditors by withholding information pertinent to the operation of its ongoing business and assets stolen from the estate? .......................................................199

     5.      Count V (Conversion) ...............................................................203

          a.      Choice of Law ...............................................................203

          b.      Did EFP/BHT and Dr. Edwards convert estate property for their own use without permission or lawful justification and willfully interfere with the Trustee's duty to protect and acquire the estate's property thereby depriving the Trustee of rightful possession of that property? ...................................................................................203

     6.      Count VI (Equitable Subordination) ........................................204

F.      Plan Confirmation Proceedings in the Bankruptcy Case ....................................208

**CONCLUSION** ...........................................................................................209

## JURISDICTION

This Court has jurisdiction over the subject matter of and the parties to these adversary proceedings and contested matters pursuant to 28 U.S.C. § 1334. This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B), (E), (K), (M), and (O). Notice of the Trial was proper under the circumstances.

## INTRODUCTION

By way of explanation and apology for the considerable length of this Opinion, this effort resolves three (3) adversary proceedings and five (5) Contested Matters. The consolidation of these proceedings and matters into a single Opinion was deemed by the Court to be the most efficient means of resolving years of disputes previously unresolved in state court, federal district court, and numerous mediations. The objective of the Court is to create a clear path for an exit strategy in the Bankruptcy Case. The journey began on

February 15, 2012, with litigation filed in state court that was removed to federal district court and then stayed by CHFS's chapter 11 bankruptcy filing on May 23, 2012.[6]  During the two (2) years it operated as a debtor-in-possession, CHFS initiated two of the three adversary proceedings addressed in this Opinion.  All of these matters were derailed by the criminal conduct of CHFS's president, resulting in the appointment of the Trustee in 2014. During several failed attempts at mediation, litigation stalled.  Because of the length of this Opinion, the Court provides a short summary of the facts to assist the reader in understanding the myriad of legal issues raised by the parties.

This Opinion describes only a portion of the long, tedious relationship between Dr. Edwards, an orthopedic surgeon from Baltimore, Maryland, and William D. "Butch" Dickson ("Dickson"), a business owner from Jackson, Mississippi.  Both Dr. Edwards and Dickson owned and operated multiple family businesses.  This unlikely pair were introduced by a broker from New York hired by Dickson to locate a lender to replace the current lender for CHFS, a mortgage servicing company managed by Dickson.  Edwards and Dickson entered into their first business deal, a credit facility of $10 million to fund the purchase of home improvement loans.  To save time and money, John Allen ("Allen"), a disbarred attorney and employee of CHFS, drafted the loan documents using as forms the documents prepared by CHFS's prior lender, cutting and pasting different names and addresses where appropriate.  In this early transaction and in all subsequent transactions regarding the home improvement loans, Dr. Edwards, entities owned by Dr. Edwards, or an offshore trust funded the loans.  Dr. Edwards relied on his daughter, Martha Edwards

---

[6] On May 23, 2012, the Bankruptcy Case was assigned originally to Bankruptcy Judge Edward Ellington.  On February 1, 2017, the Bankruptcy Case and all related adversary proceedings were transferred to the above-signed Bankruptcy Judge.  (Bankr. Dkt. 1609).

Borg, who is not a certified public accountant and does not hold a degree in accounting, to review CHFS's financial reports, calculate the principal balance and interest due on the promissory notes each month, and determine "eligible receivables" based on a "Borrowing Base Certificate." To provide some understanding as to the magnitude of their initial business deal, the flow of funds from CHFS to entities of Dr. Edwards averaged between $600,000 and $700,000 per month.

During their business relationship, Dr. Edwards and Dickson ignored or changed the terms of their agreement. For example, they increased the line of credit from $10 million to $16 million, assigned promissory notes to different entities owned or advised by Dr. Edwards, and changed the number and frequency of wire transfers. These changes were not always documented in writing; some of the written changes were implemented solely as the result of an exchange of emails. When changes were formally documented, mistakes were made. Dr. Edwards, who is not an attorney, prepared and drafted many of these documents himself. He did not always use the correct name of the alleged lender.

In 2008, Dr. Edwards and Dickson entered into an entirely new business relationship, a series of seven (7) so-called "joint ventures," in which Dr. Edwards, through entities he controlled or advised, including an offshore trust, expended approximately $20 million either as investments, loans, or purchases of portfolios of mortgages. Dr. Edwards drafted three of the purported "joint venture" agreements himself; he did not bother to memorialize in writing the remaining purported "joint venture" agreements.[7]

In the beginning, Dr. Edwards and Dickson were content with their informal business relationship. Then, in 2010, Dr. Edwards became suspicious that CHFS had

---

[7] The Court finds none of these business relationships was a "joint venture." *See infra* at 165.

exceeded the limit of the credit facility regarding the home improvement loans, and Dickson believed that Dr. Edwards was overcharging CHFS by, for example, posting payments late. Dickson also believed that Dr. Edwards was not remitting CHFS's share of the net profits from the purported joint ventures. Litigation ensued. In 2012, Dickson diverted or transferred approximately $3.7 million from CHFS's operating accounts to an account in a Panamanian bank. He then commenced the Bankruptcy Case on behalf of CHFS.

In the Bankruptcy Case, Dr. Edwards filed proofs of claim on behalf of EFP/BHT totaling approximately $30 million. As the largest creditor of CHFS, EFP/BHT challenged almost every action taken by CHFS in the Bankruptcy Case. In the fall of 2013, Dickson surreptitiously began moving CHFS's business operations to Costa Rica. Then, in early 2014, Dickson fled to Costa Rica but not before withdrawing over $9 million from CHFS's operating and escrow accounts. For his bankruptcy crimes, Dickson was sentenced to fifty-seven (57) months in a federal correctional facility.

The discovery of the unauthorized transfers led to the swift appointment of the Trustee. With limited cooperation from Dickson, the Trustee eventually recovered and/or intercepted some of the stolen funds. Needless to say, her efforts to administer the bankruptcy estate were hampered by the lack of bank records.

Without informing the Trustee, Dr. Edwards paid Dickson's business associate in Costa Rica, Mike James Meehan ("Meehan"), for information about CHFS's rogue operation and, in December of 2014, met with him in Costa Rica. Dr. Edwards and Meehan corresponded for five (5) months, and during that time, Dr. Edwards did not inform the Trustee. When Meehan himself later contacted the Trustee, she learned for the first time

that Meehan had sent Dr. Edwards two (2) compact discs ("CDs") and a dropbox.[8]  The Trustee sued Dr. Edwards and two offshore lenders.

In these consolidated Adversary Proceedings, the Trustee asks the Court to determine the respective rights and obligations of CHFS, EFP, Edwards Family Partnership, LLP ("EFP LLP"),[9] and BHT based, among other testimony and evidence, on:  (1)  documents prepared in haste using documents from another transaction as forms or documents drafted by Dr. Edwards (regardless of which the parties acted inconsistently with respect to their alleged contractual rights); (2) an interpretation and application of the law of the British Virgin Islands as explained by lawyers practicing in that jurisdiction; (3) the testimony of Dr. Edwards who admits he did not pay much attention to Dickson and CHFS until the monthly payments stopped; (4) the testimony of Borg, who held the title of bookkeeper but who had limited knowledge of general accounting principles; and (5) the testimony of an accountant, Aucoin, whose analysis was limited because of the unavailability of bank records from Panama and Costa Rica.  The Trustee also asks the Court to determine the source of the funds returned to her after Dickson's arrest as well as

---

[8] Dropbox "is a cloud storage product that allows a user to create an account to save and store digital content, including images and videos, in folders, and to share that content by providing others with the email address and password used to log in to the account." *United States v. Wilson*, 217 F. Supp. 3d 165, 169 (D.D.C. 2016).

[9] Dr. Edwards claims that no entity by the name of "Edwards Family Partnership, LLP" or "EFP LLP" entered into any business relationship with CHFS and that "Edwards Family Partnership LP" or "EFP" is the properly named entity for all of these transactions. (HIL Adv. Dkt. 341 at 129). Because the Trustee alleges that EFP LLP has filed pleadings in this Court and in other federal courts and has had checks printed, the Court distinguishes between EFP and EFP LLP in this Opinion.  (HIL Adv. Dkt. 341 at 173).

the funds she intercepted. Finally, the Trustee challenges Dr. Edwards' post-petition conduct as a stay violation and conversion.[10]

EFP/BHT assert counterclaims in these adversary proceedings, in which they ask the Court to declare, *inter alia*, that they have a secured interest in the home improvement loans, they own the notes underlying other mortgage portfolios, and they are entitled to the money recovered by the Trustee. They also seek damages against the estate for losses they incurred as a result of Dickson's criminal conduct.

## FACTS

The majority of facts elicited at Trial are undisputed. Indeed, the parties stipulated to the admissibility of 114 documents at Trial. The parties' primary disputes rest on an application of law to the facts.

## A. CHFS

CHFS, a Delaware company, is a mortgage servicing entity that for the most part purchased mortgage loan portfolios at a discount from various third parties and serviced those loans, as well as loans owned by two (2) affiliated companies, Discount Home Mortgage, Inc. and Discount Mortgage, Inc. (Bankr. Dkt. 167; HIL Adv. Dkt. 341 at 10-11). Additionally, CHFS serviced consumer loans owned by SNGC, LLC, not involved in this litigation. (HIL Adv. Dkt. 341 at 11; MPF Ex. P-15).

The majority of CHFS's shares of stock are owned by Victory Consulting Group, Inc. ("Victory Consulting") (HIL Adv. Dkt. 340 at 86). Until early 2014, Dickson was CHFS's chief executive officer and its owner through his ownership of Victory Consulting.

---

[10] The Trustee's claims against Dickson, his affiliated companies, and a former employee of CHFS are the subject of the Dickson Adversary Proceeding and are not addressed in this Opinion.

Before the fall of 2013, CHFS's principal place of business was located at 234 East Capitol Street, in Jackson, Mississippi, where employees, including Dickson's family members, serviced mortgage loan portfolios, each one consisting of hundreds of individual notes secured by mostly subordinate residential mortgages on property located in over thirty (30) states in the United States.  (HIL Adv. Dkt. 341 at 11).  For each mortgage loan there was an underlying retail installment contract signed by the consumer.  All of the loans were for a period longer than five (5) years.  (HIL Adv. Dkt. 341 at 11).

**B.  Credit Facility—Home Improvement Loans**

In 2006, near the end of CHFS's relationship with its current lender, Roy Al Finance and Loan Company, Dickson began searching for replacement financing.  (HIL Adv. Dkt. 341 at 113-14).  That same year, Joe Logan ("Logan"), a business broker hired by CHFS, brought a loan proposal to Dr. Edwards, whom Logan knew from previous business deals, whereby Dr. Edwards would replace Roy Al Finance and Loan Company.[11] (HIL Adv. Dkt. 341 at 112-14).  In July of 2006, Dr. Edwards met with Dickson in his home in Baltimore.  (HIL Adv. Dkt. 341 at 114).  At Dr. Edwards' request, his daughter Borg traveled to Jackson, Mississippi, to meet with Dickson and CHFS employees for the purpose of learning CHFS's business operations.  (HIL Adv. Dkt. 342 at 117-18).  Borg was unfamiliar with second mortgages but apparently her report to her father about CHFS was favorable.  (HIL Adv. Dkt. 342 at 182).

---

[11] In 2007, CHFS sued Logan and J.A.S. Commercial Corp. ("J.A.S.") for breach of contract in state court, and Logan and J.A.S. removed the suit to the U.S. District Court for the Southern District of Mississippi.  *See Cmty. Home Fin. Servs., Inc. v. J.A.S. Commercial Corp*, Case No. 3:07-cv-00619-HTW-LRA.  CHFS voluntarily dismissed J.A.S. as a defendant.  (*Id.* Dkt. 16).  After her appointment, the Trustee successfully moved the District Court to refer the action to this Court (*Id.* Dkt. 22), where it became adversary proceeding 14-00029-NPO.  On February 22, 2017, the Trustee voluntarily dismissed Logan.  *See* Adv. Proc. 14-00029-NPO, Dkt. 23.

From September 25, 2006, to August 10, 2010, Dr. Edwards, acting through four (4) entities owned and/or purportedly controlled by him—The Rainbow Group, Ltd., a British Virgin Islands company; Beher Holdings, Ltd. ("Beher Limited"), a British Virgin Islands company; EFP, a Delaware limited partnership; and BHT, a trust organized under the laws of Bermuda—loaned approximately $16 million to CHFS.  (Bankr. Dkt. 167 at 9).  Borg, who has a bachelor's degree in political science but does not hold a degree in accounting and is not a certified public accountant, acted as the bookkeeper for The Rainbow Group, Ltd., Beher Limited, and EFP/BHT in all of these transactions.  (HIL Adv. Dkt. 342 at 115-18, 121-22).

The parties have stipulated that the consumer mortgage loans that are at issue in the Home Improvement Loans Adversary, which CHFS purchased from various unrelated entities, are the 1,809 loans listed in schedules 2 and 3 attached to the expert report of Jeffrey N. Aucoin ("Aucoin").  (HIL Ex. P-7, Schedules 2 & 3; HIL Adv. Dkt. 331 at 40). These loans are referred to as the "Home Improvement Loans" because the consumers obtained the loans to replace windows, coat basements, and the like.  (HIL Adv. Dkt. 341 at 11).  As to these transactions, it is undisputed that the relationship between CHFS and EFP/BHT can be characterized as borrower-lender.

### 1.    Rainbow Loan Term Sheet—Initial $10 Million Loan

On July 17, 2006, Dr. Edwards sent a letter (the "Rainbow Loan Term Sheet") (HIL Ex. P-3) to Dickson outlining the terms and conditions under which The Rainbow Group, Ltd. would offer CHFS a revolving line of credit up to $10 million to replace CHFS's existing credit facility and provide capital for the purchase of additional Home

Improvement Loans.  (HIL Adv. Dkt. 331 at 40).  The Rainbow Loan Term Sheet appears

on the letterhead of:

> The Rainbow Group, Ltd.
> *Intercontinental Investment*
> P.O. Box 627, Zone 1
> Panama, Republic of Panama

(HIL Ex. P-3).  The letterhead identifies Patsy Cambra de Brackett as "President" of "The

Rainbow Group, Ltd." and Dr. Edwards as "U.S. Investment Advisor."  Pursuant to the

Rainbow Loan Term Sheet, Dr. Edwards proposed that the form of the loan documents

follow those already in existence between CHFS and its then lender, Roy Al Finance and

Loan Company.

### 2.    Execution of Rainbow Loan Agreement

Allen prepared the Loan and Security Agreement (the "Rainbow Loan Agreement")

(HIL Exs. P-1, P-2, D-17 & D-18), using as forms the documents in place between CHFS

and Roy Al Finance and Loan Company and conforming the terms to the Rainbow Loan

Term Sheet.  (HIL Adv. Dkt. 341 at 115).  On September 25, 2006, CHFS and "The

Rainbow Group, Ltd." signed the Rainbow Loan Agreement, in which "The Rainbow

Group, Ltd., a British Virgin Island [*sic*] corporation . . . or assigns" agreed to advance to

CHFS a line of credit up to $10 million to pay-off in full Roy Al Finance and Loan

Company and to acquire new consumer mortgage loans.  (HIL Adv. Dkt. 331 at 41).  Patsy

Cambra de Brackett[12] purportedly signed the Rainbow Loan Agreement on behalf of "The

Rainbow Group, Ltd." as "President," and Dr. Edwards signed the Rainbow Loan

---

[12] Patsy Cambra de Brackett, a Florida resident, did not testify at Trial.  (HIL Adv. Dkt. 341 at 13-14).  The Trustee did not produce any evidence indicating that Patsy Cambra de Brackett did not sign the Rainbow Loan Agreement, as alleged in the HIL Third Amended Complaint.  (HIL Adv. Dkt. 237 at 24-28).

Agreement on behalf of "The Rainbow Group, Ltd." as "U.S. Investment Manager." Dickson signed the Rainbow Loan Agreement on behalf of CHFS and as a personal guarantor.

### 3.      Rainbow Group

The Rainbow Loan Agreement identifies "The Rainbow Group, Ltd." as a British Virgin Islands corporation.  The British Virgin Islands is a British overseas territory located in the northeastern Caribbean.  (HIL Adv. Dkt. 342 at 12-13).  There is no entry in the British Virgin Island Register of Companies (the "BVI Company Register") for an entity named "The Rainbow Group, Ltd."  (HIL Adv. Dkt. 342 at 15).  According to Dr. Edwards, the use of "The" in the name is a drafting error, and there is no entity known as "The Rainbow Group, Ltd."  (HIL Adv. Dkt. 341 at 119-20).  There is an entry in the BVI Company Register for an entity called "Rainbow Group, Ltd."  (HIL Adv. Dkt. 342 at 36). For ease of reference, the Court refers to the Rainbow entity as the "Rainbow Group," without regard to whether its proper name is "The Rainbow Group, Ltd." or "Rainbow Group, Ltd."

### 4.      Terms & Conditions of the Rainbow Loan Agreement

The parties did not always conform their conduct to the terms and conditions of the Rainbow Loan Agreement.  *See, e.g.*, (HIL Ex. D-24).  The Rainbow Loan Agreement required CHFS to deposit all payments received on the underlying retail installment contracts into a blocked account at BancorpSouth Bank ("BancorpSouth") in Tupelo, Mississippi.  CHFS and Rainbow Group would own the blocked account jointly, but only

the Rainbow Group would have the right to withdraw funds from the blocked account.[13]
As security, CHFS was required to assign the retail installment contracts to the Rainbow
Group.

After the initial disbursement in an amount sufficient to pay off Roy Al Finance
and Loan Company and pay all loan fees owed the Rainbow Group, plus an initial advance
of $500,000,[14] CHFS could request additional advances up to 80% of "eligible
receivables," consisting of the aggregate outstanding principal balance owed to CHFS by
consumers, less the balance on any accounts more than sixty-one (61) days delinquent.  For
that calculation, CHFS was required to send the Rainbow Group a monthly "Borrowing
Base Certificate," showing the total principal balance of eligible consumer loans, the
current balance for the line of credit (as calculated by Borg), and the remaining availability.
(HIL Ex. D-14); *see, e.g.*, (HIL Ex. D-24).  As the bookkeeper for the Rainbow Group,
Borg was responsible for maintaining a list of the Home Improvement Loans, determining
whether new consumer loans met the eligibility requirements, and calculating the balance
due for the line of credit.  (HIL Adv. Dkt. 342 at 118-19).  In that role, she was responsible

---

[13] In 2014, EFP/ BHT sued BancorpSouth in the District Court in Civil Action No.
3:14-cv-0964-DPJ-FKB, alleging that BancorpSouth breached the blocked account
agreement by allowing CHFS to transfer approximately $2 million from the blocked
account to accounts other than the "concentration account," identified in the Rainbow Loan
Agreement as the account owned by the Rainbow Group at First Bank Puerto Rico.  On
February 21, 2017, the District Court awarded summary judgment to BancorpSouth on the
ground that EFP/BHT had abandoned its contractual rights by acquiescing to CHFS's
transfers to a number of different bank accounts, including accounts in the name of
EFP/BHT.  EFP/BHT appealed the summary judgment order on March 15, 2017.  (*Id.* Dkt.
116).  The Fifth Circuit Court of Appeals affirmed the District Court on October 16, 2017.
*Edwards Family P'ship, L.P. v. BancorpSouth Bank*, 699 F. App'x 312 (5th Cir. Oct. 16,
2017).

[14] A review of bank records, however, shows a deposit into CHFS's account of only
$300,000.  (HIL Ex. P-7 at 7).

for providing CHFS the figures for the current balance due that appeared each month in the Borrowing Base Certificate. According to Dr. Edwards, CHFS routinely requested and received advances under the line of credit up to the maximum availability, as shown in the Borrowing Base Certificate. (HIL Adv. Dkt. 341 at 124). If the Rainbow Group did not have sufficient funds, Dr. Edwards would arrange for payment by a different entity owned or purportedly controlled by him. (HIL Adv. Dkt. 341 at 125).

Paragraph 9.6 of the Rainbow Loan Agreement grants the Rainbow Group the right to divide and reissue the promissory note and to assign its rights, as follows:

> 9.6  ASSIGNMENT BY LENDER.  LENDER MAY AT ANY TIME (A) DIVIDE AND REISSUE (WITHOUT SUBSTANTIVE CHANGES OTHER THAN RESULTING FROM SUCH DIVISION) THE NOTE, AND/OR (B) SELL, ASSIGN, GRANT PARTICIPATION IN, DELEGATE OR OTHERWISE TRANSFER TO ANY OTHER PERSON (AN "ASSIGNEE") ALL OR PART OF RIGHTS AND DUTIES OF LENDER UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.  TO THE EXTENT INDICATED IN ANY DOCUMENT, INSTRUMENT OR AGREEMENT SO SELLING, ASSIGNING, GRANTING PARTICIPATION IN, OR OTHERWISE TRANSFERRING TO AN ASSIGNEE SUCH RIGHTS AND/OR DUTIES, (I) THE ASSIGNEE SHALL ACQUIRE ALL THE LENDER'S RIGHTS UNDER THE AGREEMENT AND THE OTHER LOAN DOCUMENTS AND (II) THE ASSIGNEE SHALL BE DEEMED TO BE THE "LENDER" UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS WITH THE AUTHORITY TO EXERCISE SUCH RIGHTS IN THE CAPACITY OF LENDER.

(HIL Exs. P-1, P-2, D-17 & D-18).  Paragraph 9.19 contains a similar provision.  Under ¶ 2.3(iii), the maturity date of the loan was March 7, 2009, but CHFS was granted an additional six (6) months to obtain alternate financing or liquidate the credit line.

### 5.    2006 Note

Consistent with the Rainbow Loan Agreement, Dickson, as president of CHFS, signed a Note (the "2006 Note") (HIL Exs. P-1, P-2, D-2, D-17 & D-18), dated September

25, 2006, obligating CHFS to pay the Rainbow Group the unpaid balance of all advances made under the $10 million line of credit. (HIL Adv. Dkt. 331 at 41). The maturity date of the 2006 Note was March 25, 2009. The 2006 Note required CHFS to pay interest only, at the initial annual rate of 13% or 5% plus prime rate, whichever is greater, and after one year, at an annual rate of 12%, on the outstanding principal amount advanced to CHFS until February 25, 2009, and, thereafter, CHFS agreed to pay principal and interest until the maturity date of March 25, 2009.

> **6.    Custodial Agreement**

CHFS entered into the Custodial Agreement (the "Custodial Agreement") (HIL Ex. D-22) to provide for the custody of the original loan documents and assignments for the benefit of the Rainbow Group. (HIL Adv. Dkt. 331 at 41). The Custodial Agreement designated Harold B. McCarley, Jr. PLLC (the "McCarley Firm"), a law firm located in Ridgeland, Mississippi, as the custodian. (HIL Adv. Dkt. 343 at 10). Dickson, as president of CHFS, and Harold B. McCarley, Jr. ("McCarley"), on behalf of the McCarley Firm, signed the Custodial Agreement. No designated individual for the Rainbow Group signed the Custodial Agreement. In the signature block, there are blanks for the signatures of Patsy Cambra de Brackett, as president of the Rainbow Group, and Dr. Edwards, as its United States investment manager.

Before any newly acquired retail installment contract could become an "eligible receivable" under the Rainbow Loan Agreement, the Custodial Agreement required CHFS to deliver to the McCarley Firm the retail installment contract, the consumer mortgage, and the assignment transferring the mortgage to the Rainbow Group. Pursuant to the Custodial Agreement, the McCarley Firm agreed to certify and confirm each new retail installment

contract and related documents delivered by CHFS, in return for payment of a $20 fee.  At

Trial, McCarley testified that he currently holds these documents and releases them only

when he receives a written request signed by both CHFS and the Rainbow Group or other

entity identified by Dr. Edwards.  (HIL Adv. Dkt. 343 at 9-10). The release of documents

was not uncommon and took place whenever a borrower paid off a mortgage.  (HIL Adv.

Dkt. 341 at 125).  There is no provision in the Custodial Agreement for the McCarley Firm

to release the documents to the Rainbow Group or other lender in the event of a default of

the Rainbow Loan Agreement by CHFS.  Sections 5.1 and 5.7 of the Custodial Agreement

prohibited any amendment or assignment without the prior written consent of the McCarley

Firm, the Rainbow Group, and CHFS, as follows:

> Section 5.1.  Amendment.  This Agreement may be amended from
> time to time by Custodian, Lender and Borrower by written agreement
> signed by such parties.

> Section 5.7  Assignment.  No party hereto shall sell, pledge, assign
> or otherwise transfer this Agreement without the prior written consent of
> the other parties hereto.

(HIL Ex. D-22).

The advances from the Rainbow Loan Agreement resulted in a flow of money to

and from the Rainbow Group.  In theory, CHFS profited from this arrangement in two

ways, on the spread (the difference between the principal balance of the consumer

mortgage loans and the price CHFS paid for them) and on the unearned discount.  The

Rainbow Group profited from CHFS's payment of interest at annual rates varying from

12.5% to 14%.  (HIL Ex. P-7 at 9).

### 7.    2007 Assignment

At some point, Dr. Edwards transferred the assets of the Rainbow Group to Beher Limited, a British Virgin Islands company that he purchased from a subsidiary of VP Bank (BVI) Limited ("VP Bank") on or about April 25, 2007, for that purpose.  (HIL Exs. D-20 & P-26).  (HIL Adv. Dkt. 341 at 126-27).  On April 28, 2007, Dr. Edwards sent an email to Dickson, informing him that Beher Limited had purchased the "Rainbow Group Loans" and that all future wires from CHFS should be sent to Beher Limited's account at JP Morgan Chase Bank.  (HIL Ex. P-20).  Shortly thereafter, on May 1, 2007, "The Rainbow Group, Ltd." purportedly assigned the 2006 Note (the "2007 Assignment") (HIL Exs. P-1, P-2, D-2, D-17 & D-18) to Beher Limited.  Dr. Edwards' handwritten endorsement appears on the last page of the 2006 Note and provides:  "Pay to the Order of:  Beher Holdings, Ltd. without recourse" and is signed by Dr. Edwards in his capacity as the investment manager for the Rainbow Group.  (HIL Adv. Dkt. 331 at 41).  There were no changes or amendments to the Rainbow Loan Agreement or the Custodial Agreement.  To be clear, there is no document that amends the Custodial Agreement to change the name of the lender from the Rainbow Group to Beher Limited or that assigns the Custodial Agreement from the Rainbow Group to Beher Limited.  (HIL Adv. Dkt. 341 at 14-15).

### 8.    2007 Note

In an email dated August 6, 2007, Dr. Edwards informed Dickson that his recent request for an advance exceeded the borrowing limit.  (HIL Ex. D-21).  Thereafter, CHFS executed a $3 million Supplemental Promissory Note and Credit Facility (the "2007 Note") (HIL Ex. D-17) payable to Beher Limited.  The 2007 Note purportedly increased the

amount of available credit under the Rainbow Loan Agreement to $12 million.[15]   (HIL Adv. Dkt. 331 at 41).  The 2007 Note required CHFS to pay interest only, at the annual rate of fourteen percent (14%) on the outstanding principal amount of the credit facility until the maturity date of March 25, 2009.

### 9.   BVI Company Register

On October 31, 2008, the Registrar struck both Beher Limited and "Rainbow Group, Ltd." from the BVI Company Register because of their failure to pay annual registration fees pursuant to the BVI Business Companies Act ("BCA").  (HIL Ex. P-12; HIL Adv. Dkt. 341 at 128).  Unlike Beher Limited, it does not appear that Rainbow Group, Ltd. engaged in any business after the strike off.

An email to Dr. Edwards from Robert Hirst ("Hirst"), head of banking at VP Bank, shows that Dr. Edwards was aware by November 2, 2009, that Beher Limited was "not in goodstanding [sic] with the companies [sic] registry" and, as a result, was legally restricted from executing any transactions until it was returned to good standing. (HIL Ex. P-26; HIL Adv. Dkt. 341 at 221).   In an email to Hirst dated November 5, 2009, Dr. Edwards complained that he received "no warning about striking the company." (HIL Ex. P-26). Dr. Edwards then became involved in a dispute with VP Bank and Beher Limited's registered agent, ATU General Trust (BVI) Limited, purportedly a subsidiary of VP Bank, regarding the payment of Beher Limited's registration fees.  (HIL Adv. Dkt. 341 at 128). Apparently, they disagreed about whether the price Dr. Edwards paid VP Bank to purchase Beher Limited should have included payment of the initial registration fee.  (HIL Adv. Dkt. 341 at 128).  It is unknown whether the fee dispute was ever resolved.  Regardless,  Dr.

---

[15] The figure of $3 million appears on the top left-hand corner of the 2007 Note, but the body of the 2007 Note indicates a loan of only $2 million.  (HIL Ex. D-17).

Edwards did not take any action to restore Beher Limited to the BVI Company Register until July 17, 2017, when he commenced a proceeding in the Eastern Caribbean Supreme Court in the High Court of Justice (Commercial Division) Virgin Islands, to have Beher Limited restored to the BVI Company Register.  (HIL Ex. P-27; HIL Adv. Dkt. 341 at 129, 172).

On May 1, 2010, before the restoration of Beher Limited to the BVI Company Register, Dr. Edwards transferred the assets of Beher Limited to BHT, a trust that he created under Bermuda law for the benefit of his children.  (HIL Ex. P-26; HIL Adv. Dkt. 341 at 127).  The trustee of BHT is Church Bay Trust Co. ("Church Bay Trust"), a licensed Bermuda trust company.  No attorney has appeared in these proceedings on behalf of Church Bay Trust.  Dr. Edwards testified that he is the "settlor" or "grantor" of BHT as well as its investment advisor and "controls" BHT in the context of this litigation.  (HIL Adv. Dkt. 341 at 127, 164 & 172).  There is no document indicating that Church Bay Trust delegated to Dr. Edwards its responsibilities for managing BHT's assets.  Dr. Edwards testified that he controls BHT.

### 10.    2010 Assignment

On May 10, 2010, before Beher Limited was restored to the BVI Company Register, Beher Limited assigned the 2006 Note to BHT (the "2010 Assignment") (HIL Adv. Dkt. 237-1 at 39) (HIL Ex. D-2) by Dr. Edwards' handwritten endorsement on the last page of the 2006 Note.  (HIL Adv. Dkt. 331 at 41).  The endorsement provides:  "Pay to the order of Beher Holdings Trust without recourse" and is signed by Dr. Edwards as the "Investment Manager" for Beher Limited.  Again, there were no changes or

amendments to the Rainbow Loan Agreement or the Custodial Agreement. Unlike the 2006 Note, the 2007 Note was never assigned to BHT.

### 11. Amended Loan Agreements

On August 6, 2010, Dr. Edwards sent an email to Dickson, "I just realized the Beher-CHFS loan has matured." (HIL Ex. P-4). Dr. Edwards attached a letter to the email proposing a new loan wherein BHT would renew a portion of the indebtedness owed by CHFS, and EFP would become CHFS's new lender for the remaining portion of the loan. (HIL Exs. P-4 & D-5). EFP was formed by Dr. Edwards as a family limited partnership under Delaware law, and Dr. Edwards is its general partner (HIL Adv. Dkt. 341 at 129) and Borg is a limited partner (HIL Adv. Dkt. 342 at 115). In the same email to Dickson, Dr. Edwards informed him that the renewal "gives us the opportunity to clean up several items." (HIL Ex. P-4 & D-5).

On August 10, 2010, CHFS executed two nearly identical amendments (the "Amended Loan Agreements") (HIL Exs. D-9 & D-10), prepared by Dr. Edwards, which amended the Rainbow Loan Agreement to increase the line of credit from $12 million to $16 million and divide the loan between two lenders, EFP ($4 million) and BHT ($12 million). (HIL Adv. Dkt. 331 at 42). This division represents a 75/25 percentage split of the loan between BHT and EFP, respectively. The Amended Loan Agreements, each consisting of a single page, were signed by Dickson on behalf of CHFS.

Dr. Edwards signed the Amended Loan Agreement on behalf of BHT (the "BHT Amended Loan Agreement") (HIL Ex. D-10) as its "US Investment Manager." Church Bay Trust did not sign the BHT Amended Loan Agreement, and there is no document authorizing Dr. Edwards to sign it on BHT's behalf. The amount of the credit line provided

by BHT is listed inconsistently as "Sixteen [*sic*] Million Dollars ($12,000,000)." The following statement appears at the bottom of the page: "The outstanding principal balance due Lender, subject to alteration upon documentation of any mistake in calculations, was $11,201,233 as of July 31, 2010."

Dr. Edwards signed the Amended Loan Agreement on behalf of EFP (the "EFP Amended Loan Agreement") (HIL Ex. D-9) as its "General Partner." (HIL Adv. Dk. 341 at 129). Notably, the EFP Amended Loan Agreement purportedly amends the Rainbow Loan Agreement although EFP was not a party to, or assignee of, the Rainbow Loan Agreement. The amount of the credit line provided by EFP is listed as "Four Million Dollars ($4,000,000)." A statement similar to the one in the BHT Amended Loan Agreement appears at the bottom of the page of the EFP Amended Loan Agreement: "The outstanding principal balance due Lender, subject to alteration upon documentation of any mistake in calculations, was $3,733,744 as of July 31, 2010."

Many changes were made to the Rainbow Loan Agreement other than the increase in the credit facility and EFP/BHT's replacement of Beher Limited as lenders. Among these changes, payments were no longer required to be made to a blocked account but were required to be wired "to the address provided from time to time in writing." The availability of eligible receivables was increased to 92% of total loans from January 1, 2011, until June 1, 2011, when it was reduced to 90%. Unlike the EFP Amended Loan Agreement, the BHT Amended Loan Agreement increased this percentage to 94% from October 1, 2010, until January 1, 2011. Additionally, the interest rate per annum was set at 12.5% effective August 1, 2010.

12.    **BHT Note & EFP Note**

Pursuant to the Amended Loan Agreements, CHFS executed a $12 million Commercial Loan Note and Line of Credit in favor of BHT (the "BHT Note") (HIL Ex. D-7) and a $4 million Commercial Loan Note and Line of Credit in favor of EFP (the "EFP Note") (HIL Ex. D-6), both of which were drafted by Dr. Edwards (HIL Adv. Dkt. 341 at 184). Of the total amount of the credit facility of $16 million, BHT undertook seventy-five percent (75%) of the obligation, and EFP undertook twenty-five percent (25%) of the obligation. (HIL Adv. Dkt. 342 at 122). The maturity date of the BHT Note and EFP Note was August 1, 2013. (HIL Adv. Dkt. 331 at 42). Both the BHT Note and EFP Note were signed by Dickson on behalf of CHFS and individually as a guarantor.

Both the BHT Note and EFP Note provided for the payment of interest only at 12.5% until maturity. Security for repayment of the loans (as evidenced by the BHT Note and EFP Note) was the assignment of the consumer mortgage loans and Dickson's written guaranties. There is no document that amends the Custodial Agreement to change the name of the lender from the Rainbow Group to EFP/BHT or that assigns the Custodial Agreement to EFP/BHT. After execution of the EFP and the BHT Notes, CHFS made three payments totaling $667,500 from September 1, 2010 to November 30, 2010. (HIL Ex. P-7, Schedule 7; HIL Adv. Dkt. 340 at 123-24; HIL Adv. Dkt. 342 at 124).

13.    **Guaranties**

In addition to signing the EFP Note and BHT Note as a personal guarantor, Dickson signed two nearly identical guaranties in favor of EFP and BHT. (Case No. 3:13-cv-00587-CWR-LRA, Dkt. 14 Exs. H & I). By each guaranty, signed on August 10, 2010, Dickson "unconditionally and absolutely guarantee[d] . . . the due and punctual payment and

performance when due of the principal of the Note and the interest thereon. . . . "  He accepted liability that was not conditioned on EFP/BHT first demanding payment from CHFS or pursuing any remedies against their collateral.  Moreover, Dickson agreed that his obligation under the guaranty agreements was independent of CHFS's obligation.  In addition, Dickson agreed to pay all costs and expenses incurred by EFP/BHT in enforcing the guarantees.

## C.    Mortgage Portfolios

In 2008, before the parties entered into the Amended Loan Agreements in 2010, Dickson approached Dr. Edwards about expanding the nature and scope of their business relationship to include a series of transactions where entities owned and/or purportedly controlled by Dr. Edwards would provide approximately $9 million for CHFS to purchase seven (7) mortgage portfolios of subprime loans (the "Mortgage Portfolios").  (HIL Adv. Dkt. 341 at 19 & 135).  Because of the financial crisis in the mortgage industry at that time, Dickson believed that CHFS could purchase loan portfolios at favorable prices.  (HIL Adv. Dkt. 341 at 19 & 135).  Dr. Edwards testified that he did not consider these transactions to be loans."[16]  (HIL Adv. Dkt. 341 at 137).

For ease of reference, the Mortgage Portfolios are referred to individually as Portfolios one through seven ("Portfolios #1-#7"), in the order in which they were purchased by CHFS.[17]  The parties to Portfolios #1-#6 are CHFS and EFP LLP; the parties to Portfolio #7 are CHFS and BHT.  Of the seven (7) transactions, only three are

---

[16] Whether the transactions are true joint ventures, loans, or something else is an issue raised in the Mortgage Portfolios Adversary and discussed in this Opinion.  (MPF Adv. Dkt. 126).

[17] In some of the exhibits, Portfolio #3 is referred to as the "Mountainview Portfolio."  *See, e.g.*, (MPF Ex. D-35; HIL Ex. D-30).

Page 35 of 214

memorialized in writing.  Dr. Edwards prepared all three (3) written agreements without the assistance of an attorney and admitted at Trial that they were poorly drafted.  (HIL Adv. Dkt. 341 at 187-88).  "I should have had attorneys write these.  I'm very sorry I didn't." (HIL Adv. Dkt. 341 at 211).  Of the three (3) written agreements, EFP LLP (not EFP) is the counterparty to two, and BHT is the counterparty to one.  The Portfolios are shown below:

| Mortgage Portfolio | Counter-party | Documentation | Portfolio Seller |
|---|---|---|---|
| #1 | EFP LLP | Written | DLJ Mortgage Capital, Inc. |
| #2 | EFP LLP | Written | DLJ Mortgage Capital, Inc. |
| #3 | Unknown | Undocumented | DLJ Mortgage Capital, Inc. |
| #4 | Unknown | Undocumented | Promor Investments, LLC |
| #5 | Unknown | Undocumented | Blue World Pools, Inc. |
| #6 | Unknown | Undocumented | Blue World Pools, Inc. |
| #7 | BHT | Written | Blue World Pools, Inc. |

(MPF Exs. P-5 to P-14 & D-3 to D-5; MPF Ex. P-2, Schedule 8; PPC Exs. D-22 & D-23). The loans in the Portfolios were serviced by CHFS.  The consumer borrower would make payment to CHFS either by check, automatic draft, or money order, and CHFS would remit collections to EFP/BHT, which then would return to CHFS its servicing fees.  (HIL Adv. Dkt. 341 at 21).  The parties have stipulated that the loans at issue in the Mortgage Portfolios Adversary are the 2,080 loans listed in schedules 2.1 to 2.7 attached to Aucoin's expert report (the "Mortgage Portfolios").  (MPF Adv. Dkt. 126 at 37).  As with the Home Improvement Loans, Borg was responsible for reviewing and maintaining the records related to the Mortgage Portfolios as EFP/BHT's bookkeeper.  (HIL Adv. Dkt. 342 at 125

& 136).  Borg testified that CHFS did not categorize the Mortgage Portfolios by portfolio until 2011 at her request.  (HIL Adv. Dkt. 341 at 132-33).

Although the purchases of the seven portfolios was funded directly by entities owned or purportedly controlled by Dr. Edwards (not necessarily EFP/BHT), all of the portfolio purchase agreements were between CHFS and the portfolio seller.  (HIL Adv. Dkt. 341 at 16-17, 19; MPF Exs. P-5 to P-14; HIL Adv. Dkt. 342 at 131).  Moreover, for Portfolios #1-#6, the portfolio sellers assigned the loans to CHFS.  (HIL Adv. Dkt. 341 at 17).  The original notes and assignments comprising the consumer loans in Portfolios #1-#6 are currently in EFP's possession as "collateral."  (HIL Adv. Dkt. 342 at 198-99).

As to Portfolio #7, the original notes and assignments were supposed to be held by Patrick Frascogna ("Frascogna"), a Mississippi attorney whose law office was in the same building as CHFS.  (MPF Ex. P-4 & D-28).  Frascogna, however, either released the original loan documents to Dickson at some point or never took possession of them. According to Dickson, the original loan documents are in a warehouse somewhere in Panama, the location of which he has not divulged.  (HIL Adv. Dkt. 341 at 6).  The original notes and loan documents, however, remain missing.[18]  According to the Custodial File Delivery Form MPF Reply to Counterclaim D-28 at 1) signed by Dickson and the Custodial Certifications (MPF Ex. D-28 at 2-5) signed by Frascogna, CHFS assigned the notes that comprise Portfolio #7 to BHT.  Each Mortgage Portfolio is discussed separately below.

---

[18] BHT sued Frascogna for his alleged breach of contract and breach of the fiduciary duty to hold the original notes.  *See Beher Holdings Tr. v. Frascogna*, Case No. 3:15-cv-00007-HTW-LRA (S.D. Miss. Jan. 5, 2015).  The case was administratively closed on February 15, 2018 (*Id.* Dkt. 42), pending resolution of Frascogna's motion to reopen his bankruptcy case.

### 1. Portfolio #1

In late 2007, CHFS entered into negotiations with DLJ Mortgage Capital, Inc. ("DLJ") for the purchase of Portfolio #1. (MPF Ex. P-5). Portfolio #1 consists of 225 second mortgages with a collective unpaid principal balance of $9,573,866.86. (MPF Ex. P-7). On January 7, 2008, Dr. Edwards emailed Dickson agreeing to provide CHFS with the funds to purchase Portfolio #1. "If I put up all $ and you manage the portfolio, the upside split will be something like 3:1 after repayment of principal, reimbursement of your costs (based upon CHFS financial statements) and interest on my funds." (MPF Ex. D-1). On January 9, 2008, CHFS executed a letter agreement committing to purchase Portfolio #1 from DLJ (MPF Ex. P-28) for 27% of the aggregate unpaid balance of the loans. CHFS and DLJ then entered into a Mortgage Loan Purchase Agreement (the "DLJ Purchase Agreement") (MPF Ex. P-6). An entity purportedly controlled by Dr. Edwards funded $2,584,944 and $143,608, on January 31, 2008, and February 8, 2008, respectively, to purchase Portfolio #1. (MPF Exs. P-2 at 2 & D-8).[19]

The formal terms of the arrangement between CHFS and EFP regarding the purchase of Portfolio #1 were reduced to writing in the Mortgage Portfolio Joint Venture *Between Edwards Family Partnership & Community Home Financial Services, Inc.* (the "MPF Agreement *I*") (MPF Exs. P-6 & D-20; MPF Adv. Dkt. 126 at 36) dated January 28, 2008, and drafted by Dr. Edwards, which he later admitted in a letter to Dickson had been "poorly written." (HIL Ex. D-30; MPF Ex. D-35). EFP LLP agreed to commit approximately $3 million to purchase Portfolio #1, and "[i]n exchange for its capital

---

[19] This exhibit (MPF Ex. D-8) and six other similar exhibits (MPF Exs. D-9 to D-14) were prepared by Borg and were admitted into evidence only for the purpose of establishing the amounts funded by EFP/BHT for the purchase of the portfolios. (HIL Adv. Dkt. 342 at 128-31).

investment, EFP [LLP] will receive interest on the outstanding balance to be paid monthly at the rate of 12% and receive 75% of net proceeds from the portfolio.  CHFS will receive a servicing fee of $20 per month for each loan payment collected and 25% of net proceeds from the portfolio."   Later, on page two, MPF Agreement *I* sets forth in detail these distribution rights:

Distributions

1.     CHFS will send a monthly statement along with the financial summary.  The statement will note the number of collections X $20 each and any out of pocket major collection expenses.

2.     EFP [LLP] will pay the CHFS invoice within 15 days of receipt.

3.     Anytime total loan interest and principal pay-offs exceed cumulative CHFS servicing invoices + interest on the EFP [LLP] investment by $10,000, EFP [LLP] will distribute 25% of the cumulative net proceeds to CHFS and retain 75%.

4.     EFP [LLP] will either provide or confirm a CHFS monthly statement of all income and expenses of joint venture.

(MPF Exs. P-6 & D-20).  Accordingly, under MPF Agreement *I*, CHFS was entitled to receive:   (1) a $20 fee for each loan payment collected each month; (2) 100% reimbursement for "any out of pocket major collection expenses"; and (3) 25% of the net proceeds "anytime total loan interest and principal pay-offs exceed cumulative CHFS servicing invoices + interest on the EFP investment by $10,000."  MPF Agreement *I* further provides, "CHFS will vigorously pursue collections for accounts 3 months or more behind. This may include personal visits to renegotiate loans, court judgments, wage garnishments and/or mortgage foreclosures.   CHFS will front collection expenses which will be reimbursed."  (MPF Exs. P-6 & D-20).

MPF Agreement *I* did not require CHFS to assign EFP LLP any rights, interests, or claims in the mortgage instruments that CHFS received as the purchaser of Portfolio #1 from DLJ under the DLJ Purchase Agreement. However, MPF Agreement *I* did require EFP LLP to hold title to the individual notes and mortgages as "collateral." Specifically, MPF Agreement *I* provides:

Security for $3 million investment

1. EFP [LLP] will hold title to all notes and mortgages as collateral and will be entitled to physically retain the original notes until they are paid.

2. EFP [LLP] will be able to assign this collateral to a national lending institution.

3. All portfolio mortgage payments will be made to a lockbox. A bank agreement will provide that funds from the lockbox may be released to only EFP [LLP].

4. CHFS represents that all statements in this Agreement are correct and that it will perform in accordance with its terms. Misrepresentation or failure to perform in accordance [with] this Agreement shall constitute a default under the Amended Note and Credit Agreement between CHFS and [Beher Limited], an affiliate of EFP [LLP].

(MPF Ex. D-3; PPC Ex. D-22). Dr. Edwards testified that the original notes and mortgages that comprise Portfolio #1 are currently at his home in Baltimore. (HIL Adv. Dkt. 341 at 140).

### 2.    Portfolio #2

On March 25, 2008, CHFS signed a letter committing to purchase Portfolio #2 from DLJ for approximately $1.37 million. (MPF Ex. P-8; MPF Adv. Dkt. 126 at 36). Portfolio #2 consists of 151 first and second mortgages with an original principal balance of $6,880,143.58. (MPF Ex. P-9). The formal terms governing the rights and obligations of

EFP LLP and CHFS concerning Portfolio #2 were reduced to writing on April 20, 2008, in the Mortgage Portfolio Joint Venture II *Between Edwards Family Partnership & Community Home Financial Services, Inc.* ("MPF Agreement *II*") (MPF Ex. D-4; MPF Adv. Dkt. 126 at 36; PPC Ex. D-23).   An entity purportedly controlled by Dr. Edwards funded $1,379,557, on April 22, 2008, to purchase Portfolio #2.   (MPF Exs. P-2 at 2 & D-9).   MPF Agreement *I* and MPF Agreement *II* contain the same or similar provisions concerning the respective ownership rights of CHFS and EFP LLP but differ as to due diligence and the treatment of costs.   (MPF Ex. D-6).

Unlike MPF Agreement *I*, MPF Agreement *II* provides that "[t]he cost of loan due diligence will be equally divided between EFP [LLP] and CHFS.   CHFS will pay all costs relating to loan servicing and collections prior to engaging outside counsel to collect on defaulted loans.   Costs of collection by outside attorneys or other third parties will be paid two thirds by EFP [LLP] and one third by CHFS."   (MPF Ex. D-4; PPC Ex. D-23).   Thus, under MPF Agreement *II*, CHFS was entitled to receive from EFP LLP:  (1) a $20 fee for each loan payment collected each month; (2) 50% reimbursement for all due diligence expenditures incurred by CHFS; (3) 100% reimbursement for out of pocket major collection expenses every month; (4) 67% reimbursement for all costs of collection by outside attorneys or other third parties; and (5) 25% distribution of proceeds "anytime total loan interest and principal pay-offs exceed cumulative CHFS servicing invoices + interest on the EFP [LLP] investment by $10,000" for servicing Portfolio #2.

### 3.  Portfolio #3

On July 14, 2008, CHFS agreed to purchase Portfolio #3 from DLJ for $1,592,285.48.  (MPF Ex. P-10).  Portfolio #3 consists of 173 mortgages with an original

principal balance of $7,591,887.60. (MPF Ex. P-10). An entity purportedly controlled by Dr. Edwards funded $1,584,008, on July 26, 2008, to purchase Portfolio #3. (MPF Exs. P-2 at 2 & D-10). There is no writing that memorializes the respective distribution rights for Portfolio #3.

### 4.    Portfolio #4

On October 28, 2009, CHFS entered into an agreement with Promor Investments, LLC to purchase Portfolio #4 for approximately $1.05 million. (MPF Ex. P-11). An entity purportedly controlled by Dr. Edwards funded $1,054,550, on October 28, 2009, to purchase Portfolio #4. (MPF Exs. P-2 at 2 & D-11). There is no writing that memorializes the respective distribution rights for Portfolio #4.

### 5.    Portfolio #5

On March 22, 2010, CHFS entered into an agreement with Blue World Pools, Inc. ("BWP") to purchase Portfolio #5 for approximately $4 million. (MPF Ex. P-12; MPF Adv. Dkt. 126 at 36). An entity purportedly controlled by Dr. Edwards funded $4,027,272, on April 22, 2010, to purchase Portfolio #5. (MPF Exs. P-2 at 3 & D-13). BWP is engaged in the business of originating residential swimming pool loans secured by home mortgages. (HIL Adv. Dkt. 342 at 205). There is no writing that memorializes the respective distribution rights for Portfolio #5.

### 6.    Portfolio #6

On November 15, 2010, CHFS entered into an agreement with BWP to purchase Portfolio #6 for $3,397,875.33. (MPF Ex. P-13). Portfolio #6 consists of 431 loans. (MPF Ex. P-13). An entity purportedly controlled by Dr. Edwards funded $3,397,875, on

November 19, 2010, to purchase Portfolio #6.  (MPF Exs. P-2 at 3 & D-12).  There is no writing that memorializes the respective distribution rights for Portfolio #6.

### 7.   Portfolio #7

On February 16, 2011, CHFS entered into an agreement with BWP to purchase Portfolio #7 for approximately $6.5 million (MPF Ex. P-14; MPF Adv. Dkt. 126 at 36). Portfolio #7 consists of second mortgages with an original principal balance of approximately $10.6 million.  (MPF Ex. P-14).  Portfolio #7 is the largest mortgage portfolio purchased by CHFS.

On March 1, 2011, CHFS signed the Mortgage Portfolio Joint Venture *Between Beher Holdings Trust & Community Home Financial Services, Inc.* ("MPF Agreement *III*") (MPF Ex. D-5 & PPC Ex. D-20).  MPF Agreement *III* was signed on behalf of BHT by Church Bay Trust.  MPF Agreement *III* contains terms that are materially different from those in MPF Agreement *I* and MPF Agreement *II*.  For example, MPF Agreement *III* provides that "[t]he benefits and obligations of the Purchase Agreement have been assigned from CHFS to [BHT].  [BHT] will be the beneficial owner of the loans, subject to the terms of this Joint Venture." (MPF Exs. D-5 & D-26; PPC Exs. D-20 & D-21).  Moreover, MPF Agreement *III* provides that "[t]he custodian selected by [BHT] will hold the original Notes and Assignments to [BHT] for all loans in the portfolio and will be entitled to physically retain the original notes until they are paid."  (MPF Ex. D-5; PPC Ex. D-20).  The parties agreed that the original notes and assignments in Portfolio #7 would not be held by BHT, Dr. Edwards, or CHFS but by a third-party custodian.  BHT selected Frascogna as the custodian.  The custodial certifications signed by Frascogna indicate that he received corporate assignments of the original notes and mortgages from CHFS to BHT.  (MPF Ex.

D-28).  As noted previously, Frascogna either allowed Dickson to take possession of the original loan documents or later released them to Dickson.  Either way, the documents remain missing.

MPF Agreement *III* contains materially different distribution terms.  "CHFS will pay all costs of loan due diligence, loan servicing and collections prior to engaging outside counsel to collect on defaulted loans.  Costs of collection by outside attorneys or other third parties will be paid two thirds by [BHT] and one third by [CHFS]."  (MPF Ex. D-5; PPC Ex. D-20).  With respect to payment, "CHFS will receive a servicing fee of $15 per month for each loan payment collected and 25% of net proceeds from the portfolio after repayment of [BHT]."  MPF Agreement *III* also includes the following provision:  "[W]hen [BHT] principal, interest and CHFS servicing fees are paid, [BHT] will distribute 25% of additional proceeds to CHFS and retain 75%."  Thus, unlike MPF Agreement *I* and MPF Agreement *II*, CHFS was required to pay all of its due diligence expenses, CHFS received a reduced monthly servicing fee of only $15 per month, and CHFS was not entitled to receive any distribution of its 25% share of the net proceeds until BHT recovered its entire cash contribution.  Moreover, a purported default under MPF Agreement *III* would also be considered a default under the Home Improvement Loans:  "CHFS represents that all statements in this Agreement are correct and that it will perform in accordance with its terms.  Misrepresentation or failure to perform in accordance [with] this Agreement shall constitute a default under the Commercial Loan Note and Line of Credit dated August 10, 2010."  On March 6, 2011, CHFS assigned the purchase agreement with BWP to Church Bay Trust.  (PPC Ex. D-21).  Between March of 2011 and June of 2011, an entity

purportedly controlled by Dr. Edwards funded $5,777,754 to purchase Portfolio #7.  (MPF Exs. P-2 at 3 & D-14).

**D.      Original State Lawsuit & Receivership Action**

In 2010, the business relationship between Dickson and Dr. Edwards soured.  CHFS made payments under the terms of the Amended Loan Agreements, the BHT Note, and the EFP Note until December of 2010, when he became convinced that Dr. Edwards was overcharging the credit line by charging interest before draws occurred.  (HIL Adv. Dkt. 342 at 139).  In a letter dated January 4, 2012, Dr. Edwards responded to Dickson's challenge regarding the calculation of net proceeds in MPF Agreement *I*.  (MPF Ex. D-35; HIL Ex. D-30).  Then, on January 20, 2012, Dr. Edwards sent identical letters to CHFS demanding that CHFS cure certain defaults on the EFP Note and BHT Note by January 31, 2012, or face acceleration of the maturity date.  (HIL Exs. D-11 & D-12).  Dr. Edwards signed the letter regarding the BHT Note as BHT's "agent."  CHFS made its last payment on the Mortgage Portfolios in February of 2012.  (HIL Adv. Dkt. 341 at 149-50).  For the last collections period paid by CHFS pre-petition, Borg received the monthly report from CHFS for Portfolio #7 dated February 14, 2012 (MPF Ex. D-16) and for Portfolios #1-#6 dated February 23, 2012 (MPF Ex. D-15).

On February 15, 2012, CHFS and Dickson sued Dr. Edwards and EFP/BHT in state court, seeking a declaration of the parties' rights (the "Original State Lawsuit") (Case No. 3:12-cv-00252-CWR-LRA, Dkt. 1-2 at 7-29).  CHFS and Dickson challenged the alleged secured status of the loans that financed the Home Improvement Loans and also asserted an interest in the net profits of the alleged Joint Ventures.  On April 11, 2012, Dr. Edwards and EFP/BHT removed the Original State Lawsuit to the District Court (the "Receivership

Action") (Case No. 3:12-cv-00252-CWR-LRA, Dkt. 1) and asserted counterclaims seeking a judgment against CHFS for amounts due on the EFP Note and BHT Note, a judgment against Dickson for his guarantees of the EFP Note and BHT Note, judicial foreclosure on their collateral, and a judgment against CHFS for its breach of the purported joint venture agreements. (HIL Adv. Dkt. 341 at 151). On May 1, 2012, EFP/BHT filed an emergency motion for the immediate appointment of a receiver for CHFS. (Case No. 3:12-cv-00252-CWR-LRA, Dkt. 6). In May of 2012, the District Court conducted a trial of the Receivership Action, which was interrupted by the filing of the Bankruptcy Case, as discussed later in this Opinion.

### E.   Pre-petition Transfers

Although CHFS was not primarily involved in the business of loaning funds, CHFS disclosed in its bankruptcy schedules that from February 14, 2012 to May 14, 2012, it loaned $3.2 million, in amounts varying from $250,000 to $500,000, to Dickson and four affiliated companies, including W.D. Dickson Enterprises, Inc., Crisco Investments, Inc., Double S Construction, Inc., and Discount Mortgage, Inc., as shown below:

| | | |
|---|---|---|
| 02/14/2012 | Discount Mortgage, Inc. | $500,000 |
| 02/14/2012 | Double S Construction, Inc. | $500,000 |
| 02/14/2012 | William D. Dickson | $250,000 |
| 02/15/2012 | W. D. Dickson Enterprises, Inc. | $350,000 |
| 03/14/2012 | Double S Construction, Inc. | $400,000 |
| 04/12/2012 | Crisco Investments, Inc. | $500,000 |
| 05/14/2012 | Discount Mortgage, Inc. | $250,000 |
| 05/14/2012 | Crisco Investments, Inc. | $450,000 |
| TOTAL | | $3,200,000 |

(Bankr. Dkt. 115 at 6, Attach. B; MPF Ex. D-41; HIL Ex. D-36). The promissory notes provided for payment of interest at the initial rate of four percent (4%) per annum. (MPF

Ex. D-41; HIL Ex. D-36). These four affiliated companies shared the same office space with CHFS and some of the same employees.

On March 1, 2012, Dickson formed the W W Warren Foundation in Panama.[20] An analysis of available bank records shows that CHFS transferred approximately $3.7 million (including the above sums), directly or indirectly, from CHFS's operating account at BancorpSouth ending in 6711 to the account of the W W Warren Foundation at Banco Panameño de la Vivenda S.A. ("Banco Panameño") (later known as Banvivienda) in Panama as well as other accounts, as shown below:

| | |
|---|---|
| Discount Mortgage, Inc. | $55,000* |
| Double S Construction, Inc. | $15,000* |
| Crisco Investments, Inc. | $50,000* |
| W.D. Dickson Enterprises, Inc. | $225,849* |
| William D. Dickson | $50,000* |
| Victory Consulting | $640,000* |
| W W Warren Foundation | $2,300,000 |
| E.S. Berry Jr. | $240,000 |
| Unknown | $124,151 |
| Total | $3,700,000 |

(HIL Ex. P-7, Schedule 8).[21]

## F.   Bankruptcy Case

On May 23, 2012, during the trial of the Receivership Action, CHFS filed a voluntary chapter 11 petition for relief (the "Petition") (Bankr. Dkt. 1). The commencement of the Bankruptcy Case stayed all proceedings against CHFS, including

---

[20] The record suggests that Dickson owns W W Warren Foundation, which he named after his father W.W. Warren. (MPF Ex. D-42; HIL Ex. D-37).

[21] In the last column of the chart, the amounts followed by an asterisk are net amounts to avoid overstating the total amount transferred from CHFS. (HIL Adv. Dkt. 340 at 88). There are no bank records from Banco Panameño. Some of the transfers to Banco Panameño are reflected in the bank records of HSBC in Florida where the W W Warren Foundation holds an account. (HIL Ex. D-39; MPF Ex. 44; PPC Ex. D-15).

the trial of the Receivership Action. 11 U.S.C. § 362(a). CHFS proceeded as the debtor-in-possession (the "DIP") in the Bankruptcy Case pursuant to 11 U.S.C. § 1101, with Dickson acting as its designated representative until December 23, 2013, when the Court entered an order approving the appointment of a chapter 11 trustee. (Bankr. Dkt. 429). The parties have stipulated that as of the date of the Petition, the total amount due on the loans made to CHFS to fund the purchases of the Home Improvement Loans was $17,832,496. (HIL Adv. Dkt. 331 at 43). The parties have also stipulated that as of the date of the Petition, the amount at issue for each Portfolio was, as follows:

| | |
|---|---|
| Portfolio #1 | $1,115,304 |
| Portfolio #2 | $564,778 |
| Portfolio #3 | $61,685 |
| Portfolio #4 | $160,103 |
| Portfolio #5 | $2,616,209 |
| Portfolio #6 | $2,395,383 |
| Portfolio #7 | $4,866,989 |

(MPF Adv. Dkt. 126 at 36-37).

### 1.      Proofs of Claim Filed by EFP/BHT

The bar date to file non-governmental proofs of claim in the Bankruptcy Case was September 20, 2012. (Bankr. Dkt. 15). On that date, EFP/BHT filed six (6) proofs of claim arising from the two distinct business relationships with CHFS regarding the Home Improvement Loans and the purported "joint ventures." (Claims 4-1 to 9-1; HIL Exs. P-1, P-2, D-17 & D-18; MPF Exs. D-20 to D-23; PPC Exs. P-1 to P-6). Proofs of claim 4-1 and 5-1 relate to the Home Improvement Loans; proofs of claim 6-1 through 9-1 relate to the Mortgage Portfolios.

EFP/BHT filed proofs of claim four ("POC 4-1") and five ("POC 5-1"), each in the amount of $18,390,660.32 for "Money Loaned" to CHFS. (HIL Exs. P-1, P-2, D-17 & D-

18; PPC Exs. P-1 & P-2).  POC 4-1 is noted in the claims register as belonging to BHT whereas POC 5-1 is noted in the claims register as belonging to EFP.  Nevertheless, both POC 4-1 and POC 5-1 name EFP/BHT jointly as the creditor, and the amounts listed are the same.  EFP/BHT jointly assert a perfected security interest, based on "Possession." (HIL Adv. Dkt. 331 at 40).  Dr. Edwards signed both POC 4-1 and POC 5-1 as BHT's "Agent" and as EFP's "Managing Partner."  Attached to both POC 4-1 and POC 5-1 are the Rainbow Loan Agreement, the Custodial Agreement, the 2006 Note, the 2007 Note, the EFP Note, the BHT Note, and the Amended Loan Agreements.  The Custodial Agreement is the only document attached to either POC 4-1 or POC 5-1 that is signed by McCarley.  (HIL Adv. Dkt. 331 at 40).

POC 4-1 and POC 5-1 are duplicate filings in which the total amount that EFP/BHT claim is $18,390,660.32 and not twice that amount, as suggested by the duplicate filings. The portion of the total amount of $18,390,660.32 that is allegedly owed to BHT and EFP, separately, is not disclosed in POC 4-1 and POC 5-1.

CHFS filed the Objection to POC 4 & 5, challenging EFP/BHT's secured status. CHFS maintained that the 2007 Assignment and 2010 Assignment are invalid because the Rainbow Group was never lawfully incorporated to transact business.  They also point out that all collateral was assigned to Beher Limited, not to EFP or BHT.  Thus, according to CHFS, even if a security interest exists in favor of EFP/BHT, it remains unperfected because of EFP/BHT's failure to establish perfection by possession through a custodian. MISS. CODE ANN. § 75-9-313(c).  EFP/BHT filed the Responses to Objection to POC 4 & 5 in which they incorporated the pleadings they filed in the Home Improvement Loans Adversary.

EFP filed nearly identical proofs of claim six ("POC 6-1") and nine ("POC 9-1") in the estimated amount of $7,101,094.35 and $7,101,094.55, respectively. (MPF Exs. D-20 & D-23; PPC Exs. P-3 & P-6). In POC 6-1, the basis for EFP's unsecured claim was a "series of six (6) Joint Venture Agreements." EFP claims damages arising out of CHFS's alleged breach of its fiduciary duty. EFP attached MPF Agreement *I* and MPF Agreement *II* as exhibits to both POC 6-1 and POC 9-1, but the counterparty in both MPF Agreement *I* and MPF Agreement *II* is EFP LLP.

EFP filed POC 9-1 "solely to protect its right to assert a secured claim against [CHFS]" in the event it was determined that EFP did not own the Mortgage Portfolios. According to Exhibit A to POC 9-1, EFP's total investment, plus interest, in the joint ventures was $7,101,094.55, as follows:

| Mortgage Portfolio | Outstanding Investment | Interest |
|---|---|---|
| Portfolio #1 | $1,249,694.32 | $34,922.62 |
| Portfolio #2 | $554,754.44 | $15,502.73 |
| Portfolio #4 | $89,202.22 | $2,492.77 |
| Mt View | $47,606.97 | $1,330.39 |
| BWP #1 | $2,598,513.87 | $71,777.63 |
| BWP #2 | $2,369,091.99 | $66,204.76 |

(POC 9-1 Ex. A).[22]

CHFS filed the Objection to POC 6 & 9. CHFS maintains that neither MPF Agreement *I* nor MPF Agreement *II* required CHFS to repay EFP in full before CHFS was entitled to 25% share of net proceeds and that EFP had improperly withheld its share of the net proceeds. Moreover, CHFS points out that it never signed a promissory note. CHFS denies that EFP/BHT owned the notes in the Mortgage Portfolios. In the absence of written

---

[22] The total reflected in POC 9-1 is not a result of the Court's own calculations.

agreements as to Portfolios #3-#6, CHFS alleges that there is no debt.  EFP filed the Responses to Objection to POC 6 & 9 in which it incorporated by reference its pleadings filed in the Mortgage Portfolios Adversary.

BHT filed nearly identical proofs of claim seven ("POC 7-1") and eight ("POC 8-1") in the estimated amount of $4,917,547.3<u>5</u> and $4,917,547.3<u>4</u>, respectively.  (MPF Exs. D-21 & D-22; PPC Exs. P-4 & P-5).  In POC 7-1, the basis for its unsecured claim is also a "series of six (6) Joint Venture Agreements."  BHT claims damages arising out of CHFS's alleged breach of its fiduciary duty.  BHT estimates its loss of the investment, plus interest, at $4,917,547.35.  (POC 7-1 Ex. A).  BHT attached MPF Agreement *III* as an exhibit to POC 7-1.

BHT filed POC 8-1 "solely to protect its right to assert a secured claim against [CHFS]" in the event it was determined that BHT did not own the Mortgage Portfolios. (POC 8-1).  In POC 8-1, BHT's investment in the joint venture was allegedly $4,917,547.3<u>4</u>, as follows:

| Portfolio | Outstanding Investment | Interest |
|---|---|---|
| Portfolio | $4,783,861.55 | $133,685.99 |

(POC 8-1 Ex. A).[23]  CHFS filed the Objection to POC 7 & 8, setting forth the same allegations contained in its Objection to POC 6 & 9.  Likewise, BHT filed the Responses to Objection to POC 7 & 8, which mirrors EFP's allegations in the Responses to Objection to POC 6 & 9.

---

[23] The total reflected in POC 8-1 is not a result of the Court's own calculations.

### 2.    Proof of Claim Filed by Dickson

Dickson filed a proof of claim ("POC 10-1") (Claim 10-1) on September 20, 2012, for an unknown amount.  In the attachment to POC 10-1, Dickson explains that his "unliquidated claim . . . is the result of an indemnity which may arise regarding his personal guaranty on the Home Improvement Line from BHT and EFP."[24]  (POC 10-1 Pt. 2).

### 3.    Claims Register

In the claims register of the Bankruptcy Case, thirty-two (32) proofs of claim were filed;  six (6) of which were filed by EFP/BHT (Claims 4-9), four (4) of which have been withdrawn (Claims 1, 11, 16 & 32), two (2) of which have been satisfied (Claims 19 & 25), and one of which was filed by Dickson (Claim 10).  The total amount of the remaining nineteen (19) proofs of claim is $207,405.62.

### 4.    Cash Collateral Orders

In order to facilitate the operation of CHFS's business, interim orders were entered in the Bankruptcy Case on July 10, 2012, and May 3, 2013, regarding its cash flow (the "Cash Collateral Orders") (Bankr. Dkt. 60 & 231; HIL Exs. D-46 & D-47; MPF Exs. D-51 & D-52).  EFP/BHT alleged that payments on the Home Improvement Loans constituted their cash collateral, which CHFS may not use without permission of the Court.  (Bankr. Dkt. 23 at 2).  Under the Cash Collateral Orders, CHFS was required to deposit all funds collected in the Home Improvement Loans into the DIP operating account (the "DIP

---

[24] In the Memorandum Opinion and Order on First Amended Verified Complaint to:  (1) Recover Money, Damages, or Property; (2) to Avoid Pre-Petition and Post-Petition Transfers; (3) for Turnover of Property; (4) for Injunctive Relief; and (5) for Equitable Subordination entered in *Johnson v. Cmty. Home Fin. Servs., Inc.*, Adv. Proc. 14-00030-NPO (the "Dickson Adversary Opinion"), entered in the Dickson Adversary Proceeding contemporaneously with this Opinion, the Court equitably subordinated POC 10-1 to all other creditors and claims pursuant to 11 U.S.C. § 510.

Operating Account") at Wells Fargo Bank ("Wells Fargo").  CHFS also was required to make adequate protection payments to EFP/BHT each month beginning July 10, 2012, and continuing until October 10, 2012, in an amount equal to all payments collected on the Home Improvement Loans during the previous month plus interest calculated at the rate of seven percent (7%) per annum.  For purposes of the Cash Collateral Orders, the principal balance as of June 1, 2012, was deemed to be $18,300,000.  According to Borg, CHFS made four adequate protection payments.  (HIL Adv. Dkt. 342 at 124-25).

As to the Mortgage Portfolios, EFP/BHT claimed that the notes do not constitute property of the estate but belonged to them.  (Bankr Dkt. 23 at 2).  Under the Cash Collateral Orders, CHFS was required to segregate collections on the Mortgage Portfolios into separate escrow accounts at Wells Fargo:  (1) the EFP Mortgage Portfolios Escrow Account ending in -9335 and (2) the BHT Mortgage Portfolios Escrow Account ending in -9343.  CHFS was required to deposit all of the collections from any EFP Mortgage Portfolio (Portfolios #1-#6) into its DIP Operating Account and transfer funds, less a $20 servicing fee, to the EFP Mortgage Portfolios Escrow Account.  Similarly, CHFS was required to deposit all of the collections from any BHT Mortgage Portfolio Loan (Portfolio #7) into its DIP Operating Account and transfer funds, less a $15 servicing fee, to the BHT Mortgage Portfolios Escrow Account.

Other than carve outs for operating and other expenses, the Cash Collateral Orders prohibited CHFS from disbursing the funds in the DIP Operating Account without further order of the Court.  CHFS segregated the collections on the Home Improvement Loans and Mortgage Portfolios from that point forward until October of 2013.  As of October 31, 2013, the EFP Mortgage Portfolios Escrow Account held a balance of $3,871,020.06 (MPF

Ex. D-50 at 30), and the BHT Mortgage Portfolios Escrow Account held a balance of $2,072,893.31 (MPF Ex. D-50 at 21).

## G.    Initiation of Home Improvement Loans Adversary

Before the Trustee's appointment on January 21, 2014, CHFS and Dickson initiated the Home Improvement Loans Adversary on August 24, 2012, by filing the Complaint to Determine the Validity and Extent of Claims (the "HIL Original Complaint") (HIL Adv. Dkt. 1) against EFP/BHT.  (HIL Adv. Dkt. 331 at 40).  In the HIL Original Complaint, CHFS and Dickson sought to determine "the validity and extent of the respective claim(s) of EFP and BHT against CHFS and Dickson, respectively, some or all of which derive solely from the knowingly unlawful actions by The Rainbow Group, Ltd. and/or some or all of its representatives."  (HIL Adv. Dkt. 1 at 2-3).  As relief, CHFS and Dickson sought to obtain a judgment against EFP and BHT declaring that the underlying loan documents are void *ab initio*.  (HIL Adv. Dkt. 1, Counts I-IX).

CHFS and Dickson amended the HIL Original Complaint twice.  They filed the Amended Complaint to Determine the Validity and Extent of Claims (HIL Adv. Dkt. 6), as of right, on September 13, 2012.  CHFS and Dickson then filed the Objection to POC 4 & 5, which mirrored the allegations in the Amended Complaint.  (HIL Adv. Dkt. 6).  On March 5, 2013, the Court entered the Order to Consolidate for Administration and Discovery (HIL Adv. Dkt. 24), consolidating the Home Improvement Loans Adversary and the Objection to POC 4 & 5 for all purposes.  CHFS and Dickson filed the Second Amended Complaint (the "HIL Second Amended Complaint") (HIL Adv. Dkt. 48) with leave of Court (HIL Adv. Dkt. 47) on June 6, 2013.

### H.    Initiation of Adversary Proceeding 12-00109-NPO

CHFS and Dickson initiated adversary proceeding 12-00109-NPO on October 24, 2012, against EFP/BHT and EFP LLP.  (Adv. Proc. 12-00091-NPO, Dkt. 1).  CHFS and Dickson sought a declaration that EFP/BHT and EFP LLP failed to pay CHFS its share of the net profits under the seven (7) agreements governing the Mortgage Portfolios entered into between January 2008 and March 2011.  CHFS's objections to POCs 6-1, 7-1, 8-1, and 9-1 mirrored these allegations.  CHFS also sought declaratory relief regarding an eighth unwritten joint venture involving the purchase through The Debt Exchange, Inc. ("DebtX") of a pool of residential real estate lots in Atlanta, Georgia (the "Atlanta Property").  CHFS and Dickson filed the Amended Complaint (Adv. Proc. 12-00109-NPO, Dkt. 7) on January 15, 2013.  The Court entered an order on March 5, 2013, consolidating for administrative purposes and discovery adversary proceeding 12-00109-NPO, the Objection to POC 6 & 9, and the Objection to POC 7 & 8.  (Adv. Proc. 12-00109-NPO, Dkt. 13).  EFP/BHT and EFP LLP filed an answer and counterclaim on March 8, 2013. (Adv. Proc. 12-00109-NPO, Dkt. 14).  In their answer, EFP/BHT and EFP LLP denied that EFP LLP (as opposed to EFP) had ever engaged in business with CHFS.   In the counterclaim, EFP/BHT sought, *inter alia*, a declaratory judgment that CHFS's only interest in the Mortgage Portfolios was a right to servicing fees of $20 or $15 and a 25% split of the net proceeds after repayment of EFP/BHT's investment.  CHFS filed an answer to the counterclaim on March 29, 2013.  (Adv. Proc. 12-00109-NPO, Dkt. 16).

### I.    Dickson Guaranty Suit

In the Receivership Action, the District Court found that the automatic stay imposed by operation of law by CHFS's commencement of the Bankruptcy Case did not apply to

the counterclaims asserted by EFP/BHT against Dickson seeking to hold Dickson personally liable on the EFP Note and BHT Note based on two guaranty agreements. (Case No. 3:12-cv-00252-CWR-LRA, Dkt. 109 & 110). The District Court reasoned that Dickson was not in bankruptcy and thus was not protected by the stay.[25] Accordingly, on March 29, 2013, the District Court severed those counterclaims from the claim asserted against CHFS, realigned the parties (with EFP/BHT as the plaintiffs and Dickson as the defendant), and assigned it a new case number, 3:13-cv-00587-CWR-LRA (the "Dickson Guaranty Suit").

**J.      Initiation of Mortgage Portfolios Adversary**

CHFS and Dickson initiated the Mortgage Portfolios Adversary against EFP/BHT, Dr. Edwards, James Edwards, Edwards Family Partnership, LLP, the Atkinson Trust, and DebtX by filing the Complaint (the "MPF Original Complaint") (MPF Adv. Dkt. 1) on November 26, 2013. Many of the allegations in the MPF Original Complaint are similar to those alleged in adversary proceeding 12-00109-NPO, with the notable exception that the MPF Original Complaint names two additional defendants, the Atkinson Trust and DebtX.

CHFS and Dickson alleged in the MPF Original Complaint that CHFS was approved as a registered user of DebtX's online loan sale platform in 2008 and that the defendants, Dr. Edwards, James Edwards, EFP, and Atkinson Trust, used CHFS's username and password in 2010 to purchase (through DebtX) the Atlanta Property, and in doing so misappropriated for themselves a business opportunity that belonged to CHFS

---

[25] The bankruptcy court denied Dickson's request to extend the automatic stay to enjoin EFP/BHT from proceeding with their counterclaims against him was denied as to their claims against him based on his guaranties of the EFP Note and the BHT Note. (HIL Adv. Dkt. 92).

and Dr. Edwards.  After acquiring the Atlanta Property in CHFS's name, Dr. Edwards then transferred the property to the Atkinson Trust.  CHFS and Dickson alleged that DebtX negligently failed to follow its procedures by allowing Dr. Edwards, James Edwards, EFP, and Atkinson Trust to bid on and acquire the Atlanta Property using CHFS's and Dickson's status as a registered user of its online loan sale platform.

## K.  Post-petition Transfers & Rogue Operation

During the course of the Bankruptcy Case, CHFS generated substantial sums of money.  For example, the October 2013 monthly operating report, the last one filed by CHFS as a DIP, showed an ending cash balance of $9,059,191.49.  (Bankr. Dkt. 416; HIL Ex. D-45; MPF Ex. D-50).  Beginning in the fall of 2013, Dickson began transferring most of CHFS's cash to accounts in his name or in the name of affiliated companies in violation of the Cash Collateral Orders.  From November 5, 2013, to January 7, 2014, Dickson transferred approximately $9,095,000 from CHFS's account.  (HIL Ex. P-7, Schedules 8 & 8.1).  There were four wire transfers totaling $8,395,000 to the account of W W Warren Foundation at Banco Panameño in Panama, and one wire transfer totaling $700,000 to the account of Victory Consulting (HIL Ex. D-41; MPF Ex. D-46; PPC Ex. D-16), another entity owned or controlled by Dickson.  The parties have stipulated that W W Warren Foundation and Victory Consulting are insiders and affiliates of Dickson and/or CHFS. (HIL Adv. Dkt. 331 at 42).

| Date | Approximate Amount | Outbound Transfers | Inbound Transfers |
|---|---|---|---|
| 11/05/2013 | $900,000 | DIP Operating Account | W W Warren Foundation at Banco Panameño |
| 11/12/2013 | $795,000 | DIP Operating Account | W W Warren Foundation at Banco Panameño |
| 11/25/2013 | $700,000 | DIP Operating Account | Victory Consulting at Wells Fargo |
| 12/11/2013 | $3,500,000 | EFP Mortgage Portfolios Escrow Account | W W Warren Foundation at Banco Panameño |
| 12/11/2013 | $2,000,000 | BHT Mortgage Portfolios Escrow Account | W W Warren Foundation at Banco Panameño |
| 12/19/2013 | $1,200,000 | DIP Operating Account | W W Warren Foundation at Banco Panameño |
| **Total** | $9,095,000 | | |

(HIL Adv. Dkt. 331 at 42; HIL Ex. P-7, Schedules 8 & 8.1). There were additional wire transfers from Victory Consulting's account at Wells Fargo to RE&B Investment Trust's account at Scotia Bank in Costa Rica totaling $1,325,000 and to W W Warren Foundation's account totaling $450,000. Dickson and others continued to divert funds totaling at least $1.3 million from the estate until approximately April of 2014. (HIL Adv. Dkt. 341 at 37).

In the fall of 2013, Dickson moved from Jackson, Mississippi to Costa Rica and set up a "rogue" operation of CHFS's business there and in Panama. (Bankr. Dkt. 918). This rogue operation had several facets, including:

- written and oral communications with borrowers to send payments to alternate addresses;

- electronic deposits into non-CHFS accounts;

- transmission of checks between the United States and Costa Rica;

- diversion of payoff checks through foreign accounts; and

- purchase of foreign assets.

(HIL Adv. Dkt. 341 at 37-40; HIL Ex. P-7). The rogue operation ceased sometime between mid- to late-April 2014. (HIL Adv. Dkt. 341 at 37).

In March of 2014, Dickson arranged for the shipment of several computer servers, other office equipment, and almost all of CHFS's current loan records to Costa Rica. (HIL Adv. Dkt. 341 at 6 & 9-10). Dickson entered into an agreement with Meehan, the owner of Advanced Communications S.A., a call center in Costa Rica, to provide debt collection services for CHFS beginning in December 2013. (HIL Adv. Dkt. 341 at 37). A former CHFS employee, Reshonda Rhodes, traveled to Cosa Rica on two separate occasions to assist Dickson in setting up the rogue operation. (HIL Adv. Dkt. 341 at 40). As part of the scheme, Dickson changed CHFS's physical mailing address from Jackson, Mississippi, to that of its corporate agent in Las Vegas, Nevada, where payments from borrowers were received and forwarded to Dickson in Costa Rica. (HIL Adv. Dkt. 341 at 54).

## L.    Appointment of Trustee

On August 15, 2012, EFP/BHT filed the Edwards Family Partnership, LP and Beher Holdings Trust's Motion to Appoint Chapter 11 Trustee for Community Home Financial Services, Inc. (the "EFP/BHT Motion to Appoint Trustee") (Bankr. Dkt. 96) based on allegations of pre-petition and post-petition misconduct of CHFS. CHFS opposed the appointment of a chapter 11 trustee (Bankr. Dkt. 120) and, on the same day, filed the Motion for Examiner (the "CHFS Motion to Appoint Examiner") (Bankr. Dkt. 121). In response, the U.S. Trustee asked the Court to grant the CHFS Motion to Appoint Examiner and hold the EFP/BHT Motion to Appoint Trustee in abeyance pending the examiner's report. (Bankr. Dkt. 122). In an order entered on September 25, 2012, the Court held both

the EFP/BHT Motion to Appoint Trustee and the CHFS Motion to Appoint Examiner in abeyance.[26]  (Bankr. Dkt. 133).

On December 20, 2013, counsel for CHFS, who was unaware of Dickson's activities at the time they occurred, filed the Disclosure of Transfer of Funds and Other Matters (the "Disclosure") (Bankr. Dkt. 426), notifying the Court of the following:

> 1)    CHFS has changed its principal place of business from Jackson, Mississippi to Panama.
>
> 2)    CHFS has transferred funds from the DIP [Operating Account] at Wells Fargo Bank to other CHFS bank accounts located in Panama.
>
> 3)    CHFS has set up two (2) branch offices-one in Panama and one in Costa Rica.  The business operations of CHFS are continuing to be conducted at these two branch locations.

(Bankr. Dkt. 426 at 1).  Contrary to the Disclosure, the funds were not transferred "to other CHFS bank accounts" but to accounts owned by Dickson or affiliated companies.  (HIL Ex. P-7 at 11).

In response to the Disclosure, the U.S. Trustee filed the United States Trustee's Emergency Motion for Order for the Appointment of a Chapter 11 Trustee (Bankr. Dkt. 427) on December 20, 2013.  On December 23, 2013, the Court entered the Order Granting United States Trustee's Emergency Motion for Order for the Appointment of a Chapter 11 Trustee (Bankr. Dkt. 429).

On January 8, 2014, the U.S. Trustee filed the United States Trustee's Application for Approval of Chapter 11 Trustee (Bankr. Dkt. 455), seeking approval of the appointment of Johnson as the chapter 11 trustee.  EFP/BHT filed the Objection to Application for

---

[26] On March 4, 2014, the Court dismissed as moot the EFP/BHT Motion to Appoint Trustee and the CHFS Motion to Appoint Examiner because of the later appointment of the Trustee.  (Bankr. Dkt. 551).

Approval of Chapter 11 Trustee (Bankr. Dkt. 458), alleging the existence of a conflict or "adverse interest" arising out of the representation by Johnson's law firm of the accountant firm retained by CHFS as an expert witness in the Bankruptcy Case.  After finding that Johnson had no conflict and was a "disinterested person" as defined under 11 U.S.C. § 101(14), the Court entered the Order (Bankr. Dkt. 473), approving Johnson's appointment as the chapter 11 trustee on January 21, 2014.

Upon entry of the order granting the emergency motion for appointment of a chapter 11 trustee and approving the appointment of Johnson as the Trustee, Dickson no longer had any decision-making authority for CHFS.  11 U.S.C. § 704, § 1106. Nevertheless, Dickson's efforts to transfer CHFS's business and assets within the United States, between the United States and Latin America, and within Latin America continued after the Trustee's appointment.  (HIL Adv. Dkt. 341 at 37).

## M.    Trustee's Investigation of Funds Stolen & Diverted

The Trustee's investigation of Dickson's conduct revealed that the $9,095,000 million transferred by him and the $1.3 million later diverted from the estate were laundered, commingled, and otherwise dissipated by the purchase of Costa Rican loans and a condominium in Los Sueños, Costa Rica, in the names of other entities including Philanfin, S.A. and Phalanx, S.A.  The Trustee eventually discovered a document that appeared to transfer shares of stock in CHFS to Dickson and Phalanx, S.A., a Costa Rican company.  (HIL Ex. P-13; MPF Ex. P-17; HIL Adv. Dkt. 341 at 22).  The Trustee also found mortgages held in the name of Philanfin, S.A. with a value of over $2 million.  (HIL Adv. Dkt. 341 at 25).  The parties have stipulated that Phalanx, S.A. and Philanfin, S.A. are insiders and affiliates of CHFS and/or Dickson.  (HIL Adv. Dkt. 331 at 42).

At the time of the Trustee's appointment, CHFS was essentially no longer an on-going business in the United States. CHFS had only approximately $7,500 cash on-hand, collectively, in numerous bank accounts. (HIL Adv. Dkt. 341 at 5). The Trustee sent letters to all individuals and entities having any connection with the Bankruptcy Case, demanding that they turn over any assets, information, or documents belonging to the estate. (HIL Adv. Dkt. 341 at 5). The Trustee conducted an examination of Dickson under Rule 2004 of the Federal Rules of Bankruptcy Procedure during which she asked him about the whereabouts of loan records, but Dickson refused to answer almost every question, invoking his Fifth Amendment right against self-incrimination. (HIL Adv. Dkt. 341 at 6).

On February 7, 2014, Dr. Edwards sent the Trustee by email a copy of a report he prepared at the request of the Federal Bureau of Investigation ("FBI"), as well as other documents. (MPF Ex. D-42; HIL Ex. D-37; PPC Ex. D-12; HIL Adv. Dkt. 341 at 50). The report included information obtained by Dr. Edwards as a result of subpoenas that Dr. Edwards' attorneys issued to all known banks where Dickson and/or his affiliated companies held accounts and also as a result of the investigation undertaken by Dr. Edwards' attorneys in Costa Rica. (HIL Adv. Dkt. 341 at 153-54). On February 9, 2014, Dr. Edwards sent the Trustee another email to which he attached a chart prepared by his lawyers in Costa Rica regarding bank accounts held by Dickson. (PPC Ex. D-1). In the email, he offered "to initiate legal proceedings in Costa Rica to freeze these assets for the bankruptcy estate." (PPC Ex. D-1).

Based on mostly outdated records obtained from Dr. Edwards and information gleaned from CHFS's mail, the Trustee sent letters to consumers instructing them to remit their loan payments to her, to provide her with copies of the loan documents (since the

borrowers initially were the Trustee's primary source of information), and to ignore payment instructions from anyone else. (HIL Adv. Dkt. 341 at 54 & 99). When the Trustee discovered that Dickson had informed borrowers that CHFS had changed its Mississippi address to the Nevada address, someone notified borrowers to send their payments to a new address in Miami, Florida, where payments again were being forwarded to Dickson in Costa Rica.

**N.     Stay of Adversary Proceedings**

In each of the Adversary Proceedings initiated by CHFS and Dickson, an order was entered on March 6, 2014, substituting the Trustee for CHFS as the proper party-in-interest. (HIL Adv. Dkt. 121; MPF Adv. Dkt. 21; Adv. Proc. 12-00109-NPO, Dkt. 71); 11 U.S.C. § 323; FED. R. BANKR. P. 6009. In the same orders, the Court stayed the Adversary Proceedings. (HIL Adv. Dkt. 121, MPF Adv. Dkt. 21; Adv. Proc. 12-00109-NPO, Dkt. 71).

**O.     Criminal Proceedings Against Dickson**

On March 10, 2014, a criminal complaint was filed against Dickson, alleging that Dickson "conspired to wire approximately $9,095,000.00 from accounts subject to bankruptcy protection to accounts [he] owned and/or controlled." (Case No. 3:14-cr-00078-TSL-FKB, Dkt. 1 at 4). Dickson was detained in Panama in federal custody and deported to the United States while *en route* to Costa Rica. Upon his return to the United States, Dickson was arrested for bank fraud and held without bond. An indictment was issued on April 9, 2014.

**P.**     **Trustee's Efforts to Locate Loan Documents**

Although the Trustee initially gained access to CHFS's computer servers in Panama with Allen's login information, Dickson reached out from his jail cell to Reshonda Rhodes to contact the computer server company in Panama to deactivate Allen's password.  (HIL Adv. Dkt. 341 at 7).  The Trustee appeared at Dickson's arraignment in April of 2014, and demanded that he execute consents to allow her access to CHFS's four (4) computer servers in Panama.  (HIL Adv. Dkt. 341 at 7).  The Trustee eventually obtained access to three of the four computer servers in Panama.  Of these, one of the servers had been wiped clean.  (HIL Adv. Dkt. 341 at 7-8).  Some information on the other two servers was encrypted.  The Trustee retained a forensic computer technician to break the codes, but he was unsuccessful.  The Trustee found inconsistencies in the data between the two servers.  (HIL Adv. Dkt. 341 at 30).  A borrower's name may be on one or both servers, and when a borrower's name was found on both servers, the borrower's information was sometimes different with no server being more accurate than the other.

After leaving a meeting with counsel for Dickson and his affiliates where she obtained permission to enter CHFS's place of business in Jackson, Mississippi, and remove whatever records were there, the Trustee went to 234 East Capitol Street but was denied access past the reception area by Dickson's family members and employees.  (HIL Adv. Dkt. 341 at 9).  When the Trustee returned the next Monday, all furniture and furnishings, including all certificates and pictures hanging on the walls, had been removed.  The Trustee found only a handful of documents, but they related to old loans.  (HIL Adv. Dkt. 341 at 9).

Despite demands from the Trustee, not all books and records of CHFS, electronic or otherwise, were surrendered to her. (HIL Adv. Dkt. 341 at 5). The original documents assigning mortgages to CHFS and purportedly from CHFS to BHT have never been recovered by the Trustee. Although Dickson testified that certain documents and access codes are in a warehouse in Panama, he has not disclosed the location of the warehouse. (HIL Adv. Dkt. 341 at 6).

**Q.     ClearSpring**

An order was entered on April 11, 2014, allowing the Trustee to service loans with the assistance of counsel, *nunc pro tunc* to January 8, 2014, until a professional mortgage servicing company could be approved by the Court. (Bankr. Dkt. 616). That same day, the Trustee filed an application seeking permission to hire Vantium Capital, Inc., later known as ClearSpring Loan Services, Inc. ("ClearSpring"),[27] to service the vast majority of the consumer loans. (Bankr. Dkt. 618; HIL Adv. Dkt. 341 at 18, 92). EFP/BHT objected to the proposed servicing contract, alleging that the fees the Trustee proposed to pay ClearSpring were unreasonably high. (Bankr. Dkt. 630). The parties resolved their dispute, and the application was approved on June 3, 2014. (Bankr. Dkt. 702; PPC Ex. P-16). In the Agreed Order Granting Trustee's Application to Employ Loan Servicing Company and to Establish Settlement Authority (Bankr. Dkt. 702; PPC Ex. P-16), the Trustee proposed to pay ClearSpring, in general, an electronic boarding fee of $25 per loan (including dormant loans); a one-time administrative accounting work fee of $35 per loan, a deboarding/transfer fee of $25 per loan; a performing loan fee of 10% of payments collected, up to $50 per loan with a minimum $20 fee; fifty percent (50%) of late fees; and

---

[27] ClearSpring changed its name to Sortis Financial Inc., effective January 1, 2018. (HIL Adv. Dkt. 353).

base fees of $7.50 per month per dormant loan.   EFP/BHT agreed to cooperate with ClearSpring in order to smooth the transition and reduce costs by releasing original loan documents, when requested, and providing information to ClearSpring.   In return, ClearSpring agreed to allow EFP/BHT to track its servicing activities by granting them "view only" access to its proprietary web-based software.  In addition, the Trustee agreed to provide EFP/BHT with monthly reports of collections received from ClearSpring. Finally, the parties agreed that ClearSpring's fees and expenses would be a surcharge under 11 U.S.C. § 506(c) that would not be subject to "claw back" for any cause other than a violation of the terms of the servicing agreement with ClearSpring.

The electronic information on CHFS's computer servers along with physical records and files created by the Trustee when borrowers contacted her, were transferred to ClearSpring, and ClearSpring went "live" in June of 2014.  (HIL Ex. P-24).  Alan Sercy ("Sercy"), president and chief executive officer of ClearSpring, testified at Trial that the information from CHFS's servers designated loans as either EFP, BHT, CHFS, or Discount Home Mortgage, Inc., and ClearSpring continued those same designations.  (HIL Adv. Dkt. 341 at 96-97; HIL Ex. P-24 at 3).  The Trustee did not ask ClearSpring to verify that a loan belonged to any particular portfolio. (HIL Adv. Dkt. 341 at 29).   Initially, 3,828 loans were "boarded" with ClearSpring.  (HIL Ex. P-24 at 3).

**R.    Turnover Order**

On April 25, 2014, the Court entered the Order Granting Edwards Family Partnership, LP and Beher Holding Trust's Emergency Motion for Order Directing William D. Dickson to Show Cause and Directing Him to Return the Funds Transferred from the Bankruptcy Estate (the "Turnover Order") (Bankr. Dkt. 631; PPC Ex. P-27) in

the Bankruptcy Case. The Turnover Order required Dickson to provide information and documents to the Trustee pursuant to 11 U.S.C. § 521(a)(3)-(4) within ten (10) business days. Dickson failed to comply with the Turnover Order. (HIL Adv. Dkt. 341 at 5).

**S.      Edwards TRO Case**

In District Court, EFP/BHT sued W.D. Dickson Enterprises, Inc., Crisco Investments, Inc., Phalanx, S.A., Victory Consulting, and Dickson (the "Edwards TRO Case") (Case No. 3:14-cv-00436-CWR-LRA) on June 3, 2014. Dr. Edwards became concerned that Dickson, from his jail cell, was attempting to auction real property held for him by shell corporations. EFP/BHT asked the District Court to issue an injunction restraining the named defendants from selling the real property. On June 11, 2014, EFP/BHT filed the First Amended Complaint (the "Amended Edwards TRO Complaint") (Case No. 3:14-cv-00436-CWR-LRA, Dkt. 10), adding as defendants W W Warren Foundation, Discount Mortgage, Inc., Discount Home Mortgage, Inc., and Double S Construction, Inc., all of whom are affiliates and/or insiders of CHFS. The Amended Edwards TRO Complaint asserted claims to avoid the fraudulent conveyance of the stock of Victory Consulting (present owner of CHFS stock) to W W Warren Foundation, avoidance of fraudulent liens related to certain items of real property owned by affiliates of CHFS, injunctive relief and the appointment of a receiver, imposition of a constructive trust, and piercing of the corporate veil of certain affiliates/insiders of CHFS. According to EFP/BHT, the Amended Edwards TRO Complaint was filed "against these non-debtor persons and companies to try to un-do and/or stop certain pre- and post-bankruptcy fraudulent transfers by the debtor." (Case No. 3:14-cv-00436-CWR-LRA, Dkt. 35). After no substantive activity in the Edwards TRO Case for nearly two (2) years, the District Court

entered an order on January 12, 2017, closing the Edwards TRO Case without prejudice. (Case No. 3:14-cv-00436-CWR-LRA, Dkt. 42).

T.    **Dickson Adversary Proceeding**

On June 4, 2014, the Trustee initiated an action similar to the Edwards TRO Case, adversary proceeding 14-00030-NPO (the "Dickson Adversary Proceeding"), against Dickson, certain related companies, and insiders, seeking to recover pre-petition and post-petition transfers under the avoidance powers granted her by 11 U.S.C. § 544.  In the Dickson Adversary Proceeding, the Trustee alleged certain defendants related to Dickson continued to withhold funds and proprietary information belonging to the estate.  The Trustee also alleged "[u]pon information and belief, some of [CHFS's] money transferred pre-petition and/or post-petition to bank accounts in Latin America has been transferred to one or more of the Defendants or has funded purchases by one or more of the Defendants, including real property in Latin America and mortgage loans in Latin America, the proceeds of which are generating income received from additional borrowers."  (Adv. Proc. 14-00030-NPO, Dkt. 33 n.23).  The Trustee also sought to equitably subordinate Dickson's claims, including his claim for indemnity, and to enjoin the sale at auction of the properties owned by insiders and/or affiliates of CHFS.[28]

U.    **Recovery of Funds**

Beginning in July of 2014, the Trustee recovered and/or intercepted funds totaling $6,693,838.38.  (HIL Ex. P-7 at 12-13).  On July 10, 2014, $3,099,154.09 was wired to the Trustee from a CHFS account at Banco Panameño.  (HIL Adv. Dkt. 331 at 43).  (Banco Panameño later became Banvivienda Bank.  (HIL Adv. Dkt. 341 at 28)).  On July 10, 2014,

---

[28] The trial of the Dickson Adversary Proceeding took place on December 7, 2017, and is the subject of the Dickson Adversary Opinion.

$1,824,871.49 was wired to the Trustee from a "Dickson William D" account at Banco Panameño.  On March 19, 2015, $408,146.70 was wired to the Trustee from a CHFS account at Banco Panameño.  Finally, on April 3, 2015, $566,106.61 was wired to the Trustee from a CHFS account at Banco Panameño.

| 07/10/2014 | $3,099,154.09 | CHFS Account at Banco Panameño |
| 07/10/2014 | $1,824,871.49 | "Dickson William D" Account at Banco Panameño |
| 03/19/2015 | $408,146.70 | CHFS Account at Banco Panameño |
| 04/03/2015 | $566,106.61 | CHFS Account at Banco Panameño |
| **Total** | $5,898,278.89 | |

(HIL Ex. P-7 at 12-13).  The Trustee also intercepted two cashier's checks totaling $540,000 made payable to CHFS.  The Trustee intercepted the first cashier's check in the amount of $300,000 from BancorpSouth dated January 29, 2014, and the second $240,000 cashier's check from a W.D. Dickson account at OmniBank, dated February 25, 2014. (HIL Adv. Dkt. 341 at 26).

| Date | Amount | Account |
| --- | --- | --- |
| 01/29/2014 | $300,000 | BancorpSouth |
| 02/25/2014 | $240,000 | W.D. Dickson Account at OmniBank |
| **Total** | $540,000 | |

The Trustee also received $144,191.90 from a settlement related to Coastal Condos and $111,367.59 from the sale of Willow Court.  (HIL Ex. P-7 at 13; HIL Adv. Dkt. 340 at 94). The Trustee testified that she was unable to credit these funds against any particular CHFS borrower loans.  (HIL Adv. Dkt. 341 at 28).

## V.    Partial Summary Judgment in Dickson Guaranty Suit

In the Dickson Guaranty Suit, EFP/BHT moved for partial summary judgment as to Dickson's liability as guarantor since the EFP Note and BHT Note matured on August 1, 2013, and remain unpaid.  (Case No. 3:13-cv-00587-CWR-LRA, Dkt. 14).  The District Court entered an order granting partial summary judgment in favor of EFP/BHT on

September 10, 2014 (the "September 10 Order") (PPC Ex. P-25); *Edwards Family P'ship, LP v. Dickson*, Case No. 3:13-cv-00587-CWR-LRA, 2014 WL 4494283 (S.D. Miss. Sept. 10, 2014). The District Court found that CHFS had defaulted on the EFP Note and BHT Note and that Dickson was personally liable by virtue of the guaranties he signed. (*Id.*, at *3). "Dickson signed these agreements [with EFP/BHT] and testified to its validity . . . . According to Dickson, CHFS made payments under the terms of the original loan agreements, the amended agreements, and the BHT and EFP notes until October 2011." (*Id.*, at *1-2). Applying Mississippi contract law, the District Court ruled that the clear and unambiguous language of the guaranty agreements rendered Dickson personally liable for the debt owed by CHFS. The District Court ordered the parties to file affidavits establishing the extent of Dickson's liability. On August 26, 2015, the District Court concluded that Dickson owed, as of September 20, 2014, on the EFP Note $3,775,995 (principal), $2,651,983 (interest), and $2,946 (per diem) and on the BHT Note $11,327,984 (principal), $8,021,207 (interest), and $8,868 (per diem) (Case No. 3:13-cv-00587-CWR-LRA, Dkt. 67). The District Court entered a final judgment in favor of EFP/BHT on September 1, 2015. (PPC Ex. P-30).

Dickson appealed the decision to the Fifth Circuit Court of Appeals, arguing that the summary judgment was premature because of the pending Home Improvement Loans Adversary in which he and CHFS were challenging the extent and validity of the EFP Note and BHT Note. Dickson posited that if CHFS's obligation fell away, then his should too. On May 23, 2016, the Fifth Circuit affirmed the District Court. *Edwards Family P'ship L.P. v. Dickson*, 821 F.3d 614 (5th Cir. 2016). Based on the unambiguous language of the guaranty agreements, the Fifth Circuit ruled that Dickson waived any defenses to the

enforcement of the EFP Note and BHT Note, and, therefore, was required to satisfy the obligations "no matter what." *Id.* at 614.

## W.      Rejection of Servicing Contract

On June 4, 2014, the Trustee obtained authority from the Court pursuant to 11 U.S.C. § 365(a) to reject the servicing agreement entered into between CHFS and SNGC, LLC on August 26, 2005.  (MPF P-15; Bankr. Dkt. 705; HIL Adv. Dkt. 341 at 12).  Under the contract, CHFS had agreed to service certain loans that SNGC, LLC had purchased prior to the Petition date for a servicing fee.   The Trustee determined it was not economically feasible to continue to service these loans and that it was in the best interest of the estate to allow SNGC, LLC to service its own loans.

## X.      Dr. Edwards & Meehan

Dr. Edwards testified that Meehan[29] first contacted him by telephone on September 11, 2014.  (HIL Adv. Dkt. 341 at 200).  The next day, Dr. Edwards emailed Meehan a copy of the September 10 Order "granting Edwards Family Partnership its Judgment against Dickson under his Guaranty.  (PPC Ex. P-32).[30]  Only two days before, on September 10, 2014, the District Court had entered the September 10 Order, but at this juncture the District Court had not yet determined the amount of damages that Dickson owed EFP/BHT and had not yet entered a final judgment in the Guaranty Suit.  (PPC Ex. P-25).

---

[29] Meehan is a U.S. citizen who resides in Costa Rica.  (HIL Adv. Dkt. 341 at 31). Meehan did not testify at Trial and was not deposed by either party. The Trustee testified that she subpoenaed Meehan to attend the Trial, but he was unable to comply with the subpoena because leaving Costa Rica would have jeopardized a pending custody dispute with his estranged spouse.  (HIL Adv. Dkt. 341 at 31-32).

[30] In the chain of emails between Dr. Edwards and Meehan, the Court admitted into evidence only those written by Dr. Edwards.  (HIL Adv. Dkt. 341 at 203).

In other emails on September 12, 2014, Dr. Edwards informed Meehan that he was "trying to arrange a trip to San Jose" and would like to meet with him "to review the CHFS computers and Dickson's property," and talk to Dickson's former attorney.  (PPC Ex. P-32).  There were other email exchanges between Dr. Edwards and Meehan from September 25, 2014, through February of 2015.  (PPC Ex. P-32).

On October 11, 2014, at 9:32 a.m.,[31] Dr. Edwards wrote in an email to Barber, counsel for the Trustee, "Martha [Borg] forwarded your question on the Sanford mortgage release . . . Jeff [Barber], please exit the loan servicing business as we cannot abide by your firm's charges.  Let Vantium deal with CHFS loose ends; Martha [Borg] and I will deal with EFP and BHT loose ends."  (PPC Ex. P-12).  Dr. Edwards did not reveal to Barber his ongoing communications with Meehan.  Later that same day at 11:00 a.m., Dr. Edwards emailed Meehan, "Did you receive the first wire? Was your IT guy able to open the loan files?"  (PPC Ex. P-32 at 59).

On October 14, 2014, Meehan emailed Dr. Edwards the link to a dropbox account containing CHFS data pulled from a CHFS computer.  (PPC Ex. P-32 at 61).  Dr. Edwards was unable to access the dropbox and asked Meehan to mail him the information on CDs.  (HIL Adv. Dkt. 341 at 206).  Sometime later, Meehan mailed Dr. Edwards two CDs containing the hard drive of the computer used by Reshonda Rhodes.  (HIL Adv. Dkt. 341 at 157 & 203; PPC Ex. P-34).  On October 15, 2014, Dr. Edwards informed Meehan in an email that he had opened the two CDs but that they did not contain all of the loan servicing data he needed.  He instructed Meehan to use Dickson's former employees to obtain access to CHFS information from another off-site server.  Dr. Edwards also inquired whether

---

[31] The times shown on the emails from Dr. Edwards are assumed to reflect Eastern Standard Time.

Meehan had received the first wire transfer payment, noting that he had "agreed to send the second thousand if I was able to find any useful information. Certainly some of the information on the CDs will find a use." (PPC Ex. P-32 at 66).

At Trial, Edwards testified that he believed the CDs to be duplicates of each other and that they contained no new or relevant information. (HIL Adv. Dkt. 341 at 157). Nevertheless, he admitted that he wired Meehan money but only "out of just appreciation." (HIL Adv. Dkt. 341 at 207). Dr. Edwards gave one of the CDs to the FBI and kept the other. (HIL Adv. Dkt. 341 at 208-09; PPC Ex. P-34).

**Y.      Extension of 11 U.S.C. § 546 Deadline**

On October 27, 2014, the Trustee filed in the Bankruptcy Case the Trustee's Motion to Extend 11 U.S.C. § 546 Deadline (the "Motion to Extend") (Bankr. Dkt. 848). On November 13, 2014, the Court entered the Order Granting Trustee's Motion to Extend 11 U.S.C. § 546 Deadline [Dkt. #848] (Bankr. Dkt. 877), enlarging the one-year limitations period in 11 U.S.C. § 546 to January 21, 2016.

**Z.      Dr. Edwards' Plans to Travel to Costa Rica**

Between November 12 and 19, 2014, Dr. Edwards and Meehan began discussing, through emails, Dr. Edwards' plans to visit Costa Rica from December 3 to December 9, 2014. (PPC Ex. P-32). He also planned a telephone interview with Daniel Romero ("Romero"), Meehan's attorney. On November 28, 2014, Dr. Edwards asked Meehan to arrange a meeting with Martinez, Dickson's former attorney, to "enlist his help in reclaiming stolen assets." (PPC Ex. P-32 at 51-52). Dr. Edwards also asked Meehan, "Can you get a list of the mortgages and other investments that attorney Jose Martinez prepared for Dickson? Is he still willing to help us reclaim stolen funds or is he backing off?" Dr.

Edwards then stated, "If he is still on our side I would like to set up a meeting with him between December 6 evening to Dec 8 AM."  (PPC Ex. P-32 at 42).

**AA.    Cash Collateral Objection & Trustee's Cash Motion**

On December 3, 2014, EFP/BHT filed the Cash Collateral Objection, objecting to the Trustee's use of their alleged cash collateral and asserting that the collections by the Trustee and ClearSpring on the Home Improvement Loans and the Mortgage Portfolios belonged to them.  They expressed concerns over the demands for payment of administrative expenses and sought an order prohibiting the Trustee from using any of the cash generated by collections on either the Home Improvement Loans or the Mortgage Portfolios.

On December 22, 2014, the Trustee filed the Response to Cash Collateral Objection, stating that the relief requested by EFP/BHT exceeded the relief afforded under 11 U.S.C. § 363 and that EFP/BHT's interest in the cash was adequately protected.  The Trustee incorporated by reference the authorities and arguments presented in the Trustee's Cash Motion filed on December 5, 2014, shortly after the filing of the Cash Collateral Objection.

In the Trustee's Cash Motion, the Trustee sought permission from the Court, to the extent required, to use cash to maintain the operations of CHFS in the ordinary course of business until the confirmation of a plan of liquidation.  The Trustee explained that until the filing of the Cash Collateral Objection, EFP/BHT had agreed to the use of cash to operate the business, first by CHFS and then by the Trustee.

The Trustee asserted that the interests of EFP/BHT were adequately protected by: (a) repatriation of approximately $4.9 million wrongfully removed from the estate and the

Trustee's ongoing efforts to repatriate additional funds; (b) the monthly accumulation of cash through the servicing of loans by ClearSpring; (c) numerous orders preserving the rights, claims, and defenses of EFP/BHT regarding estate assets; (d) estate funds being safeguarded in the Trustee's accounts subject to her sole access; and (e) the monthly operating reports, which are current and accessible, pursuant to an agreed order, to ClearSpring's reports. The Trustee expressed her willingness to remit monthly payments to EFP/BHT, provided that sufficient funds remained in the estate to meet its obligations.

The Trustee disputed EFP/BHT's assertion that the cash generated from the Home Improvement Loans belonged to them. Also, she pointed out that 11 U.S.C. § 363 permits the Court to order the use of cash irrespective of a putative secured creditor's lack of consent. The Trustee also disputed EFP/BHT's assertion that they own the Mortgage Portfolios because no adjudication had been made to that point. Certain of the transactions were not governed by a written agreement, and complicated issues existed as to which law applied to fill in the gaps, according to the Trustee. Moreover, some of the alleged Mortgage Portfolios are titled in the name of CHFS.

The Trustee characterized EFP/BHT's request for relief as an attempt to "strangle" the estate and prevent her from exercising her statutory duties. (Bankr. Dkt. 906 at 8). For example, without the use of cash, the Trustee could not: (1) maintain corporate good standing in states that require payment of franchise fees and annual fees as a condition precedent to foreclosing loans or suing to collect indebtedness; (2) pay the monthly charge for remote access to CHFS's computer servers in Panama necessary to service loans that have not been boarded with ClearSpring; (3) refund amounts to borrowers improperly assessed by CHFS in violation of federal statutes; (4) pay recording fees to cancel

mortgages that have been paid in full; (5) pay U.S. Trustee fees; and (6) pay appropriate state and federal taxes. (Bankr. Dkt. 906 at 9). To the extent required, the Trustee requested permission to use cash for ordinary expenses of the estate *nunc pro tunc* to January 16, 2014, the date the Court approved her appointment.

In the Response to Trustee's Cash Motion, EFP/BHT alleged that the overwhelming majority of the cash collected was either their cash collateral or cash in which the estate held no interest. In support of their position, they pointed to the criminal conduct of Dickson in taking the post-petition collections and diverting them to accounts in Latin America. If the cash collected belonged to CHFS, they reasoned, "Dickson would not have needed to resort to self-help." (Bankr. Dkt. 919 at 1). They claimed that the Home Improvement Loans Adversary placed a "choke hold" on their ability to obtain relief from the automatic stay and realize on their collateral. They asked the Court to prohibit any use of their cash collateral until resolution of the Home Improvement Loans Adversary. In the Reply to Response to Trustee's Cash Motion, the Trustee claimed that EFP/BHT did not oppose the order holding in abeyance the Home Improvement Loans Adversary and did not request that the Court lift the hold. The Trustee interposed a procedural objection in that "EFP/BHT should not be permitted to obtain factual findings on the Joint Venture Loans in a contested matter that could arguably have preclusive effect in the Adversary Proceeding relating to the Joint Venture Loans." (Bankr. Dkt. 926 at 4 n.7).

## BB.    Dr. Edwards' Trip to Costa Rica

Dr. Edwards traveled to Costa Rica on December 3, 2014. (HIL Adv. Dkt. 341 at 157). While there, he met with Meehan as they had planned. On December 10, 2014, Dr. Edwards notified Meehan by email that he had wired $1,000 to his account so that Meehan

"will be able to accomplish 3 things ASAP." (PPC Ex. P-32 at 64). Among them, Dr. Edwards asked Meehan to "[d]ownload to CD information in hard drive of one container computer and one call center computers." (PPC Ex. P-32 at 64). In an email from Dr. Edwards dated December 27, 2014, he asked Meehan, "I have not received the downloads from the two computers we found in your office. Do you have them?" (PPC Ex. P-32 at 62).

In a letter dated February 4, 2015, the Trustee informed Borg and McCarley that ClearSpring "ha[d] been trying to locate documents on certain loan files in order to pursue collections, respond to borrower Qualified Written Requests under RESPA,[32] analyze modification requests, and respond to inquiries by borrowers or governmental agencies." (PPC Ex. P-15). The Trustee reminded Borg and McCarley that their compliance with this request was required pursuant to the order that approved ClearSpring as the loan servicer (Bankr. Dkt. 702; PPC Ex. 16). Neither Dr. Edwards nor Borg notified the Trustee of the CHFS information they had obtained from Meehan. (HIL Adv. Dkt. 341 at 41).

In emails between February 6 and 9, 2015, Dr. Edwards asked about the assets seized by the Costa Rican government from Dickson. In an email to Meehan's attorney on February 13, 2015, Dr. Edwards asked whether any seized assets would be "paid over to the victims (my companies), the FBI or to whom?" (PPC Ex. P-32 at 68).

According to Dr. Edwards, the only information he ultimately received from Meehan were some computer records of the Home Improvement Loans and the other EFP/BHT portfolios that Meehan copied onto CDs. Dr. Edwards testified that he believed the information on the CDs were duplicative of records already in the Trustee's possession.

---

[32] Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 *et seq.*

Thus, Dr. Edwards supposedly believed he had no useful information to turn over to the Trustee.  (HIL Adv. Dkt. 341 at 157-58).  Dr. Edwards testified that despite his efforts, he was unable to collect any money from any source in Costa Rica or Panama.  (HIL Adv. Dkt. 341 at 158).

According to the Trustee, as a result of Dr. Edwards' contact with Meehan from September of 2014 to February of 2015, Dr. Edwards had knowledge of approximately 2,000 loans, at least two bank accounts in CHFS's name (one with Banco de Costa Rica and the other with Banco Panameño), over $1.5 million in loans purchased in Costa Rica with funds stolen from the estate, and the names of two CHFS affiliates (Pirrana SA and Mary Madison Foundation), all of which she was previously unaware.

## CC.   Trustee & Meehan

Meehan attempted to contact the Trustee for the first time on February 17, 2015. (HIL Adv. Dkt. 341 at 30-31).  But for Meehan contacting the Trustee directly, she would not have known the location of CHFS's computers in Costa Rica or other information regarding the financial affairs as well as books and records of CHFS's operations there, all of which Dr. Edwards knew five months earlier.  In February or March of 2015, Meehan gave the Trustee a CD, which was another copy of the hard drive of Reshonda Rhodes' computer.  (HIL Adv. Dkt. 341 at 40; PPC Ex. P-34).[33]  The CD contained borrower information, information about Costa Rican loans, and forms that changed automatic draft deposits into Victory Consulting's account at Wells Fargo.  (HIL Ex. D-38).  There was also information about the Mary Madison Foundation, a foreign company formed by Dickson after the Trustee's appointment.  The CD also contained information about Costa

---

[33] After Trial, the Court became aware that the CD admitted as "PPC Ex. P-34" contained a computer virus.

Rican and Panamanian bank accounts. (HIL Adv. Dkt. 341 at 42). The Trustee learned that from September of 2014 to March of 2015, the Costa Rican government seized from those accounts and affiliated accounts of Dickson $587,749.95 as part of its criminal investigation. (HIL Adv. Dkt. 341 at 42). The Trustee testified at Trial that she incurred increased attorney's fees of $61,000 and increased servicing costs as a result of not having this information earlier. (HIL Adv. Dkt. 341 at 43-44).

In the Trustee's Supplemental Response to Cash Collateral Objection filed on April 7, 2015, the Trustee alleged that EFP/BHT, by and through Dr. Edwards, had violated the automatic stay by exercising possession and control over property of the estate located in Costa Rica. The Trustee indicated that she would shortly file pleadings seeking an adjudication as to whether EFP/BHT should be stripped of its rights to the cash as the result of Dr. Edwards' conduct. Likewise, in the Supplemental Reply to Response to Trustee's Cash Motion filed on April 7, 2015, the Trustee reiterated that EFP/BHT, by and through Dr. Edwards, had violated the automatic stay by exercising possession and control over property of the estate located in Costa Rica. The Trustee again indicated that she would shortly file pleadings seeking an adjudication as to whether EFP/BHT should be stripped of its rights to the cash as the result of Dr. Edwards' conduct. (HIL Adv. Dkt. 341 at 42).

## DD.    Trustee's Initiation of RICO Case

On April 7, 2015, the Trustee initiated a civil action in District Court against EFP, BHT, Dr. Edwards, Borg, and James R. Edwards in *Johnson v. Edwards Family P'ship, LP*, Case No. 3:15-cv-00260-CWR-LRA (S.D. Miss. 2015) (the "RICO Case"). The Trustee alleged nine (9) counts in the complaint (the "RICO Complaint"), including: damages under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18

U.S.C. § 1962(c) (the "RICO Claim"), declaratory judgment and damages for violations of the automatic stay under 11 U.S.C. § 362(a), (k); equitable subordination of the claims of EFP/BHT to the rights of all of CHFS's creditors except Dickson, pursuant to 11 U.S.C. § 510(c); turnover of property pursuant to 11 U.S.C. § 542(a); unauthorized post-petition transactions under 11 U.S.C. § 549; re-characterization of EFP/BHT's claims as equity; tortious interference with contract; civil conspiracy; and conversion. (Case No. 3:15-cv-00260-CWR-LRH, Dkt. 1).

## EE.    Trustee's Withdrawal Motions

In early April, 2015, the Trustee filed five (5) motions in the Bankruptcy Case and related adversary proceedings, asking the District Court to withdraw the reference to the Bankruptcy Court of the entire Bankruptcy Case or, alternatively, to withdraw certain adversary proceedings and contested matters, pursuant to 28 U.S.C. § 157(d) and to consolidate them with other pending District Court cases, pursuant to FED. R. CIV. P. 42(a), into two (2) new parallel District Court cases (the "Withdrawal Motions") (Bankr. Dkt. 1026; HIL Adv. Dkt. 156; Adv. Proc. 12-00109-NPO, Dkt. 77; MPF Adv. Dkt. 26; Dickson Adv. Dkt. 90; PPC Adv. Dkt. 6). The filing of the Withdrawal Motions initiated five (5) new District Court actions: Case No. 3:15-cv-00312-CWR-LRA; Case No. 3:15-cv-00313-CWR-LRA; Case No. 3:15-cv-00314-CWR-LRA; Case No. 3:15-cv-00315-CWR-LRA; and Case No. 3:15-cv-00316-CWR-LRA. Specifically, the Trustee asked the District Court either to withdraw the reference of the entire Bankruptcy Case or alternatively to withdraw the reference of the following adversary proceedings and contested matters:

     a.     Home Improvement Loans Adversary;
     b.     Mortgage Portfolios Adversary;
     c.     Adversary Proceeding 12-00109-NPO;
     d.     Dickson Adversary Proceeding;
     e.     Cash Collateral Objection & related contested matters;
     f.     POC 4-1 through 9-1; and
     g.     POC 10-1.

The Trustee then asked the District Court to consolidate all of these matters into two (2) federal court actions, one of which would include:

     a.     Dickson Guaranty Suit;
     b.     RICO Case;
     c.     Home Improvement Loans Adversary
     d.     Mortgage Portfolios Adversary;
     e.     Adversary Proceeding 12-00109-NPO;
     f.     Cash Collateral Objection & related contested matters; and
     g.     POC 4-1 through 9-1.

The second federal court action would include:

     a.     Edwards TRO Case and
     b.     Dickson Adversary Proceeding.

**FF.**    **RICO Case**

On April 14, 2015, the Trustee filed a motion to consolidate the RICO Case with the Dickson Guaranty Suit. (Case No. 3:15-cv-00260-CWR-LRA, Dkt. 5). On May 22, 2015, EFP/BHT, Dr. Edwards, Borg, and James Edwards filed a motion challenging the legal sufficiency of the allegations of the RICO Complaint. (*Id.*, Dkt. 19). On July 15, 2015, the District Court entered an order denying, without prejudice, all relief requested by the parties. (*Id.*, Dkt. 27). In the order, the District Court questioned whether the RICO Claim was properly supported and suggested that the remaining counts of the RICO Complaint would best be heard in the Bankruptcy Court. The District Court, "[a]ssuming without deciding that the current complaint is defective," granted the Trustee leave to amend the RICO Complaint on the basis that "an amended complaint would likely have a

better chance of surviving the motion to dismiss standard." The District Court, however, stayed the filing of an amended complaint until the parties had an opportunity to meet with the Magistrate Judge to arrive at a timeline for litigation.

After a status conference with the Magistrate Judge, the Trustee agreed to dismiss the RICO count without prejudice to facilitate mediation. (*Id.*, Dkt. 28). Mediation proved to be unsuccessful, and by an agreed order entered on December 10, 2015, the District Court referred the action to this Court pursuant to 28 U.S.C. § 157(a), where the RICO Case became the Post-Petition Conduct Adversary. (Case No. 3:15-cv-00260-CWR-LRA, Dkt. 30). In the same agreed order referring the action to this Court, the District Court instructed the Trustee to amend the RICO Complaint by February 15, 2016.

In early May of 2015, the Trustee, prompted by the information provided by Meehan, met with Dickson's criminal counsel in Costa Rica to investigate the affairs of Dickson and his affiliated companies, to talk to witnesses, and to search for documents. (HIL Adv. Dkt. 341 at 10 & 22). The Trustee found some documents in garbage bags thrown in the back room of an abandoned bar. (HIL Adv. Dkt. 341 at 10). The Trustee arranged for the shipment of those documents, in twenty (20) boxes, to her office in Jackson, Mississippi.

## GG.   Terminating the Stays

The District Court denied the Withdrawal Motions. (HIL Adv. Dkt. 176; MPF Adv. Dkt. 35). Thereafter, the Court *sua sponte* terminated the stay of the Home Improvement Loans Adversary on July 28, 2015 (HIL Adv. Dkt. 187) and on December 3, 2015, granted the Trustee's motions to terminate the stays of the Mortgage Portfolios Adversary (MPF

Adv. Dkt. 41) and adversary proceeding 12-00109-NPO (Adv. Proc. 12-00109-NPO, Dkt. 92).

**HH.    Restitution Order**

On September 10, 2015, Dickson pled guilty to two counts of bankruptcy fraud in violation of 18 U.S.C. § 152(2), (5).  *See United States v. Dickson*, Case No. 3:14-cr-00078-TSL-FKB, Dkt. 44.  As part of the plea agreement, Dickson was informed that the District Court could order forfeiture and/or restitution.

On May 31, 2016, the District Court entered a Second Amended Final Order of Forfeiture (the "Forfeiture Order") (Case No. 3:14-cr-00078-TSL-FKB, Dkt. 79; PPC Ex. P-36), ordering Dickson to forfeit the $587,749.95 seized by the Costa Rican government from Dickson, the condominium in Costa Rica, and the $9,095,000 money judgment, less the liquidation of the condominium, the $587,749.95, the value of all loans purchased in Costa Rica and/or Panama with the corpus of the $9,095,000, and the total amount of money repatriated to the custody of the Trustee.  The Trustee attempted to negotiate an amount of restitution with Dickson's criminal counsel but had little success.  (Adv. Dkt. 341 at 56).

On September 13, 2016, Dickson reached an agreement with the government in which Dickson agreed to pay the bankruptcy estate restitution in the amount of $5,442,004.58 (the "Restitution Order").  (Case No. 3:14-cr-00078-TSL-FKB, Dkt. 83; HIL Ex. D-48; MPF Ex. D-53; PPC Ex. P-37).  Exhibits introduced into evidence at the restitution hearing indicate how the government calculated the restitution amount.  (HIL Ex. D-43; MPF Ex. D-48).  The chart below reflects the losses to the bankruptcy estate, as presented by the government at the restitution hearing:

| Losses to the Bankruptcy Estate | |
|---|---|
| Wire Transfers | $9,095,000.00 |
| Funds Diverted to Victory Consulting's Wells Fargo Account | $1,345,462.46 |
| CHFS Checks Deposited to OmniBank Account | $196,973.24 |
| Uncollected Loan Payments from Nov. 2013 to Apr. 2014 | $1,508,406.66 |
| **Total** | $12,145,842.36 |

(HIL Ex. D-43; MPF Ex. D-48). The Trustee explained that the $9,095,000 loss attributed to the wire transfers referred to the post-petition transfers that occurred from November 5, 2013, to January 7, 2014. (HIL Adv. Dkt. 341 at 57). The $1,345,462.46 loss consisted of automatic draft or electronic deposits diverted into the Victory Consulting's Wells Fargo account. (HIL Adv. Dkt. 341 at 57-58). The $196,973.24 loss represented checks made payable to CHFS that Dickson endorsed and deposited into an OmniBank account. (HIL Adv. Dkt. 341 at 59). Finally, the Trustee calculated $1,508,406.66 in "lost" loan payments from November of 2013 to April of 2014, based on a two-year average of electronic deposits into CHFS's accounts. (HIL Adv. Dkt. 341 at 59-60).

The Trustee disagreed with the total loss as calculated by the government. (HIL Adv. Dkt. 341 at 61-63), largely because it did not include losses sustained by the bankruptcy estate but for Dickson's criminal conduct, such as "Penalties Associated with Application of Time Deposits Prior to Maturity" or "Trustee's Fees, Legal Fees and Expenses of Estate Professionals and ClearSpring Loan Service Charges in Excess of CHFS Servicing Charges." (HIL Ex. D-43; MPF Ex. D-48). According to the Trustee, the government removed those items from the categories of losses because counsel for Dickson indicated that the amounts were being disputed in this Court. (HIL Adv. Dkt. 341 at 63).

Against the total losses to the bankruptcy estate, the government credited the following amounts recovered and/or intercepted by the Trustee:

| Credits to the Bankruptcy Estate | |
| --- | --- |
| BancorpSouth Check | $300,000.00 |
| OmniBank Check | $250,000.00 |
| Funds from Panama | $5,898,278.29 |
| Costal Condos Sale | $144,191.90 |
| Willow Court Sale | $111,367.59 |
| **Total** | $6,703,837.78 |

(HIL Ex. D-43; MPF Ex. D-48). The first two credits represent the checks intercepted by the Trustee from BancorpSouth in the amount of $300,000 and from OmniBank in the amount of $240,000. (HIL Adv. Dkt. 341 at 61). The Trustee testified that the $250,000 amount shown in the chart for the OmniBank check is incorrect and should be $240,000. (HIL Adv. Dkt. 341 at 61). The $5,898,278.29 credit represents the total funds sent the Trustee from different accounts at Banco Panameño belonging to CHFS and Dickson. (HIL Adv. Dkt. 341 at 61). The two remaining credits represent proceeds from the sale of condominiums and Willow Court, which Dickson asked to be included in the restitution calculation. (HIL Adv. Dkt. 341 at 62). The difference between the total losses and total credits, as calculated by the government, is $5,442,004.58.[34] Later, Dickson was sentenced to serve fifty-seven (57)-months in a federal correctional facility. (HIL Ex. D-49; MPF Ex. D-54; PPC Ex. P-38). Dickson is currently serving the remainder of his sentence in a halfway house in Maryland.

## II.    HIL Third Amended Complaint

On December 9, 2015, the Court dismissed the HIL Second Amended Complaint filed by CHFS and Dickson without prejudice, subject to the Trustee filing an amended complaint by January 21, 2016, as to claims asserted solely by the estate. (HIL Adv. Dkt.

---

[34] $12,145,842.36 (Total Losses) - $6,703,837.78 (Total Credits) = $5,442,004.58. (HIL Ex. D-43; MPF Ex. D-48).

227).  In the same order, all personal claims asserted by Dickson were dismissed without prejudice.  (*Id.*).  The Trustee filed the HIL Third Amended Complaint on January 15, 2016.

The Trustee pleads causes of action under six (6) counts in the HIL Third Amended Complaint.  In general, the Trustee asks the Court to:  (1) avoid any interest EFP/BHT assert in the Home Improvement Loans because of the alleged defects in the underlying loan documents; (2) disallow POC 4-1 and POC 5-1 because of the alleged defects in the underlying documents purporting to grant EFP/BHT an interest in the Home Improvement Loans; and (3) if POC 4-1 and POC 5-1 are allowed, determine the amount of the claims following an accounting.  More specifically, as to each count in the HIL Third Amended Complaint, the Trustee seeks a declaratory judgment that:

> Count I:  The Rainbow Loan Agreement, the 2006 Note, and/or the Custodial Agreement are void *ab initio*.

> Count II:  The 2010 Assignment by Beher Limited is invalid, and, therefore, any claims by EFP/BHT are similarly invalid.

> Count III:  The EFP Note and the BHT Note are fraudulent, and, therefore, any claims by EFP/BHT are invalid.

> Count IV:  The Custodial Agreement was never validly assigned to Beher Limited, or validly assigned later to BHT, and as a result, EFP/BHT do not have a perfected security interest.

> Count V:  EFP/BHT do not have any security interest in the nearly $6 million turned over to the Trustee or in any other monies from sources other than CHFS borrowers.

> Count VI:  POC 4-1 and POC 5-1 are duplicative and declare the respective amounts owed to EFP/BHT under POC 4-1 and POC 5-1, pursuant to a complete and itemized accounting.

(HIL Adv. Dkt. 237 at 30-38).

**JJ.**     **Post-Petition Conduct Adversary**

On February 12, 2016, the Trustee filed the PPC Amended Complaint against EFP/BHT and Dr. Edwards, alleging:  violations of the automatic stay under 11 U.S.C. §§ 105(a), 362(a), (k); turnover of all estate property to the Trustee under 11 U.S.C. § 542(a); reverting all improper post-petition transfers to the Trustee under 11 U.S.C. § 549; civil conspiracy; conversion of estate property; and equitable subordination.  (PPC Adv. Dkt. 48).  The PPC Amended Complaint did not name Dr. Edwards' adult children, James Edwards and Borg, as defendants and did not include a RICO claim.

In the Post-Petition Conduct Adversary, the Trustee seeks a declaratory judgment that the actions of Dr. Edwards, imputed to EFP/BHT, including the receipt, concealment, and withholding of loans and/or recorded information belonging to the estate, constituted a willful violation of the stay for which the Trustee seeks appropriate damages and/or sanctions against Dr. Edwards, EFP/BHT, jointly and severally, including all costs and attorneys' fees associated with this matter.  The Trustee estimates that the estate has been damaged in additional servicing costs in excess of $10,000 that could have been avoided had Dr. Edwards promptly notified her of his contact with Meehan or turned over the information in his possession.  (PPC Adv. Dkt. 115 at 27).  Moreover, the Trustee contends that Dr. Edwards' conduct deprived her of the opportunity to obtain $587,749.95 subsequently seized by the Costa Rican government in connection with its investigation of Dickson's affairs in that country.  The Trustee claims she lost a window of opportunity to obtain CHFS funds prior to the freezing of the assets by the Costa Rican government and has incurred and will incur legal fees and expenses in attempting to retrieve those assets from a foreign government.  Additionally, the Trustee alleges that Dr. Edwards instructed

Meehan not to pay a promissory note, and, as a result, the estate was damaged in the amount of $50,000. According to the Trustee, the estate has incurred legal fees and expenses attributable to Dr. Edwards' conduct in excess of $61,458.25[35] through July 31, 2017, and will incur additional legal fees and expenses from August 1, 2017, through trial.

**KK.   Bankruptcy Court's Consolidation Orders**

On February 1, 2017, the Bankruptcy Case and all related adversary proceedings were reassigned to the above-signed bankruptcy judge. (Bankr. Dkt. 1609). On February 15, 2017, a status conference was held on all pending matters in the Bankruptcy Case and all related adversary proceedings. (Bankr. Dkt. 1612). As a result of the status conference, the Court issued the Order: (1) Severing and Consolidating Claims and (2) Scheduling Discovery and Other Pretrial Matters (the "MPF Consolidation Order") (MPF Adv. Dkt. 55; Adv. Proc. 12-00109-NPO, Dkt. 111), severing and consolidating the claims asserted by the Trustee in Adversary Proceeding 12-00109-NPO with those claims alleged by the Trustee in the Mortgage Portfolios Adversary and similarly severing and consolidating the claims asserted by Dickson in the Mortgage Portfolios Adversary with those claims alleged by Dickson in adversary proceeding 12-00109-NPO. As a result of the MPF Consolidation Order, all claims asserted by Dickson were severed and consolidated into Adversary Proceeding 12-00109-NPO. To effectuate the severance and consolidation of the claims, the Court ordered Dickson to amend the complaint filed in adversary proceeding 12-00109-NPO by March 6, 2017.

---

[35] This amount does not include the fees and expenses related to the RICO Case, which the Court disallowed on an interim basis, and those related to the Trustee's attempt to withdraw the reference to this Court, which the Court reduced by half on an interim basis. (Bankr. Dkt. 1787).

On March 2, 2017, the Court consolidated, for discovery, pretrial, and trial purposes, all claims asserted by the Trustee in the Home Improvement Loans Adversary and the Mortgage Portfolios Adversary against EFP/BHT, Dr. Edwards, James Edwards, and the Atkinson Trust, as well as the Contested Matters filed in the Bankruptcy Case (the "HIL & MPF Consolidation Order") (HIL Adv. Dkt. 285; MPF Adv. 57). The HIL & MPF Consolidation Order did not consolidate the claims asserted by the Trustee in the Mortgage Portfolios Adversary against DebtX.

To effectuate the consolidation of the claims, the Court found it necessary to advance the Home Improvement Loans Adversary and the Mortgage Portfolios Adversary to the same stage of preparedness for trial. To that end, the Court instructed the Trustee to file an amended complaint in the Mortgage Portfolios Adversary by March 6, 2017 and EFP/BHT to answer the HIL Third Amended Complaint by March 20, 2017.

## LL.    MPF Complaint

On March 6, 2017, the Trustee, consistent with the HIL & MPF Consolidation Order, filed the MPF Complaint, consolidating the claims and parties from adversary proceeding 12-00109-NPO and the Mortgage Portfolios Adversary. The relief sought by the Trustee in the Mortgage Portfolios Adversary relates to Portfolios #1-#7 and an eighth unwritten transaction involving the purchase through DebtX of the Atlanta Property (the "DebtX Matters").

The Trustee pleads causes of action under nine (9) counts in the MPF Complaint. As to Portfolios #1, #2, and #7 the Trustee contends that CHFS did not receive all distributions and reimbursements to which it was entitled to receive under MPF Agreement *I*, MPF Agreement *II*, MPF Agreement *III*, and Mississippi's version of the Uniform

Partnership Act, MISS. CODE ANN. § 79-13-1201 *et seq.* As to Portfolios #3, #4, #5, and #6, for which there are no written agreements, the Trustee contends that CHFS did not receive all distributions and reimbursements to which it was owed under the Uniform Partnership Act, MISS. CODE ANN. § 79-13-1201 *et seq.* Finally, as to the eighth transaction, the Trustee alleges that a joint venture or partnership exists between CHFS and the Atkinson Trust (the current owner) with CHFS owning a fifty percent (50%) share of the assets and obligations of the joint venture or partnership. The Trustee also alleges that DebtX was negligent by allowing one or more entities owned or purportedly controlled by Dr. Edwards to use CHFS's authority to submit a bid on the Atlanta Property. The Trustee seeks a declaratory judgment regarding the rights and obligations of the parties as to all of the transactions.

On March 20, 2017, EFP/BHT, Dr. Edwards, and James Edwards filed the MPF Answer & Counterclaim. They denied the relief requested by the Trustee and asserted numerous affirmative defenses, including statute of limitations and the doctrine of waiver or estoppel. (MPF Adv. Dkt. 70 at 2-3). In their counterclaim, EFP/BHT allege eight (8) counts. (MPF Adv. Dkt. 70 at 20-25). In general, EFP/BHT seek a judgment declaring that they are the owners of the notes and mortgages that comprise the Mortgage Portfolios, the Mortgage Portfolios are not property of the estate, and CHFS's only interest in the Mortgage Services are servicing fees of $20 or $15 and 25% of the net proceeds after the repayment of EFP/BHT's investment. EFP/BHT ask the Court to find that Portfolios #1-#6 are governed by MPF Agreement *I* and MPF Agreement *II*. EFP/BHT seek damages against the estate for CHFS's alleged breach of the Mortgage Portfolio agreements and its fiduciary duties. EFP/BHT seek damages to the extent the fees charged by ClearSpring

exceed the amount they agreed to pay CHFS.  They seek a declaratory judgment that EFP/BHT are entitled to 65.7% of the $5,918,279 or $3,888,309.30 in stolen funds recovered by the Trustee.  EFP/BHT arrive at 65.7% because they contend that the total amount of the Mortgage Portfolios, according to the monthly operating report of October 2013 (Bankr. Dkt. 416 at 6; HIL Ex. D-45; MPF Ex. D-50), was $5,943,913.37, and the total funds in all of CHFS's accounts were $9,059,191.49.[36]  Finally, EFP/BHT seek a judgment requiring the Trustee to return any proceeds from the Mortgage Portfolios used to pay expenses of the estate.

DebtX filed its answer and counterclaim on March 20, 2017.  (MPF Adv. Dkt. 66).  DebtX denied all claims and allegations and sought damages against the Trustee for all expenses it incurred in connection with the Mortgage Portfolios Adversary based on an indemnification provision in the Investor Representation and the Purchaser Qualification Agreement signed by CHFS.  On April 10, 2017, the Trustee filed the MPF Reply to Counterclaim, denying the relief sought by EFP/BHT.

**MM.   HIL Answer & Counterclaim**

On March 20, 2017, EFP and BHT, "acting by and through its Trustee, Church Bay Trust Company, Ltd.," filed the HIL Answer & Counterclaim denying that the Trustee was entitled to any relief and asserted numerous affirmative defenses, including statute of limitations, waiver and/or estoppel, and lack of standing.  (HIL Adv. Dkt. 289 at 2 & 17).  In Count I of their counterclaim, EFP/BHT seek a declaratory judgment that their claims are secured with a first lien on all loans held by the McCarley Firm as custodian for the lender under the Rainbow Loan Agreement, as amended.  (HIL Adv. Dkt. 289 at 21-22).

---

[36] The Court's calculation results in a percentage rate of 65.6%.  ($5,943,913 ÷ $9,059,191.49 = 0.6561196.)

In Count II of their counterclaim, EFP/BHT seek a declaratory judgment that they are entitled to 34.3% of the funds recovered by the Trustee ($5,918,279) or $2,029,969.60 (34.3% of $5,918,279), representing the collections on the Home Improvement Loans. (HIL Adv. Dkt. 289 at 22-23). EFP/BHT arrive at 34.3% because they claim that the total amount of collections generated by the Home Improvement Loans, according to the monthly operating report of October 2013 (Bankr. Dkt. 416; HIL Ex. D-45; MPF Ex. D-50), were $3,115,278.12, and the total funds in all of CHFS's accounts were $9,059,191.49.[37]   On April 10, 2017, the Trustee filed the HIL Reply to Counterclaim, denying the relief sought by EFP/BHT.

**NN.    Panamanian Counsel**

The Trustee obtained permission to employ the law firm of Arias, Fabrega & Fabrega, *nunc pro tunc* to March 27, 2017, to represent her as special counsel in Panama. (Bankr. Dkt. 1847). Since then, the Trustee has initiated judicial proceedings in Panama to obtain bank records from Banco Panameño. (HIL Adv. Dkt. 341 at 27-28). Those proceedings remain pending.

**OO.    Adversary Proceeding 12-00109-NPO**

Notwithstanding the MPF Consolidation Order, Dickson failed to file an amended complaint in Adversary Proceeding 12-00109-NPO by March 6, 2017. On May 5, 2017, DebtX filed the Motion to Dismiss All Claims Against the Debt Exchange, Inc. with Prejudice (Adv. Proc. 12-00109-NPO, Dkt. 118). The Court issued the Amended Order to Show Cause (Adv. Proc. 12-00109-NPO, Dkt. 125) (the "Show Cause Order") on June 9, 2017, requiring Dickson to show cause why adversary proceeding 12-00109-NPO should

---

[37] $3,115,278.12 ÷ $9,059,191.49 = .3438804.

not be dismissed because of his failure to comply with the MPF Consolidation Order. On June 12, 2017, the Court entered an order granting DebtX's motion, thereby dismissing with prejudice all claims alleged by Dickson against DebtX. (Adv. Proc. 12-00109-NPO, Dkt. 126). Dickson did not respond to the Show Cause Order or appear at the hearing. On July 19, 2017, the Court entered the Order Dismissing Adversary (Adv. Proc. 12-00109-NPO, Dkt. 129).

**PP.    Settlement & Dismissals in Mortgage Portfolios Adversary**

On June 6, 2017, the Trustee filed a motion for authority to settle with DebtX. (MPF Adv. Dkt. 83). The next day, the Trustee filed a motion to dismiss James Edwards and the Atkinson Trust as defendants in the Mortgage Portfolios Adversary as well as certain claims against Dr. Edwards as they relate to the DebtX Matters. (MPF Adv. Dkt. 86). The Court granted both motions on July 5, 2017. (MPF Adv. Dkt. 96 & 97). As a result of these orders, the only remaining defendants in the Mortgage Portfolios Adversary are Dr. Edwards, EFP, EFP LLP, and BHT, the only counter-plaintiffs are EFP/BHT, and the only surviving counts in the MPF Complaint are counts I-VI.

**QQ.    Restoration Order**

Pursuant to the HIL & MPF Consolidation Order, the trial of the Home Improvement Loans Adversary and the Mortgage Portfolios Adversary was set to begin on August 21, 2017. Without notifying the Trustee, Dr. Edwards initiated a proceeding in the Eastern Caribbean Supreme Court in the High Court of Justice (Commercial Division) Virgin Islands (the "BVI Court") on July 14, 2017, to have Beher Limited restored to the BVI Company Register under BCA § 218. (HIL Ex. P-27). Because Beher Limited was struck off the BVI Company Register on October 31, 2008, and remained struck off

continuously for a period longer than seven (7) years, it was dissolved by operation of BCA § 216 as of October 31, 2015.  For that reason, a BVI court proceeding was necessary to restore Beher Limited.  BCA § 218.

In support of the restoration, Dr. Edwards filed:  (1) the Fixed Date Claim Form; (2) his affidavit and the affidavit of La Fleece Prince, a paralegal; (3) a certificate of urgency; and (4) numerous exhibits related to the incorporation of Beher Limited.  (HIL Ex. P-27).  In the Fixed Date Claim Form, Dr. Edwards alleged that he was unaware of the effect of the strike off in 2010.  In his affidavit, Dr. Edwards alleged as grounds for the restoration the Trustee's claim in the Home Improvement Loans Adversary that the 2010 Assignment was invalid because of Beher Limited's dissolution. (HIL Ex. P-27).  He maintained that the restoration order was necessary to moot this argument and informed the BVI Court that the proceeding was an urgent matter, given the fast approaching trial date of August 21, 2017.

On July 20, 2017, the BVI Court signed an order restoring Beher Limited to the BVI Company Register (the "Restoration Order") (HIL Ex. D-23).  Consistent with the Restoration Order, the Registrar issued a Certificate of Restoration to the Register (HIL Ex. D-58) on August 4, 2017.

## RR.    Motion to Continue

On August 11, 2017, EFP/BHT filed the Motion to Continue Trial (the "Motion to Continue") (HIL Adv. Dkt. 314; MPF Adv. Dkt. 106), seeking a continuance of the trial date on the ground that Dr. Edwards had become ill and was not expected to recover from his illness until after the scheduled trial date.  The Court granted the Motion to Continue

and reset the Trial to begin on October 30, 2017.  (HIL Adv. Dkt. 318; MPF Adv. Dkt. 112).

**SS.      Motion to Prohibit Amendment**

Before the Trial was continued, the parties submitted on August 9, 2017, a proposed Joint Pretrial Order for entry in the Mortgage Portfolios Adversary (the "MPF Proposed Pretrial Order") (MPF Adv. Dkt. 103-2) and in the Home Improvement Loans Adversary, in anticipation of the August 21, 2017 trial date.  In connection with the Motion to Continue, the parties asked the Court not to enter the proposed pretrial orders, and the Court set a new deadline of September 1, 2017, for resubmitting a joint pretrial order.  (HIL Adv. Dkt. 318; MPF Adv. Dkt. 112).  After reviewing the Trustee's portion of the MPF Proposed Pretrial Order and the Supplemental Expert Witness Report of Jeffrey N. Aucoin, CPA/CFF, CFE, CIA (the "Supplemental Report") (MPF Adv. Dkt. 103-1) produced by the Trustee on August 1, 2017, EFP/BHT filed the Motion to Prohibit Untimely Amendment of Complaint and to Strike Supplemental Expert Report of Jeffrey Aucoin (the "Motion to Prohibit Amendment") (MPF Adv. Dkt. 103), on August 9, 2017.  In the MPF Proposed Pretrial Order, the Trustee contended that "[o]ne or more of the Joint Ventures are loans rather than true joint ventures."  (MPF Adv. Dkt. 103-2 at 13).  Under the heading, "Accounting and Tax Treatment of J[oint] V[enture] Loans," which was not part of the original expert report produced by the Trustee on July 5, 2017, Aucoin opined that CHFS's accounting for, and tax treatment of, the Mortgage Portfolios was consistent with its accounting for, and tax treatment of, the Home Improvement Loans.  (MPF Adv. Dkt. 103-1 at 7).  EFP/BHT alleged that the Trustee was attempting to amend the MPF Complaint

through the MPF Proposed Pretrial Order to interject a new legal theory at Trial that some or all of the transactions are traditional loans.

Although any issue arising out of the MPF Proposed Pretrial Order ordinarily would be rendered moot by the submission of a new order, the Court ruled on the merits of the Motion to Prohibit Amendment because EFP/BHT indicated their intent to raise this issue again. After a hearing, the Court denied the Motion to Prohibit Amendment, ruling that the Trustee's legal theory in the MPF Proposed Pretrial Order (that one or more of the transactions were loans) did not constitute a "back door" amendment of the MPF Complaint and further found that the Supplemental Report was not untimely produced. (MPF Adv. Dkt. 116). In addition, the Court found that the continuance of the trial date, at EFP/BHT's request, would ameliorate any alleged prejudice.

**TT.    Trial**

The Trial took place on four consecutive days, October 30, October 31, November 1, November 2, and thereafter on November 27, 2017. On the third day of Trial, November 1, 2017, EFP/BHT and Dr. Edwards offered the testimony of William Richard Hare ("Hare") to show that Beher Limited was restored to the BVI Company Register on August 4, 2017. The Trustee objected to Hare's testimony because the restoration was not disclosed in Hare's expert report and, additionally, the Restoration Order was not produced to the Trustee until August 4, 2017, well after the discovery deadline and expert designation deadline had expired. (HIL Adv. Dkt. 341 at 15). EFP/BHT and Dr. Edwards argued that they did not receive a copy of the Restoration Order until August 1, 2017, and, therefore, the disclosure of the Restoration Order to the Trustee three days later, on August 4, 2017, was timely.

The Court found that Dr. Edwards controlled the timing of Beher Limited's restoration, and that his decision to wait until the eve of Trial on July 14, 2017, to initiate the proceedings unfairly prejudiced the Trustee.  As the Court made clear during the Trial, the issue of timeliness was not when the Restoration Order was produced to the Trustee relative to when it was obtained by counsel for Dr. Edwards (a gap of three days) but when Dr. Edwards began the court proceedings in the British Virgin Islands that led to the entry of the Restoration Order.  Compared to the date of these court proceedings, Dr. Edwards first became aware that Beher Limited was struck off the BVI Company Register eight years earlier.  Further, Dr. Edwards knew that the validity of the transfers by BVI was an issue in the Home Improvement Loans Adversary four years earlier.[38]  To cure the prejudice to the Trustee, the Court ordered Dr. Edwards to produce all documents related to the restoration and allowed the Trustee to reopen Dr. Edwards' deposition and supplement the report of the Trustee's expert in British Virgin Islands law, Kirk.  The Court also continued and reset the Trial to November 27, 2017, so that the Trustee could present additional evidence regarding the restoration issue.  Closing arguments were likewise delayed until November 27, 2017.

## DISCUSSION

### A.    Home Improvement Loans Adversary

The gravamen of the Trustee's allegations in the HIL Third Amended Complaint are that the Rainbow Group, the entity that originated the loan and that is listed as the

---

[38] The Court noted that Dr. Edwards' decision to delay restoring Beher Limited to the BVI Company Register despite his belief that restoration would moot a substantial issue in the Home Improvement Loans Adversary was inconsistent with Dr. Edwards' repeated complaints about the amount of expenses incurred by the Trustee in litigating that issue. For example, the Trustee incurred the expense of retaining Jeffrey Albert Kirk ("Kirk") to opine on the effect of the strike off.  (Bankr. Dkt. 1785).

secured beneficiary in the Custodial Agreement, is not a valid corporate entity with the capacity to contract under the law of the British Virgin Islands; the 2006 Note was assigned by Beher Limited in 2010 in violation of the law of the British Virgin Islands; the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement are void *ab initio*; the EFP Note and BHT Note are fraudulent; and EFP/BHT are not the secured beneficiaries of the Custodial Agreement. At Trial, counsel for the Trustee announced that she had abandoned her allegation in the HIL Amended Complaint that the EFP Note and BHT Note are fraudulent.

In the HIL Answer & Counterclaim, EFP/BHT contend that the Trustee is barred by the doctrines of waiver and/or estoppel from challenging the validity of the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement. EFP/BHT also assert that the Trustee's claims are barred by Mississippi's general three (3)-year statute of limitations. Finally, EFP/BHT seek a judgment declaring that their claims are secured by the Home Improvement Loans and that they are entitled to 34.3% of the funds recovered by the Trustee.

## 1.    Choice of Law—Generally

In determining which law governs the issues in the Home Improvement Loans Adversary, the Court must decide first which choice-of-law rules control. It is well settled that a federal court sitting in diversity jurisdiction must apply the choice-of-law rules of the forum state in which it sits—here, Mississippi. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). This Court, however, sits in federal question jurisdiction arising out of CHFS's filing of the Bankruptcy Case. The Fifth Circuit Court of Appeals has not ruled on whether bankruptcy courts should apply federal or state choice-of-law rules. *Tow*

*v. Rafizadeh (In re Cyrus II P'ship)*, 413 B.R. 609, 613 (Bankr. S.D. Tex. 2008).  In the absence of compelling federal policy, bankruptcy courts generally apply state choice-of-law rules.  *Id.*  Because the Trustee seeks to avoid EFP/BHT's interest in the Home Improvement Loans under § 544, a cause of action rooted in federal bankruptcy law and policy, the Court applies federal choice-of-law rules.

Dr. Edwards lives in Maryland; Dickson is currently serving the remainder of his sentence at a halfway house in Maryland but before his arrest, resided in Mississippi; CHFS is a Delaware corporation with its principal place of business in Mississippi; the Rainbow Group and Beher Limited are purportedly British Virgin Islands companies; the McCarley Firm is a Mississippi law firm, EFP is a Delaware company; and BHT is a Bermuda trust. The Home Improvement Loans are secured by real property located in thirty (30) states in the United States.  The original notes and mortgages underlying the Home Improvement Loans are located in Mississippi.  Many of the relevant documents contain a contractual choice-of-law provision.  These documents provide that the law of either Maryland, California, or Mississippi applies.  Specifically, the Rainbow Loan Agreement is governed by the substantive laws of Maryland but requires the application of Mississippi and Maryland laws in determining the rights and remedies of a secured party under the Uniform Commercial Code (the "UCC").  The 2006 Note is governed by the substantive laws of Maryland.  The Custodial Agreement is to be construed in accordance with the laws of California, but the parties agree to submit to personal jurisdiction in Mississippi in any court action or proceeding.  The 2007 Note is governed by the substantive laws of Maryland.  Both the BHT Note and the EFP Note apply the substantive laws of Maryland. Because the Trustee, as a hypothetical lien creditor, was not a signatory to any of the

agreements or notes, these contractual choice-of-law provisions are not necessarily controlling. Instead, the Court must conduct a general choice-of-law inquiry.

The choice-of-law analysis is issue-based, so that the laws of different jurisdictions may govern different issues in the same proceeding. *See, e.g.*, *Cates v. Creamer*, 431 F.3d 456, 463 (5th Cir. 2005). In the Home Improvement Loans Adversary, the parties raise issues of corporate formation/dissolution and the secured status of EFP/BHT. The Court finds that the corporate formation/transfer issue as to the Rainbow Group and Beher Limited is governed by the law of the British Virgin Islands, whereas the perfection issue is governed by the version of the UCC enacted by Mississippi. The Court's application of Mississippi law is consistent with the choice of law made by the Fifth Circuit and the District Court in the Dickson Guaranty Suit. *Dickson*, 821 F.3d at 617 n.2; *Dickson*, 2014 WL 4494283, at *3. The differences in the laws of Mississippi and Maryland, the two states with the most significant relationship to the transactions and the parties, are minimal. *Schneider Nat'l Transp. v. Ford Motor Co*., 280 F.3d 532, 536 (5th Cir. 2002) (recognizing that no choice-of-law analysis is necessary when the laws of the jurisdictions do not conflict).

Before separately addressing the five counts in the HIL Third Amended Complaint, the Court considers the affirmative defenses alleged by EFP/BHT that some or all of the Trustee's claims are barred by the doctrines of waiver and estoppel or by the statute of limitations. (HIL Adv. Dkt. 331 at 46-48). Because the Court rejects these arguments under provisions of the Bankruptcy Code, it is unnecessary for the Court to consider choice-of-law issues as to these preliminary matters.

### 2.    Doctrines of Waiver and/or Estoppel

Dr. Edwards and EFP/BHT contend that because CHFS executed the BHT Note and EFP Note on August 10, 2010, and made payments on the BHT Note and EFP Note, the doctrines of waiver and/or estoppel bar the Trustee from asserting any claim:  (1) that the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement are invalid; or (2) that Beher Limited lacked legal authority to execute the 2010 Assignment to BHT. (HIL Adv. Dkt. 331 at 30-31).  In effect, EFP/BHT contend that CHFS's execution in 2010 of the Amended Loan Agreements, the BHT Note, and the EFP Note cured any alleged deficiencies in the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement. EFP/BHT rely on case authority holding that a party who has full knowledge of all defenses to a note waives those claims by renewing that note.  (HIL Adv. Dkt. 331 at 30); *see Austin Dev. Co. v. Bank of Meridian*, 569 So. 2d 1209, 1212 (Miss. 1990); *Brickell v. First Nat'l Bank*, 373 So. 2d 1013, 1025 (Miss. 1979).  EFP/BHT also cite case law holding that a creditor who has recognized the corporate existence of an association, by, for example, transacting business with the association as if it were a properly-formed corporation, is estopped from denying the corporate existence of the association with respect to any claim arising out of the creditor's dealings with that association.  (HIL Adv. Dkt. 331 at 30); *see Cranson v. Int'l Bus. Machs. Corp.*, 200 A.2d 33, 39 (Md. Ct. App. 1964).

EFP/BHT base their defenses of waiver and estoppel on the assumption that the Trustee, in challenging the validity of the agreements with the Rainbow Group, has stepped into the shoes of CHFS.  The Trustee, however, seeks to avoid the Home Improvement Loans under 11 U.S.C. § 544,[39] known as the "strong arm" clause.  *See Gandy v. Gandy*

---

[39] All references are to the Bankruptcy Code found in title 11 of the United States Code, unless noted otherwise.

*(In re Gandy)*, 299 F.3d 489, 495 (5th Cir. 2002).  Under § 544(a), a trustee occupies the status of a hypothetical judicial lien creditor "without regard to any knowledge of the trustee or of any creditor."  11 U.S.C. § 544(a).  Section 544(a) provides:

> (a)     The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> > (1)     a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists[.]

11 U.S.C. § 544(a)(1).  Section 544(a)(1) gives a trustee the status of a hypothetical judicial lien creditor who "extends credit to the debtor at the time of filing and, at that moment, obtains a judicial lien on all property in which the debtor has any interest that could be reached by a creditor."  *Musso v. Ostashko*, 468 F.3d 99, 104 (2d Cir. 2006).

The term "knowledge" in § 544 refers to actual knowledge.  *Wilson v. Parson (In re Jones)*, 77 B.R. 541, 545 (Bankr. N.D. Tex. 1987).  Although the strong-arm rights and powers are conferred on a trustee by federal bankruptcy law, the extent of the trustee's rights and powers as a judicial lien creditor is governed by the substantive law of the state governing the property in question.  *Gaudet v. Babin (In re Zedda)*, 103 F.3d 1195, 1201-02 (5th Cir. 1997); 5 COLLIER ON BANKRUPTCY ¶ 544.02[1] (16th ed. 2017).  Thus, although actual knowledge is irrelevant under § 544, a trustee is still bound by other state-law limitations upon judgment lien status, including the effect of constructive notice.  *Realty Portfolio, Inc. v. Hamilton (In re Hamilton)*, 125 F.3d 292, 299 (5th Cir. 1997).

Here, EFP/BHT rely on CHFS's actual knowledge to establish defenses of waiver and estoppel against the Trustee.  The Trustee, however, became a "hypothetical judgment

lien creditor" after CHFS signed the EFP Note and BHT Note in 2010 and, under § 544, has the right to dispute a creditor's claim as such. Simply put, CHFS's knowledge cannot be imputed to the Trustee.

In *Boudreaux v. Dolphin Press Inc. (In re Dolphin Press Inc.)*, No. 99-60253, 1999 WL 800170 (5th Cir. Sept. 17, 1999), for example, the Fifth Circuit Court of Appeals affirmed the bankruptcy court's avoidance of a creditor's lien under § 544(a) where the creditor failed to file a financing statement in accordance with Mississippi law. The creditor argued that "actual knowledge of the contents of the financial statement" precluded any challenge to his secured status under § 544(a). *In re Dolphin Press*, 1999 WL 800170, at *1. The Fifth Circuit disagreed because a debtor's "actual knowledge" is irrelevant to the strong-arm avoidance powers. *Id.* As in *In re Dolphin Press*, EFP/BHT's claim that CHFS's actual knowledge bars the Trustee's claims under the doctrines of estoppel and waiver is misplaced.

### 3.     Statute of Limitations

EFP/BHT and Dr. Edwards contend that the statute of limitations bars the Trustee from asserting claims: (1) that Beher Limited was struck from the BVI Company Register in 2008 and, therefore, Beher Limited lacked legal authority to execute the 2010 Assignment; or (2) that there was no valid assignment of the Custodial Agreement to EFP/BHT. (HIL Adv. Dkt. 331 at 31 & 33). According to EFP/BHT, these claims assert different conduct than those alleged in the HIL Original Complaint filed on August 24, 2012, and the Trustee first raised these claims in the HIL Third Amended Complaint filed on January 15, 2016. EFP/BHT maintain that because these new claims had not expired upon the filing of the Petition, the Trustee had the longer of the remaining statute of

limitations, M<small>ISS</small>. C<small>ODE</small> A<small>NN</small>. § 15-1-49, or two (2) years from the date of the Petition (May 23, 2014) to assert the claims.  11 U.S.C. § 108(a).  More than two (2) years, however, had passed before the Trustee asserted these claims in the HIL Third Amended Complaint. *Robinson v. Gen. Motors Corp.*, 150 F. Supp. 2d 930, 932 (S.D. Miss. 2001); *Dawson v. Donahoe*, Case No. 3:14-cv-627-DPJ-FKB, 2015 WL 1636864, at *3, n.3 (S.D. Miss. Apr. 13, 2015).

In the HIL Third Amended Complaint, the Trustee seeks to avoid EFP/BHT's alleged security interest in the Home Improvement Loans.  Pursuant to § 546, the Trustee is empowered to bring an avoidance action under § 544:

> (1)   the later of—
>
>   (A)   2 years after the entry of the order for relief; or
>
>   (B)   1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 120-2, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
>
> (2)   the time the case is closed or dismissed.

11 U.S.C. § 546.  The Trustee was appointed on January 21, 2014.  (Bankr. Dkt. 473).  On November 13, 2014, the Trustee filed the Motion to Extend, which the Court granted, enlarging "the one-year limitations period in 11 U.S.C. § 546 . . . to January 21, 2016." (Bankr. Dkt. 877); *see McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1337-38 (5th Cir. 1995) (adopting majority view that § 546 is a statute of limitations as opposed to a jurisdictional bar).  The HIL Third Amended Complaint was filed on January 15, 2016, before the extended deadline to bring an avoidance action under § 546.  Thus, the Court finds that the Trustee's avoidance action is timely.

Even if § 546 were inapplicable, the Court finds that the Trustee's claims against EFP/BHT are timely because the HIL Third Amended Complaint relates back to the HIL Second Amended Complaint filed on June 6, 2013, before EFP/BHT contend that the statute of limitations expired.  The relation back of an amendment to a pleading is governed by Rule 15(c) of the Federal Rules of Civil Procedure ("Rule 15(c)"), as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7015.  Under Rule 15(c)(1)(B), "an amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." FED. R. CIV. P. 15(c)(2).  Under the doctrine of relation back, a complaint amended to add a new claim that arises out of the conduct, occurrence, or transaction alleged in a timely original complaint may be treated, for purposes of statute of limitations, as having been filed on the date of the original complaint.  6A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1497 (3d ed. 2010).  The Court finds that the allegations in the HIL Third Amended Complaint arise out of the same conduct, transaction, and occurrence alleged in the HIL Second Amended Complaint.  *See FDIC v. Bennett*, 898 F.2d 477, 480 (5th Cir. 1990) (holding that a complaint properly relates back, even when the theory of recovery is wholly different, when the factual situation upon which the action depends remains the same and has been brought to the defendant's attention by the original pleading).

Counts II and IV are not new allegations unrelated to the conduct described in the HIL Second Amended Complaint.  Count II of the HIL Third Amended Complaint seeks to invalidate the 2010 Assignment because Beher Limited was struck from the BVI

Company Register in 2008 and "did not have the authority to assign its alleged rights." (HIL Adv. Dkt. 237 at 31-32). Similarly, Count V of the HIL Second Amended Complaint sought to invalidate the 2010 Assignment as "void *ab initio* and/or that the 2010 Assignment is invalid as a matter of law for failure of consideration and/or is unenforceable because it arises out of an invalid contract." (HIL Adv. Dkt. 48 at 20). The HIL Second Amended Complaint also alleged that Beher Limited is a former lender "believed to be non-existent and/or defunct . . . ." (HIL Adv. Dkt. 48 at 9).

Count IV of the HIL Third Amended Complaint seeks a declaratory judgment that the Custodial Agreement was never validly assigned to Beher Limited or assigned later to BHT thereby avoiding any lien on the Home Improvement Loans. (HIL Adv. Dkt. 237 at 32-35). Similarly, paragraphs 31 through 43 of the HIL Second Amended Complaint include allegations which, if proven, would establish that EFP/BHT failed to obtain a perfected security interest in any collateral owned by CHFS. (HIL Adv. Dkt. 48 at 9-12).

The Court's findings that Counts II and IV of the HIL Third Amended Complaint relate back to the HIL Second Amended Complaint is consistent with the Fifth Circuit's holding that a plaintiff has the right "to correct a technical difficulty, state a new legal theory of relief, or amplify the facts alleged in the prior complaint" to relate back to the prior complaint. *FDIC v. Conner*, 20 F.3d 1376, 1386 (5th Cir. 1994).

In *Conner*, the FDIC filed suit against the former directors of a bank, alleging that they had engaged in various "unsafe, unsound, imprudent or unlawful acts and omissions . . . with respect to the management of the [b]ank." *Id.* at 1378. The FDIC filed a motion for leave to file an amended complaint. *Id.* The FDIC sought to include allegations that the defendants' wrongful conduct had caused the bank to suffer losses from

several loans that were not identified in the original complaint. The defendants opposed the amendment, arguing that allowing the amendment would be futile because the FDIC's claims, based on the newly challenged loans, would not relate back to the date of the original complaint and would be barred by the applicable statute of limitations. The Fifth Circuit disagreed, finding that the amended complaint would relate back to the date of the original complaint because the damage caused by the newly identified loans arose out of the same conduct as the damage caused by the twenty-one loans listed in the original complaint and because the additional sources of damages "were caused by the same pattern of conduct identified in the original complaint." *Id.* at 1386. "[O]nce litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading." *Id.* at 1385 (citing 6A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1496, at 64 (1990)).

As in *Conner*, EFP/BHT cannot reasonably be surprised by the allegations in the HIL Third Amended Complaint. *See Flores v. Cameron Cty.*, 92 F.3d 258, 273 (5th Cir. 1996) ("Notice is the critical element involved in Rule 15(c) determinations.") (quotation omitted). The Trustee's claims (that the 2010 Assignment is invalid and the Custodial Agreement was never validly assigned to Beher Limited or BHT) relate back to the HIL Second Amended Complaint, are deemed filed on June 6, 2013, and, therefore, are timely. *See* 6A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1497 (when complaint is dismissed without prejudice, amended

pleading which amplifies factual allegations of new pleading or asserts new claims based on earlier factual allegations generally relates back to original pleading).

### 4. Count I (Legal Capacity of the Rainbow Group)

In Count I of the HIL Third Amended Complaint, the Trustee seeks a declaration that the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement are void *ab initio* because: (1) the Rainbow Group lacked the requisite legal capacity to make any contract on September 25, 2006; (2) the agreements lacked the requisite number of competent parties to make a valid contract; (3) failure of mutual consent between two competent parties; and (4) Patsy Stecco ("Stecco"),[40] whose signature appears on the documents as president of "The Rainbow Group, Ltd.," but who has testified that she had never heard of that entity, was not its president and did not sign the documents. (HIL Adv. Dkt. 237 ¶¶ 6, 13, 52-61 & at 7 n.9). In the HIL Amended Pretrial Order, EFP/BHT contend that the use of "The" is a misnomer that does not affect the validity of the Rainbow Loan Agreement under Maryland law. *Curtis G. Testerman Co. v. Buck*, 667 A.2d 649, 652 (Md. Ct. App. 1995) (holding that use of "Inc." instead of "Company" was a misnomer that did not release corporation from contractual liability); (HIL Adv. Dkt. 331 at 30).

### a. Choice of Law

It is a longstanding rule that the internal affairs of a corporation are governed by the law of the jurisdiction in which it was organized. *Atherton v. FDIC*, 519 U.S. 213, 224 (1997); *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983). The internal affairs doctrine is a choice-of-law rule that recognizes that only one jurisdiction should have authority to regulate a corporation's internal affairs—matters

---

[40] Patsy Stecco is also known as Patsy Cambra de Brackett.

peculiar to the relationships between the corporation and its shareholders, directors, and officers—because otherwise a corporation could be faced with inconsistent rules regarding its internal governance procedures.  Courts normally look to the jurisdiction of a business's incorporation for the law that provides the relevant corporate government general standard of care.

The issues arising out of the corporate existence of the Rainbow Group and its capacity to contract are governed by the jurisdiction of its incorporation, which is purportedly the British Virgin Islands.  Thus, the Court concludes that the law of the British Virgin Islands applies to Count I.  Despite EFP/BHT's citation of Maryland law in the HIL Amended Pretrial Order, all counsel and their experts at Trial relied solely on British Virgin Islands law with respect to Count I.

### b.    Are the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement void *ab initio*?

In the HIL Third Amended Complaint, the Trustee challenges the corporate status of the Rainbow Group because of the absence of "<u>The</u> Rainbow Group, Ltd." from the BVI Company Register; the Rainbow Loan Term Sheet prepared by Dr. Edwards on the purportedly official letterhead of "<u>The</u> Rainbow Group, Ltd."; the numerous entities owned by Dr. Edwards and/or related parties that use some variation of "Rainbow Group" in their names; the deposition testimony of Stecco (the purported president of "<u>The</u> Rainbow Group, Ltd."), that she has never heard of that entity and was unaware of her alleged role in the alleged transaction; and Dr. Edwards' use of Stecco's uncle's post office box as the mailing address for "<u>The</u> Rainbow Group, Ltd."  (HIL Adv. Dkt. 237 ¶¶ 6, 13, 52-61 & at 7 n.9).  The Trustee does not deny that money was loaned to CHFS from some entity; only that the Rainbow Group, Beher Limited, BHT, and EFP are not that entity.

Stecco did not testify at Trial, her deposition testimony was not introduced into evidence (HIL Adv. Dkt. 341 at 13-14), and the Trustee's factual statement in the HIL Amended Pretrial Order does not mention Stecco (HIL Adv. Dkt. 331 at 9-12).  With the Trustee's apparent abandonment of her allegations regarding Stecco's role in The Rainbow Group, Ltd., the Trustee's contention in the HIL Third Amended Complaint that the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement are invalid was supported at Trial only by the undisputed fact that The Rainbow Group, Ltd. is not registered as a British Virgin Islands company.  Although the Trustee did not identify this contention as a legal issue in the HIL Amended Pretrial Order (HIL Adv. Dkt. 331 at 46), EFP/BHT addressed it at length at Trial as if she had.

The principle governing statute on company law in the British Virgin Islands is the BVI Business Companies Act 2004 (the "BCA").  In interpreting foreign law, such as the BCA, this Court is bound by Federal Rule of Civil Procedure 44.1 ("Rule 44.1"), as made applicable by Federal Rule of Bankruptcy Procedure 9017.  Rule 44.1 provides, in pertinent part:

> In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.

FED. R. CIVIL P. 44.1.  The advisory committee's note to Rule 44.1 explains:

> In further recognition of the peculiar nature of the issue of foreign law, the new rule provides that in determining this law the court is not limited by material presented by the parties; it may engage in its own research and consider any relevant material thus found.

FED. R. CIVIL P. 44.1 advisory committee's note.  "Although expert testimony is the most common way to determine foreign law, it is no longer 'an invariable necessity in establishing foreign law, and indeed, federal judges may reject even the uncontradicted

conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities.'" *Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 275 (S.D. Tex. 1997) (quoting *Curtis v. Beatrice Foods Co.*, 481 F. Supp. 1274, 1285 (S.D.N.Y.), *aff'd mem.*, 633 F.2d 203 (2d Cir. 1980)). "In making its determination of foreign law the court may rely on foreign case law decisions, treatises, and learned articles, even if they are not generally admissible under the Federal Rules of Evidence." *Id.* at 275-76 (citation omitted).

### (1.)    British Virgin Islands Law

The British Virgin Islands is a dependent overseas territory of the United Kingdom. (HIL Adv. Dkt. 342 at 12-13 & 62). The local legislature and courts of the British Virgin Islands are independent from the United Kingdom, but the British government is responsible for its defense and security and for its international relations. Under The Common Law (Declaration of Application) Act (Cap 13), enacted in the 1700s, where there is no British Virgin Islands law, English law applies. (HIL Adv. Dkt. 342 at 62). As a result, English common law, although not binding, is highly persuasive and routinely relied upon by the BVI Court. (HIL Adv. Dkt. 342 at 13). The British Virgin Islands has developed an international financial center and comprehensive corporate laws, apart from the laws of the United Kingdom. As to certain financial and corporate matters, therefore, British Virgin Islands law would govern rather than English common law.

### (2.)    BCA

The BCA, which became effective on January 1, 2005, is the principal statute of the British Virgin Islands relating to British Virgin Islands company law, regulating both offshore companies and local companies. For a small fee, a licensed registered agent in

the British Virgin Islands may apply to the Registrar to incorporate a company under the BCA.  BCA § 6(2).  In determining whether to incorporate the company, the Registrar considers whether the name of the company complies with the BCA, which sets forth rules governing what expressions or designations a company name may include. BCA §§ 17-19. Section 26(1) of the BCA also requires that:

> [A] company . . . ensure that its full name . . . is clearly stated in
>
> (a)     every written communication sent by, or on behalf of, the company; and
>
> (b)     every document issued or signed by, or on behalf of, the company that evidences or creates a legal obligation of the company.

BCA § 26(1).  Section 26(2) of the BCA provides that "[a] company that contravenes subsection (1) commits an offence and is liable on summary conviction to a fine of $1,000." BCA § 26(2).  At Trial, the parties presented the testimony of Kirk and Hare, both of whom qualified as experts in British Virgin Islands law, to assist the Court in interpreting and applying the provisions of the BCA.

### (3.)    Kirk

The Trustee's expert, Kirk, is the managing partner of the Appleby law firm in the British Virgin Islands.  (HIL Adv. Dkt. 342 at 6).  Kirk attended the University of the Witwatersrand in Johannesburg, South Africa, where he obtained a baccalaureus procurationis degree, a four-year undergraduate law degree.  (HIL Adv. Dkt. 32 at 5).  Kirk was admitted to practice law in South Africa in 1998.  He was admitted as a solicitor in Wales in 2003, as a solicitor and barrister in Bermuda in 2008, and as a solicitor in the British Virgin Islands in 2010.  Since July of 2014, Kirk has been the managing partner at the British Virgin Islands office of the Appleby law firm where he practices primarily

British Virgin Islands law and Bermuda law. (HIL Adv. Dkt. 342 at 6-7). The Court accepted Kirk as an expert to testify about the corporate laws of the British Virgin Islands and Bermuda. Kirk was not offered as an expert in British Virgin Islands bankruptcy or insolvency law. (HIL Adv. Dkt. 342 at 9).

Kirk testified that he performed a search of the BVI Company Register for the name "The Rainbow Group, Ltd.," which is the name reflected on the Rainbow Loan Term Sheet, the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement.[41] Kirk's search showed that no entity by that name had ever been registered in the British Virgin Islands. (HIL Adv. Dkt. 342 at 14-15). His search, however, did reveal that an entity by the nearly identical name "Rainbow Group, Ltd." had been registered. Kirk opined that if "Rainbow Group, Ltd." were the correct name of the company, then its use of the name, "The Rainbow Group, Ltd." violated BCA § 26(2), which requires British Virgin Islands companies to use the full name of the company on all correspondence and legal documents. (HIL Adv. Dkt. 342 at 15-16).

### (4.)    Hare

EFP/BHT's expert, Hare, is the managing partner of Forbes Hare, a law firm established in the British Virgin Islands in 2005. (HIL Adv. Dkt. 342 at 55). Hare holds an undergraduate degree in politics and economics from Newcastle University in England. (HIL Adv. Dkt. 342 at 54). Hare underwent the common law professional examination for non-law graduates and the bar vocational course at the Inns of Court School of Law in London. He holds a master's degree in law from University College London with a

---

[41] Kirk prepared a report dated July 3, 2017, and a supplemental report dated November 19, 2017, that were admitted at Trial as demonstrative exhibits. (HIL Exs. P-6 & P-28).

concentration in commercial law.  Hare has practiced law since 1994.  In 1999, he relocated to the Caribbean, and that same year, was admitted to the Bar of the Eastern Caribbean in the British Virgin Islands.  He also has been admitted to practice law in Anguilla, St. Kitts and Nevis, and Grenada.  Hare worked as a litigation barrister at the law firm of Harney Westwood & Riegels, before establishing Forbes Hare in 2005.  His practice at Forbes Hare is primarily in the field of commercial litigation.  Hare is familiar with the BCA, having contributed to its drafting.  The Court accepted Hare as an expert to testify about the laws of the British Virgin Islands generally and the BCA specifically.[42]  (HIL Adv. Dkt. 342 at 57).  Hare was not offered as an expert in British Virgin Islands bankruptcy or insolvency law.

Hare testified that if confronted with the issue, the BVI Court would reject the Trustee's contention that the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement are invalid and would construe the reference to "The Rainbow Group, Ltd." as a reference to "Rainbow Group, Ltd."[43]  The BVI Court would consider whether there was any confusion about the true identity of the contracting party, and if not, the BVI Court would treat the mistake as a misnomer.

Hare opined, in the alternative, that the BVI Court would follow the precedent of courts in English common-law jurisdictions, and rectify the mistake.  (HIL Adv. Dkt. 342 at 76).  Hare did not believe rectification would be necessary under these facts where the only mistake in the company name was the addition of the article "The"; rather, the BVI

---

[42] The Court previously accepted Hare as an expert in the laws of Nevis in *Fogerty v. Condor Guar., Inc. (In re Condor Ins. Ltd.)*, Adv. Proc. 07-05049-NPO (Bankr. S.D. Miss. May 10, 2012).  (HIL Adv. Dkt. 342 at 57).

[43] Hare prepared a report dated July 5, 2017, that was admitted at Trial as a demonstrative exhibit.  (HIL Ex. D-28).

Court would construe the documents using its correct name.  If, however, the name "The Rainbow Group International Ltd." appeared in the documents and if that company did in fact exist, the BVI Court would rectify the documents to refer to the intended party.  He did not view the mistaken inclusion of "The" in the name of the company as a violation of BCA § 26.

   **c.**    **Analysis**

   At Trial, counsel for Dr. Edwards and EFP/BHT cited four cases in support of Hare's expert testimony:  *Chartbrook Ltd v. Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101; *Derek Hodd Limited v. Climate Change Capital Limited* [2013] EWHC 1665 (Ch); *Liberty Mercian Limited v. Cuddy Civil Engineering Limited* [2013] EWHD 2688 (TCC); and *Staray Capital Limited v. Yang*, BVIHCMAP2013/0009.  (HIL Adv. Dkt. 342 at 39-41.  Of these four (4) cases, the Court finds that *Climate Change Capital* is the most analogous.

   In *Climate Change Capital*, Derek Hodd Limited sued Climate Change Capital Limited ("CCC") to recover a contingency fee payable for consultancy services provided pursuant to a written agreement dated November 13, 2006 (the "2006 Agreement"). *Climate Change Capital*, [2013] EWHC 1665 at 3.  Derek Hodd Limited, a company owned by Derek Hodd ("Hodd"), was not a party to the 2006 Agreement but sued CCC as the assignee of the 2006 Agreement from Zukra Limited, a company owned by Dominic Hollywood ("Hollywood").

   CCC is the main subsidiary of Climate Change Holdings Limited and one of eighteen (18) such subsidiary companies.  During the litigation, a question arose as to which of the CCC companies was a signatory to the 2006 Agreement.  CCC denied having

entered into the 2006 Agreement. Hollywood, who prepared the letter of engagement (the "Letter of Engagement"), identified the client as "Climate Change <u>Group</u> Limited" rather than CCC, but Climate Change <u>Group</u> Limited was a dormant company. Hollywood explained that he chose Climate Change <u>Group</u> Limited after finding the name on the website of the CCC group of companies. The High Court of Justice, Chancery Division, described Hollywood's choice as "little more than a shot in the dark," *id.* at 34-35, and agreed with Hodd that the references in the Letter of Engagement to Climate Change <u>Group</u> Limited were obvious misnomers.

The High Court explained that there is a misnomer whenever a party knows to whom he wishes to refer but by mistake uses the wrong name. Because Hollywood never decided which company in the CCC group of companies was his client, his mistake was not one about the identity of a particular counterparty. Still, the High Court found that the parties intended that the chief operating company of the CCC group of companies, namely CCC, be the company contracting for consultancy services. "[O]nce the court has decided, as a matter of construction, that the parties intended the contracting party to be CCC, I can see no good reason why the error should not be corrected as a matter of construction." *Id.* at 50. The High Court found its conclusion supported by the failure of the CCC group to raise any issue about the identity of the contracting party until Hollywood first sought to enforce the 2006 Agreement. *Id.* at 46.

In the alternative, the High Court held that the 2006 Agreement should be rectified so as to replace the references to Climate Change <u>Group</u> Limited with references to CCC. *Id.* at 51. The High Court cited the basic requirements for rectification set forth by Lord

Hoffman in *Chartbrook Limited v. Persimmon Homes Limited* [2009] UKHL 38, [2009] 1 AC 1101, at [48], as follows:

> The party seeking rectification must show that: (1) the parties had a common continuing intention, whether or not amounting to an agreement, in respect of a particular matter in the instrument to be rectified; (2) there was an outward expression of accord; (3) the intention continued at the time of the execution of the instrument sought to be rectified; (4) by mistake, the instrument did not reflect that common intention.

*Chartbrook* at 48.  The High Court also cited Lord Hoffman regarding the admissibility and relevancy of prior negotiations in considering a rectification claim:

> The party seeking rectification must show that he indeed made the relevant mistake when he entered into the contract.  Rectification is an equitable remedy.  In order to get rectification, it is necessary to show that the parties were in complete agreement on the terms of their contract, but by an error wrote them down wrongly. . . . You look at their outward acts, that is, at what they said or wrote to one another in coming to their agreement, and then compare it with the document which they have signed.

*Chartbrook* at 60 (citation omitted).  Again, the High Court concluded that the common intention of the parties was that CCC was the contracting party and by mistake, the Letter of Engagement failed to reflect the parties' common intention.

The holding in the *Climate Change Capital* case is consistent with Hare's testimony.  Kirk testified on cross-examination that he was unaware of *Climate Change Capital* but admitted that under the principles of construction in British Virgin Islands law, if the parties know whom they are dealing with, then the BVI Court would construe a legal document as if it contained the correct name.  (HIL Adv. Dkt. 342 at 39-40).

In applying the test set out in *Chartbrook* and discussed in *Climate Change Capital*, the Court considers first whether there is a clear mistake in the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement when the documents are read with regard to their background and context.  Second, the Court considers whether it is clear what

correction ought to be made to cure the mistake.  The Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement all named "<u>The</u> Rainbow Group, Ltd." as the lender.[44] These documents were prepared by Allen, who used as forms the documents that governed the relationship between CHFS and Roy Al Finance and Loan Company.  Dr. Edwards testified that the use of "The" was his mistake.  Kirk testified that his search of the BVI Company Register showed there is no British Virgin Islands company known as "<u>The</u> Rainbow Group, Ltd.," but there is a company named "Rainbow Group, Ltd."

The Court finds that under *Chartbrook* and the law of the British Virgin Islands, Dr. Edwards' mistake in inserting "The" before the name "Rainbow Group, Ltd." would be remedied under British Virgin Islands law by applying the principle of misnomer.  In the alternative, the Court finds that these documents would be rectified to correct the mistake.  As Hare explained at Trial, the purpose of BCA § 26 is to ensure that counterparties know who they are dealing with, and no evidence was presented at Trial that CHFS was confused about the identity of the Rainbow Group.  The Court, therefore, rejects the Trustee's argument, to the extent raised at Trial, that the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement are invalid because of the absence of "The Rainbow Group, Ltd." from the BVI Company Register.  Indeed, in closing argument, counsel for the Trustee maintained that the corporate status of the Rainbow Group was raised as an issue only to show, in support of other allegations, that Dr. Edwards routinely ignored or neglected corporate formalities in business transactions.  It thus appears that the Trustee abandoned Count I at Trial.  Regardless, the Court finds in favor of EFP/BHT on Count I.

---

[44] Even as recently as July, 2017, Dr. Edwards submitted an affidavit to the BVI Court referring to the lender as "<u>The</u> Rainbow Group Limited."  (HIL Ex. P-27 at 7).

5.      **Count II (Legal Capacity of Beher Limited)**

In Count II, the Trustee seeks a declaratory judgment that the 2010 Assignment by Beher Limited to BHT is void because, at the time of the 2010 Assignment, Beher Limited had been struck by the Registrar from the BVI Company Register. EFP/BHT contend that the restoration of Beher Limited to the BVI Company Register on August 4, 2017, moots the Trustee's claim. BCA § 217(6). In the alternative, EFP/BHT contend that the striking of Beher Limited from the BVI Company Register did not affect the validity of the 2010 Assignment. BCA § 29(1).

a.      **Choice of Law**

For the reasons discussed with respect to Count I, the Court finds that the law of the British Virgin Islands governs the effect of Beher Limited being stricken in Count II. Before addressing the merits of the Trustee's claim, the Court discusses the affirmative defense raised by EFP/BHT that the Trustee lacks standing to challenge the validity of the 2010 Assignment. As to the issue of standing, EFP/BHT rely on cases applying the laws of Maryland, Delaware, Pennsylvania, and Florida (HIL Adv. Dkt. 331 at 31-32) with no regard to which state law applies.

The 2010 Assignment has no choice-of-law provision. The 2006 Note (the subject of the 2010 Assignment) contains a provision requiring the application of Maryland law, but the Trustee was not a signatory to the 2006 Note. CHFS collected payments on the Home Improvement Loans at its office in Mississippi and sent payments owed to the Rainbow Group to an account at a bank in Puerto Rico and, thereafter, to various accounts as instructed by Dr. Edwards. The underlying mortgages and notes are in Mississippi. Dr. Edwards resides in Maryland. The Court finds no discernible relationship with Delaware,

Pennsylvania, or Florida. Applying the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188, the Court finds that Mississippi has the most significant relationship to the 2010 Assignment and the parties.

> **b.** **Does the Trustee have standing to complain about the legal authority of Beher Limited to execute the 2010 Assignment or to object to the validity of the 2010 Assignment?**

EFP/BHT argue that the Trustee lacks standing as a hypothetical lien creditor under § 544 to challenge the legal authority of Beher Limited to execute the 2010 Assignment to BHT or to object to the validity of the 2010 Assignment of the 2006 Note to BHT because, unlike CHFS, she is not a party to the 2010 Assignment. (HIL Adv. Dkt. 331 at 31-32, 34-36). EFP/BHT cite two (2) Maryland cases, *Henry v. Aurora Loan Services, LLC*, Case No. CV TDC-14-1344, 2016 WL 1248672 (D. Md. Mar. 25, 2016) and *Danso v. Ocwen Loan Servicing, LLC*, Case No. CV PX 16-1396, 2016 WL 4437653 (D. Md. Aug. 23, 2016). In those cases, the Maryland court held that the plaintiff lacked standing to challenge the propriety of an assignment because the plaintiff was not a party to the assignment or an intended beneficiary. *Danso*, 2016 WL 4437653, at *2; *Henry*, 2016 WL 1248672, at *3. In both cases, however, the Maryland court emphasized that the plaintiff lacked standing because the defect alleged by the plaintiff rendered the assignment voidable at the option of the "innocent" contracting party, rather than void. Applying Mississippi law, the district court reached the same conclusion in *Neel v. Fannie Mae*, Case No. 1:12-cv-00311-HSO-RHW, 2014 WL 896754 (S.D. Miss. Mar. 6, 2014).

Courts addressing the issue of standing have recognized, however, that a non-party, non-third-party beneficiary to a contract may challenge an assignment when the alleged defect renders it void. *See, e.g.*, *Yvanova v. New Century Mortg. Corp.*, 365 P.3d 845, 853

(Cal. 2016); *Reinagel v. Deutsche Bank Nat'l Tr. Co.*, 735 F.3d 220, 228 (5th Cir. 2013) (applying Texas law).  In *Yvanova*, the California Supreme Court explained, "[b]orrowers who challenge the foreclosing party's authority on the grounds of a void assignment 'are not attempting to enforce the terms of the instruments of assignment; to the contrary, they urge that the assignments are void ab initio.'" *Yvanova*, 365 P.3d at 856 (quoting Reinagel, 735 F.3d at 225).  A void contract is without legal effect; "It binds no one and is a mere nullity." *Id*. (citation omitted).  "Such a contract has no existence whatever. It has no legal entity for any purpose and neither action nor inaction of a party to it can validate it…." *Id.* (citation omitted).  Unlike a voidable transaction, a void transaction cannot be ratified or validated by the parties to it even if they so desire.  *Id.*  Consequently, even a non-party and non-third-party beneficiary to a contract has standing to challenge a transaction that is void. *Id.*

The Trustee asserts in the HIL Third Amended Complaint that "The Rainbow Group, Ltd." was never a valid existing BVI company and, "[t]herefore, any agreements entered into by 'The Rainbow Group, Ltd.' are null and void." (HIL Adv. Dkt. 237 at 30-31).  The Trustee also maintains that because Beher Limited was struck from the BVI Company Register in 2008, it did not have the requisite legal capacity in 2010 to assign the 2006 Note to EFP/BHT.  (HIL Adv. Dkt. 237 at 31-32).  Because the Trustee's claims would render the 2010 Assignment void, not voidable, the Court finds that the Trustee has standing to challenge Beher Limited's corporate status.

Counsel for EFP/BHT supposed in his closing argument at Trial that British Virgin Islands law would treat the 2010 Assignment as voidable, not void, because the actions of a dissolved company are deemed retroactively valid upon that company's restoration to the

BVI Company Register. (HIL Adv. Dkt. 352 at 45). Under § 215(1) of the BCA, however, transactions by a dissolved company are deemed void by operation of law without regard to the interests of the contracting parties and without the need for any further action. The Court, therefore, rejects EFP/BHT's attempt to recharacterize the Trustee's claim, which, would render the 2010 Assignment void, to a claim which would render the 2010 Assignment only voidable.

> ### c.   Under British Virgin Islands law, does the striking of Beher Limited from the BVI Company Register in 2008 void the 2010 Assignment (of the 2006 Note to BHT)?

As to the effect of the strike off of Beher Limited, the Trial testimony of Kirk and Hare was mostly consistent and, from the Court's own reading of the BCA, their testimony provided a reasonable interpretation of British Virgin Islands law. Both agreed that all companies formed in the British Virgin Islands must be registered under the BCA. (HIL Adv. Dkt. 342 at 14). Under the BCA, the Registrar may strike off the name of a company from the BVI Company Register for many reasons, including the company's failure to appoint a registered agent, to file documents required by the BCA, or "to pay its annual fee or any late payment penalty by the due date." BCA § 213(1); (HIL Ex. P-12). Before striking off a company from the BVI Company Register, the Registrar must send that company thirty (30)-days' notice and publish notice of his intention to do so. BCA § 213(3).

Under § 215(1) of the BCA, the effect of being struck off the BVI Company Register is that the company and its directors, members, and any liquidator or receiver may not: "(a) commence legal proceedings, carry on any business or in any way deal with the assets of the company; (b) defend any legal proceedings, make any claim or claim any right

for, or in the name of, the company; or (c) act in any way with respect to the affairs of the company." BCA § 215(1). There are a few statutory exceptions. For example, a company that has been struck off may continue to defend or carry on legal proceedings that were instituted prior to the date of striking off. BCA § 215(2). When a company remains struck off the BVI Company Register continuously for seven (7) years, it is dissolved effective from the last day of that period. BCA § 216.

Notwithstanding BCA § 215, a transfer of assets from a struck-off company to a third party may be deemed valid under BCA § 29, which provides:

> (1)    No act of a company and no transfer of an asset by or to a company is invalid by reason only of the fact that the company did not have the capacity, right or power to perform the act or to transfer or receive the asset.

BCA § 29(1). The protections afforded by BCA § 29(1) do not apply, however, when the third party is aware of the strike off by either actual or constructive notice. As to the issue of constructive notice, BCA § 32(1) further provides:

> (1)    A person is not deemed to have notice or knowledge of any document relating to a company, including the memorandum and articles, or of the provisions or contents of any such documents, by reason only of the fact that a document
>
> (a)    is available to the public from the Registrar

BCA § 32(1).

A company that has been struck off the BVI Company Register but has not yet been dissolved, that is, a company that has not remained struck off continuously for seven (7) years, may be restored by filing an application with the Registrar and paying any outstanding fees and penalties. BCA § 217(1). A company that has been dissolved by having been struck off for more than seven (7) years, however, must have the dissolution declared void before the company may be restored to the BVI Company Register. BCA

§ 218.  Doing so requires the company to file an application with the BVI Court within ten (10) years of the dissolution.  BCA § 218.  Regardless, once a company is restored, "the company is deemed never to have been dissolved or struck off the [BVI Company] Register."  BCA § 218(3).

### (1.)   Kirk

Kirk opined that because Beher Limited was struck off the BVI Company Register on October 31, 2008, and remained struck off the BVI Company Register continuously for the next seven (7) years, Beher Limited did not have any legal capacity to take any corporate action, conduct any business, or transfer any interest since that time.  (HIL Adv. Dkt. 342 at 18).  He further opined that because Beher Limited attempted to assign the 2006 Note to BHT on May 10, 2010, when it was prohibited from conducting any business, the 2010 Assignment would not be considered legal, valid, or binding under British Virgin Islands law.  For that reason, the Amended Loan Agreements, having been entered on August 10, 2010, when Beher Limited was prohibited from transacting any business, would also not be considered legal, valid, or binding.  Moreover, Kirk testified that BHT would not qualify for protection as an innocent third party under BCA § 29 because of Dr. Edwards' role in both Beher Limited and BHT.  Dr. Edwards is the sole member of Beher Limited, signed POC 4-1 as BHT's agent, appeared at Trial as BHT's representative (HIL Adv. Dkt. 342 at 20 & 28), and admitted at Trial that he acted as the agent of BHT (HIL Adv. Dkt. 341 at 165).

According to Kirk, BCA § 29(1) is an expansion of the common-law "indoor management rule," the effect of which is to relieve innocent third parties from having to inquire into and satisfy themselves that the requisite internal formalities of a company

formed under British Virgin Islands law have been met.  (HIL Ex. P-28).  An innocent third

party is entitled to assume that a company has acted in accordance with its memorandum

and articles of association.  Accordingly, internal management failures, such as the failure

of a company to duly appoint or authorize a director to enter into the subject transaction,

cannot be asserted by that company against an innocent third party.  When the third party

is aware of the internal management failure, however, the protections afforded by BCA

§ 29(1) and the indoor management rule do not apply.

As to the issue of constructive notice, Kirk opined that the strike off of a company

from the BVI Company Register is a fact that can be determined by means of a public

search.  The BVI Company Register operates as an online platform, enabling law firms and

other service providers to search the names of companies.  Because strike off and

dissolution do not result by virtue of documents filed with the Registrar but result

automatically by operation of the BCA, Kirk testified that BCA § 32(1)(a) does not apply.

On cross examination, Kirk admitted that his opinion that the transfers in 2010 were

invalid was based on the assumption that Beher Limited had never been restored to the BVI

Company Register.  Yet, at Dr. Edwards' request, Beher Limited was restored on August

1, 2017, by Hare and his law firm.

### (2.)    Hare

Hare opined that the transfers in question are not invalid by virtue of BCA § 215

for two reasons.  First, the effect of BCA § 215 may be avoided simply by restoring a

struck-off company to the BVI Company Register.  (HIL Adv. Dkt. 342 at 68).  At Dr.

Edwards' request, Hare and his law firm initiated the court proceedings that led to the

restoration of Beher Limited to the BVI Company Register on August 1, 2017.  If a struck-

off company or a struck-off and dissolved company is restored, it "is deemed never to have been dissolved or struck off the Register." BCA § 218(3). "If you unstitch that process, once it's back on the register, it retrospectively validates all the actions." (HIL Adv. Dkt. 342 at 74). Pursuant to this "deeming" provision, the restoration of Beher Limited had a curative effect on all questions of corporate capacity at the time of the 2010 transfers, according to Hare. Hare further opined that there is no subjective element to the restoration process. "[I]t's a binary question; the company is either restored or it's not." (HIL Adv. Dkt. 342 at 74).

The second reason why the transfers in question are not invalid, according to Hare, is that even if Beher Limited had not been restored, BCA § 29(1) and § 32 validated the transfers of assets. (HIL Adv. Dkt. 342 at 75). Hare acknowledged that there are exceptions to BCA § 29(1). For example, a transferee may not, as a matter of law, enjoy the benefit of BCA § 29(1) if it had actual notice that the transferor was unable to transact business because it had been struck off the BVI Company Register.

Unlike Kirk, Hare questioned whether BHT would have had constructive notice that Beher Limited had been struck off the BVI Company Register, given that the BVI Company Register is not always properly updated. Even if the information were discoverable by a search of the public record, Hare testified that it would not constitute notice to BHT because of BCA § 32. According to Hare, BCA § 29(1) and § 32 mitigate the effect of BCA § 215 so that the transfers in question are valid unless it can be shown that BHT had actual knowledge of Beher Limited being struck off and unable to transact business at the time of those transfers in 2010. Hare testified he was not aware of any facts indicating that BHT had actual knowledge of the strike off.

### d.      Analysis

The Court finds that under BCA §218(3), the restoration of Beher Limited in 2017 retroactively rendered the transactions in 2010 valid under British Virgin Islands law for the reasons given by Hare.  Notwithstanding the retroactive effect of the Restoration Order under British Virgin Islands law, an issue remains as to whether it should be disregarded as conflicting with federal bankruptcy law.  (HIL Adv. Dkt. 352 at 16-17).  When Dr. Edwards filed POC 4-1 and POC 5-1 on September 20, 2012 (the bar date for filing nongovernmental proofs of claim in the Bankruptcy Case), Beher Limited was struck off the BVI Company Register, and the transactions in 2010 were invalid under BCA § 215.  Should the status of POC 4-1 and POC 5-1 remain unchanged by events occurring after the bar date?[45]

In his closing argument, counsel for the Trustee cited *In re W.R. Grace & Co.*, 366 B.R. 302 (Bankr. D. Del. 2007).  (HIL Adv. Dkt. 352 at 17).  There, the Delaware bankruptcy court held that claimants could not ratify, after expiration of the claims bar date, a law firm's act of submitting unauthorized proofs of claim on their behalf.  *Id.* at 307.  After filing a chapter 11 bankruptcy case, the debtors received 4,200 asbestos property damage claims, 2,938 of which were filed by the same law firm.  None of the 2,938 proofs of claim were personally signed by the actual claimants.  The debtors filed an objection on the ground that Rule 3001(b) of the Federal Rules of Bankruptcy Procedure requires the creditor or the creditor's authorized agent to execute the proof of claim.  The

---

[45] EFP/BHT complained at Trial that the Trustee failed to raise the ratification issue in the HIL Amended Pretrial Order.  (HIL Adv. Dkt. 352 at 44).  Because EFP/BHT raised as an issue in the HIL Amended Pretrial Order (HIL Adv. Dkt. 331 at 47) the effect of the Restoration Order on the Trustee's claim, and because EFP/BHT disclosed the Restoration Order to the Trustee in an untimely manner, the Court finds that the ratification issue was not waived by its omission.

bankruptcy court entered an order requiring the law firm to provide the debtors with copies of express written authorizations establishing the law firm's authority to represent the claimants in the bankruptcy case. For seventy-one (71) of the proofs of claims, the written authorizations were either undated or dated after expiration of the claims bar date.

The bankruptcy court noted that under the doctrine of ratification, acts performed outside the scope of an agent's authority or performed by one who is not an agent, may be ratified by the principal and, moreover, that the doctrine of ratification has been deemed applicable in bankruptcy cases. *W.R. Grace & Co.*, 366 B.R. at 305. The bankruptcy court, however, held that ratification is not effective when it takes place after a deadline. *Id.* at 306. For its holding, the bankruptcy court cited *Federal Election Commission v. NRA Political Victory Fund*, 513 U.S. 88 (1994), in which the Supreme Court discussed the limitations on ratification: "[I]t is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at the time the ratification was made." *Federal Election*, 513 U.S. at 98 (citing *Cook v. Tullis*, 85 U.S. 332, 338 (1873)). Because allowing ratification after the bar date for filing proofs of claim would grant the seventy-one (71) claimants the unilateral power to extend the deadline, the bankruptcy court found that it would be unfair to the other creditors who properly and timely filed their claims and would disrupt the reorganization process to apply ratification. For those reasons, the bankruptcy court disallowed the seventy-one (71) proofs of claims.

Similarly, the Court finds that to render the 2010 Assignment by Beher Limited retroactively valid, based on an act that took place on August 1, 2017, would be unfair. EFP/BHT's claims should be allowed or disallowed based on the status of the claimants at

the time POC 4-1 and POC 5-1 were filed or no later than the bar date.[46] The Court, therefore, disregards the effect of the Restoration Order. The Court notes that to avoid a discovery dispute, EFP/BHT offered at Trial to stipulate that Beher Limited was never restored to the BVI Company Register, but the Court refused to accept the stipulation in light of Hare's conflicting testimony. Apparently, EFP/BHT were willing to enter into the stipulation because of their alternative argument that British Virgin Islands law would uphold the transfers under BCA § 29 and § 32 notwithstanding BCA § 215.

Both Kirk and Hare interpreted BCA § 29 as protecting a third-party transferee (BHT) only if it had no actual or constructive knowledge of the strike off of the transferor (Beher Limited). The emails exchanged between Dr. Edwards and Hirst, head of banking at VP Bank, show that Dr. Edwards was aware by at least November 2, 2009, that Beher Limited had been struck off the BVI Company Register. Dr. Edwards suggests that because he is not an attorney, he did not understand the significance of the strike off. The effect of the strike off, however, was explained by Hirst in the same email to Dr. Edwards, "Legally, the company is restricted from executing any transactions until it is returned to goodstanding [*sic*]." (HIL Ex. P-26). Dr. Edwards' terse response—"I received no reminder from you . . . and no warning about striking the company!"—indicates that he was somewhat concerned about the consequences resulting from the strike off. (HIL Ex. P-26). If not from the November 2, 2009, email, then Dr. Edwards certainly was made aware of the legal consequences of the strike off in another email from Hirst on November 19, 2009, informing Dr. Edwards: "We are in receipt of your instructions for a payment of $212,000, however as [Beher Limited] is not in goodstanding [*sic*] it is not possible [to]

---

[46] EFP/BHT filed POC 4-1 and POC 5-1 on the same day as the bar date, September 20, 2012.

process the payment until [Beher Limited] is returned to goodstanding [*sic*] status." (HIL Ex. P-26). Yet for his own reasons, he chose to ignore the effect of the strike off under British Virgin Islands law while disputing the payment of registration fees with Beher Limited's registered agent. The Court finds that BHT was not an innocent third party transferee entitled to the protections afforded by BCA § 29. As a result, the Court finds that the 2010 Assignment of the 2006 Note is void.

### 6. Count IV (Perfection of Security Interest)

In Count IV, the Trustee seeks a declaratory judgment that the Custodial Agreement was never validly assigned to EFP/BHT. Because the Custodial Agreement was never validly assigned, the Trustee contends that the McCarley Firm does not hold the Home Improvement Loans for the benefit of EFP/BHT. As a result, the Trustee asserts that EFP/BHT's alleged security interest is unperfected.

### a. Choice of Law

The Custodial Agreement provides that it is to be construed according to the laws of California but in the same paragraph requires the parties to submit to personal jurisdiction in Mississippi in any ensuing litigation. (HIL Ex. D-22). There is no discernible relationship, however, between California and the parties or the transaction. It appears that the choice of California law was arbitrary and may have been the result of the parties' use of the documents in place between CHFS and its prior lender as forms. Moreover, the Trustee was not a signatory to the Custodial Agreement.

The Court finds that whether EFP/BHT have a perfected security interest in the Home Improvement Loans is governed by the UCC. *Mills Morris Co. of Miss., Inc. v. Scanlon* (*In re King-Porter Co.*), 446 F.2d 722, 732 (5th Cir. 1971) ("The Uniform

Commercial Code has been adopted in all but one state. It should generally be considered

as the federal law of commerce—including secured transactions.").  Under the UCC, the

determination of whether a creditor has properly perfected its security interest is governed

by the law of the place where the collateral is located:

> (1)   Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral.
>
> (2)   While collateral is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a possessory security interest in that collateral.

UCC § 9-301.  The UCC provides the following relevant definitions:

> (a)   In this section, "place of business" means a place where a debtor conducts its affairs.
>
> (b)   Except as otherwise provided in this section, the following rules determine a debtor's location: . . .
>
> > * * *
> >
> > (2)   A debtor that is an organization and has only one place of business is located at its place of business.

UCC § 9-307.  CHFS's principal place of business before the rogue operation was at 234

East Capitol Street in Jackson, Mississippi.  The McCarley Firm's place of business is at

357 Towne Center Boulevard in Ridgeland, Mississippi, which is also the location of

EFP/BHT's purported collateral, the Home Improvement Loans.  Because CHFS, the

McCarley Firm, and the collateral at issue are in Mississippi, the Court finds that

Mississippi law applies to the issue of perfection.

b.      Do EFP/BHT have a perfected security interest in the Home
        Improvement Loans?

EFP/BHT allege that they have a perfected security interest in the Home
Improvement Loans pursuant to the Rainbow Loan Agreement and the Custodial
Agreement.  The Trustee seeks to avoid any interest of EFP/BHT in the Home
Improvement Loans as an unperfected security interest avoidable by a hypothetical lien
creditor under § 544.  From the position of a hypothetical judicial lien creditor, the Trustee
takes priority over any unperfected security interests attached to the Home Improvement
Loans.  MISS. CODE ANN. § 75-9-317(a)(2).  Accordingly, if EFP/BHT's alleged security
interest was unperfected at the time of the filing of the Petition, EFP/BHT's claims are
unsecured.

Article 9 of the UCC, as adopted by Mississippi, governs when and how a security
interest in personal property or fixtures is perfected.  MISS. CODE ANN. § 75-9-102.  The
method of perfection permitted under Article 9 depends on the type of "property subject to
a security interest or agricultural lien."  MISS. CODE ANN. § 75-9-102(12) (defining
"collateral").  The Rainbow Loan Agreement describes the collateral, as follows:

> COLLATERAL.  The term "Collateral" shall mean all Retail Installment
> Contracts and Receivables owned by CHFS.

(HIL Exs. P-1 & P-2, Part 2 at 3).  The terms "Retail Installment Contract" and
"Receivables" are defined as follows:

> RETAIL INSTALLMENT CONTRACT.  The term "Retail Installment
> Contract" shall mean the retail installment contract, promissory note or
> other similar instrument originally payable to an Originator and executed
> by an Account Debtor to evidence a Consumer Mortgage Loan, such
> contract being sold and assigned by such Originator to Borrower and
> assigned by Borrower to Lender.

Page 132 of 214

RECEIVABLES. The term "Receivables" shall mean any and all indebtedness or obligations evidenced by Consumer Mortgage Loan now or hereinafter owned by Borrower and in which Lender has been granted a first priority security interest therein.

(HIL Exs. P-1 & P-2, Part 2 at 6). The Rainbow Loan Agreement defines "Consumer Mortgage Loan" and a "Consumer Mortgage," as follows:

CONSUMER MORTGAGE LOAN. The term "Consumer Mortgage Loan" shall mean any loan made by an Originator to an Account Debtor (a) evidenced by a Retail Installment Contract, (b) secured by a Consumer Mortgage, and (c) the proceeds of which were used by the Account Debtor to remodel or renovate such Account Debtor's residence.

CONSUMER MORTGAGE. The term "Consumer Mortgage" shall mean a mortgage, deed of trust or other security deed in land and interests in real property (including, without limitation, Consumer Fixture Filings), structures, improvements, fixtures and buildings located on or used in connection with real property or rights and interest in real property which secures a Retail Installment Contract.

(HIL Exs. P-1 & P-2, Part 2 at 4-5). From these definitions in the Rainbow Loan Agreement, the collateral in which EFP/BHT assert a security interest falls within the definition of an "instrument" under Mississippi's version of the UCC:

(47) "Instrument" means a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary endorsement or assignment. The term does not include (i) investment property, (ii) letters of credit, or (iii) writings that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card.

MISS. CODE ANN. § 75-9-102(47).

According to POC 4-1 and POC 5-1, the sole basis for perfection of EFP/BHT's alleged security interest in the Home Improvement Loans is "possession." (HIL Exs. P-1 & P-2 at 1). The relevant statutory provisions regarding perfection of a security interest in an instrument by possession are as follows:

(a)    Except as otherwise provided in subsection (b) and Section 75-9-312(b), a financing statement must be filed to perfect all security interests and agricultural liens.

(b)    The filing of a financing statement is not necessary to perfect a security interest:

* * *

(6)    In collateral in the secured party's possession under Section 75-9-313;

MISS. CODE ANN. § 75-9-310(a), (b)(6). Specifically, EFP/BHT themselves do not possess

the Home Improvement Loans; rather, they contend they have constructive possession of

the Home Improvement Loans under MISS. CODE ANN. § 75-9-313(c), which provides:

(c)    With respect to collateral other than certificated securities and goods covered by a document, a secured party takes possession of collateral in the possession of a person other than the debtor, the secured party, or a lessee of the collateral from the debtor in the ordinary course of the debtor's business, when:

(1)    The person in possession authenticates a record acknowledging that it holds possession of the collateral for the secured party's benefit; or

(2)    The person takes possession of the collateral after having authenticated a record acknowledging that it will hold possession of collateral for the secured party's benefit.

MISS. CODE ANN. § 75-9-313(c)(1)-(2). EFP/BHT claim that they have a perfected security

interest in all the Home Improvement Loans because the McCarley Firm, acting either as

their agent or as a bailee, holds possession of the Home Improvement Loans for the benefit

of the "Edwards companies."[47]    EFP/BHT rely on their status as "assignees" of the

---

[47] Counsel for EFP/BHT repeatedly referred to both EFP and BHT as "Edwards-controlled entities" or the "Edwards companies" at Trial. *See, e.g.*, (HIL Adv. Dkt. 340 at 106-09). That description may properly refer to EFP but not BHT. Under Bermuda trust law, Dr. Edwards as the settlor of BHT has only limited powers. *See* The Trusts (Special Provisions Act) 1989 § 2A(2)(3); (HIL Adv. Dkt. 342 at 24-25). Thus, the Court uses the adverb "purportedly" regarding the statement of control by Dr. Edwards.

Rainbow Loan Agreement and point out that the UCC does not require "re-perfection" of a security interest. (HIL Adv. Dkt. 331 at 33).

### (1.)   Are EFP/BHT assignees of the Custodial Agreement?

Under the Custodial Agreement, the McCarley Firm acts as the custodian of the Home Improvement Loans "for the exclusive use and benefit of the Lender":

> Section 4.2.   <u>Custodian of Documents</u>.  Custodian, either directly or by acting through an agent, shall hold all documents relating to any Receivable that comes into its possession for the exclusive use and benefit of Lender.

(HIL Exs. P-1 & P-2, Part 3 at 7).  "Lender" is defined in the first paragraph of the Custodial Agreement:

> This Custodial Agreement ("<u>Agreement</u>"), dated as of September 25, 2006, is by and among THE RAINBOW GROUP, LTD., a British Virgin Island[s] corporation ("<u>Lender</u>"), COMMUNITY HOME FINANCIAL SERVICES, INC., a Delaware Corporation ("<u>Borrower</u>") and HAROLD B. MCCARLEY, JR, PLLC a Mississippi professional limited liability company ("<u>Custodian</u>").

(HIL Exs. P-1 & P-2, Part 3 at 2).  This definition of "Lender" does not include BHT or EFP by name or by reference as an assignee of the Rainbow Group.  Indeed, the Custodial Agreement expressly provides that it may only be assigned pursuant to a writing signed by the parties.

> Section 5.7.   <u>Assignment</u>.  No party hereto shall sell, pledge, assign or otherwise transfer this Agreement without the prior written consent of the other parties hereto.

(HIL Exs. P-1 & P-2, Part 3 at 12).  McCarley testified at Trial that he has never executed an assignment or amendment of the Custodial Agreement.  (HIL Adv. Dkt. 343 at 5-6).  Additionally, the Custodial Agreement expressly provides that the McCarley Firm is not an agent of either the Lender or Borrower.

Section 5.5.   No Partnership.  Nothing herein contained shall be deemed or construed to create a co-partnership or joint venture between the parties hereto and the services of Custodian shall be rendered as an independent contractor and not as agent for Lender or Borrower.

(HIL Exs. P-1 & P-2 at 12).

The contractual designation of the McCarley Firm as an "independent contractor" in the Custodial Agreement forecloses EFP/BHT's argument that the McCarley Firm possesses the collateral as their agent.  As to the alternative argument that the McCarley Firm holds the collateral as their non-agent bailee, Mississippi law requires some writing where the bailee acknowledges "that it holds possession of the collateral for the secured party's benefit" or "that it will hold possession of the collateral for the secured party's benefit."  MISS. CODE ANN. § 75-9-313(c)(1)-(2).  Yet the only evidence of such a written acknowledgment by the McCarley Firm is the Custodial Agreement, which does not name EFP/BHT as the secured parties and which has never been assigned to them.

EFP/BHT, nevertheless, maintain that the McCarley Firm acted as their bailee under the contractual right of assignment found in ¶ 9.6 of the Rainbow Loan Agreement, which provides:

9.6 ASSIGNMENT BY LENDER.  LENDER MAY AT ANY TIME (A) DIVIDE AND REISSUE (WITHOUT SUBSTANTIVE CHANGES OTHER THAN RESULTING FROM SUCH DIVISION) THE NOTE, AND/OR (B) SELL, ASSIGN, GRANT PARTICIPATION IN, DELEGATE OR OTHERWISE TRANSFER TO ANY OTHER PERSON (AN "ASSIGNEE") ALL OR PART OF THE RIGHTS AND DUTIES OF LENDER UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.  TO THE EXTENT INDICATED IN ANY DOCUMENT, INSTRUMENT OR AGREEMENT SO SELLING, ASSIGNING, GRANTING PARTICIPATION IN, OR OTHERWISE TRANSFERRING TO AN ASSIGNEE SUCH RIGHTS AND/OR DUTIES, (I) THE ASSIGNEE SHALL ACQUIRE ALL THE LENDER'S RIGHTS UNDER THE AGREEMENT AND THE OTHER LOAN DOCUMENTS AND (II) THE ASSIGNEE SHALL BE DEEMED TO BE THE "LENDER" UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS WITH

THE AUTHORITY TO EXERCISE SUCH RIGHTS IN THE CAPACITY
OF THE LENDER.

(HIL Exs. P-1, P-2, D-17 & D-18).  McCarley's testimony at Trial supports EFP/BHT's

contention.  McCarley testified that he understood that he was the bailee of the Home

Improvement Loans for the "lender" under the Custodial Agreement and that at some point,

the "lender" changed from Rainbow Group, Ltd. to Beher Limited.  (HIL Adv. Dkt. 343 at

14-15).  After that initial change, McCarley apparently took instruction from Dr. Edwards

as to the identity of the lender.

To reach this result, EFP/BHT attempt to incorporate ¶ 9.6 of the Rainbow Loan

Agreement into the Custodial Agreement, but ¶ 9.6 of the Rainbow Loan Agreement

contradicts § 5.7 of the Custodial Agreement.  *See Alford v. Kuhlman Elec. Corp.*, 716 F.3d

909, 913 (5th Cir. 2013) ("[A] reference in subcontract to the provisions, plans and

specifications of a general contract imports them into the subcontract where not

inconsistent with its terms . . ." (quoting *Perry v. United States*, 146 F.2d 398, 400 (5th Cir.

1945)).   To remove the conflict between these provisions, EFP/BHT suggest a narrow

interpretation of § 5.7 of the Custodial Agreement—that it prohibits an assignment only by

the McCarley Firm without the written consent of the parties.  (HIL Adv. Dkt. 341 at 179).

The plain language of § 5.7 of the Custodial Agreement, however, prohibits any party from

assigning the Custodial Agreement "without the prior written consent of the other parties."

To allow EFP/BHT to inject § 9.6 of the Rainbow Loan Agreement to the Custodial

Agreement would be contrary to the principle of contractual construction that the express

terms of a valid contract should not be altered or amended.  *Epperson v. SOUTHBank*, 93

So. 3d 10, 17 (Miss. 2012). The Court, therefore, finds that EFP/BHT are not assignees of the Custodial Agreement.[48]

**(2.)      Are EFP/BHT required by the UCC to "re-perfect" their security interest?**

EFP/BHT contend, in the alternative, that the UCC does not require the Rainbow Group or Beher Limited to assign the Custodial Agreement to them. They rely on MISS. CODE ANN. § 75-9-310(c), which provides: "If a secured party assigns a perfected security interest or agricultural lien, a filing under this article is not required to continue the perfected status of the security interest against creditors of and transferees from the original debtor." *Id.* Under MISS. CODE ANN. § 75-1-302, however, parties may agree to vary the effect of provisions of the UCC:

> (a)      Except as otherwise provided in subsection (b) or elsewhere in the Uniform Commercial Code, the effect of provisions of the Uniform Commercial Code may be varied by agreement.
>
> * * *
>
> (c)      The presence in certain provisions of the Uniform Commercial Code of the phrase "unless otherwise agreed," or words of similar import, does not imply that the effect of other provisions may not be varied by agreement under this section.

MISS. CODE ANN. § 75-1-302(a),(c). The Court finds that the parties "varied by agreement" the terms of MISS. CODE ANN. § 75-9-310(c) by providing in ¶ 5.7 certain conditions that must occur before any assignment of the Custodial Agreement.

Notwithstanding EFP/BHT's contention at Trial that "re-perfection" is unnecessary under the UCC, Dr. Edwards apparently thought otherwise at the time CHFS signed the

---

[48] To the extent EFP/BHT rely on the 2010 Assignment of the 2006 Note to BHT as evidence of an assignment of the Custodial Agreement, the Court has found that the 2010 Assignment is void.

Page 138 of 214

EFP Note and BHT Note.  In an email Dr. Edwards sent to Dickson on August 6, 2010, Dr. Edwards explained, "The new loan should be divided into two loans, one from Beher and one from EFP. I hope to work out the % from each entity by Saturday."  (HIL Ex. P-4 & D-5).  Dr. Edwards then sets out eight (8) points related to this new loan.  In the second point, he states, "The name on the lockbox, custodial agreement, and all other documents should be amended."  (HIL Ex. P-4 & D-5).  Dr. Edwards did not follow through with the amendment of the Custodial Agreement.

A pattern has developed.  In a separate but related suit against BancorpSouth Bank, EFP/BHT alleged that "because of the way certain interests were shared and transferred from Rainbow [Group, Ltd.] to the other Edwards Entities, EFP and BHT may enforce the [blocked account agreement] against BancorpSouth" even though they were not an original party to that agreement.  *Edwards Family P'ship, LP v. BancorpSouth Bank*, 236 F. Supp. 3d 964, 967 (S.D. Miss. 2017), *aff'd*, 699 F. App'x 312 (5th Cir. 2017).  The District Court assumed the truth of this allegation in considering BancorpSouth Bank's summary judgment motion and in the end held that EFP/BHT had abandoned their right to enforce the agreement by acquiescing "to a sustained deviation from their contractual rights."  *Id.* at 966-67.  Here, EFP/BHT again seek to succeed to the rights of an agreement to which they were not the original parties and which they were never assigned.  As noted by another Mississippi bankruptcy court, "Although strict adherence to the Code requirements may at times lead to harsh results, efforts by courts to fashion equitable solutions for mitigation of hardships experienced by creditors in the literal application of statutory filing requirements may have the undesirable effect of reducing the degree of reliance the market should be able to place on the Code provisions. The inevitable harm doubtless would be more serious

to commerce than the occasional harshness from strict obedience." *United States v. Williams* (*In re Williams*), 82 B.R. 430, 435 (Bankr. N.D. Miss. 1988) (citing *Sec. Nat'l Bank & Tr. Co. v. Dentsply Prof'l Plan*, 617 P.2d 1340, 1343 (Okla. 1980)); *Pongetti v. Nat'l Bank of Commerce* (*In re Frady*), 276 B.R. 456, 460 (Bankr. N.D. Miss. 2000) ("While the results in this proceeding might initially appear harsh, [the creditor] could certainly have better protected itself.")

### c.    Analysis

The Court finds that EFP/BHT failed to perfect their alleged security interest in the Home Improvement Loans before the date of the Petition. The Custodial Agreement is ineffectual to grant EFP/BHT a perfected security interest in the Home Improvement Loans. Neither EFP nor BHT is in possession of the Home Improvement Loans and the McCarley Firm does not hold the Home Improvement Loans as an agent or bailee for EFP/BHT. Because their interest in the Home Improvement Loans is unperfected, EFP/BHT are general unsecured creditors. Accordingly, the Court finds that the Objection to POC 4 & 5 should be sustained to the extent that EFP/BHT are not secured creditors of CHFS.

### 7.    Count V (Tracing of Funds)

In Count V, the Trustee seeks a declaratory judgment that, to the extent that EFP/BHT have a perfected security interest in the Home Improvement Loans, their security interest does not attach to any of the funds recovered by the Trustee because EFP/BHT have failed to trace those funds. The Court already has found that EFP/BHT failed to perfect their security interest. Assuming EFP/BHT have a perfected security interest in the Home Improvement Loans, the Court finds that they do not have a security interest in the

$5,490,132.19 wired to the Trustee from accounts at Banco Panameño or in the $540,000 in loan payments intercepted by the Trustee. Because the issue of tracing concerns proceeds of both the Home Improvement Loans and the Mortgage Portfolios, the Court delays addressing this issue in full until after discussing the Trustee's claims and EFP/BHT's counterclaim in the Mortgage Portfolios Adversary.

### 8.    Count VI (POC 4-1 & POC 5-1)

In Count VI, the Trustee seeks a declaratory judgment that POC 4-1 ($18,390,660.32) and POC 5-1 ($18,390,660.32), both of which were filed by EFP/BHT, are duplicative and that the claims are calculated incorrectly. (HIL Adv. Dkt. 342 at 179-83).

#### a.    Calculation of Claims

According to the claims register, POC 4-1 belongs to BHT, and POC 5-1 belongs to EFP. For convenience, the Court will maintain these separate designations.

The Trustee retained Aucoin to identify and categorize the Home Improvement Loans, evaluate the transactions between CHFS and EFP/BHT, and analyze and recalculate the amount owed to each under the EFP Note and the BHT Note. (HIL Ex. P-7). Since 2010, Aucoin has been a partner in the fraud, forensic, and litigation services group of Horne LLP, a regional accounting and consulting firm. Aucoin graduated from Louisiana State University with a bachelor of science degree in accounting and a master of science degree in accounting and internal auditing. He is a certified public accountant, certified internal auditor, and a certified fraud examiner. Aucoin is also certified in financial forensics. Before he was a partner at Horne LLP, Aucoin was employed as a forensic accountant at Ernest & Young, LLP and Postlethwaite & Netterville, APAC. The Court

accepted Aucoin as an expert in the fields of public accounting, fraud examination, financial forensics, and internal audits.  (HIL Adv. Dkt. 340 at 73-75).

According to Aucoin, from September 26, 2006, to August 11, 2010, CHFS received funds totaling $18,771,500 (not including $6,572,949.45 that were paid to Roy Al Finance and Company) from Beher Limited, EFP, Florida Mutual Assurance Trust, LLC, Rainbow Group, Ltd., and an unknown JP Morgan Chase account.  (HIL Ex. P-7, Schedule 6).  During that same period of time, Aucoin identified payments totaling $17,421,250 from CHFS to BHT, Beher Limited, EFP, a Merrill Lynch account, the Rainbow Group, and VP Bank BVI, Ltd.  (HIL Ex. P-7, Schedules 6 & 9).  Aucoin calculated a loan balance of $17,832,496, due on the EFP Note and the BHT Note, combined, from September 26, 2006, to May 23, 2012, the date of the Petition.  (HIL Ex. P-7 at 10).  This amount consists of principal of $14,919,181 and interest of $2,913,315.  (HIL Adv. P-7, Schedules 7 & 10).  It does not appear that any attempt was ever made to separate the Home Improvement Loans funded by the EFP Note from those funded by the BHT Note.  For that reason, there were no records available from which Aucoin could calculate the amount owed EFP and BHT separately.

In reaching his calculation of the loan balance, Aucoin disagreed with the amounts set forth in the Amended Loan Agreements as the "outstanding principal balance" due as of July 31, 2010, and in the affidavit of Borg submitted in the Dickson Guaranty Suit. Aucoin found three (3) variances which he attributed to Borg's overstatement of the initial draw by $200,000 and her failure to credit $126,246 in payments made by CHFS.  Aucoin also found two other issues.  First, Borg applied compound interest rather than simple interest.  In other words, she included outstanding interest in the interest calculation and

continued to add any unpaid interest to the principal balance. Aucoin found that the EFP Note and the BHT Note made no provision for compound interest. (HIL Adv. Dkt. 340 at 149). Second, there were delays in posting CHFS's payments. Before Trial, EFP/BHT agreed to stipulate to Aucoin's calculation of principal and interest of $17,832,496 due on the EFP Note and BHT Note, combined, as of May 23, 2012. (HIL Adv. Dkt. 331 at 43). Based on this stipulation and the percentage amount of the $16 million credit facility divided between EFP/BHT, as reflected in the EFP Note (25%) and the BHT Note (75%), the Court finds that as of May 12, 2012, CHFS owed BHT $13,374,372, consisting of $11,189,385.80 in principal and $2,184,986.25 in interest, and CHFS owed EFP $4,458,124, consisting of $3,729,795.25 in principal and $728,328.75 in interest. Accordingly, the Court finds that POC 4-1 should be allowed as an unsecured claim in the principal amount of $11,189,385.80 and interest of $2,184,986.25, and POC 5-1 should be allowed as an unsecured claim in the principal amount of $3,729,795.25 and $728,328.75 in interest

The parties disagree as to the amount that is owed on the Home Improvement Loans after the Petition date because they cannot agree on the post-petition interest rate or the amount of post-petition payments traceable to the Home Improvement Loans. For the post-petition period June 1, 2012, through September 30, 2012, Aucoin calculated the interest due based on a seven percent (7%) per annum rate (as set forth in the Cash Collateral Orders). After applying post-petition adequate protection payments of $958,839 made by CHFS during that period, Aucoin calculated a loan balance due of $17,223,688 as of September 30, 2012, consisting of principal of $14,310,373 and interest of $2,913,315.[49]

---

[49] Aucoin applied $608,808 to the principal balance and $350,031 to interest.

(HIL Ex. P-7, Schedule 10). Aucoin then applied to the outstanding principal due a total of $4,389,241 collected by ClearSpring from June 30, 2014, through May 31, 2017, which he could trace to the Home Improvement Loans.[50] (HIL Adv. Dkt. 340 at 94; HIL Ex. P-7, Schedule 9).

Aucoin explained how he traced ClearSpring's collections to the Home Improvement Loans, as opposed to the Mortgage Portfolios or other sources. Aucoin first identified the loans classified as Home Improvement Loans by CHFS and found that from February of 2006 to October of 2011, CHFS categorized 2,888 loans as Home Improvement Loans. (HIL Ex. P-7, Schedule 1). Aucoin then reconciled the 2,888 loans with ClearSpring's boarding data. Within the boarding data, 1,796 loans had the designation of "COMMUNITY HOME FINANCIAL SERVICES – 1." (HIL Ex. P-7, Schedule 2). Of these 1,796 loans, 128 loans did not appear anywhere in the information provided by CHFS. (HIL Ex. P-7, Schedule 5). There were thirteen (13) additional loans that sometime after October of 2011 were moved from the category of Home Improvement Loans to Discount Home Mortgage, Inc. loans. (HIL Ex. P-7, Schedule 3). Aucoin reclassified these thirteen (13) loans as Home Improvement Loans, which increased the total number of Home Improvement Loans from 1,796 to 1,809. (HIL Ex. P-7, Schedules 2 & 3). The parties stipulated that there are 1,809 Home Improvement Loans, as determined by Aucoin. (HIL Adv. Dkt. 331 at 40).

From June 30, 2014, to May 31, 2017, ClearSpring collected approximately $11 million related to Home Improvement Loans, Mortgage Portfolios, Discount Home Mortgage, Inc. loans, and other unknown loans. These funds were remitted to the Trustee,

---

[50] $4,389,241 = $4,348,082 + $41,159 (HIL Ex. P-7, Schedule 9).

less servicing fees of $2,426,826 for collections of Home Improvement Loans, Mortgage Portfolios, and all other loans. (HIL Ex. P-7, Schedule 9). As to the 1,809 Home Improvement Loans, ClearSpring collected $4,348,082 and $41,159 related to the loans identified by ClearSpring as Home Improvement Loans that were not identified as such in CHFS's records. Applying these collections on the Home Improvement Loans to the outstanding principal due, Aucoin calculated the loan balance as of May 31, 2017, to be $12,834,447, which includes principal of $9,921,132 and interest of $2,913,315. (HIL Adv. Dkt. 340 at 132; HIL Ex. P-7 at 14).

EFP/BHT disagree with Aucoin's post-petition calculations. Because the Cash Collateral Orders required payment of interest at the rate of seven percent (7%) per annum only until September 30, 2012, Aucoin did not include interest payments after that date. (HIL Adv. Dkt. 340 at 139). EFP/BHT contend that Aucoin should have applied the contract rate of interest of 12.5% during the entire post-petition period. EFP/BHT also contend that Aucoin should have applied compound interest, rather than simple interest, but do not point to any specific language in the EFP Note or BHT Note. On cross-examination, Aucoin agreed that the calculations provided by Borg to CHFS for the Borrowing Base Certificates included compound interest. Aucoin, however, testified that he did not find any indication that CHFS was aware that Borg was doing so. Finally, EFP/BHT question why Aucoin reduced the principal amount by the amount of ClearSpring's collections without first deducting ClearSpring's servicing fees. (HIL Adv. Dkt. 340 at 149).

b.    **Analysis**

The Court finds that EFP/BHT, who are general, unsecured creditors as to the Home Improvement Loans, are not entitled to post-petition interest.[51]  11 U.S.C. § 506(b) ("[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim. . . .").  Moreover, the Court finds that EFP/BHT failed to meet their burden of proving the portion of ClearSpring's servicing fees attributable to the Home Improvement Loans, which they contend should not have been included by Aucoin in his calculation of the principal amount.  EFP/BHT did not present any evidence as to this issue and did not identify any report from which the information might be gleaned.  On cross-examination, Aucoin could not recall whether he reviewed any report prepared by ClearSpring that showed the portion of its total servicing fees attributable to Home Improvement Loans, as opposed to the Mortgage Portfolios or some other loan.

Under the burden-shifting framework of § 502(a), POC 4-1 and POC 5-1 constitute *prima facie* proof of the amount of EFP and BHT's claims.  Aucoin's testimony, however, shifted the burden to EFP/BHT to prove the amount of their claims by a preponderance of the evidence.  *In re 804 Congress, L.L.C.*, 529 B.R. 213, 219 (Bankr. W.D. Tex. 2015).  In the absence of any evidence by EFP/BHT showing the amount of ClearSpring's servicing fees attributable to the Home Improvement Loans, the Court adopts Aucoin's calculation of the loan balance as of May 31, 2017, of $12,834,447, which includes principal of $9,921,132 and interest of $2,913,315.  Consistent with the percentages set forth in the EFP

---

[51]  The Court also finds that the EFP Note and BHT Note clearly provide for payment of simple interest, not compound interest.  "The Borrower promises to pay interest only on the outstanding principal amount of the credit facility. . . ."  (HIL Exs. P-1 & P-2, Part 4 at 1).

Note and BHT Note, the Court finds that as of May 31, 2017, assuming the collections identified by Aucoin are paid EFP/BHT, $9,625,835.25 is owed BHT (consisting of principal of $7,440,849 and interest of $2,184,986.25) and $3,208,611.75 is owed EFP (consisting of $2,480,283 in principal and $728,328.75 in interest) as unsecured creditors.

**B.      Mortgage Portfolios Adversary**

**1.      MPF Complaint**

In Count I of the MPF Complaint, the Trustee seeks a broad declaratory judgment that determines the rights and obligations of the parties with respect to the Mortgage Portfolios and Portfolios #1-#7.   In Count II, the Trustee seeks a declaratory judgment disallowing POCs 6-1 to 9-1, in whole or in part.   In Count III, she seeks an accounting of the net proceeds owed CHFS.   Because both Counts II and III relate to POCs 6-1 to 9-1 and the amounts owed in connection with the Mortgage Portfolios, the Court addresses Counts II and III in the same discussion.   In Count IV, the Trustee seeks specific performance of MPF Agreement *I*, MPF Agreement *II*, and MPF Agreement *III*.   For convenience, Counts I and IV are combined in the discussion below.   In Count V, the Trustee seeks the imposition of a constructive trust on all proceeds of the Mortgage Portfolios, and in Count VI, she seeks damages in excess of $1 million for conversion of property of the estate.   Because the Trustee did not seek relief based on her claims in Count V and Count VI in the MPF Amended Pretrial Order (MPF Adv. Dkt. 126 at 12-13), the Court considers Counts V and VI to have been abandoned and will not discuss them further until the conclusion of this Opinion.

### 2. MPF Counterclaim Counts

EFP/BHT and Dr. Edwards filed the MPF Answer & Counterclaim, alleging eight (8) counts (the "MPF Counterclaim Counts"). In MPF Counterclaim Counts I-III of the MPF Answer & Counterclaim, EFP/BHT and Dr. Edwards seek a declaratory judgment that sets forth the rights and obligations of the parties with respect to Portfolios #1-#7. Because MPF Counterclaim Counts I-III seek a declaration of the same rights that are the subject of the Trustee's Counts I and IV in the MPF Complaint, MPF Counterclaim Counts I-III and Counts I and IV are included in the same discussion. In MPF Counterclaim Count IV, EFP/BHT and Dr. Edwards seek damages because of CHFS's alleged pre-petition and post-petition breaches of the purported "joint ventures." In MPF Counterclaim Count V, they seek damages for CHFS's alleged breach of its fiduciary duties. In MPF Counterclaim Count VI, they seek damages in the amount of the difference in servicing fees charged by ClearSpring and CHFS. In MPF Counterclaim Count VII, they seek a declaratory judgment that they are entitled to $3,888,309.30 or 65.7% of the $5,918,279 recovered by the Trustee. Finally, in MPF Counterclaim Count VIII, EFP/BHT and Dr. Edwards seek an accounting from the Trustee of all funds collected from the Mortgage Portfolios and a return of any funds used by the Trustee to pay expenses of the estate. MPF Counterclaim Count VIII is combined with the discussion of Counts II and III, given that they all relate to POCs 6-1 to 9-1.

### 3. Misjoinder of Parties

As a procedural matter, the Trustee alleged as an affirmative defense in the MPF Reply to Counterclaim that EFP/BHT improperly joined Church Bay Trust and CHFS as parties in the Mortgage Portfolios Adversary. (MPF Adv. Dkt. 72 at 3). The MPF

Counterclaim Counts in the MPF Answer & Counterclaim are asserted on behalf of EFP and BHT "acting by and through its trustee, Church Bay Trust" and identify the parties as EFP, BHT, Church Bay Trust, CHFS, and the Trustee.  (MPF Adv. Dkt. 70 at 15).

No attorney appeared at Trial on behalf of Church Bay Trust or CHFS.  When questioned on cross-examination, Dr. Edwards testified that he was acting in a representative capacity for BHT but was unaware of any separate claim brought by Church Bay Trust in the Mortgage Portfolios Adversary.  (HIL Adv. Dkt. 341 at 164-71).  Moreover, it does not appear that EFP/BHT seek any relief against CHFS, as opposed to the Trustee, in her representative capacity.  *See Nicholas v. United States*, 384 U.S. 678, 692-93 & n.27 (1966); 11 U.S.C. § 323(b) (as representative of the estate, the trustee has exclusive capacity to sue and be sued on behalf of the estate).

Pursuant to Rule 21 of the Federal Rules of Civil Procedure ("Rule 21"), as made applicable to adversary proceedings by Rule 7021 of the Federal Rules of Bankruptcy Procedure, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."  FED. R. CIV. P. 21.  Because Rule 21 does not provide any standards for determining if parties are misjoined, courts look to Rule 20 of the Federal Rules of Civil Procedure ("Rule 20") for guidance.  *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521 (5th Cir. 2010).  Rule 20 provides, in pertinent part, that "[p]ersons may join in one action as plaintiffs if . . . they assert any right to relief jointly."  FED. R. CIV. P. 20.  Because no relief is sought by Church Bay Trust or against CHFS, the Court agrees with the Trustee that Church Bay Trust and CHFS are misjoined parties and should be dismissed from the Mortgage Portfolios Adversary.

### 4.      Choice of Law

As in the Home Improvement Loans Adversary, the Court finds that the rights and obligations of the parties with respect to Portfolios #1-#7 is governed by Mississippi law. As noted previously, Dr. Edwards lives in Maryland; Dickson is currently serving the remainder of his sentence at a halfway house in Maryland but before his arrest, resided in Mississippi; CHFS is a Delaware corporation with its principal place of business in Mississippi; EFP is a Delaware company; and BHT is a Bermuda trust; and Frascogna is a Mississippi attorney. The Mortgage Portfolios are secured by real property located in thirty (30) states in the United States. The original notes and mortgages that comprise Portfolios #1-#6 are located in Maryland. The original notes and mortgages that comprise Portfolio #7 are missing but presumed to be in Costa Rica. MPF Agreement *I*, MPF Agreement *II*, and MPF Agreement *III* do not contain a choice-of-law provision. The differences in the laws of Mississippi and Maryland, the two states with the most significant relationship to the transactions and the parties, are minimal. *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) (recognizing that no choice-of-law analysis is necessary when the laws of the jurisdictions do not conflict). The Court's application of Mississippi law is consistent with the choice of law made by the Fifth Circuit and the District Court in the Dickson Guaranty Suit. *Dickson*, 821 F.3d at 617 & n.2; *Dickson*, 2014 WL 4494283, at *3.

### 5.      Counts I & IV/MPF Counterclaim Counts I-III (Mortgage Portfolios)

In Counts I & IV and MPF Counterclaim Counts I-III, the parties dispute the ownership of the Mortgage Portfolios and almost every other aspect of their business relationship. The Trustee maintains that CHFS owns the loans that comprise Portfolios #1-

#7 and that they constitute property of the bankruptcy estate (MPF Adv. Dkt. 126 at 12); EFP/BHT contend that EFP owns the loans that comprise Portfolios #1-#6 and BHT owns the loans that comprise Portfolio #7 (MPF Adv. Dkt. 126 at 31).

The Trustee questions whether the transactions are true joint ventures, loans, or something else. The Trustee asks the Court to decide this issue and alleges various claims depending on whether the Court finds that the transactions are true joint ventures, loans, or something else.

If any of the transactions are true joint ventures, according to the Trustee, then the funds used to purchase the Mortgage Portfolios are a capital contribution of EFP/BHT and are not obligations of CHFS. Moreover, the Trustee contends that with respect to Portfolios #1, #2, and #7, the estate is entitled to a distribution according to the terms of MPF Agreement *I*, MPF Agreement *II*, and MPF Agreement *III*, once EFP/BHT has been repaid its "investment" plus interest. With respect to Portfolios #3-#6 (for which there are no documents), the Trustee maintains that the estate has an equal ownership interest in the loan proceeds of Portfolios 1#-#6 pursuant to the default rules under the Mississippi Uniform Partnership Act, MISS. CODE ANN. § 79-13-101 *et seq.*

If any of the transactions are loans and not true joint ventures, however, the Trustee asserts that the loans are void or unenforceable against the estate under Mississippi's Statute of Frauds, MISS. CODE ANN. § 15-3-1(d), due to the lack of a written instrument. Even if the loans are enforceable, the Trustee contends the loans are unsecured or, if secured, are unperfected and do not accrue post-petition interest. As to the issue of perfection, the Trustee asserts that BHT's security interest in Portfolio #7 is unperfected for an additional reason—Frascogna released the underlying consumer loans to Dickson.

According to EFP/BHT, the transactions are true "joint ventures" with respect to all of the Mortgage Portfolios, and they have paid all sums due CHFS under the terms of their agreements. EFP/BHT contend that MPF Agreement *I* and MPF Agreement *II*, by their express terms, govern Portfolios #1 and #2 and by the parties' course of performance also govern Portfolios #3-#6. Moreover, EFP/BHT maintain that Portfolio #7 is governed by MPF Agreement *III*. They conclude that because the Mortgage Portfolios are not property of the estate, the payments on the Mortgage Portfolios are not property of the estate and cannot be used by the Trustee to pay any expenses of the estate.[52]

According to Dr. Edwards, the arrangement between CHFS and EFP/BHT was that CHFS serviced the loans in Portfolios #1-#7 for a flat "per collected payment" fee. Additionally, once EFP or BHT recovered their capital investment and twelve percent (12%) interest per annum as to any of the Portfolios, CHFS was entitled to a twenty-five percent (25%) share of the profits. Dr. Edwards insisted that EFP/BHT have not yet recovered their capital investment plus interest as to any of the Portfolios, and, therefore, CHFS is not entitled to receive any percentage share of the profits.

### a.   Are Portfolios #1-#7 assets of true joint ventures, collateral for loans, or the subject of servicing contracts?

A joint venture is "an association of two or more persons to carry out a single business enterprise for profit." *Boxwell v. Champagne*, 91 So. 2d 256, 261 (Miss. 1956). "Most courts agree that it is easier to define a joint venture than to recognize one." *In re York Furniture Co.*, 32 B.R. 211, 214 (Bankr. S.D.N.Y. 1983). As described by the Mississippi Supreme Court, a joint venture exists when two or more persons "combine

---

[52] EFP/BHT also raised this argument in the Cash Collateral Objection. *See supra* at 74-76.

their property, money, effects, skill and knowledge and agree to share jointly or in proportion to the capital contributed in the profits and losses. One may provide the necessary funds and another may put up only his labor, skill or experience." *Boxwell*, 91 So. 2d at 261 (citations omitted).

A partnership and a joint venture are identical "except the latter has limited and circumscribed boundaries." *Hults v. Tillman*, 480 So. 2d 1134, 1141 (Miss. 1985). Indeed, the Mississippi Supreme Court has described a joint venture as a "single shot partnership." *Id.* at 1143; *Sample v. Romine*, 8 So. 2d 257, 261 (Miss. 1942) (noting that a joint venture is usually of shorter duration than a partnership). Notwithstanding the differences, "[t]he legal principles for determining the existence of each are identical." *Hults*, 480 So. 2d at 1141. In that regard, the Mississippi Uniform Partnership Act defines a partnership as "the association of two or more persons to carry on as co-owners of a business for profit[.]" MISS. CODE ANN. § 79-13-202(a); *Allied Steel Corp. v. Cooper*, 607 So. 2d 113, 116 (Miss. 1992) (holding that statutory provisions of Mississippi Uniform Partnership Law, then in effect, applied to joint ventures). "The three main questions that are considered in partnership determination are (1) the intent of the parties, (2) the control question, and (3) profit sharing." *Carlson v. Brabham,* 199 So. 3d 735, 740 (Miss. Ct. App. 2016) (quoting *Smith v. Redd*, 593 So. 2d 989, 994 (Miss. 1991)).

In the discussion below, the Court divides the Portfolios into three categories. The first group consists of Portfolios #1 and #2, for which there are written agreements between EFP and CHFS; the second group consists of Portfolios #3-#6, for which there are no written agreements but which involve the same parties as Portfolios #1 and #2 (EFP and

CHFS); and the third group consists of Portfolio #7 for which there is a written agreement between BHT and CHFS.

### (1.)   Portfolios #1 & #2 (EFP & CHFS)

As a preliminary matter, the Court considers whether the counterparty to MPF Agreement *I* and MPF Agreement *II* is EFP or EFP LLP.  The name that appears in MPF Agreement *I* and MPF Agreement *II* is EFP LLP, but POC 6-1 and POC 9-1 were filed by EFP.  No proof of claim was filed by EFP LLP, and no representative of EFP LLP made an appearance in the Mortgage Portfolios Adversary.  Dr. Edwards testified that EFP LLP does not exist, and the use of that name in MPF Agreement *I* and MPF Agreement *II* was his mistake.  (HIL Adv. Dkt. 341 at 141).  The evidence at Trial showed that he repeated this mistake by opening a bank account and having checks printed in the name of EFP LLP. This issue resembles the issue discussed in the Home Improvement Loans Adversary regarding the corporate status of the Rainbow Group.  In applying the law of the British Virgin Islands, the Court concluded that Dr. Edwards' mistake in identifying the Rainbow Group as the "Rainbow Group, Ltd." rather than "The Rainbow Group, Ltd." did not render the Rainbow Loan Agreement, the 2006 Note, or the Custodial Agreement invalid. Likewise, the Court finds that the mistaken use of "LLP" did not render MPF Agreement *I* and MPF Agreement *II* invalid under Mississippi law.  *See, e.g.*, *Journeay v. Berry*, 953 So. 2d 1145, 1153-54 (Miss. Ct. App. 2007).  These mistakes show, however, that Dr. Edwards was careless in his drafting of legal documents.  There are consequences when an orthopedic surgeon attempts to prepare documents dictating the terms of a complicated business relationship involving thousands of mortgages and millions of dollars, just as there would be consequences if a lawyer attempted to perform spinal surgery.

Here, the existence of joint ventures, loans, or servicing contracts depends on the provisions of MPF Agreement *I* and MPF Agreement *II* and an application of the Mississippi Partnership Act and Mississippi contract law. "A joint venture is a form of contract, and [is] governed by contract law." *Hults*, 480 So. 2d at 1143. Mississippi courts embrace "a three-tiered process" to contract interpretation. *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 351-53 (Miss. 1990). "First, the 'four corners' test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement." *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 284 (Miss. 2005). Second, if the parties' intent remains unclear, a court should look to "the discretionary canons of contract construction." *Austin v. Carpenter*, 3 So. 3d 147, 150 (Miss. Ct. App. 2009). Third, "if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence." *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 753 (Miss. 2003).

The Court finds that the business arrangements set forth in MPF Agreement *I* and MPF Agreement *II* possess characteristics of both true joint ventures and loans. The business arrangements are like joint ventures in that they are labeled as a "Mortgage Portfolio Joint Venture" in MPF Agreement *I* and MPF Agreement *II*, respectively. Both CHFS and EFP contributed something to the enterprise. EFP (through Dr. Edwards) contributed the funds to purchase Portfolios #1 and #2. CHFS contributed its loan servicing experience and fronted "collection expenses." There is no obligation of CHFS to repay EFP except from collections on Portfolios #1 and #2. Moreover, CHFS was entitled to receive twenty-five percent (25%) of the "cumulative net proceeds."

The business arrangements also contain many features that are unlike true joint ventures. There was no sharing of control. CHFS serviced Portfolios #1 and #2, sent collections to EFP, and was reimbursed a servicing fee "in the amount of $20 per month for each loan payment collected." EFP's role in the enterprise was limited to its initial contribution of funds. Also, there was no sharing of losses. *See Sample*, 8 So. 2d at 261 (discussing that the absence of any agreement to share losses supports the conclusion that no joint venture existed). Finally, CHFS's ability to share in any profits did not occur until after EFP had recouped both its investment and a return on its investment in the form of interest payments.

The business arrangements possess characteristics of loans. Pursuant to MPF Agreement *I* and MPF Agreement *II*, EFP agreed, in return for funding the purchases of Portfolios #1 and #2, to "receive interest on the outstanding balance to be paid monthly at the rate of 12%." (MPF Ex. D-20). EFP would hold title to the notes and mortgages that comprise Portfolios #1 and #2 as "collateral" and "would be entitled to physically retain the original notes until they are paid." Also, EFP would "be able to assign this collateral to a national lending institution." CHFS was required to make all payments to a "lockbox." The terms "interest," "collateral," "assign," and "lockbox" are terms generally found in loan documents.

After "read[ing] the contract[s] as a whole, so as to give effect to all of its clauses," the Court finds that MPF Agreement *I* and MPF Agreement *II* contain conflicting provisions and, therefore, are ambiguous. *Royer*, 857 So. 2d at 752. "[C]ontractual provisions are ambiguous where they are susceptible of two or more reasonable interpretations, or where one provision is in direct conflict with another provision, or where

terms are unclear or of doubtful meaning." *Reece v. State Farm Fire & Cas. Co.*, 684 F. Supp. 140, 143 (N.D. Miss. 1987) (citation omitted). The Court, therefore, considers rules of contract construction and parol evidence in determining whether the intent of the parties, the exercise of control over the enterprise, and the sharing of profits shows that the transactions are true joint ventures, loans, or servicing contracts. In that regard, the Court notes that the rules of contract construction require that ambiguous contract terms be construed most strongly against the party responsible for drafting them. *Wallace v. United Miss. Bank*, 726 So. 2d 578, 588 (Miss. 1998). The Court, therefore, construes MPF Agreement *I* and MPF Agreement *II*, both of which were drafted by Dr. Edwards, against EFP. Also, EFP, as the proponent of a finding of joint ventures has the burden of proving their existence by a preponderance of the evidence. *Davis v. Noblitt & Caper Elec. Co.*, 594 So. 2d 610, 613 (Miss. 1992).

### (a.)   Intent

The first question in determining the existence of a joint venture is whether the parties intended to form a joint venture. *Hults*, 480 So. 2d at 1143 ("[A]ctual intent to form a joint venture is essential."). The title "Mortgage Portfolio Joint Venture" appears in both MPF Agreement *I* and MPF Agreement *II*. The Court is convinced, however, that the title was chosen by Dr. Edwards, who drafted the documents. He used the phrase as a casual description of the parties' relationship, and did not intend to attach any legal meaning to its use. Dr. Edwards should not be allowed to point to the title as evidence of the parties' intent to enter into a joint venture but also ask the Court to ignore the legal meaning of other terms that appear in MPF Agreement *I* and MPF Agreement *II*, such as "collateral" and "security," as drafting mistakes made by a non-lawyer. With respect to MPF

Agreement *I* and MPF Agreement *II*, Dr. Edwards testified, "I will be first to say it is a poorly constructed document." (HIL Adv. Dkt. 341 at 187). Thus, the Court finds that the appearance of "Mortgage Portfolio Joint Venture" in the title does not necessarily imply the parties' intent to enter into a partnership relationship.

Aucoin's testimony at Trial showed that CHFS treated the arrangements as business loans for tax purposes. Aucoin evaluated the available tax returns and financial statements of CHFS. (MPF Ex. P-2 at 7). From 2008 to 2012, he found that CHFS recorded the Mortgage Portfolios as assets and recorded EFP/BHT's investments as a reduction of those assets. Because the Mortgage Portfolios were purchased at a discount, there was a difference between the purchase price for each portfolio and the principal balances of the loans at the respective purchase dates. These differences were recorded by CHFS as a liability, which he referred to as unearned discounts. In 2008, CHFS recorded the income associated with the Mortgage Portfolios on its tax returns and the interest paid to EFP/BHT as expenses. This is the same treatment CHFS provided the Home Improvement Loans. From 2009 to 2012, CHFS recorded income associated with the Mortgage Portfolios. In conclusion, Aucoin testified that CHFS treated these transactions as if EFP/BHT had loaned money to CHFS, rather than as joint ventures. (MPF Ex. P-2 at 7 & Schedule 14).

Aucoin was unable to evaluate EFP/BHT's accounting and tax treatment of the Mortgage Portfolios because EFP/BHT objected to producing their tax returns in response to the Trustee's discovery requests. (HIL Adv. Dkt. 342 at 201). Moreover, the Trustee did not file a motion to compel production of EFP/BHT's tax returns. The only evidence regarding EFP's tax treatment was Borg's testimony that she understood that EFP listed the Mortgage Portfolios on its books as assets. Borg's testimony was unsupported by any

documents, and Borg admitted that she did not prepare tax returns for EFP. (HIL Adv. Dkt. 342 at 199-200). The Court thus gives little weight to Borg's unsubstantiated testimony about EFP's internal treatment of the Mortgage Portfolios. In light of all of the evidence presented at Trial, the Court concludes that EFP failed to prove by a preponderance of the evidence that the parties intended to enter into a joint venture for the purpose of servicing the loans that comprise Portfolios #1 and #2.

### (b.)   Control

It is undisputed that EFP made no actual work contribution to the enterprise. There was no evidence at Trial that EFP controlled in any measure the day-to-day operations of the servicing loan business.

> We [have] broadly defined a joint venture as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill, and knowledge. We said it exists when two or more persons combine in a joint business enterprise for their mutual benefit with an understanding that they are to share in profits or losses and . . . have a voice in its management. We noted a condition precedent for its existence was a joint proprietary interest in the enterprise and right of mutual control.

*Pittman v. Weber Energy Corp.*, 790 So. 2d 823, 826 (Miss. 2001) (quotation omitted). The Court thus finds that EFP failed to prove by a preponderance of the evidence that the parties exercised mutual control over the enterprise.

### (c.)   Profit Sharing

The Mississippi Uniform Partnership Act imposes a presumption that a partnership exists if profit sharing is proven "unless the profits were received in payment . . . of wages or other compensation." MISS. CODE ANN. § 79-13-202(c)(3)(iii). Under MPF Agreement *I* and MPF Agreement *II*, CHFS was entitled to a twenty-five percent (25%) share of the net proceeds upon the achievement of certain milestones related to EFP's recoupment of

its investment, plus interest at the rate of twelve percent (12%) per annum. This provision suggests a creditor/borrower relationship. "If money, loaned to another for use in the enterprise, is to be repaid by the borrower, whether the venture succeeds or fails, the contract is ordinarily construed as one of lending and borrowing and not of [a] joint adventure." *Boxwell*, 91 So. 2d at 261. Moreover, that the arrangement did not contemplate profit-sharing is supported by Dr. Edwards' testimony. When asked at Trial about the parties' business relationship with respect to the Mortgage Portfolios, Dr. Edwards testified, "It is a servicing agreement with a bonus feature, an inventive bonus I would call it." (HIL Adv. Dkt. 341 at 210). The Court, therefore, finds that MPF Agreement *I* and MPF Agreement *II* gave CHFS the opportunity to share in the net proceeds as a loan servicer paid a bonus for its services and not as a joint venturer sharing in the profits of the business enterprise.

Because of the pervasive borrower/lender language in MPF Agreement *I* and MPF Agreement *II*, CHFS's treatment of Portfolios #1 and #2 as assets, the lack of mutual control over the enterprise, and the manner in which CHFS was paid for its services, the Court finds from a preponderance of the evidence that the transactions set forth in MPF Agreement *I* and MPF Agreement *II* are loans rather than true joint ventures. The Court arrives at this conclusion even though Dr. Edwards testified that EFP did not intend to loan money to CHFS, and that he knew how to draft a loan agreement if he had intended to do so, as evidenced by the Rainbow Loan Agreement. Although the Court does not doubt that Dr. Edwards thinks he knows how to draft a loan agreement, the evidence presented at Trial demonstrated that Dr. Edwards did not know how to draft a joint venture agreement. Moreover, EFP recognized the possibility that the business arrangements could be viewed

as loans by filing POC 8-1 and POC 9-1, in which EFP seeks treatment as a secured creditor. Having found that the business arrangements are loans and not true joint ventures, the Court next considers whether EFP or CHFS owns Portfolios #1 and #2, and if CHFS owns Portfolios #1 and #2, whether EFP has a perfected security interest in Portfolios #1 and #2.

### (d.)    Who owns Portfolios #1 & #2?

Three undisputed facts support a finding that CHFS owns Portfolios #1 and #2. First, CHFS purchased both Portfolios #1 and #2 from DLJ, as evidenced by the DLJ Purchase Agreement and the letter dated March 25, 2008. (MPF Ex. P-8). Second, the notes and mortgages that comprise Portfolios #1 and #2 were assigned to CHFS. Third, CHFS treated Portfolios #1 and #2 as assets in its tax returns.

Despite EFP's contention that it owns Portfolios #1 and #2 (at least until it received its seventy-five percent (75%) of the profits) because it paid DLJ directly for Portfolios #1 and #2, it is undisputed that EFP provided only a portion of the funds that financed the purchases. Although EFP committed to provide the funds for the purchases, the source of the funds was not only EFP but also Dr. Edwards and other entities purportedly controlled by him. The Court finds that the evidence at Trial shows that CHFS owns Portfolios #1 and #2.

### (e.)    Does EFP have a perfected security interest?

The basis for perfection of EFP's alleged security interest in the Mortgage Portfolios (including Portfolios #1 and #2) is possession. (MPF Ex. D-23). The relevant statutory provisions regarding perfection of a security interest in an instrument by possession are as follows:

(a)     Except as otherwise provided in subsection (b) and Section 75-9-312(b), a financing statement must be filed to perfect all security interests and agricultural liens.

(b)     The filing of a financing statement is not necessary to perfect a security interest:

* * *

(6)    In collateral in the secured party's possession under Section 75-9-313;

MISS. CODE ANN. § 75-9-310(a), (b)(6).  The Court finds that as of the Petition date, EFP had a perfected security interest in Portfolios #1 and #2, less CHFS's servicing fees (including twenty-five percent (25%) of the net proceeds if certain milestones were achieved) pursuant to MISS. CODE ANN. § 75-9-313(a), which provides:

(a)     Except as otherwise provided in subsection (b), a secured party may perfect a security interest in tangible negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral. . . .

MISS. CODE ANN. § 75-9-313(a).  Here, the original notes and mortgages that comprise Portfolios #1 and #2 are in Baltimore in EFP's possession.

### (2.)     Portfolios #3-#6 (EFP & CHFS)

There is no written agreement between EFP and CHFS regarding Portfolios #3-#6. Nevertheless, "[t]he existence of a joint venture may be inferred from the facts, circumstances, and conduct of the parties."  *Pennebaker v. Gray*, 924 So. 2d 611, 618 (Miss. Ct. App. 2006).  The evidence at Trial demonstrated that the parties treated Portfolios #3-#6 the same way as Portfolios #1 and #2.  For the reasons discussed at length with respect to Portfolios #1 and #2, the Court finds that the transactions regarding Portfolios #3-#6 are also loans and not true joint ventures.

**(a.)     Who owns Portfolios #3-#6?**

The same undisputed facts that support a finding that CHFS owns Portfolios #1 and #2, also support a finding that CHFS owns Portfolios #3-#6.  CHFS purchased Portfolio #3 from DLJ (MPF Ex. P-10); Portfolio #4 from Promor Investments, LLC (MPF Ex. P-11); and Portfolios #5-#6 from BWP (MPF Exs. P-12 & P-13).  The notes and mortgages that comprise Portfolios #3-#6 were assigned by the portfolio sellers to CHFS.  Finally, CHFS treated Portfolios #3-#6 as assets in its tax returns.

**(b.)     Are the loans enforceable?**

The Trustee contends that the loans related to the purchase of Portfolios #3-#6, for which there is no written agreement, violate the general Statute of Frauds in Mississippi, which provides, in pertinent part:

> An action shall not be brought whereby to charge a defendant or other party:
>
> * * *
>
> (d)     upon any agreement which is not to be performed within the space of fifteen months from the making thereof . . .
>
> * * *
>
> unless, in each of said cases, the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith or signed by some person by him or her thereunto lawfully authorized in writing.

MISS. CODE ANN. § 15-3-1.  Because the loans that comprise Portfolios #3-#6 are all for terms longer than five (5) years, the Court agrees with the Trustee that the loans to CHFS to purchase Portfolios #3-#6 could not be performed within the space of fifteen (15) months and, therefore, are unenforceable against the estate.

### (3.)    Portfolio #7 (BHT & CHFS)

As with Portfolios #1 and #2, the Court finds that the existence of a joint venture, loan, or servicing contract with regard to Portfolio #7 depends on the provisions of MPF Agreement *III* and an application of the Mississippi Uniform Partnership Act. *Hults,* 480 So. 2d at 1142. The Court's analysis of Portfolio #7, however, is not the same as its analysis of Portfolios #1 and #2 because the arrangement between CHFS and BHT regarding Portfolio #7 is different due to the influence of Church Bay Trust in the negotiations.

MPF Agreement *III* provides, "[t]he custodian selected by [BHT] will hold the original Notes and Assignments to [BHT] for all loans in the portfolio and will be entitled to physically retain the original notes until they are paid." (MPF Ex. D-5). Thus, the notes and mortgages would not be held by Dr. Edwards (as they are with respect to Portfolios #1-#6) but by an independent party. Also, CHFS assigned the agreement to purchase Portfolio #7 from BWP to Church Bay Trust. (PPC Ex. D-21). Although the notes and mortgages that comprise Portfolio #7 are missing, the custodial certifications signed by Frascogna indicate that at some point, the notes and mortgages were assigned by CHFS to BHT. (MPF Ex. D-28). Finally, unlike MPF Agreement *I* and MPF Agreement *II*, CHFS was required to pay all of its due diligence expenses, and the monthly servicing fee was reduced from $20 to only $15.

There are conflicting terms in MPF Agreement *III* that render it ambiguous as to whether the parties intended to enter into a joint venture, a loan, or something else. Although "Mortgage Portfolio Joint Venture" appears in the title, MPF Agreement *III* also contains such terms as "security" "collateral," "assign," and "lockbox." It thus suffers many of the same internal inconsistencies as do MPF Agreement *I* and MPF Agreement *II*.

Without repeating the Court's discussion of Portfolio #1 and #2 but for the same reasons set forth in that discussion, the Court finds that the parties did not enter into a joint venture with respect to Portfolio #7. The Court also finds, however, that the parties did not enter into a loan agreement. CHFS owns the notes and mortgages that comprise Portfolios #1-#6 but not those that comprise Portfolio #7. Under these facts, where CHFS has no rights in Portfolio #7 (other than its contractual right to service the loans), no security interest can attach to Portfolio #7 as collateral for a loan. MISS. CODE ANN. § 75-9-203; *Germany v. Farmers Home Admin. (In re Germany)*, 73 B.R. 19, 21-22 (Bankr. S.D. Miss. 1986). The Court, therefore, concludes that the arrangement between the parties with respect to Portfolio #7 constitutes a servicing contract rather than a loan.

The Court finds that the business arrangements between CHFS and EFP with respect to Portfolios #1-#6 are loans and not true joint ventures. The Court further finds that the business arrangement between CHFS and BHT with respect to Portfolio #7 was a loan-servicing agreement. CHFS owns Portfolios #1-#6; BHT owns Portfolio #7. EFP had a perfected security interest in the loan proceeds of Portfolios #1 and #2 as of the Petition date, less CHFS's servicing fees of $20 for each loan payment collected each month (including twenty-five percent (25%) of the net proceeds once certain milestones were achieved) and reimbursement of certain costs.[53] The undocumented loans between CHFS and EFP for the purchase of Portfolios #3-#6 are unenforceable under the Statute of Frauds.

---

[53] MPF Agreement *I* and MPF Agreement *II* contain similar, but not identical terms for the reimbursement of costs incurred by CHFS in servicing the loans that comprise Portfolios #1 and #2. *See supra* at 41. No evidence was presented at the Trial regarding CHFS's "out of pocket major collections expenses" or its due diligence expenses. If necessary, the parties may request a hearing for a determination of these amounts.

### 6.    Counts II & III/MPF Counterclaim Count VIII (POC 6-1 to POC 9-1)

In Counts II and III, the Trustee seeks a declaratory judgment disallowing POCs 6-1 to 9-1, in whole or in part, and also requests an accounting of the net proceeds owed CHFS.  In MPF Counterclaim Count VIII, EFP/BHT likewise seek an accounting of all funds collected from the Mortgage Portfolios.  Additionally, EFP/BHT ask the Court to require the Trustee to return any such funds used by her to pay expenses of the estate.

#### a.    Calculation of Claims

The Court finds that POC 6-1 ($7,101,094.35) and POC 9-1 ($7,101,094.55), filed by EFP, are duplicative filings as are POC 7-1 ($4,917,547.35) and POC 8-1 ($4,917,547.34), filed by BHT.  It is undisputed that they are for the same amount (except for a difference of a few pennies).  EFP/BHT explain that the claims are based on distinct legal theories.  (MPF Adv. Dkt. 126 at 31).  One set (POC 6-1 and POC 7-1) relate to CHFS's alleged breach of its fiduciary duties to EFP/BHT, and the other set (POC 8-1 and POC 9-1) relate to their alleged secured claims.  For the reasons discussed below, the Court finds that MPF Counterclaim Count V, based on CHFS's alleged breach of its fiduciary duties, should be dismissed.  The Court, therefore, finds that POC 6-1 and POC 7-1 should be disallowed.  The Court limits its calculation of claims to POC 8-1 filed by BHT and POC 9-1 filed by EFP.

The Trustee retained Aucoin to identify and categorize the Mortgage Portfolios, analyze payments made to EFP/BHT, and recalculate amounts due EFP/BHT.  (MPF Ex. P-2 at 7).  Aucoin calculated the total loan balance due on the Mortgage Portfolios, as of May 23, 2012, the Petition date, of $7,113,951 to EFP and $5,024,355 to BHT.  Aucoin separated the loan balance by portfolio, as follows:

| Portfolio | Balance Due May 23, 2012 |
|---|---|
| Portfolio #1 | $1,147,647 |
| Portfolio #2 | $581,157 |
| Portfolio #3 | $63,473 |
| Portfolio #4 | $164,746 |
| Portfolio #5 | $2,692,079 |
| Portfolio #6 | $2,464,849 |
| Portfolio #7 | $5,024,355 |

(MPF Ex. P-2, Schedule 13). As to Portfolio #7, the Court finds that POC 8-1 should be disallowed in whole. 11 U.S.C. § 502(b). BHT is not a creditor of the estate, as alleged in POC 7-1 and 8-1. As to Portfolios #1-#6, the Court finds that POC 9-1 should be allowed to the extent that EFP is a secured creditor in the amount of $1,728,804 (Portfolios #1 and #2) and an unsecured creditor in the amount of $5,385,147 (Portfolios #3-6) as of May 23, 2012. 11 U.S.C. § 502(b).

The parties disagree as to the amount that is owed on the Mortgage Portfolios after the Petition date because they cannot agree on the payment of post-petition interest or the amount of post-petition payments. Aucoin identified 2,103 loans classified as Mortgage Portfolios by CHFS. Aucoin then compared the 2,103 loans to lists provided by Dr. Edwards and identified a total of 2,080 Mortgage Portfolios. (MPF Ex. P-2, Schedules 2.1 to 2.7). Next, he reconciled the 2,080 Mortgage Portfolios with ClearSpring's boarding data. Aucoin found that some of the 2,080 loans were not identified as such in the boarding date, some of the loans were missing, and some were classified as possible Mortgage Portfolios. Before Trial, the parties stipulated that there are 2,080 Mortgage Portfolios, as determined by Aucoin. (MPF Adv. Dkt. 126 at 36).

Post-petition, Aucoin was unable to find any source of information to identify collections by portfolio until July of 2012. (HIL Adv. Dkt. 340 at 174; MPF Ex. P-2,

Schedules 9 & 10). Likewise, for the period of November of 2013 to May of 2014, he was unable to find information supporting the amount of collections by portfolio. For the period from June of 2014 to May of 2017, however, ClearSpring captured the collection data by portfolio. (MPF Ex. P-2, Schedule 12). From the information available to him, Aucoin traced a total of $6,096,800 in collections to the Mortgage Portfolios, of which he attributed the following amount to each portfolio:[54]

| | |
|---|---|
| Portfolio #1 | $481,936 |
| Portfolio #2 | $306,675 |
| Portfolio #3 | $593,062 |
| Portfolio #4 | $841,240 |
| Portfolio #5 | $1,097,525 |
| Portfolio #6 | $967,486 |
| Portfolio #7 | $1,808,876 |
| TOTAL | $6,096,800 |

(MPF Ex. P-2, Schedule 13). These amounts do not include any of the funds stolen by Dickson. (HIL Adv. Dkt. 340 at 185).

Aucoin compared ClearSpring's collections by portfolio to the balance and interest due as of May 23, 2012, to determine if any portfolio collections exceeded EFP/BHT's original investment, less any payments and interest that accumulated before the Petition date. (MPF Ex. P-2, Schedule 13). Assuming that the parties had entered into a true joint venture as to all of the Mortgage Portfolios, Aucoin performed this calculation to determine whether CHFS was entitled to share in the collections. Similarly, under MPF Agreement *I* (Portfolio #1) and MPF Agreement *II* (Portfolio #2), once total interest and principal pay-offs exceeded CHFS's servicing fees and EFP's investment and interest by $10,000, CHFS was entitled to 25% of the collections. Under MPF Agreement *III* (Portfolio #7), once

---

[54] $6,096,800 = $5,992,418 + $95,525 + $8,857. (MPF Ex. P-2, Schedule 12; HIL Adv. Dkt. 340 at 183).

BHT's principal and interest and CHFS's servicing fees were paid, CHFS was entitled to 25% of the collections. Because there were no written agreements for Portfolios #3-#6, the Trustee asked Aucoin to assume, pursuant to the Mississippi Uniform Partnership Act, that once the total interest and principal payoffs exceeded CHFS's servicing fees and EFP's interest, CHFS would be entitled to 50% of the collections.

Aucoin determined that the collections for Portfolio #3 and Portfolio #4 exceeded the balance due EFP by at least May 23, 2012, as shown in the shaded rows of the chart below:

| Portfolio | Balance Due May 23, 2012 | ClearSpring's Collections | Collections Over/(Under) |
|---|---|---|---|
| Portfolio #1 | $1,147,647 | $481,936 | $(665,711) |
| Portfolio #2 | $581,157 | $306,675 | $(274,482) |
| Portfolio #3 | $63,473 | $593,062 | $529,588 |
| Portfolio #4 | $164,746 | $841,240 | $676,494 |
| Portfolio #5 | $2,692,079 | $1,097,525 | $(1,594,555) |
| Portfolio #6 | $2,464,849 | $967,486 | $(1,497,362) |
| Portfolio #7 | $5,024,355 | $1,808,876 | $(3,215,479) |

(MPF Ex. P-2, Schedule 13).[55] Aucoin did not determine the precise date when Portfolio #3 and/or Portfolio #4 exceeded the balance due. (HIL Adv. Dkt. 340 at 175).

EFP/BHT disagree with Aucoin's post-petition analysis. They contend that Aucoin should have applied the contract rate of interest of 12% during the entire post-petition period. EFP/BHT also question why Aucoin reduced the principal amount due as of May 23, 2012, by the gross amount of ClearSpring's collections without accounting for ClearSpring's servicing fees. (HIL Adv. Dkt. 340 at 184).

---

[55] Applying both ClearSpring's collections and CHFS's collections to the balance due results in Portfolio #3 and Portfolio #4 exceeding the balance due EFP, as of May 23, 2012, by $822,989 and $1,071,526, respectively. (MPF Ex. P-2 at 10, Schedule 10).

The Court finds that EFP/BHT failed to meet their burden of proving the portion of ClearSpring's servicing fees attributable to the Mortgage Portfolios, which they contend should not have been included in the calculation of the principal amount. EFP/BHT did not present any expert testimony by an accountant[56] or other qualified professional as to this issue and did not identify any report from which the information may be gleaned. On cross-examination, Aucoin could not recall whether he reviewed any report prepared by ClearSpring that showed the portion of its total servicing fees attributable to the Mortgage Portfolios, as opposed to the Home Improvement Loans or some other loan.

Under the burden-shifting framework of § 502(a), POC 4-1 and POC 5-1 constitute *prima facie* proof of the amount of EFP's and BHT's claims. Aucoin's testimony, however, shifted the burden to EFP/BHT to prove the amount of their claims by a preponderance of the evidence. *In re 804 Congress, L.L.C.*, 529 B.R. 213, 219 (Bankr. W.D. Tex. 2015). In the absence of any evidence by EFP/BHT showing the amount of ClearSpring's servicing fees attributable to the Portfolios, the Court adopts Aucoin's calculation of the loan balances as of May 31, 2017.

####        b.        Analysis

As stipulated by the parties, the Court finds that there are a total of 2,080 Mortgage Portfolios. Moreover, the loan balance due on the Mortgage Portfolios, as of May 23, 2012, without regard to the enforceability of the loans, is $7,113,951 to EFP and $5,024,355 to BHT. The Court also finds, as to EFP/BHT's request for an accounting, that the post-petition collections of all the Mortgage Portfolios is $6,096,800. The Court finds that EFP is a secured creditor in the amount of $1,728,804 with respect to Portfolios #1

---

[56] Borg is not a certified public accountant and has no education in general accounting principles.

and #2 as of May 23, 2012.  EFP's loans to CHFS as to Portfolios #3-#6 are unenforceable in the total amount of $5,385,147.  As to the Trustee's request for an accounting of the net proceeds, the Court finds that Portfolios #3 and #4 exceeded EFP/BHT's original investment by $529,588 and $676,494, respectively.  Because the Court already has determined that none of the business arrangements constituted true joint ventures, the Mississippi Uniform Partnership Act does not apply.  No loan balance is owed BHT as to Portfolio #7, but BHT owns the post-petition collections of $1,808,876, less CHFS's servicing fees of $15 for each loan payment collected each month (including twenty-five percent (25%) of the net proceeds once certain milestones were achieved).  Finally, the Court denies EFP/BHT's request to require the Trustee to return funds used to pay expenses of the estate.[57]

### 7.    MPF Counterclaim Count IV (Breach of MPF Agreements)

EFP/BHT claim that CHFS breached the terms of the MPF Agreements pre-petition "by failing to pay all of the collections into lock box accounts" and post-petition "by transferring funds that were in the EFP Escrow Account and the BHT Escrow Account to Panama so that the funds could be stolen by [Dickson]."  (MPF Adv. Dkt. 70 at 23).  MPF Agreement *I* and MPF Agreement *II* contain the following relevant provision:   "All portfolio mortgage payments will be made to a lockbox.  A bank agreement will provide that funds from the lockbox may be released only to EFP."  (MPF Exs. D-20 & D-23).  MPF Agreement *III* contains the same provision except that "funds from the lockbox may be released only to [BHT]."  (MPF Exs. D-21 & D-22).

---

[57] See *infra* at 184-87 for a discussion of the Cash Collateral Objection.

EFP/BHT did not mention any facts regarding the lockbox in the MPF Amended Pretrial Order, did not produce the bank agreements as exhibits at Trial, and offered no testimony related to the lockbox requirement. The Court, therefore, finds that EFP/BHT have abandoned their breach of contract claim regarding CHFS's purported failure to comply with the lockbox agreements.[58]

### 8.   MPF Counterclaim Count V (Breach of Fiduciary Duty)

EFP/BHT claim that they are entitled to damages from the estate for CHFS's breach of its fiduciary duty arising out of its failure to honor the terms of the MPF Agreements. EFP/BHT allege that CHFS owed them a fiduciary duty as a joint venturer. The Court, having previously found that none of the business arrangements between EFP/BHT and CHFS constituted true joint ventures, finds that CHFS was not in a fiduciary relationship with EFP/BHT. In the absence of a fiduciary relationship, no fiduciary duty exists and no claim for a breach of that duty can arise. *Merchs. & Planters Bank of Raymond v. Williamson*, 691 So. 2d 398, 403 (Miss. 1997). The Court, therefore, finds that EFP/BHT have failed to meet their burden of proof and concludes that MPF Counterclaim Count V should be dismissed with prejudice. Accordingly, the Court also finds that POC 6-1 and POC 7-1, which are based on CHFS's alleged breach of its fiduciary duties, should be disallowed.

---

[58] As mentioned previously, EFP/BHT sued BancorpSouth in District Court in Case No. 3:14-cv-00964-DPJ-FKB, alleging that BancorpSouth breached a lockbox agreement related to the Home Improvement Loans. On February 21, 2017, the District Court found that EFP/BHT had abandoned its contractual rights by acquiescing to CHFS's transfers to a number of different bank accounts, including accounts in the name of EFP/BHT. EFP/BHT lost its appeal to the Fifth Circuit. *BancorpSouth*, 699 F. App'x 312.

9.      MPF Counterclaim Count VI (Servicing Fees)

EFP/BHT seek damages against the estate for the difference between the servicing costs of ClearSpring and CHFS under the MPF Agreements. Given the Court's previous findings that there are no enforceable loans between CHFS and EFP as to Portfolios #3-#6, EFP's damages claim is limited to the servicing costs incurred with respect to Portfolios #1 and #2. BHT's damages claim arises out of the servicing costs incurred with respect to Portfolio #7.

EFP contends that it agreed to pay CHFS a servicing fee of $20 per month for each loan payment collected on the loans that comprise Portfolios #1 and #2; BHT asserts that it agreed to pay CHFS a servicing fee of $15 per month for each loan payment collected on the loans that comprise Portfolio #7. In comparison, ClearSpring's servicing fees, pursuant to the Agreed Order Granting Trustee's Application to Employ Loan Servicing Company and to Establish Settlement Authority [Dkt. #618][59] (Bankr. Dkt. 702; PPC Ex. P-16), include: an electronic boarding fee of $25 per loan; a one-time administrative accounting work fee of $35 per loan; a deboarding/transfer fee of $25 per loan; a performing loan fee of ten percent (10%) of payments collected, up to $50 per loan with a minimum $20 fee; fifty percent (50%) of late fees; and base fees of $7.50 per month per dormant loan.

To establish the difference between the servicing fees EFP/BHT agreed to pay CHFS and those charged by ClearSpring, EFP/BHT rely on the testimony of Borg and a summary prepared by her. (HIL Adv. Dkt. 342 at 161). Borg calculated that through June

---

[59] Neither EFP nor BHT appealed the Agreed Order Granting Trustee's Application to Employ Loan Servicing Company and to Establish Settlement Authority [Dkt. #618] (Bankr. Dkt. 702; PPC Ex. P-16), but they reserved their rights, claims, and defenses asserted in any of the adversary proceedings pending before this Court.

of 2017, ClearSpring charged the Trustee $725,363.21 that CHFS would not have charged EFP to service the loans in Portfolios #1-#6. (HIL Adv. Dkt. 342 at 175; MPF Ex. D-30). Similarly, Borg calculated that through June of 2017, ClearSpring charged the Trustee $312,978.54 more than what CHFS would have charged BHT to service the loans in Portfolio #7. (*Id.*). To simplify her calculations as to what CHFS would have charged EFP/BHT, Borg used a blanket servicing fee of $20 for all Mortgage Portfolios, including those that comprise Portfolio #7, although MPF Agreement *III* provided for payment of only $15. (HIL Adv. Dkt. 342 at 206; MPF Ex. D-30).

The Court finds Borg's conclusion drawn from her comparison of the servicing fees to be without merit. First, Borg failed to consider all of the compensation EFP/BHT agreed to provide CHFS. The $20 or $15 flat servicing fee was only one component of the compensation package contained in MPF Agreement *I*, MPF Agreement *II*, and MPF Agreement *III*. Another component of CHFS's compensation package was a bonus payment of twenty-five percent (25%) of the cumulative net proceeds, depending on the amount of cash collections for each Mortgage Portfolio. Borg erred in her assumption that calculating the difference in servicing fees was as simple as subtracting X dollars per loan payment from Y dollars per loan payment.

The second reason why Borg's comparison is meritless is Sercy's testimony. Sercy explained how the services provided by ClearSpring vastly differed from those provided by CHFS. After ClearSpring obtained access to CHFS's computer servers in June of 2014, Sercy described the situation as "quite bizarre." (HIL Adv. Dkt. 341 at 95). Data and images were missing due to the refusal of representatives of CHFS to surrender books and record to the Trustee, so it was like "putting a puzzle back together." (*Id.*). ClearSpring

also faced the task of "ingesting" into its system the information posted by the Trustee on "call logs," recording her direct contacts with individual borrowers. Moreover, ClearSpring's servicing of the loans was complicated by Dickson's contacts with borrowers just months beforehand. (HIL Adv. Dkt. 341 at 99). Understandably, some borrowers were mistrustful when told to send their payments to ClearSpring after Dickson had given them conflicting instructions. Given the largely destabilized condition of the Mortgage Portfolios and the uncertain condition of information obtained by the Trustee, the Court concludes that the services rendered by ClearSpring (for which there were significant front-end costs and other necessary expenses) differed from those provided by CHFS, and EFP/BHT have not met their burden of proving damages. Accordingly, the Court finds that MPF Counterclaim Count VI should be dismissed with prejudice.

### 10.    MPF Counterclaim Count VII (Tracing of Funds)

In MPF Counterclaim Count VII, EFP/BHT seek a declaratory judgment that they are entitled to $3,888,309.30 or 65.7% of the $5,918,279 recovered by the Trustee. The Court has found that EFP is a secured creditor only with respect to Portfolios #1 and #2, and that BHT is not a secured creditor but holds a servicing contract with respect to Portfolio #7. Thus, the tracing issue is relevant only with respect to EFP and Portfolios #1 and #2. Because the issue of tracing was raised in both the Home Improvement Loans Adversary and the Mortgage Portfolios Adversary, the Court addresses this issue separately in the immediately following section.

### C.    Tracing of Funds

The Court previously has found that EFP/BHT are general unsecured creditors with respect to the Home Improvement Loans, that EFP is a general unsecured creditor with

respect to Portfolios #3-#6; and BHT is not a creditor of CHFS but the owner of Portfolio #7.  The tracing of funds, therefore, is an issue only as to EFP's security interest in the loan proceeds of Portfolios #1 and #2.

### 1.   Choice of Law

The issue as to whether EFP's security interest in Portfolios #1 and #2 attached to the funds recovered or intercepted by the Trustee is an issue under the UCC.  The statutes of Maryland and Mississippi are materially identical as to a secured creditor's burden to trace funds.

### 2.   Does EFP have a security interest in the $5,490,132.19 wired to the Trustee from accounts at Banco Panameño or the $540,000 in loan payments intercepted by the Trustee?

The loan payments collected on Portfolios #1 and #2 are proceeds from EFP's collateral.  As defined under Mississippi's version of the UCC, "[p]roceeds" include:  "(A) Whatever is acquired upon the sale, lease, license, exchange or other disposition of collateral; [or] (B) Whatever is collected on, or distributed on account of, collateral."  MISS. CODE ANN. § 75-9-102(64).   Under MISS. CODE ANN. § 75-9-315(a)(2), "[a] security interest attaches to any identifiable proceeds of collateral."  Moreover, "[p]roceeds that are commingled with other property are identifiable proceeds . . . [i]f the proceeds are not goods, to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law."  MISS. CODE ANN. § 75-9-315(b)(2).  Simply put, a secured creditor, upon any disposition of collateral, has a continuing security interest in proceeds that can be identified by some method of tracing conducted and proved by that secured party.

According to EFP, Dickson stole funds from the bankruptcy estate that were subject to EFP's security interest. In calculating the amount of restitution Dickson was required to pay in connection with the criminal proceedings against him for bankruptcy fraud, the government credited all payments recovered or intercepted by the Trustee. EFP maintains that these payments constitute the proceeds of the property stolen from the estate that were subject to EFP's security interest.

According to the Trustee, Dickson's multiple transfers of funds from the DIP Operating Accounts to accounts in Latin America, the rogue operation of CHFS in Costa Rica and Panama prior and subsequent to the Disclosure filed on December 20, 2013, the unauthorized post-petition purchases of assets through affiliates in foreign countries, the difficulties presented by Panamanian bank secrecy laws, and the laundering of money have made it impossible to identify and trace collections on Home Improvement Loans, collections on Mortgage Portfolios, and funds from other sources (including Dickson's own personal funds and/or collections from loans purchased post-petition).

### a.      Tracing of Funds-General

The Trustee retained Aucoin to trace the funds that left the estate and the funds were delivered to the Trustee or collected on her behalf. In summary, Aucoin testified that approximately $13.2 million left accounts belonging to CHFS and the estate, both pre-petition and post-petition, and over $6.5 million was recovered or intercepted by the Trustee. (HIL Adv. Dkt. 340 at 96). Almost $12.3 million was deposited into offshore accounts held by W W Warren Foundation at Banco Panameño in Panama and RE&B Investment at Scotia Bank in Costa Rica. Aucoin was unable to trace the source of over $1.2 million deposited into Victory Consulting's account at Wells Fargo, which he believed

were payments from borrowers of either CHFS, Discount Home Mortgage, Inc., SNGC, LLC, or other lender. Aucoin was unable to determine the source of $6.5 million turned over to the estate or the property seized/identified in Costa Rica because of the pre-petition and post-petition commingling of funds and gaps in the data. (HIL Ex. P-7; HIL Adv. Dkt. 340 at 96).

### b.    Tracing of Pre-petition Funds

Aucoin testified that usually, if not always, the lenders purportedly controlled by Dr. Edwards wired funds to CHFS's account ending in 6711 at BancorpSouth. CHFS deposited payments from borrowers to a different account at BancorpSouth ending in 3644, referred to as the "lock box account." Borrowers whose funds were deposited into the -3644 account included those with loans in both the Home Improvement Loans and the Mortgage Portfolios as well as other loans. In other words, CHFS commingled collections from all loans into the BancorpSouth -3644 account. Moreover, collections from consumer loans were not the only deposits made into the -3644 account. (HIL Adv. Dkt. 340 at 204). Each month, CHFS wired payments from the -3644 account directly to an entity purportedly controlled by Dr. Edwards for payments related to the Home Improvement Loans. For payments related to the Mortgage Portfolios, however, CHFS transferred funds from the -3644 account to BancorpSouth accounts ending in 7901 and 7677, and then CHFS wired money from the BancorpSouth -7901 and -7677 accounts to EFP and BHT, respectively. These wires were consistent in timing and frequency. (HIL P-7 at 10).

In early 2012, the wires to the entities purportedly controlled by Dr. Edwards and the consistency of the transfers between CHFS accounts stopped. Pre-petition, approximately $3.7 million was moved to the W W Warren Foundation account in Panama

and other accounts through multiple transactions. Aucoin was unable to determine the portion of the $3.7 million that related to the Home Improvement Loans, the Mortgage Portfolios, or other sources. Moreover, Aucoin was unable to trace the source of $2.3 million, the largest deposit into the W W Warren Foundation account in Panama in May of 2012.

### c. Tracing of Post-petition Funds

Post-petition, but before the Trustee's appointment, CHFS continued to use the BancorpSouth account ending in 3644 to receive most of the payments from its borrowers related to both the Home Improvement Loans and the Mortgage Portfolios. In addition, interest payments on the loans to Dickson and his affiliated companies were deposited into the -3644 account. (HIL Adv. Dkt. 342 at 149-51). For a brief period, CHFS's prior practice of moving funds to other accounts based on collections from Mortgage Portfolios continued on a monthly basis. The funds were moved from -3644 to the DIP Operating Account at Wells Fargo, and two transfers were made from the DIP Operating Account to the EFP Mortgage Portfolios Escrow Account and the BHT Mortgage Portfolios Escrow Account, also at Wells Fargo. This flow of funds changed in late 2013 when most payments from borrowers were diverted to Victory Consulting's Wells Fargo account ending in 2196. From November of 2013 to January of 2014, more than $300,000 per month in electronic deposits were made into Victory Consulting's Wells Fargo account. Because of the lack of detail associated with these electronic deposits, Aucoin was unable to determine whether the payments were for the Home Improvement Loans or the Mortgage Portfolios. A small number of borrowers continued to submit funds to the BancorpSouth account ending in 3644, and any checks were deposited into the W.D.

Dickson Enterprise, Inc. account at OmniBank. Aucoin was unable to trace directly to CHFS some large deposits into Victory Consulting's Wells Fargo account made during this period.

In late 2013, approximately $9,095,000 were transferred from CHFS accounts. Aucoin provided an analysis of these transactions. (HIL Ex. P-7, Schedules 8 & 8.1). Aucoin was not able to determine where $8,395,000 went once they were wired to the W W Warren Foundation account at Banco Panameño because of the absence of bank records. As to the remaining $700,000 that were wired to Victory Consulting, Aucoin identified funds totaling $1,445,000 that were transferred from accounts owned by Victory Consulting and Discount Mortgage, Inc. to the RE&B Investment Trust account, as shown below:

| 01/25/2013 | $150,000 | Victory Consulting |
|------------|----------|--------------------|
| 02/07/2013 | $175,000 | Victory Consulting |
| 03/15/2013 | $100,000 | Victory Consulting |
| 08/08/2013 | $120,000 | Discount Mortgage, Inc. |
| 11/26/2013 | $900,000 | Victory Consulting |
| TOTAL | $1,445,000 | |

(HIL Ex. P-7, Schedule 8). A document provided by the Costa Rican government, however, reflected deposits totaling almost $5.2 million into the RE&B Investment Trust account. These other funds apparently came from accounts belonging to W W Warren Foundation, Phalanx, S.A., and Viene De Phalant S.A. With no records from these accounts, Aucoin was unable to trace the source of funds in excess of $1,445,000.

Aucoin opined that the original funds totaling $1,445,000 were converted into different types of investments. Based on documents provided by the Costa Rican government, Aucoin further opined that all of the RE&B Investment Trust account funds were connected in some way to most, if not all, of the following transactions:

- Eight (8) loans totaling $492,500 secured by real property in the name of Phalanfin;

- Fifteen (15) loans totaling $2,557,700 secured by real property in the name of Phalanx, S.A.;

- $180,840.72 as of November 14, 2014, held in Phalanx S.A.'s bank account in Costa Rica, which may have been seized by the Costa Rican government;

- $587,749.95 seized by the Costa Rican government from unknown sources;

- A residential condominium located at Marina Los Sueños in Costa Rica, seized by the Costa Rican government, which was purchased with unknown sources; and

- Other real property or rights to real property that were collateral for the loans mentioned above or other loans not yet identified.

(HIL Ex. P-7 at 12).

### d.    Tracing of Funds Recovered or Intercepted

Aucoin was unable to trace any of the funds recovered or intercepted by the Trustee in the amount of $6,693,838.38 to the Home Improvement Loans or the Mortgage Portfolios. He traced $5,898,278.29 to accounts at Banco Panameño belonging to CHFS and Dickson.  Aucoin attempted to trace two (2) cashier's checks in the total amount of $540.000.  The immediate source of the $300,000 cashier's check from BancorpSouth dated January 29, 2014, was the Discount Mortgage, Inc. account.  These funds appeared to have come from the Victory Consulting account.  Although these funds could be further traced to the BancorpSouth account ending in 3644, they could not be tied to either the Home Improvement Loans or the Mortgage Portfolios exclusively.

The second cashier's check in the amount of $240,000 from OmniBank dated February 25, 2014, and made payable to CHFS was traced to Dickson's account.  These

funds, in turn, appeared to have come from Costal Condos, but Aucoin could not determine the source of the funds from Costal Condos. Aucoin researched the Willow Court Sale, for which the Trustee received $111,367.59 in restitution, and concluded that W.D. Dickson Enterprises, Inc. held the interest in the real estate. Aucoin was unable to tie Costal Condos to CHFS, for which the Trustee also received $144,191.90 in restitution. (HIL Adv. Dkt. 340 at 94).

For its tracing analysis, EFP did not present any expert testimony at Trial. Instead, EFP relied on Borg's testimony. She testified that at least $5,898,278.29 of the funds recovered by the Trustee can be traced to the funds stolen in late 2013 because these funds were withdrawn from the same bank (Banco Panameño) where approximately $8,395,000 of the stolen funds were deposited, although not from the same accounts.

In the alternative, EFP relies on the government's calculation of $5,442,004.58 in the Restitution Order. In his criminal case, the federal government determined that Dickson's criminal conduct resulted in losses to the estate of $12,145,842.36. From this amount, the government subtracted the funds recovered or intercepted by the Trustee ($6,448,278.29)[60] and proceeds from the sale of real property ($255,559.49) to arrive at a restitution amount of $5,442,004.58. Because the federal government gave Dickson credit for all amounts recovered or intercepted by the Trustee, regardless of the source of those funds, in its restitution calculation and because restitution, by definition, is the return of stolen property or payment to the victim for the harm caused, EFP claims it is entitled to a pro rata share of the restitution payments. For this proposition, EFP cites *Cameron v. Orix*

---

[60] The government's calculation overstates this amount by $10,000. *See supra* at 85.

*Credit Alliance, Inc. (In re Larson)*, Adv. Proc. 93-7049, 1993 WL 367106, at *5-6 (Bankr. N.D. July 1, 1993).

In *Larson*, the Internal Revenue Service ("IRS") held perfected federal tax liens on all property and rights to property belonging to the debtor pursuant to Internal Revenue Code ("IRC") §§ 6321, 6322 before the commencement of the debtor's bankruptcy case. The post-petition theft of estate funds resulted in a restitution order requiring the thief to pay restitution to the estate of $17,500. The chapter 7 trustee objected to the IRS's assertion of tax liens on the restitution order. The bankruptcy court ruled in favor of the IRS, holding that the IRS's tax liens continued to attach to the restitution order, "which constitute[d] the proceeds from the recovery of the stolen property which property the IRS had perfected liens pre-petition." *Larson*, 1993 WL 3671016, at *6.

### 3.    Analysis

The Court finds that EFP has failed to meet its burden of tracing the collections stolen from Portfolios #1 and #2 to any of the funds recovered by the Trustee. Aucoin's testimony amply demonstrates the many obstacles that he faced in attempting to trace the stolen funds and the reasons for his failed efforts to do so. Moreover, the Court finds EFP's attempt to rebut Aucoin's testimony flawed for two reasons. First, the accounts from which the funds were withdrawn from Banco Panameño are not the same accounts that held the stolen funds. Without records from Banco Panameño, Borg's tracing analysis is speculative.

Second, EFP's reliance on the Restitution Order is misplaced. The Trustee did not agree with the government's restitution calculations. Although she provided information to the government about losses to the estate and her recovery of some funds, the Trustee

did not negotiate or agree to the restitution amount. Moreover, the government made no attempt to trace the source of the funds that Dickson agreed to pay the Trustee. In that regard, the Court finds EFP's reliance on *Larson* misplaced. In refusing to avoid the government's tax liens after a post-petition theft of estate funds, the bankruptcy court in *Larson* cited statutory provisions of the IRC. Here, EFP's security interest in Portfolios #1 and #2 arose from statutory provisions of the UCC, not the IRC, and, therefore, the UCC determines the reach of EFP's lien. *See* MISS. CODE ANN. § 75-9-315(b)(2) (upon disposition of collateral, secured creditor has continuing security interest only in proceeds that can be identified by some method of tracing).

## D.      Cash Collateral Contested Matters

In the Trustee's Cash Motion, the Trustee sought permission from the Court, to the extent required, to use cash collections to operate CHFS in the ordinary course of business until confirmation of a chapter 11 plan of liquidation. In the Cash Collateral Objection, EFP/BHT alleged that all cash collections from the Home Improvement Loans and the Mortgage Portfolios belonged to them and sought an order prohibiting the Trustee from using any of its cash collateral. These contested matters were filed prior to the Court's resolution of the issues raised in the Home Improvement Loans Adversary and the Mortgage Portfolios Adversary. Given the findings of the Court, the only cash collateral in question are the proceeds from Portfolios #1 and #2, which belong to EFP.

Section 363(c)(2) provides that a trustee may not use cash collateral without the consent of the creditor holding the security interest or leave of court. 11 U.S.C. § 363(c)(2). If a trustee uses cash collateral with court approval, § 363(e) requires that

> at any time, on request of an entity that has an interest in the property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the

> court, with or without a hearing, shall prohibit or condition such use, sale,
> or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e). Section 361 provides the following examples of adequate protection:

(1) periodic cash payments; (2) additional or replacement liens; and (3) such other relief as

will provide the "indubitable equivalent" of the secured creditor's interest. 11 U.S.C.

§ 361. "The term 'adequate protection' is intended to be a flexible one." 3 COLLIER ON

BANKRUPTCY ¶ 363.05 (16th ed. 2017). On the issue of adequate protection, the burden of

proof falls on the Trustee. 11 U.S.C. § 363(p).

The Court finds that the Trustee met her burden proving that EFP is being

adequately protected by the following: (1) the Trustee's repatriation of approximately $6.5

million stolen or diverted from the bankruptcy estate and the Trustee's on-going efforts to

repatriate additional funds, including $587,749.95 seized by the Costa Rican government;

(2) the monthly accumulation of cash through ClearSpring's servicing of Portfolios #1 and

#2; and (3) EFP's access to ClearSpring's reports. The Court, therefore, concludes that the

Trustee should be able to use EFP's traceable cash collateral.

In the alternative, the Court finds EFP's post-petition security interest in traceable

proceeds from Portfolios #1 and #2 is limited by § 552, which provides, in relevant part:

> (a)     Except as provided in subsection (b) of this section, property
> acquired by the estate or by the debtor after the commencement of the case
> is not subject to any lien resulting from any security agreement entered into
> by the debtor before the commencement of the case.
>
> (b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and
> 548 of this title, if the debtor and an entity entered into a security agreement
> before the commencement of the case and if the security interest created
> by such security agreement extends to property of the debtor acquired
> before the commencement of the case and to proceeds, product, offspring,
> or profits of such property, then such security interest extends to such
> proceeds, products, offspring, or profits acquired by the estate after the
> commencement of the case to the extent provided by such security

>agreement and by applicable nonbankruptcy law, except to any extent that
>the court, after notice and a hearing and *based on the equities of the case*,
>orders otherwise.

11 U.S.C. § 552(a), (b)(1) (emphasis added).  Under § 552(b), the Court has broad equitable

powers in determining the extent that EFP may maintain its security interest in Portfolios

#1 and #2 post-petition.  "This 'equities of the case' provision is intended to prevent

secured creditors from receiving windfalls."  *In re Patio & Porch Sys., Inc.*, 194 B.R. 569,

575 (Bankr. D. Md. 1996).  The Court finds that the equities of this Bankruptcy Case

warrant a finding that EFP's security interest does not flow to all traceable proceeds

generated by Portfolios #1 and #2, since they represent, in large part, the yeoman's work

of the Trustee and numerous professionals of the estate.  *Id.*  At this juncture, however, the

Court is unable to determine the extent to which the Trustee may use these proceeds.

In the Trustee's Cash Motion, the Trustee seeks authority to use EFP's cash

collateral for ordinary expenses of the estate for six (6) months in order to afford her an

opportunity to file a disclosure statement and plan of liquidation.  The Trustee lists six (6)

categories of ordinary expenses, but she does not provide the amount she seeks to use or a

budget for the six-month period during which she seeks to use the cash collateral.  Even if

the Trustee had provided this information, it would have been irrelevant at this point, the

Trustee's Cash Motion having been filed more than three years ago on December 5, 2014.

It appears then that the only issue before the Court regarding the use of cash collateral at

Trial was whether the Trustee should be able to use it and not the extent to which she may

use it.  The extent to which the Trustee may use the traceable proceeds of Portfolios #1 and

#2 cannot be made by the Court at this time but should be addressed at a future hearing in

the Bankruptcy Case, perhaps in connection with hearings on the confirmation of a plan of liquidation.

Accordingly, the Court finds that the Cash Collateral Objection should be overruled, and the Trustee's Cash Motion should be granted in part and denied in part. The Trustee's Cash Motion should be granted to the extent that the Trustee may use proceeds from Portfolios #1 and #2 to pay certain ordinary expenses, with the amount and extent of such use to be determined at a later hearing. The Trustee's Cash Motion should be denied to the extent that proceeds from the Home Improvement Loans and from Portfolios #3 and #6 are not cash collateral of EFP/BHT and, therefore, no relief is necessary or required. Similarly, the Trustee's Cash Motion should be denied as to Portfolio #7, given the Court's finding that the arrangement between the parties with respect to Portfolio #7 constitutes a servicing contract rather than a loan.

**E.      Post-Petition Conduct Adversary**

In four of the six counts alleged in the PPC Amended Complaint, the Trustee seeks relief under the Bankruptcy Code: Count I (§ 362(a)(k)), Count II (§ 542(a)), Count III (§ 549), and Count VI (§ 510). In the remaining two counts, Counts IV and V, she asserts state law claims for civil conspiracy and conversion.

**1.      Count I (Violation of Automatic Stay)**

The Trustee contends that the post-petition conduct of Dr. Edwards and EFP/BHT (acting through Dr. Edwards), including his communications with Meehan and his trip to Costa Rica in the aftermath of Dickson's theft of funds, violated the automatic stay and damaged the estate. Dr. Edwards, in contrast, contends that his post-petition efforts to locate assets of Dickson, the missing loan files that comprise Portfolio #7, and information about the loans on which EFP/BHT assert a secured lien did not violate the automatic stay.

Once a bankruptcy petition is filed an automatic stay arises by operation of law. *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 354-55 (5th Cir. 2008). The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986) (quoting S. REP. NO. 95-989, at 54-55 (1978)); *see* H. REP. NO. 95-595, at 12-13 (1977). Further, "[t]he automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property . . . . Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that." S. REP. NO. 95-989, at 49 (1978). Included among the actions prohibited by the automatic stay is "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The violation of the automatic stay is viewed as tantamount to the violation of a court order. *Campbell*, 545 F.3d at 354-55 (noting that the automatic stay "operates as a self-executing injunction"). For this reason, a bankruptcy court may address a violation of the stay by exercising its civil contempt powers under 11 U.S.C. § 105(a). *See In re RX Pro of Miss., Inc.,* Adv. Proc. 16-00288-NPO (Bankr. S.D. Miss. Mar. 4, 2016), Dkt. 120 (granting corporate debtor relief under § 105 for violation of the automatic stay). A party violating the automatic stay has a duty to rectify the stay violation to the extent possible. *Leverette v. Cmty. Bank (In re Leverette)*, No. 12-05005-KMS, 2013 WL 5350902, at *3 (Bankr. S.D. Miss. Sept. 25, 2013); *Frankel v. Strayer (In re Frankel)*, 391 B.R. 266, 275 (Bankr. M.D. Pa. 2008).

The Fifth Circuit has established three (3) elements of a claim under § 362(k): (1) the party must have known of the existence of the stay; (2) the party's acts must have been

intentional; and (3) the acts must have violated the automatic stay. *Young v. Repine (In re Repine)*, 536 F.3d 512, 519-20 (5th Cir. 2008). If all three (3) elements are proven, the party seeking to recover under § 362(k) is entitled to actual damages, including attorney's fees, and may recover punitive damages for egregious conduct. *Id.* at 521.

In a civil contempt proceeding, the movant must show by clear and convincing evidence that: (1) a court order was in effect; (2) the order required certain conduct; and (3) the respondent failed to comply with the order. *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987). The Fifth Circuit has observed that "[j]udicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)).

### a.    Did Dr. Edwards know about the existence of the automatic stay?

The Court finds that Dr. Edwards knew about the automatic stay by virtue of his knowledge of the pending Bankruptcy Case. *Johnson v. Magee Rentals, Inc. (In re Johnson)*, 478 B.R. 235, 246 (Bankr. S.D. Miss. 2012) (holding that knowledge of a pending bankruptcy case is deemed to be the legal equivalent of knowledge of the automatic stay); *Leverette,* 2013 WL 5350902, at *2 n.17 (noting that the burden is on the creditor to determine the scope of the automatic stay and to ensure against automatic stay violations). EFP/BHT has actively participated in the Bankruptcy Case almost from the date of its commencement, filing their first of many motions on May 30, 2012. (Bankr. Dkt. 23). Moreover, Dr. Edwards is no stranger to automatic stay issues. *See* Motion to

Recover Damages for Violation of § 362 Automatic Stay, *In re Coastal Condos, LLC*, No. 12-01746-EE (Bankr. S.D. Miss. July 5, 2012), Dkt. 53.

### b.     Did Dr. Edwards intend his actions?

Dr. Edwards testified at Trial that he did not believe that his conduct violated the automatic stay.  Dr. Edwards believed that he was entitled to enforce the September 10 Order because the assets he was pursuing in Costa Rica belonged to Dickson, not CHFS.  He also believed that he was entitled to locate the missing loan files comprising Portfolio #7 because they were owned by BHT, not CHFS.  Dr. Edwards was aware, however, that the September 10 Order did not award him any damages, and that Portfolio #7 was the subject of adversary proceeding 12-00109-NPO, in which CHFS, even before the Trustee's appointment, asserted an interest in Portfolio #7.  Regardless, Dr. Edwards' argument that he did not intend to violate the automatic stay is misplaced.  An act is deemed to be a willful violation of the automatic stay if the violator knew of the automatic stay and intentionally committed the act regardless of whether the violator specifically intended to violate the stay.  *Campbell*, 545 F.3d at 355; *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 302 (5th Cir. 2005).

### c.     Did Dr. Edwards violate the automatic stay?

The Court finds that Dr. Edwards undertook acts to exercise control over property of the bankruptcy estate, thereby violating § 362(a)(3). Section 541(a)(1) defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  The bankruptcy estate also includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate."  11 U.S.C. § 541(a)(6).  "This generous provision sweeps into the bankruptcy estate *all*

interests held by the debtor—even future, nonpossessory, contingent, speculative, and derivative interests." *In re Dibiase*, 270 B.R. 673, 676 (Bankr. W.D. Tex. 2001).   The bankruptcy estate also includes "[a]ny interest in property that the estate acquires after the commencement of the case."   11 U.S.C. § 541(a)(7).   "Congress enacted § 541(a)(7) to clarify its intention that § 541 be an all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate." *In re Hanley*, 305 B.R. 84, 87 (Bankr. M.D. Fla. 2003) (quotation omitted).

The prohibition in § 362(a)(3) against acts to "obtain possession of" or "exercise control over" property of the estate applies both to tangible and intangible property. *See Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir. 1983)*; West v. Hsu (In re Advanced Modular Power Sys., Inc.)*, 413 B.R. 643, 670 (Bankr. S.D. Tex. 2009) (determining that intangible assets associated with operation of debtor's business are included in property of estate).   Section 362(a)(3) "reaches farther [than other provisions in § 362], encompassing every effort to 'exercise control over property of the estate.'" *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708 (7th Cir. 1994).   Section 362(a)(3) is generally viewed as a provision designed to prevent the "dismemberment" of the bankruptcy estate until the bankruptcy process permits either a reorganization of the debtor or an orderly liquidation of the assets of the bankruptcy estate. *In re HSM Kennewick, L.P.*, 347 B.R. 569, 572 (Bankr. N.D. Tex. 2006).

Here, Dr. Edwards paid Meehan at least $1,000 and, in return, received two CDs of data from CHFS's computers in Costa Rica.   Dr. Edwards insists there was no violation of the stay because he was unsuccessful in recovering any monetary assets of the estate, the CDs are duplicative and contain only useless information about existing loans and paid off

loans, and a copy of one of the CDs eventually was provided to the Trustee (albeit not by Dr. Edwards).  In effect, Dr. Edwards argues that there is no violation of the stay since the estate suffered no negative impact as a result of his actions.

Although Dr. Edwards may not have succeeded in collecting any estate funds, the Court finds that his concerted efforts to do so, while keeping the Trustee unaware of his communications with Meehan from September of 2014, to February of 2015, his trip to Costa Rica, and his receipt and retention of the original CDs, constitute violations of the automatic stay and an attempt to circumvent the bankruptcy process.  There is no question that Dr. Edwards' intent in paying Meehan and traveling to Costa Rica was to exercise control over property of the estate located there to the exclusion of the Trustee.  Why else would Dr. Edwards conceal his activities from the Trustee for nearly five months?  From the beginning of the Bankruptcy Case, Dr. Edwards has been vocal about his status as the largest creditor of the bankruptcy estate (by virtue of his purported control of EFP/BHT), and his actions in Costa Rica reflect a mistaken belief that his status entitled him to decide unilaterally what constitutes property of the estate and what information to share with the Trustee.  "The purpose of the automatic stay is not to . . . ultimately prevent the exercise of the available rights of any party . . . [but instead is] to prevent any creditor from becoming a *self-determined arbiter* of what constitutes property of the estate and what actions are permitted or prohibited by the stay."  *Clark v. United States (In re Clark)*, 207 B.R. 559, 564-65 (Bankr. S.D. Ohio 1997) (emphasis added).  Questions such as "what constitutes property of the estate" and "what actions are permitted or prohibited by the stay" fall under the exclusive jurisdiction of the bankruptcy court.  This point was made clear in *Chesnut*, where the Fifth Circuit ruled that a creditor violates the automatic stay

even when the debtor's interest in the property is "arguable." *Chesnut*, 422 F.3d at 303. Dr. Edwards' actions in Costa Rica took place while EFP/BHT's rights to the loans were disputed by CHFS and with full knowledge of the Trustee's need and search for them.

Just as Dr. Edwards does not have the unilateral right to determine what constitutes property of the estate, he does not have the unilateral right to determine the value of the information contained in the CDs. Dr. Edwards' characterization of the information on the CDs as useless at Trial was disputed by the Trustee, who testified that the CD she obtained from Meehan included the following helpful information that was previously unknown to her:

> Two (2) bank accounts in CHFS's name at Banco de Costa Rica in Costa Rica and Banco Panameño in Panama;
>
> Two (2) affiliates of CHFS, Pirrana SA and Mary Madison Foundation; and
>
> $1.5 million in Costa Rican loans purchased with stolen CHFS funds.

Moreover, only Dr. Edwards and Meehan (and perhaps Borg) have had the opportunity to compare the original CDs to determine whether they are in fact duplicative and whether the CD obtained by the Trustee is duplicative of one or both of the original CDs. Despite Dr. Edwards' testimony at Trial to the contrary, in an email to Meehan on October 15, 2014, he wrote, "I opened almost all the files on the 2 discs. *Most* of the *second* disc repeats sections of the first disc. . . . Certainly some of the information on the CDs will find a use." (PPC Ex. P-32) (emphasis added). Dr. Edwards, nevertheless, insists that this issue has been laid to rest by the following exchange of emails between Barber (Trustee's counsel) and Meehan on August 21, 2015. Barber asked Meehan, "Mike, did Edwards get two different CDs? One of his emails to you implies that there were two CDs with similar but not identical data. Just trying to make sure we have accounted for everything." (PPC Adv.

Dkt. 115 at 42).  In response, Meehan wrote, "1 cd to him and 1 for his lawyer in cr all the same data."  (PPC Adv. Dkt. 115 at 42).  This exchange of emails on August 21, 2015, however, demonstrates only the existence of a dispute.  To definitively resolve this issue, Dr. Edwards should have produced the original CDs to the Trustee during discovery for a side-by-side comparison, but he chose not to do so.

The purpose of the automatic stay is to preserve the estate to promote the orderly and effective reorganization or liquidation of the debtor.  Based upon the evidence, the Court finds that Dr. Edwards' conduct constituted a willful violation of the automatic stay and a disruption of the bankruptcy process.  The Court further finds that Dr. Edwards continues to violate the automatic stay by refusing to surrender both original CDs referenced in his email of October 15, 2014, to the Trustee.[61]

### d.    May the Trustee recover damages under 11 U.S.C. § 362(k)?

Because Dr. Edwards willfully violated the automatic stay, the Court next evaluates the appropriate remedies under § 362(k).  "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1).

As a preliminary matter, Dr. Edwards contends that even if his actions constitute a technical violation of the stay, the Trustee cannot recover damages under § 362(k) because the remedy is available only to individuals.  11 U.S.C. § 362(k); *see Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1550-53 (11th Cir. 1996) (holding that a corporation is not an "individual" under § 362(h)); *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re*

---

[61] The original CDs are the subject of the Trustee's turnover claim.

*Chateaugay Corp*.), 920 F.2d 183, 184-86 (2d Cir. 1990) (holding that an "individual" means a "natural person," not a corporation under § 362(h)); *Garner v. Knoll, Inc. (In re Tusa-Expo Holdings, Inc.)*, Case No. 10-04271-DML, 2014 WL 172276, at *4 (Bankr. N.D. Tex. Jan. 15, 2014) (holding that the "trustee, acting on behalf of the estate of a debtor corporation lacks standing to seek damages under section 362(k)"); 3 COLLIER ON BANKRUPTCY ¶ 362.12[3] (16th ed. 2017) ("Although the automatic stay is of critical importance in bankruptcy cases, the better approach is to recognize that section 362(k) provides a remedy only for natural persons."). Dr. Edwards alleges that the Trustee, in her capacity as a trustee for a corporate debtor, is not an "individual" as required by the statute. It is unnecessary for the Court to address this issue. *See St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 541 (5th Cir. 2009) (holding that individuals other than the debtor have standing to pursue a claim under § 362(k) and noting in its examination of the scope of the term "individual" that a district court within the Fifth Circuit has held that a corporate creditor fell within that definition). Even assuming that only natural persons in their individual capacities have standing under § 362(k), this Court and others have awarded damages to trustees and corporate debtors for stay violations under § 105(a). *See In re RX Pro of Miss., Inc.,* Adv. Proc. 16-00288-NPO (granting corporate debtor relief under § 105 for violation of the automatic stay); *see also Cuffee v. Atlantic Bus. & Cmty. Dev. Corp. (In re Atlantic Bus. & Cmty. Dev. Corp.)*, 901 F.2d 325, 329 (3d Cir. 1990); *Leverette*, 2013 WL 5350902, at *11 & n.18; *In re Am. Med. Utilization Mgmt. Corp.*, 494 B.R. 626, 635 (Bankr. E.D.N.Y. 2013) (awarding chapter 11 trustee legal fees and costs due to respondent's failure to reverse actions taken in violation of the stay).

The Trustee testified at Trial that the conduct of Dr. Edwards resulted in monetary damages of more than $10,000 in additional servicing costs, as well as attorneys' fees and expenses of $61,458.25 through July 31, 2017. The Court finds that the Trustee met her burden of proof as to these damages and that she is entitled to a judgment against Dr. Edwards and EFP/BHT in the total amount of $71,458.25 pursuant to § 362(k). In addition, the Trustee is entitled to attorneys' fees and expenses incurred from August 1, 2017, through the last day of Trial, November 27, 2017, in connection with the prosecution of the Post-Petition Conduct Adversary. Because these fees and expenses already have been included, or will be included, in a fee application filed, or to be filed, by Trustee's counsel in the Bankruptcy Case, the Court will determine the amount of these additional fees and expenses in connection with counsel's final fee application.

The Trustee also testified that Dr. Edwards' conduct deprived her of the opportunity to obtain $587,749.95 seized by the Costa Rican government from an account at Scotia Bank sometime before February 1, 2015. (HIL Adv. Dkt. 341 at 81). The Court finds that the Trustee failed to prove that Dr. Edwards' conduct precluded her from collecting these funds. *See Magee Rentals, Inc.*, 478 B.R. at 248 (explaining that damages must be proven with "reasonable certainty"). These funds are the subject of the Forfeiture Order, and there have been recent discussions between the U.S. Government and the Costa Rican Government regarding the release of those funds to the Trustee. Accordingly, the Court does not award any damages to the Trustee arising out of the Costa Rican government's seizure of $587,749.95.

### 2.     Count II (Turnover of Property)

The Trustee alleges a cause of action under § 542, which provides:

> [A]n entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."

11 U.S.C. § 542(a). Dr. Edwards alleges that there is no estate property to be turned over to the Trustee. It is undisputed, however, that Dr. Edwards received two CDs from Meehan containing CHFS information dating from 2009 through March of 2014. It is also undisputed that Dr. Edwards has never turned the original CDs over to the Trustee. The Court already has found in its discussion of Dr. Edwards' violation of the automatic stay that the information and data on the original CDs constitute intangible assets of the bankruptcy estate under the broad definition set forth in § 541. The Court further finds that the Trustee is entitled to a judgment requiring Dr. Edwards to turn over the original CDs to the Trustee.

### 3.    Count III (Post-petition Transfer)

As an additional cause of action in the PPC Amended Complaint, the Trustee seeks a judgment revesting certain post-petition transfers in the estate pursuant to § 549.    To avoid a post-petition transfer, the Trustee must show:  (1) a transfer of property occurred; (2) the transfer occurred after the commencement of the Bankruptcy Case; (3) the transfer was made without authority from this Court; and (4) the property transferred was property of the estate. *In re Advanced Modular Power Sys.*, 413 B.R. at 672 (holding that a transfer of records is actionable under § 549).    Under these facts, there is considerable overlap between the Trustee's post-petition claim (Count III) under § 549 and her turnover claim (Count II) under § 542. The main difference between these claims is the remedy.  Once a transfer is classified as a post-petition transfer under § 549, the Trustee has the option of

recovering the property transferred or obtaining a judgment for its value under § 550. In the PPC Amended Pretrial Order, however, the Trustee does not mention her § 549 claim and does not seek a judgment for the value of the original CDs or of any other estate property. Accordingly, the Court finds that the Trustee has not met her burden of proving her claim under § 549.

### 4.      Count IV (Civil Conspiracy)

#### a.      Choice of Law

Paragraph 11 of the EFP Note and BHT Note provides: "This Note shall be governed by and construed in accordance with the laws of the State of Maryland without giving effect to its choice of law provisions." (HIL Exs. P-1, P-2, D-17 & D-18). The Court finds that this choice-of-law provision, which speaks only of "[t]his Note," does not encompass tort claims. *See Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726-27 (5th Cir. 2003) (applying Texas law to conclude that the choice-of-law provision, "the Agreement shall be governed by, and construed in accordance with the internal laws of the State of New York," did not encompass tort claims).

The RESTATEMENT (SECOND) OF CONFLICT OF LAWS applies the "law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." RESTATEMENT (SECOND) OF CONFLICT OF LAWS §145; *In re Cyrus II P'ship*, 413 B.R. at 614-16 (discussing federal choice of law rules). Section 145 lists several factors relevant in applying the principles of § 6:

> (a)      the place where the injury occurred,
> (b)      the place where the conduct causing the injury occurred,
> (c)      the domicile, residence, nationality, place of incorporation and place of business of the parties, and
> (d)      the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145.  Section 6, in turn, provides the factors relevant to the choice-of-law analysis:

> (a)    the needs of the interstate and international systems,
> (b)    the relevant policies of the forum,
> (c)    the relevant polices of other interested states and the relative interests of those states in the determination of the particular issue,
> (d)    the protection of justified expectations,
> (e)    the basic policies underlying the particular field of law,
> (f)    certainty, predictability and uniformity of result, and
> (g)    ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6.

A summary of the facts here shows that Mississippi has the most significant contacts to the occurrence and the parties.  Dickson maintained the principal place of business of CHFS in Mississippi.  Although payments were made on the consumer loans from thirty (30) states, they were deposited into the DIP Operating Account located in Mississippi.  *See Houston Cas. Co. v. Certain Underwriters at Lloyd's London,* 51 F. Supp. 2d 789, 797 (S.D. Tex. 1999) (finding that the insured's obligation under the parties' agreement was to pay a premium and the insurer's obligation was to indemnify certain losses but w*here* the losses occurred did not affect either obligation).  The conduct resulting in the losses occurred in Mississippi.  Therefore, the Court concludes that Mississippi substantive law applies to the dispute between the parties.  The parties do not dispute that Mississippi law applies to the Trustee's civil conspiracy claim.

> **b.    Did EFP/BHT and Dr. Edwards act in concert to hinder, delay, and otherwise defraud the estate and its creditors by withholding information pertinent to the operation of its ongoing business and assets stolen from the estate?**

In Mississippi, the elements of civil conspiracy are "(1) two or more persons or corporations; (2) an object to be accomplished; (3) a meeting of the minds on the object or

course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result." *Palmisano v. Miss. Dep't of Wildlife, Fisheries & Parks*, No. 5:14-cv-00094-KS-MTP, 2015 WL 1925466, at *1 (S.D. Miss. Apr. 28, 2015) (quoting *Gallaher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004)). The Trustee bases her civil conspiracy claim on conversion. *See Ward v. Life Inv'rs Co. of Am.*, 383 F. Supp. 2d 882, 890 (S.D. Miss. 2005) (former insurance agents brought an action against the insurers alleging, among other things, that the insurers conspired to deprive them of commissions under a theory of breach of contract, tortious interference with a contract, and civil conspiracy).

The Court agrees with Dr. Edwards that the Trustee's claim fails to satisfy the first element of a civil conspiracy claim, known as the plurality requirement. Under Mississippi law, "[a] conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Levens v. Campbell*, 733 So. 2d 753, 761 (Miss. 1999) (quotation omitted). Further, the intra-corporate conspiracy doctrine provides that "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of agents are the acts of the corporation." *Frye v. Am. Gen. Fin. Inc.*, 307 F. Supp. 2d 836, 843-44 (S.D. Miss. 2004) (quotation omitted); *see Cooper v. Drexel Chem. Co.*, 949 F. Supp. 1275, 1285 (N.D. Miss. 1996) (holding that individual defendants are incapable of conspiring with their corporate employer unless they acted outside their employment capacities).

The facts here implicate the intra-corporate conspiracy doctrine but raise a slightly different issue. May two entities conspire through a single agent? Dr. Edwards did not

raise this precise issue but challenged the Trustee's claim on the ground that one person cannot conspire with himself.

In the PPC Amended Complaint, the Trustee named as defendants EFP/BHT and Dr. Edwards. Dr. Edwards is the only natural person named as a defendant in the Post-Petition Conduct Adversary.[62] The evidence at Trial did not show that any partner or agent of EFP or BHT other than Dr. Edwards was involved in the alleged conspiracy. The Trustee's testimony focused on Dr. Edwards' communications with Meehan and his trip to Costa Rica where he met with Meehan, Meehan's attorney (Romero), and Dickson's attorney (Martinez). The Trustee, however, did not allege that Meehan, Romero, or Martinez participated in the conspiracy. In effect, the Trustee's civil conspiracy claim rests solely on the conduct of Dr. Edwards, a single agent purportedly acting on behalf of two entities (EFP/BHT). No reported Mississippi case has discussed or applied the intra-corporate conspiracy doctrine under these facts. Courts in other jurisdictions have concluded that the tort of conspiracy does not exist apart from the underlying wrongful act on which the conspiracy is based in the absence of two human conspirators. *United States v. Panhandle Trading, Inc.*, Case No. 05:05-cr-00044-RS-ALL, 2006 WL 1883436, at *3-4 (N.D. Fla. July 7, 2006).

In a factually analogous case widely cited for its treatment of the "single agent problem," *Lockwood Grader Corp. v. Bockhaus*, 270 P.2d 193 (Colo. 1954), the Supreme Court of Colorado ruled that "a conspiracy cannot be shown by acts of one person, no matter how many corporations he represents." *Id.* at 196; *see, e.g.*, *Panhandle Trading,*

---

[62] In the PPC Amended Complaint, the Trustee did not include any allegations against Borg or Dr. Edwards' son, James Edwards, who she initially named as defendants in the RICO Case.

*Inc.*, 2006 WL 1883436, at \*1-2; Kathleen F. Brickey, *Conspiracy, Group Danger and the Corporate Defendant*, 52 U. CIN. L. REV. 431, 434-35 (1983).  In *Lockwood Grader Corp.*, Ralph L. Bockhaus ("Bockhaus") alleged that Lockwood Grader Corporation, Lockwood Graders of Colorado, and T.J. Lockwood ("Lockwood") unlawfully conspired to force him out of business. Lockwood was the majority stockholder, director, and president of both Lockwood Grader Corporation and Lockwood Graders of Colorado. The jury returned a verdict in favor of Bockhaus.  On appeal, the state court reversed, holding that Bockhaus failed to prove the existence of a conspiracy because the evidence at trial showed that Lockwood was the only person who could possibly have acted for either of the corporations. *Lockwood Grader Corp.*, 270 P.2d at 196-97.

The Court finds that Dr. Edwards, acting alone, lacked the ability to form a conspiracy with himself.  The policy underlying a conspiracy claim—holding combinations of individuals responsible—does not apply when one person uses two entities to carry out his tortious conduct.  Although a conspiracy might be formed by two entities acting through two agents, more than one person must be involved in the conspiracy.  Thus, if some partner or agent of EFP/BHT other than Dr. Edwards had participated in the alleged conspiracy, then the Trustee would have satisfied the plurality requirement for a civil conspiracy.  Because the evidence did not show that anyone other than Dr. Edwards was involved in the alleged conspiracy, however, the Court finds that the Trustee has failed to meet her burden of proof.

**5.     Count V (Conversion)**

      **a.     Choice of Law**

For the reasons given with respect to the Trustee's civil conspiracy claim, the Court

also finds that Mississippi substantive law applies to the Trustee's conversion claim.

      **b.     Did EFP/BHT and Dr. Edwards convert estate property for their own use without permission or lawful justification and willfully interfere with the Trustee's duty to protect and acquire the estate's property thereby depriving the Trustee of rightful possession of that property?**

Under Mississippi law, a conversion claim exists where "a plaintiff owns or has the

right to possess property, and the defendant exercises dominion or control over that

property in a manner that is inconsistent with the plaintiff's rights." *Songcharoen v. Plastic*

*& Hand Surgery Assocs., PLLC*, Case No. 3:11-cv-00308-WHB-LRA, 2012 WL 4480746,

at *6 (S.D. Miss. Sept. 26, 2012), *aff'd in part, rev'd in part on other grounds*, 561 F.

App'x 327 (5th Cir. 2014).  "The intent required [for conversion] is not necessarily a matter

of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the

goods which is in fact inconsistent with the plaintiff's rights." *Morris Schneider Wittstadt,*

*LLC v. Beau Rivage Resorts, Inc.*, Case No. 1:15-cv-00403-LG-RHW, 2016 WL 1254387,

at *3 (S.D. Miss. Mar. 29, 2016) (quotation omitted).

An action for conversion in Mississippi is available only for wrongful interference

with tangible items of property and those "intangible rights that are customarily merged in,

or identified with some document."  5 Jeffrey Jackson & Mary Miller, Encyclopedia

of Miss. Law § 41:89 (2001) (citation omitted).  The Court agrees with Dr. Edwards that

Mississippi law does not recognize the tort of conversion for strictly intangible property,

such as computer data.  *DirecTV, Inc. v. Hubbard*, Case No. 2:03-cv-00261, 2005 WL

1994489, at *4 (N.D. Miss. Aug. 17, 2005) (ruling that interception of satellite transmission did not give rise to tort of conversion under Mississippi law); *Holbert v. Wal-Mart Assocs.*, Case No. 3:09-cv-00509-TSL-MTP, 2011 WL 3652202, at *3-4 (S.D. Miss. Aug. 18, 2011) (holding that allegations of identity theft failed to state a claim for conversion under Mississippi law); *Morris Schneider Wittstadt, LLC*, 2016 WL 1254387, at *3 ("Mississippi federal courts have stated that money and other intangible assets cannot be converted under Mississippi law unless the funds or other property can be specifically identified.").  The Court finds, however, that the two original CDs possessed by Dr. Edwards constitute either tangible assets or the information and data on the original CDs constitute intangible assets "merged in" the CDs and, therefore, may be subject to conversion. 6 JEFFREY JACKSON & MARY MILLER, ENCYCLOPEDIA OF MISS. LAW § 55:2 (unlike tangible property, intangible property cannot be physically touched).

The Court finds that the Trustee has met her burden of proving her conversion claim as to the original CDs.  Dr. Edwards has exercised and continues to exercise control over the original CDs in a manner inconsistent with the Trustee's rights.   The Trustee testified at Trial that Dr. Edwards' conduct resulted in monetary damages of more than $10,000 in additional servicing costs. The Court finds that the Trustee is entitled to a judgment in the amount of $10,000 against Dr. Edwards and EFP/BHT, jointly and severally, for the conversion of the original CDs.

### 6.    Count VI (Equitable Subordination)

The Trustee seeks to equitably subordinate EFP/BHT's claims (POC 4-1 to POC 9-1) below the claims of all other creditors with the exception of Dickson.  (PPC Adv. Dkt. 115 at 27).   Under § 510(c)(1), a bankruptcy court may "subordinate for purposes of

distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(1). The Bankruptcy Code, however, does not otherwise specify when equitable subordination is appropriate. In the seminal case on equitable subordination, the Fifth Circuit articulated the following three-prong test for determining when such action is permitted: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977); *see Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir. 1991) (recognizing that equitable subordination is to be invoked according to case law in existence at the time of § 510's enactment). A category of misconduct that traditionally has been held to constitute inequitable conduct includes fraud, illegality, and breach of fiduciary duties. *See In re Fabricators, Inc.*, 926 F.2d at 1467-69 (finding that interference with the completion of a contract to gain preferential payments and a release from liability amounted to inequitable conduct). The inequitable conduct need not be related to the challenged claim. *In re Mobile Steel Co.*, 563 F.2d at 700-01. Notwithstanding the broad three-part test set forth in *In re Mobile Steel Co.*, the Fifth Circuit has "largely confined equitable subordination to three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." *U.S. Abatement Corp. v. Mobil Expl. & Producing U.S., Inc. (In re U.S. Abatement Corp.)*, 39 F.3d 556, 561 (5th Cir. 1994).

The Fifth Circuit emphasized that when the remedy is invoked, a claim "should be subordinated only to the extent necessary to offset the harm which the [debtor] and its creditors suffered on account of the inequitable conduct." *In re Mobile Steel Co.*, 563 F.2d at 701. Dr. Edwards argues that none of the three general paradigms exists for the following reasons: (1) Dr. Edwards and EFP/BHT are not fiduciaries of CHFS, *Harrison v. Commercial Credit Corp.*, Case No. 4:01-cv-00151-LN, 2002 WL 548281, at *4-5 (S.D. Miss. Mar. 29, 2002) (holding that lenders and debtors typically are not in a fiduciary relationship under Mississippi law); (2) CHFS is not controlled by Dr. Edwards or EFP/BHT; and (3) Dr. Edwards did not defraud any other creditor. (PPC Adv. Dkt. 115 at 35).

As a preliminary matter, the Court finds it disingenuous of Dr. Edwards and EFP/BHT to dispute their status as fiduciaries in the Post-Petition Conduct Adversary, while seeking damages against CHFS in the Mortgage Portfolios Adversary based on the allegation that "CHFS owed a fiduciary duty to BHT and EFP, as a joint venturer." (MPF Adv. Dkt. 70 at 23); *see Braddock Law Firm, PLLC v. Becnel*, 949 So. 2d 38, 50 (Miss. Ct. App. 2006) (holding that fiduciary duties are owed to fellow joint venturers under Mississippi law). Dr. Edwards and EFP/BHT either intended to contradict themselves or believe that fiduciary duties among joint venturers are not mutual. Regardless, the Court already has ruled that the transactions are not true joint ventures. At best, EFP/BHT are in a contractual relationship with CHFS, which does not give rise to fiduciary obligations.

As to the second paradigm, the Court finds that there was no evidence at Trial that would support a finding that Dr. Edwards controlled or dominated CHFS, at least with respect to his post-petition conduct. The Court thus finds that the Trustee's equitable

subordination claim rests solely on the third general paradigm. The issue before the Court, therefore, is whether Dr. Edwards, acting on behalf of EFP/BHT, "defraud[ed] other creditors." *In re U.S. Abatement Corp.*, 39 F.3d at 561. EFP/BHT and Dr. Edwards deny that they committed fraud, but "[i]t is well established that actual fraud need not be shown for equitable subordination." *Mach. Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709, 720 (5th Cir. 1980).

Dr. Edwards' alleged inequitable conduct began in September of 2014, when he obtained information from Meehan regarding the location of CHFS's stolen assets in Costa Rica. Rather than turn this information over to the Trustee, Dr. Edwards paid Meehan to perform certain services aimed at collecting assets of the bankruptcy estate. Meehan mailed Dr. Edwards two CDs, one of which contained the hard drive of a computer removed by Dickson from CHFS's office in Jackson, Mississippi, and was used in the rogue operation in Latin America after the Trustee's appointment. As shown in the exchange of emails, Dr. Edwards told Meehan that all information and assets relating to CHFS ultimately belonged to him and/or EFP/BHT as the largest creditor of the estate. Why didn't Dr. Edwards tell Meehan about the Trustee? Why didn't Dr. Edwards tell the Trustee about Meehan?

The Court finds that Dr. Edwards' post-petition conduct violated "rules of fair play and good conscience" and increased the administrative expenses of the estate. *Pepper v. Litton*, 308 U.S. 295, 310 (1939). Mindful that equitable subordination is only rarely granted, the Court, however, declines to invoke equitable subordination as a remedial measure for the harm caused by Dr. Edwards. *In re U.S. Abatement Corp.*, 39 F.3d at 561.

### F.   Plan Confirmation Proceedings in the Bankruptcy Case

Given the breadth of this Opinion and the impact it will have on the liquidation of assets of the estate, the Court will enter an order in the Bankruptcy Case rescinding the Order Approving First Amended Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of the First Amended Plan of Reorganization Combined with a Notice of Hearing (the "Order Approving Disclosure Statement") (Bankr. Dkt. 1556) and disapproving the First Amended Disclosure Statement for the Chapter 11 Plan of Liquidation of the Estate of Community Home Financial Services, Inc. Proposed by the Trustee, Kristina M. Johnson Dated as of May 15, 2015 ("First Amended Disclosure Statement") (Bankr. Dkt. 1080) filed by the Trustee.  As a result, the Court will not schedule a confirmation hearing on the First Amended Chapter 11 Plan of Liquidation of the Estate of Community Home Financial Services, Inc. Proposed by the Trustee, Kristina M. Johnson Dated as of February 1, 2017 (the "First Amended Plan") (Bankr. Dkt. 1607). The Court will set a status conference for the purpose of scheduling dates for the filing of an amended disclosure statement and an amended chapter 11 plan of liquidation.

The Court's rescission of the Order Approving Disclosure Statement and the disapproval of the First Amended Disclosure Statement renders the following related contested matters moot:

> Notice of Filing Immaterial Modifications to First Amended Chapter 11 Plan of Liquidation of the Estate of Community Home Financial Services, Inc. Proposed by the Trustee, Kristina M. Johnson Dated as of February 1, 2017 (the "Notice of Filing Immaterial Modifications") (Bankr. Dkt. 1606) filed by the Trustee;

> First Amended Plan;

> Edwards Family Partnership, LP and Beher Holdings Trust's Objection to Tabulation and Summary of Ballots Accepting or Rejecting Debtor's [*sic*]

First Amended Plan of Reorganization (Dkt. #1626) (the "Objection to Tabulation and Summary of Ballots") (Bankr. Dkt. 1741) filed by EFP/BHT;

Trustee's Response to Edwards Family Partnership, LP and Beher Holdings Trust's Objection to Tabulation and Summary of Ballots Accepting or Rejecting Debtor's First Amended Plan of Reorganization [Dkt. #1741] (the "Response to the Objection to Tabulation and Summary of Ballots") (Bankr. Dkt. 1753) filed by the Trustee; and

Chapter 11 Trustee's Motion *in Limine* to Limit the Testimony of Dr. Charles C. Edwards in Connection with Matters Scheduled for Hearing on March 23, 2017 (the "Motion *in Limine*") (Bankr. Dkt. 1747) filed by the Trustee.

In the same order that rescinds the Order Approving Disclosure Statement and disapproves the First Amended Disclosure Statement, the Court will deny as moot the above contested matters without prejudice.

## CONCLUSION

For the reasons discussed above, the Court declares and/or finds as follows:

A.     In the Home Improvement Loans Adversary and related consolidated Contested Matter,

1.     Count I (Legal Capacity of the Rainbow Group):  The Trustee is not entitled to a judgment that the Rainbow Loan Agreement, the 2006 Note, and the Custodial Agreement are void *ab initio*.  In the alternative, the Trustee has abandoned this claim.

2.     Count II (Legal Capacity of Beher Limited):  The Trustee is entitled to a judgment that the 2010 Assignment is void.

3.     Count III (Fraudulent EFP Note & BHT Note):  The Trustee has abandoned her claim that the EFP Note and BHT Note are fraudulent.

4.     Count IV (Perfection of Security Interest):  The Trustee is entitled to a judgment declaring that EFP/BHT do not have a perfected security interest in the Home

Improvement Loans, and EFP/BHT are general unsecured creditors of the bankruptcy estate of CHFS.

5.      Count V (Tracing of Funds):  EFP/BHT are not entitled to a judgment declaring that they have a security interest in any of the stolen funds recovered or intercepted by the Trustee.

6.      Count VI (POC 4-1 & POC 5-1):  The Objection to POC 4 & 5 is overruled in part and sustained in part.  The Objection to POC 4 & 5 is overruled, and POC 4-1 is allowed to the extent that BHT has an unsecured claim of $13,374,372, consisting of $11,189,385.80 in principal and $2,184,986.25 in interest, as of May 23, 2012.  The Objection to POC 4 & 5 is overruled, and POC 5-1 is allowed to the extent that EFP has an unsecured claim of $4,458,124, consisting of principal of $3,729,795.25 and interest of $728,328.75, as of May 23, 2012.  The Objection to POC 4 & 5 is sustained in all other respects.  Once all traceable collections from the Home Improvement Loans are applied, including the collections by ClearSpring, CHFS owed BHT $7,440,849 in principal and $2,184,986.25 in interest, and CHFS owed EFP $2,480,283 in principal and $728,328.75 in interest, as of May 31, 2017.

B.      In the Mortgage Portfolios Adversary and related consolidated Contested Matter,

1.      Misjoinder of Parties:  Church Bay Trust and CHFS are misjoined parties and are dismissed with prejudice from the Mortgage Portfolios Adversary.

2.      Counts I & IV/MPF Counterclaim Counts I-III (Mortgage Portfolios):  The Trustee is entitled to a judgment declaring that:

        (a.)    CHFS and EFP entered into loans with respect to Portfolios #1-#6;

(b.)     The loans EFP provided CHFS for the purchase of Portfolios #1 and #2 are enforceable and are secured by the mortgages and notes that comprise Portfolios #1 and #2 and also by the proceeds of the mortgages and notes that comprise Portfolios #1 and #2, but only to the extent the proceeds can be traced to funds of the estate;

(c.)     EFP's security interest in Portfolios #1 and #2 is subject to the Court's ruling on the Cash Collateral Objection and Trustee's Cash Motion;

(d.)     The loans EFP provided CHFS for the purchase of Portfolios #3-#6 are unenforceable;

(e.)     CHFS owns the original notes and mortgages that comprise Portfolios #1-#6;

(f.)     Dr. Edwards and EFP are ordered to turn over to the Trustee the original notes and mortgages that comprise Portfolios #1-#6;

(g.)     BHT is not a creditor of the bankruptcy estate, as alleged in POC 7-1 and POC 8-1;

(h.)     BHT owns the original notes and mortgages that comprise Portfolio #7; and

(i.)     CHFS entered into a servicing agreement with BHT with respect to Portfolio #7, and CHFS is entitled to the servicing fees and reimbursement of costs set forth in MPF Agreement *III*.

3.     Counts II & III/MPF Counterclaim Count VIII (POC 6-1 to POC 9-1):  The Objection to POC 6 & 9 is sustained in part and overruled in part.  The Objection to POC 6 & 9 is sustained to the extent that POC 6-1 is disallowed in whole.  The Objection to

POC 6 & 9 is overruled to the extent that, as of May 23, 2012, EFP has a secured claim of $1,728,804 with respect to Portfolios #1 and #2.  The Objection to POC 6 & 9 is sustained in all other respects.  Once all traceable collections from Portfolios #1 and #2 are applied, including the collections by ClearSpring, CHFS owed EFP $665,711 as to Portfolio #1 and $274,482 as to Portfolio #2, as of May 31, 2017.  The Objection to POC 7 & 8 is sustained. POC 7-1 and POC 8-1 are disallowed in whole.

4.      Count V (Constructive Trust):  The Trustee has abandoned her claim for the imposition of a constructive trust on all proceeds of the Mortgage Portfolios.

5.      Count VI (Conversion):  The Trustee has abandoned her claim for damages for conversion of property of the estate.

6.      MPF Counterclaim Count IV (Breach of MPF Agreements):  EFP/BHT's counterclaim for CHFS's alleged breach of the "joint venture" agreements is dismissed with prejudice.

7.      MPF Counterclaim Count V (Breach of Fiduciary Duty):  EFP/BHT's counterclaim for CHFS's alleged breach of its fiduciary duty is dismissed with prejudice.

8.      MPF Counterclaim Count VI (Servicing Fees):  EFP/BHT's counterclaim against the Trustee for servicing costs is dismissed with prejudice.

9.      MPF Counterclaim Count VII (Tracing of Funds):  EFP/BHT are not entitled to a judgment declaring that they have a security interest in any of the stolen funds recovered or intercepted by the Trustee.

C.      In the Home Improvement Loans Adversary and the Mortgage Portfolios Adversary,

1.      The Cash Collateral Objection is overruled.

2.      The Trustee's Cash Motion is granted in part and denied in part.  The Trustee should be able to use the traceable proceeds from Portfolios #1 and #2 to pay ordinary expenses of the bankruptcy estate, with the amount and extent of such use to be determined at a later hearing.  The proceeds from the Home Improvement Loans and from Portfolios #3-#6 are not cash collateral and, therefore, no relief is necessary or required.

D.      In the Post-Petition Conduct Adversary,

1.      Count I (Violation of Automatic Stay):  The Trustee is entitled to damages against Dr. Edwards and EFP/BHT, jointly and severally, in the amount of $10,000 representing additional servicing costs and $61,458.25 in attorneys' fees and expenses incurred by the Trustee through July 31, 2017, pursuant to 11 U.S.C. § 362(k).  The Trustee also is entitled to an award of attorneys' fees and expenses incurred from August 1, 2017, through the last day of Trial, in connection with the prosecution of the Post-Petition Conduct Adversary.  Because these fees and expenses already have been included, or will be included, in a fee application filed, or to be filed, by Trustee's counsel in the Bankruptcy Case, the Court will determine the amount of these additional fees and expenses in connection with the final fee application.  In addition, the Trustee is entitled to post-judgment interest at the legal rate until satisfied on these amounts.

2.      Count II (Turnover of Property):  The Trustee is entitled to a judgment requiring Dr. Edwards to turn over the two (2) original CDs to the Trustee.

3.      Count III (Post-petition Transfer):  The Trustee's claim for post-petition transfers is dismissed with prejudice.

4.      Count IV (Civil Conspiracy):  The Trustee's claim for civil conspiracy is dismissed with prejudice.

5.      Count V (Conversion):  The Trustee is entitled to a judgment against Dr. Edwards and EFP/BHT, jointly and severally, for the conversion of the original CDs in the amount of $10,000, together with post-judgment interest at the legal rate until satisfied.

6.      Count VI (Equitable Subordination):  The Trustee's claim for equitable subordination is dismissed with prejudice.

E.      In the Bankruptcy Case,

1.      An order should be entered rescinding the Order Approving Disclosure Statement, disapproving the First Amended Disclosure Statement, and denying as moot the following contested matters, without prejudice:  (a.) the Notice of Filing Immaterial Modifications; (b.) the First Amended Plan; (c.) the Objection to Tabulation and Summary of Ballots; (d.) the Response to the Objection to Tabulation and Summary of Ballots; and (e.) the Motion *in Limine*.

2.      A status conference should be set for the purpose of scheduling dates for the filing of an amended disclosure statement and an amended chapter 11 plan of liquidation.

The costs of these Adversary Proceedings and Contested Matters are taxed against Dr. Edwards and EFP/BHT under 28 U.S.C. § 1920.  The Trustee is entitled only to a single recovery where the same damages are granted under different legal theories.  To the extent the Court has not addressed any of the parties' other arguments or positions, it has considered them and determined they would not alter the result.  A separate final judgment consistent with this Opinion will be entered in accordance with Rules 7054, 9014, and 9021 of the Federal Rules of Bankruptcy Procedure.

###END OF OPINION###